UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL SALLOUM,

     Plaintiff,

v.

CHARLES H. KABLE IV, *et al.*,

     Defendants.

Case No. 19-cv-13505
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (ECF __ No. 12)

Plaintiff Samuel Salloum is a United States citizen who resides in Lebanon. In this action, Salloum contends that the federal government has wrongfully placed him in its Terrorist Screening Database (the "TSDB") and has deprived him of a meaningful opportunity to challenge that erroneous placement.  He alleges that his wrongful inclusion in the TSDB burdens his fundamental right to travel and has resulted in violations of his First, Fourth, and Fifth Amendment rights.  Salloum seeks, among other things, an order that requires Defendants to remove him from the TSDB. (*See id.*)

Defendants have now moved to dismiss Salloum's claims. (*See* Mot. to Dismiss, ECF No. 12.)  For the reasons explained below, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

# I

## A

The TSDB is "the U.S. government's consolidated terrorist watchlist." *Mokdad v. Lynch*, 804 F.3d 807, 810 (6th Cir. 2015).    It is "developed and maintained by the Terrorist Screening Center (TSC), a multi-agency center that was created in 2003 and is administered by the Federal Bureau of Investigation (FBI), which in turn is part of the Department of Justice." *Beydoun v. Sessions*, 871 F.3d 459, 463 (6th Cir. 2017) (quoting *Mokdad,* 804 F.3d at 809).  The information stored in the TSDB includes, among other things, "biographic and biometric data" regarding the individuals who have been listed in the database. *Elhady v. Kable*, 391 F.Supp.3d 562, 568 (E.D. Va. 2019).

Nominations for inclusion into the TSDB are made by the FBI and/or the National Counterterrorism Center. *See Beydoun*, 871 F.3d at 463.  The decision whether to accept or reject a nomination is then made by the TSC. *See id.*  The TSC adds a nominated individual to the TSDB if it finds that "the United States Government has a reasonable suspicion that the individual is a known or suspected terrorist." *Elhady*, 391 F.Supp.3d at 568 (internal quotation marks omitted).  "A 'suspected terrorist' is an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in

2

aid of, or related to terrorism and/or terrorist activities." *Id.* at 569 (internal quotation marks omitted).

There are a number of "subset[s]" within the TSDB, including the "No Fly List," the "Selectee List," and the "Expanded Selectee List." *El Ali v. Barr*, --- F.Supp.3d ---, 2020 WL 4051866, at *3 (D. Md. July 20, 2020).  Individuals on the No Fly List "are prevented altogether from boarding an aircraft that flies through United States airspace." *Id.*   Individuals on the Selectee List and the Expanded Selectee List are designated "for enhanced security screening due to the threat they may pose to civil aviation or national security." *Beydoun*, 871 F.3d at 462 (internal quotation marks omitted). *See also El Ali*, 2020 WL 4051866, at *3 (explaining that the individuals on the Selectee List and the Expanded Selectee List are "are routinely subjected to extra screening at airports").

The TSA has created a procedure through which individuals may challenge their inclusion in the TSDB.  This challenge process – known as the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP") – was established by a final TSA administrative order. *See* 49 C.F.R. §§ 1560.201 – 1560.207.  As another Judge on this Court has explained, the DHS TRIP process works as follows:

> After a redress inquiry form is submitted, the TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, if necessary, will review all the documentation and information

> requested from the individual, correct any erroneous information, and provide the individual with a timely written response. These written responses vary in content, but generally state whether corrections have been made as a result of the redress inquiry and DHS TRIP's review.

*Beydoun v. Lynch*, 2016 WL 3753561, at *1 (E.D. Mich. July 14, 2016) (internal punctuation and citations omitted). *See also* 49 C.F.R. § 1560.205 (describing the DHS TRIP procedure).

## B

Salloum alleges that the TSC utilizes unreliable and discriminatory factors to determine whether to place individuals into the TSDB. For example, Salloum says that the TSC considers the following matters which, he contends, are not fair and accurate predictors of terrorist affiliations: an individual's "race, ethnicity, religious affiliation, engagement in activities protected by the First Amendment, travel history, associates, business associations, international associations, and even whether the individual has engaged in the 'study of Arabic.'" (First Am. Compl. at ¶34, ECF No. 10, PageID.432.) Salloum further claims that "travel to majority Muslim countries … is also a basis for" inclusion in the TSDB, and he says that "[t]he federal government uses guilt-by-association presumptions to place family members and friends of listed persons" in the database. (*Id.* at ¶¶ 36-37, PageID.433.)

## C

Salloum was born in 1965 in Lebanon. (*See id.* at ¶53, PageID.436.)   He moved to the United States in 1994 and became a United States citizen in 2004. (*See id.* at ¶55, PageID.436.)   He is now the chairman of several companies that do business in the United States and around the world. (*See id.* at ¶¶ 56-58, PageID.436.)   Salloum frequently travels to and from the United States in order to run his various businesses. (*See*, *e.g.*, *id.* at ¶97, PageID.443-44.)

Salloum claims that he has worked with the United States to combat terror. In 2004, Salloum was featured in a *USA Today* article profiling Muslim-American businessmen who helped the United States fight terrorism. (*See id.* at ¶60, PageID.436.)   The article explained how Salloum developed a tracking system that uses satellites to monitor cargo shipped to the United States. (*See* ECF No. 10-6, PageID.639.)   It then explained how the system allows law "enforcement agents worldwide [to] use intelligence more efficiently to flag questionable shipments" for inspection by border agents. (*Id.*)   In addition, Salloum has testified before the United States Congress "as an expert on the best practices for securing the United States ports from terrorism." (First Am. Compl. at ¶62, ECF No. 10, PageID.437.)

Salloum is also a published author. He has co-written "prestigious articles in official G20 and B20 publications with notable officials including H.E. Joko Widodo, President of Indonesia, H.E. Yves Leterme, former Prime Minister of

Belgium, H.E. Dirk Niebel, former German Minister of Economic Development, Mr. Donald Johnston, former OECD Secretary General and Dr. Merza Hasan, Dean of the World Bank Executive Board." (*Id.* at ¶61, PageID.437.)

### D

Salloum alleges that despite his work to detect and prevent terrorism, the TSC has wrongly placed him in the TSDB.[1]  Salloum says that as a result of that placement, "every single time" he travels through airports in the United States, both for domestic and international travel, "he is detained and interrogated … for up to three to four hours [before he is allowed to fly].  His computer and phone are [also] taken and the data [is] downloaded off of them and made available" to government agencies and others. (*Id.* at ¶¶ 66, 68, PageID.438.)

Salloum alleges that he "is asked virtually identical questions every time he is detained …. a. Why he travels to countries such as Lebanon, Indonesia, Malaysia, Turkey, and China; b. Who his family members are and where they live; and c. Why he has multiple companies and bank accounts located outside the United States." (*Id.* at ¶70, PageID.438.)  "These three questions are always asked to [Salloum] countless times during his detentions." (*Id.* at ¶72, PageID.439.)  In addition, Salloum is "also

---

[1] While Salloum alleges that he is included in the TSDB, he does not specifically allege that he is included on a "subset" of the TSDB such as the Selectee List or the Expanded Selectee List.  His allegations are consistent with the additional screening individuals on the Selectee List and the Expanded Selectee List experience. *See El Ali*, 2020 WL 4051866, at *3.

asked very specific, personal, and unique questions regarding his friends and family, his personal dispositions, his relations, his friends and family's relations and dispositions, all relating tangentially to his Muslim faith or (unrelatedly) Islamic Extremism." (*Id.* at ¶75, PageID.439.)  These interrogations have taken place "both in a separate room and, humiliatingly, beside the airport security line." (*Id.* at ¶78, PageID.440.)  Salloum insists that his business partner, who was born in the United States, who frequently travels with Salloum, and who "has virtually all of the same business ties and associations as [Salloum], including bank accounts and businesses in the same foreign countries, … does not suffer the extreme burden of being interrogated for hours each time he flies." (*Id.* at ¶81, PageID.440.)

Salloum asserts that his placement in the TSDB has harmed him in numerous ways.   First, he says that it "has caused great economic harm to him and his business." (*Id.* at ¶82, PageID.440; *see also id.* at ¶¶ 84-85, PageID.441.)   For example, he contends that due to the "extreme burdens" that enhanced screening placed upon his ability to travel, he was forced to move from the United States to Lebanon and to sell his home at a $300,000 loss. (*Id.* at ¶¶ 83, 86, PageID.441-442.) In addition, "[t]he extreme burden placed on [Salloum] while traveling … has caused him to not pursue appointments to secure $300,000,000 in capital to expand his business, which resulted in approximately $50,000,000 of additional operating costs to [Salloum's] businesses." (*Id.* at ¶84, PageID.441.)  He also "can no longer travel

with his phone or computer, and so does not, as the delay in downloading his data often caused greater [travel] delay[s]." (*Id.* at ¶69, PageID.438.)   Salloum further insists that the interrogations have caused him "humiliation and stigma of being a 'known of suspected terrorist.'" (*Id.* at ¶88, PageID.442.)

Finally, Salloum says that his inclusion in the TSDB has caused harm to his family by preventing them from living in the United States. (*See*, *e.g.*, *id.* at ¶92, PageID.443.)   More specifically, Salloum alleges that his wife was denied a visa to live in the United States because of Salloum's "inclusion" in the TSDB. (*Id.* at ¶¶ 92-93, PageID.443.)   Salloum says that the denial of his wife's visa also prevented his oldest daughter from attending college in the United States and prevented his youngest daughter from having a necessary medical procedure performed in the United States. (*See id.* at ¶¶ 94-95, PageID.443.)   Salloum further asserts that his "inability to maintain a domicile, let alone a frequent presence, in the United States has unfortunately devastated his relationship with his brother, a United States citizen and resident." (*Id.* at ¶95, PageID.443.)

## E

On several occasions, Salloum has attempted to avail himself of the DHS TRIP procedure in order to have his name removed from the TSDB, but those efforts have gone nowhere. (*See id.* at ¶89, PageID.442.)   When Salloum submitted a request that his name be removed from the TSDB, he received a response that could

"neither confirm nor deny any information about [him] which may be within federal watchlists." (*Id.* at ¶90, PageID.443; *see also* DHS TRIP Response Letter, ECF No. 10-9.) It does not appear that the TSA, the Department of Homeland Security, or any of the Defendants have taken any action in response to Salloum's complaints or removed him from the TSDB.

## II

Salloum filed this action on November 26, 2019. (*See* Compl., ECF No. 1.) Defendants thereafter moved to dismiss. (*See* Mot. to Dismiss, ECF No. 8.) The Court then granted Salloum leave to file a First Amended Complaint so that he could "remedy the purported pleading defects that Defendants have raised in their motion." (Order, ECF No. 9, PageID.421.) Salloum filed a First Amended Complaint on March 17, 2020. (*See* First Am. Compl., ECF No. 10.)

Salloum brings the First Amended Complaint against the following Defendants, each in their official capacity:

- Charles H. Kable, Director of the TSC;
- Rick Kopel, Principle Deputy Director of the TSC;
- G. Clayton Grigg, Deputy Director of Operations of the TSC;
- Russell Travers, Director of the National Counterterrorism Center;
- Chad F. Wolf, Acting Secretary of the United States Department of Homeland Security;
- David P. Pekoske, Administrator of the Transportation Security Administration;

- Christopher H. Wray, Director of the Federal Bureau of Investigation; and
- Mark A. Morgan, Commissioner of United States Customs and Border Protection.

Salloum also names several unidentified "John Does" and "Jane Does" as Defendants in their individual capacities. Salloum claims that these Defendants "are the individual agents and governmental employees who physically enforced the violations of [his] constitutional rights." (*Id.* at ¶19, PageID.429-430.)

The First Amended Complaint includes seven claims brought against all Defendants. The claims are as follows:

- In Count I, Salloum asserts a procedural due process claim. That claim has two components. In the first component, Salloum alleges that the Defendants violated his due process rights by placing him in the TSDB "without … providing [him] notice." (*Id.* at ¶103, PageID.445.) In the second component, Salloum asserts that the DHS TRIP redress process violates his due process rights because it does not provide him a "meaningful opportunity to contest his placement" in, and seek removal from, the TSDB. (*Id.* at ¶104, PageID.445.)

- In Count II, Salloum asserts that the Defendants violated his substantive due process rights by placing him in the TSDB. (*See id.* at ¶111, PageID.447.)

10

- In Count III, Salloum alleges that the Defendants violated his Fourth Amendment rights when they seized "his phone, laptop, and the data contained therein" and then disseminated that data "to domestic and foreign, private and public, organizations and individuals." (*Id.* at ¶121, PageID.449.)

- In Count IV, Salloum claims that the Defendants violated his Fourth Amendment rights when they "seized" him personally and subjected him to repeated questioning for several hours every time he traveled through airports in the United States. (*Id.* at ¶125, PageID.449.)

- In Count V, Salloum alleges that the Defendants discriminated against him on the basis of his race, religion, ethnicity, and nationality in violation of the Equal Protection Clause by placing him in the TSDB. (*See id.* at ¶138, PageID.452.)

- In Count VI, Salloum asserts that the Defendants interfered with his "right to free association" with his family by placing him in the TSDB and inhibiting his travel. (*Id.* at ¶145, PageID.453.)

- Finally, in Count VII, Salloum alleges that Defendants exceeded the scope of their lawful authority when they created the TSDB. Salloum asserts that "Congress has not directed the Executive Branch to create either a No Fly List or a Selectee List" and has not "authorized the Executive Branch to

utilize the federal terror watch list to encourage federal law enforcement to detain individuals such as [Salloum] based on their watch list status." (*Id.* at ¶¶ 156-157, PageID.456.)

Salloum seeks as relief, among other things, (1) a declaration "that Defendants' policies, practices, and customs violate the Fourth and Fifth Amendments to the United States Constitution, the Administrative Procedure Act, and the non-delegation doctrine of the United States Constitution," (2) "a permanent injunction on Defendants requiring them to remove [Salloum] from any and all of their watch lists, including the TSDB, and notify all agencies, domestic and foreign of this removal," and (3) "a permanent injunction on Defendants requiring them to destroy all data downloaded from [Salloum's] phones or computers, at any time, however and wherever stored." (*Id.*, PageID.458.)

Defendants moved to dismiss Salloum's First Amended Complaint on April 14, 2020. (*See* Mot. to Dismiss, ECF No. 12.) Salloum responded, and Defendants filed a reply. (*See* Salloum Resp. to Mot. to Dismiss, ECF No. 14; Defendants' Reply Br., ECF No. 15.) The Court held a video hearing on the motion on September 24, 2020. (*See* 9/24/2020 Hr'g Tr., ECF No. 18.) The parties then filed supplemental briefs. (*See* Defendants' Supp. Br., ECF No. 19; Salloum Supp. Br., ECF No. 20.)

## III

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id.* When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

The Court begins with Salloum's claim that Defendants violated his procedural due process rights when they placed him in the TSDB without sufficient

notice. "To establish a procedural due process violation under 42 U.S.C. § 1983, [a plaintiff] is required to demonstrate three elements: (1) that [he] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [he] was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [him] adequate procedural rights before depriving [him] of its protected interest." *Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010).

Defendants argue that Salloum's procedural due process claim based upon his placement in the TSDB fails at elements two and three. They insist that he has failed to plausibly allege that he was deprived of a liberty interest. And they argue that even if he has alleged the deprivation of a liberty interest, he has not plausibly alleged that the deprivation occurred without sufficient process. The Court will examine each of these contentions in turn.

**A**

Salloum alleges that this placement in the TSDB deprived him of two liberty interests: his right to travel and his interest in his personal reputation. The Court concludes that Salloum has plausibly alleged a deprivation of the right to travel and has thus satisfied the second element of his due process claim. But he has not sufficiently alleged a deprivation of his reputational interest, and thus the claim may not proceed on that ground.

**1**

Defendants argue that Salloum "has failed to plead a deprivation of the right to travel" because his "alleged travel difficulties are commensurate with the delays that this circuit has held do not unconstitutionally burden the right to travel." (Mot. to Dismiss, ECF No. 12, PageID.749.)   In support, Defendants rely primarily on the Sixth Circuit's decision in *Beydoun*, *supra*.   But that decision is materially distinguishable from the facts Salloum alleges here.

The plaintiffs in *Beydoun* alleged that they were wrongfully placed on the Selectee List and, as a result, were "only allowed to board flights after undergoing additional screening and experiencing excessive delays." *Beydoun*, 871 F.3d at 462. They also "attempted to use the procedure established by DHS TRIP to challenge their inclusion on the Selectee List," but "the government failed to remove them from the list and [] only sent them generalized responses to their inquiries." *Id.* at 463.   The plaintiffs then filed separate civil actions – that were eventually consolidated on appeal – against the Attorney General of the United Sates, the Director of the FBI, the Director of the TSC, and the Director of the TSA. *See id.* The plaintiffs contended that the defendants violated their right to substantive due process by placing them on the Selectee List. *See id.*   In support, the plaintiffs alleged, among other things, that the defendants "infringed upon" their "fundamental

right[] … to 'travel[ ] free from unreasonable burdens within, to or from the United States of America….'" *Id.* at 466 (quoting plaintiffs' allegations).

Because the plaintiffs' claims rested upon the right to travel, the Sixth Circuit examined the contours of that right.  The court explained that the freedom to travel domestically is a "basic right under the Constitution" and that the freedom "to travel abroad …. is subject to reasonable governmental regulation":

> The Supreme Court has recognized that "[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (internal quotation omitted*); see also Kent v. Dulles*, 357 U.S. 116, 125–26, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment.... Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." (citations omitted)). Indeed, "[t]he constitutional right of interstate travel is virtually unqualified." *Califano v. Aznavorian*, 439 U.S. 170, 176, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978). However, "the *freedom* to travel outside the United States must be distinguished from the right to travel within the United States." *Haig v. Agee*, 453 U.S. 280, 306, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). Therefore, "the freedom to travel abroad ... is subject to reasonable governmental regulation." *Id.*

*Id.* at 466-467.

The court then noted that the key "issue in these cases is whether [p]laintiffs' alleged placement on the Selectee List has created more than an incidental burden

16

on their right to travel." *Id*. at 467. The court concluded that the plaintiffs made only vague and generalized allegations concerning the burdens they experienced and failed to plead more than an incidental infringement on their right to travel:

> On appeal, Plaintiffs argue that the district court erred in considering the burden placed on Plaintiffs by their inclusion on the Selectee List as negligible or incidental. Beydoun alleged that he has missed "countless flights" after being subjected to lengthy secondary screenings. According to Beydoun, these delays had the effect of deterring him from flying and taking away his right to travel. However, Beydoun has not attempted to provide any information about when those delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling.

> Bazzi's complaint provides a few more details. For example, Bazzi mentions several instances when he has been delayed or subjected to additional screening, with delays ranging from ten minutes to one hour in duration. Bazzi also points to the fact that, in his complaint, he specifically alleged that he had been deterred from flying on one occasion.

> The district court correctly held that Plaintiffs did not allege that any protected interest was violated by them being on the Selectee List. While Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane, these burdens do not amount to a constitutional violation. Importantly, Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane. Therefore, Plaintiffs' cases are distinguishable from those in which the plaintiffs claimed they could not fly at all because they were on the No Fly List. *See, e.g., Latif v. Holder*, 969 F.Supp.2d 1293, 1303–04 (D. Or. 2013) ("Having to show

identification to board a commercial aircraft and undergoing enhanced security screening for less than an hour does not rise to the same level of deprivation as being denied boarding on any flight for the indefinite future."); *Mohamed v. Holder*, —— F.Supp.3d ——, 2017 WL 3086644 (E.D. Va. 2017).

The burdens alleged by Plaintiffs, to the extent they provided specific details about those incidents, can only be described as incidental or negligible and therefore do not implicate the right to travel. Plaintiffs point to no authority supporting their claim that a delay of ten minutes, thirty minutes, or even an hour at the airport violates their fundamental right to travel, and we are aware of none. Indeed, the Second Circuit rejected a claim that plaintiffs were impeded from exercising their right to travel when they were delayed for an entire day. *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 133–36, 141 (2d Cir. 2010). When Plaintiffs' only allegations amount to delays that many individuals are likely to experience at the airport, it is hard to conclude that the fundamental right to travel has been implicated.

*Id.* at 467-68.

As this passage makes clear, the Sixth Circuit's inquiry in *Beydoun* was a narrow one. The court considered only whether the right to travel is unduly burdened by "delays that many individuals are likely to experience at the airport." *Id*. Thus, *Beydoun* stands for the limited proposition that ordinary delays incident to airport screening do not infringe upon the right to travel. *See El Ali*, 2020 WL 4051866, at *16 (recognizing the limited holding of *Beydoun*); *Elhady*, 391 F.Supp.3d at 577-78 (declining to follow *Beydoun* where plaintiff provided detailed allegations of more substantial burdens).

*Beydoun* does not control here because Salloum alleges substantially greater burdens, in significantly more detail, than those alleged in *Beydoun*. Indeed, Salloum alleges the *very* facts about the burdens he experienced that were absent in *Beydoun*. He has alleged when the delays occurred (*see* Salloum flight log, ECF No. 10-10), how long the delays were (*see*, *e.g.*, First Am. Compl. at ¶127, ECF No. 10, PageID.450, alleging that "each and every time" he flies he is detained for "three to four hours"), and what type of enhanced screening he was subjected to (*see id.* at ¶¶ 66, 70, 75, PageID.438-439, describing the specific questions he is repeatedly asked). More importantly, unlike the plaintiffs in *Beydoun*, Salloum alleges that he experiences more than just enhanced questioning before he is allowed to board flights. He alleges that in addition to hours of questioning, his phone and computer are "taken," the data from those devices is "downloaded" by federal agents, and that data is then "made available" to others. (*Id.* at ¶66, PageID.438.) Simply put, Salloum's allegations that he "experience[es] a pattern of multi-hour delays nearly every time [he] travel[s], arising from hours-long searches, detentions, and interrogations, often conducted in front of fellow passengers and travel companions .... amount to a significant impediment to travel – a far cry from the 'delays that

many individuals are likely to experience at the airport.'" *El Ali*, 2020 WL 4051866, at *16 (quoting and distinguishing *Beydoun*).[2]

Two federal district courts have recently held that allegations like those made by Salloum are sufficient to support a claim for deprivation of the right to travel. *See Elhady* and *El Ali*, *supra*. First, in *Elhady*, United States citizens alleged, among other things, that their inclusion in the TSDB infringed upon their right to travel. In support of that claim, one of the plaintiffs said that because he was listed in the TSDB, "his phone [had been] confiscated multiple times at the U.S. border, [he had] been pressured to reveal its password to border agents, been questioned about its contents, and been told by an FBI agent that his cell phone conversations were being monitored." *Elhady*, 391 F.Supp.3d at 572. Likewise, five other plaintiffs claimed that because they were included in the TSDB, "their electronics and those of family members [had been] searched, seized, and copied." *Id.* And other plaintiffs alleged that they "have regularly and repeatedly had their travel disrupted by long and

---

[2] Defendants also cite several other, out-of-circuit cases for the proposition that Salloum has not plausibly alleged a deprivation of his right to travel. *See*, *e.g.*, *Torraco v. Port Auth. of NY & NJ*, 615 F.3d 129, 133 (2d Cir. 2007); *Abdi v. Wray*, 942 F.3d 1019, 1031-32 (10th Cir. 2019). But the plaintiffs in *Town of Southold* and *Abdi* did not allege a combination of (1) repeated multi-hour interrogations, that involve the asking of identical questions, each and every time they attempted to fly through an American airport and (2) the repeated downloading and dissemination of data from the plaintiffs' computers and phones. Thus, those decisions do not address the circumstances alleged by Salloum.

invasive secondary inspections, causing them to … sometimes avoid travel all together." *Id.* The court in *Elhady* held that these consequences of placement in the TSDB placed "a substantial burden on Plaintiffs' exercise of their rights to international travel and domestic air travel, thus constituting a deprivation of Plaintiffs'' liberty interests that requires some measure of due process." *Id.* at 579. Second, in *El Ali*, the court held that a group of plaintiffs sufficiently alleged a deprivation of their liberty interest in travel where they pleaded that they "experience[ed] a pattern of multihour delays nearly every time they travel, arising from hourslong searches, detentions, and interrogations, often conducted in front of fellow passengers and companions." *El Ali*, 2020 WL 4051866, at *16. Like the courts in *Elhady* and *El Ali*, the Court concludes here that Salloum has plausibly alleged a deprivation of his right to travel by pleading that he was subject to lengthy and intrusive interrogations and extensive seizures of data from of his electronic devices every time he traveled (domestically and internationally) through American airports.[3]

---

[3] Salloum has plausibly alleged a deprivation of his right to travel even though modes of transportation other than air travel may theoretically have been available to him. "[I]n many instances air travel constitutes the only practical means of traveling across great distances, especially internationally." *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019). *See also El Ali*, 2020 WL 4051866, at *20 ("That the No Fly List Plaintiffs may use a less convenient means of transportation does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option"). It is plausible that Salloum could not reasonably satisfy his need to travel through modes of travel other than air.

**2**

Defendants next argue that Salloum has failed to sufficiently plead that Defendants infringed on his liberty interest in his reputation. The Court agrees.

"For a reputational harm to infringe on a protected liberty interest, [a] plaintiff must meet the 'stigma-plus' test, that is, [a] plaintiff must demonstrate that the government's action 'damaged his... reputation (the stigma) and that it 'deprived [him] of a right previously held under [the] law' (the plus).'" *Beydoun*, 2016 WL 3753561, at *5 (quoting *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 502 (6th Cir. 2007). Here, Salloum has not sufficiently alleged the "plus" element.

At the hearing on Defendants' motion, the Court specifically asked counsel for Salloum to "identify a right guaranteed to Mr. Salloum under American law, either a state law or a federal law, that he was deprived of as a consequence of some sort of disclosure of him being [in the TSDB]." (9/24/2020 Hr'g Tr., ECF No. 18, PageID.922.) The only right that Salloum's counsel identified was the "right to be with his family." (*Id.*) Counsel explained that Salloum was deprived of that right when – due to his status in the TSDB – his wife's application for a visa was denied by a consular official at the United States embassy in Lebanon. (*See id.*, PageID.922-923; *see also* First Am. Compl. at ¶¶ 92, 94, ECF No. 10, PageID.443.)

But Salloum has failed to demonstrate that his claimed right to "be with his family" includes the right to have visas granted to non-citizen family members.

While the Supreme Court has recognized that "the Constitution protects the sanctity of the family," *Moore v. City of Cleveland, Ohio*, 431 U.S. 494, 504 (1977), Salloum has not cited any authority holding that a citizen's right to the sanctity of his family includes the right to secure visas for non-citizen family members.  Moreover, there is a substantial body of case suggesting that federal courts may not review visa denials – even those that result in the exclusion of non-citizen family members. *See, e.g., Allen v. Milas*, 896 F.3d 1094, 1004 (9th Cir. 2018) (holding that court did not have authority to review denial of visa for service member's wife).  This body of case law further undercuts Salloum's claim that the family protections found in the Constitution include the right to obtain visas for non-citizen family members.  Simply put, Salloum has failed to persuade the Court that his placement in the TSDB interfered with his claimed constitutional right to be with his family.  Since the deprivation of that alleged right is the only "plus" identified by Salloum, Salloum's allegations do not satisfy the stigma-plus test.  Thus, he may not pursue his procedural due process claim to the extent that the claim rests upon alleged damage to his reputation.

### 3

In sum, the Court concludes that Salloum has alleged a deprivation of at least one protected liberty interest – his interest in travel.  Thus, he has satisfied the second element of his procedural due process claim.

23

**B**

Defendants next argue that Salloum has not satisfied the third element of his procedural due process claim because he has not plausibly alleged that he was deprived of his right to travel without sufficient process. The Court disagrees.

When determining whether the government has afforded a plaintiff sufficient process, courts "weigh three factors, commonly referred to as the *Mathews* factors":

> (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*El Ali*, 2020 WL 4051866, at *14 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

With respect to the first *Mathews* factor, the Defendants argue Salloum's "constitutionally protected interest … is quite limited." (Mot. to Dismiss, ECF No. 12, PageID.755.) However, Salloum alleges, among other things, that his inclusion in the TSDB burdens his right to travel domestically, and he a very strong interest in such travel. Indeed, as noted above, the "[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972) (internal quotation marks omitted). In addition, Salloum plausibly alleges undue interference with his right to international travel.

24

While "the freedom to travel abroad" may be "subject to reasonable government regulation," *Beydoun*, 871 F.3d at 467, American citizens nonetheless retain "a strong liberty interest in … international travel." *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019). *See also Kent v. Dulles*, 357 U.S. 116, 126 (1958) (explaining that "[t]ravel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values").

Defendants next argue that under the second *Mathews* factor, the risk of an erroneous deprivation is small in Salloum's case because "[w]hen an individual is placed on the TSDB, that placement decision undergoes several layers of review." (Mot. to Dismiss, ECF No. 12, PageID.756.) Defendants further argue that the DHS TRIP "redress process is adequate to protect against [the] erroneous deprivation" of Salloum's interests. (*Id.*) Thus, according to the Defendants "[a]ssuming, *arguendo*, that a liberty or property interest was infringed, the existing redress process is more than sufficient for [Salloum] to challenge his alleged placement in the TSDB." (*Id.*, PageID.755.)

The defendants in *El Ali* made this same argument, and the court rejected it:

> Defendants contend that the redress procedures afforded are sufficient to address the constitutional deprivations when balanced against the Government's keen interest in protecting the country's borders. Defendants maintain the internal procedures applicable to the TSDB protect against erroneous constitutional deprivations. ECF No. 49-1 at 69.

They highlight that potential TSDB listees must be nominated and approved before being placed in the database and that the TSDB is then subject to ongoing internal audits. The DHS TRIP procedure, say Defendants, provides further protection in that it draws attention to possible erroneous placement in the database. *Id.* [….] Thus, according to Defendants, the Amended Complaint fails to demonstrate that procedures were inadequate to protect against erroneous deprivation of a protected liberty interest.

Viewing the Amended Complaint most favorably to Plaintiffs, the TSDB nomination and approval process is, in short, a black box. The process is governed by "amorphous criteria," devoid of any notice, and utterly lacking in safeguards, such that over 98% of those nominated are approved. ECF No. 48 ¶¶ 135, 185, 220. As a result, the risk of erroneous deprivation is high, according to Plaintiffs: given that none of the million-plus individuals in the database have ever perpetrated an act of domestic terrorism, the government would be better off randomly choosing individuals to include in the TSDB. *Id.* ¶¶ 179–80, 188. Once in the TSDB, no redress mechanism exists for individuals who suffer overly broad and seemingly irrational restrictions with air and land travel, government credentialing, or financial institutions. *Id.* ¶ 211.

Plaintiffs further aver the DHS TRIP process is unavailing. DHS TRIP provides no information on how the TSA and TSC evaluates complaints, *id.* ¶ 212; inquiries generate merely a "standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual." *Id.* ¶ 217. Allegedly, "as of December 2017, the TSA Administrator had taken no action regarding the removal of TSDB Listees in two years." *Id.* ¶ 213. Indeed, each affected Plaintiff alleges having received only a "redress control number" in response to their DHS TRIP inquiries, nothing else. *See, e.g.*, *id.* ¶¶ 765, 879.

26

[….]

> Accordingly, the existing procedural protections are inscrutable, opaque, and as to DHS TRIP No Fly List inquires, not followed. The process affords little to no opportunity to be heard, before, during, or after being placed in the TSDB and deprived of protected liberty interests. [….] As pleaded, therefore, the claims survive.

*El Ali*, 2020 WL 4051866, at ** 18-19.

The court in *Elhady* reached a similar conclusion:

> [U]nder the TSDB's inclusion standard, the TSC may consider a wide range of factors in determining whether an individual belongs on the Watchlist, including an individual's "race, ethnicity, or religious affiliation," beliefs and activities protected by the First Amendment, travel history, personal and professional associations, and financial transactions. Pls.' Statement of Material Facts ¶¶ 18-19. The vagueness of the standard for inclusion in the TSDB, coupled with the lack of any meaningful restraint on what constitutes grounds for placement on the Watchlist, constitutes, in essence, the "absence of any ascertainable standard for inclusion and exclusion," which "is precisely what offends the Due Process Clause." *See Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

> The Defendants contend that there are sufficient safeguards to protect against the risk of erroneous deprivation since two agencies – the nominating agency and TSC – must review the nomination to ensure that there is sufficient supporting information, and the supporting information requires concrete criteria to be met. They further contend that the risk of erroneous deprivation is low because Plaintiffs may seek redress for their erroneous inclusion in the TSDB through DHS TRIP. But it is undisputed that there is no independent review of a person's placement on the TSDB by a neutral

decisionmaker, and when coupled with the limited disclosures and opportunity to respond by a person who requests that his status be reviewed, there exists a substantial risk of erroneous deprivation, regardless of the internal procedures used to determine whether a nomination to the TSDB is accepted.

Nor is DHS TRIP, as it currently exists, a sufficient safeguard because, in the context of individuals challenging their placement on the TSDB rather than on the No Fly List, it is a black box – individuals are not told, even after filing, whether or not they were or remain on the TSDB watchlist and are also not told the factual basis for their inclusion. *See* Pls.' Statement of Material Facts ¶ 124; *see also Latif*, 28 F. Supp. 3d at 1154-61 (explaining why DHS TRIP process failed constitutional muster as applied to individuals on the No Fly List, and mandating changes to that process that have subsequently been made). Accordingly, the Court concludes that the risk of erroneous deprivation of Plaintiff's travel-related and reputational liberty interests is high, and the currently existing procedural safeguards are not sufficient to address that risk.

*Elhady*, 391 F.Supp.3d at 581-82.

This reasoning from *El Ali* and *Elhady* is persuasive, and it applies here because Salloum's allegations concerning placement into the TSDB and concerning the DHS TRIP process parallel the allegations made in those cases. (*See*, *e.g.*, First Am. Compl. at ¶¶ 34, 36-37, 89-90, ECF No. 10, PageID.433, 442.)  The Court may ultimately conclude – after discovery and/or following a trial – that the government's "internal processes may provide sufficient protection to withstand scrutiny," but "the Court cannot make that determination as a matter of law" as this early stage of the

proceedings and in the face of Salloum's well-pleaded allegations. *El Ali*, 2020 WL 4051866, at *19.

Finally, with respect to the third *Mathews* factor, Defendants argue that "there is obviously [a] compelling government interest in preventing terrorist attacks against commercial aviation." (Mot. to Dismiss, ECF No. 12, PageID.756.)   That is certainly true.  But the third factor involves more than just whether the government's interest is compelling.  In applying this factor, a court must also consider (1) the effectiveness of the current procedures in protecting that interest and (2) the administrative burdens and efficacy of other procedures that the government could use to achieve that interest. *See Mathews*, 424 U.S. at 335.  Here, Salloum has plausibly alleged that the current procedures are "demonstrably ineffective" and "highly inaccurate" (First Am. Compl. at ¶6, ECF No. 10, PageID.426), and his allegations support an inference that alternative procedures would be more reasonable and effective.  In the face of these plausible allegations, the Court cannot resolve the third *Mathews* factor without the development of a factual record.  As the Court in *El Ali* concluded, "[d]iscovery as to whether and how [the] TSDB and the Watchlisting system furthers national security interests, as well as the administrative burdens that additional procedural protections [would] place on the [Defendants] remain critical to [the] final analysis" under the *Mathews* factors. *El Ali*, 2020 WL 4051866, at *19.

In sum, Salloum's allegations satisfy all three parts of the *Mathews* test and, if proven, could establish that the Defendants did not provide him sufficient process. Accordingly, Salloum has satisfied the third element of his procedural due process claim. And because Salloum has plausibly alleged all of the elements of that claim with respect to the alleged deprivation of his right to travel, that portion of Salloum's procedural due process claim is not subject to dismissal.

## V

The Court next turns to the second component of Salloum's procedural due process claim – that the DHS TRIP redress process is constitutionally inadequate. Defendants argue that the Court lacks subject matter jurisdiction over this claim.[4] The Court agrees.

Under federal law, a person seeking to challenge a final order issued by the TSA must "apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals

---

[4] At the hearing on Defendants' motion to dismiss, the Court confirmed with counsel for Defendants that the only portions of Salloum's claims that Defendants were asserting that the Court lacked jurisdiction over were (1) the component of Salloum's procedural due process claim that challenged the sufficiency of the DHS TRIP redress process and (2) the portion of Salloum's Fourth Amendment claim challenging TSA search procedures that arose out of final orders of the TSA. (*See* 9/24/2020 Hr'g Tr., ECF No. 18, PageID.914-915.) Thus, Defendants do not contend that the Court lacks subject matter jurisdiction to adjudicate Salloum's procedural due process claim based upon his *placement* in the TSDB (which the Court analyzed in section (IV)(A) above).

of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a). The circuit courts of appeal, not federal district courts, have "exclusive jurisdiction to affirm, amend, modify, or set aside any part of [a TSA final] order." 49 U.S.C. § 46110(c).

Here, Salloum seeks to challenge the adequacy of the DHS TRIP redress process. As described in detail above, that process was created by a final order of the TSA. *See* 49 C.F.R. §§ 1560.201 – 1560.207. Therefore, Salloum's challenge to the DHS TRIP redress process is a challenge to a final TSA order, and "exclusive jurisdiction" over the challenge rests in the courts of appeal.

That conclusion necessarily follows from the Sixth Circuit's decision in *Mokdad*, *supra*. The plaintiff in *Mokdad* had been placed on the No Fly List. *See Mokdad*, 804 F.3d at 808. In order to seek his removal from that list, he attempted to utilize the DHS TRIP redress process on "three occasions." *Id.* He alleged that that process was constitutionally inadequate. *See id.* at 808-09. The Sixth Circuit explained that "[t]o the extent that [the plaintiff] challenge[d] the adequacy of the redress process, his claims amount[ed] to a challenge to a TSA order." *Id.* at 811. The Sixth Circuit then highlighted that "Section 46110 makes clear that the federal courts of appeals have exclusive jurisdiction to review the orders of certain federal agencies, including the Transportation Security Administration." *Id.* at 809. In light of *Mokdad*, "[a]ny challenge to the DHS TRIP redress process should be raised with

31

the appropriate appellate court pursuant to 49 U.S.C. § 46110." *Kadura v. Lynch*, 2017 WL 914249, at *5 (E.D. Mich. Mar. 8, 2017) (relying on *Mokdad* and holding that district court lacked subject matter jurisdiction over plaintiff's challenge to the adequacy of the DHS TRIP redress procedure). *See also Bazzi v. Lynch*, 2016 WL 4525240, at *4 (E.D. Mich. Aug. 30, 2006) (relying on *Mokdad* and holding that "[r]egardless of whether [p]laintiff's [c]omplaint was intended to challenge the adequacy of the DHS TRIP Redress Process, by its allegations it does so. This Court lacks jurisdiction over that challenge").

For all of these reasons, the Court concludes that is lacks subject matter jurisdiction over Salloum's procedural due process claim to the extent that claim challenges the adequacy of the DHS TRIP redress process.   That portion of Salloum's claim is **DISMISSED WITHOUT PREJUDICE**.

## VI

In Count II of the First Amended Complaint, Salloum alleges that Defendants violated his substantive due process rights by placing him in the TSDB.  Defendants argue that this claim fails because Salloum has not identified the deprivation of a sufficient liberty interest.  They assert that "the set of liberty interests protected by substantive due process is much narrower than that protected by procedural due process." (Mot. to Dismiss, ECF No. 12, PageID.758, citing *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012).)  And they insist that the "binding

precedent" in *Beydoun* compels the Court to dismiss Salloum's substantive due process claim. *Id.*  The Court disagrees.

For all of the reasons state above, *Beydoun* does not control here.  Unlike the plaintiffs in *Beydoun*, Salloum has plausibly alleged a substantial interference with his right to travel.  And that right – at least with respect to domestic travel – has long been recognized as fundamental. *See*, *e.g.*, *Dunn*, 405 U.S. at 338; *Kent*, 357 U.S. at 125-26.  For all of these reasons, the Court declines to dismiss Salloum's substantive due process claim arising out of the alleged deprivation of his right to travel. [5]

## VII

In Count III of the First Amended Complaint, Salloum claims that Defendants violated his Fourth Amendment rights when they seized "his phone [and] laptop," downloaded "the data contained therein," and then "disseminated [that data] to domestic and foreign, private and public, organizations and individuals." (First Am. Compl. at ¶121, ECF No. 10, PageID.449.)  Defendants argue that they are entitled to dismissal of this claim because (1) Salloum's allegations do not provide them "fair notice" of his claim and (2) "even if [Salloum] had pled sufficient facts … the government may search and seize property crossing the border without any

---

[5] Part of Salloum's substantive due process claim relies upon an alleged injury to his reputation.  For all of the reasons explained above, Salloum may not proceed on his claimed injury to his reputational interests.

suspicion." (Mot. to Dismiss, ECF No. 12, PageID.764-765.)  The Court concludes that dismissal of this claim is not appropriate at this time.

Salloum has pleaded sufficient facts to put Defendants on notice of his illegal seizure claim arising out of the seizure and downloading of his personal data.  He has alleged that each and every time he travels, "[h]is computer and phone are taken and the data downloaded off of them and made available to all of the individuals whom the [TSDB] is made available to." (First Am. Compl. at ¶66, ECF No. 10, PageID.438.)  And Salloum has attached a flight log to his First Amended Complaint that identifies fourteen specific flights between January 2016 and January 2019 (with flight numbers, departure and arrival dates, and the airports Salloum travelled through) where Salloum says his data was seized, downloaded, and disseminated. (*See* Salloum flight log, ECF No. 10-10; *see also* First Am. Compl. at ¶98, ECF No. 10, PageID.444.)  While Salloum perhaps could have included some additional level of detail regarding the seizure of his phone and computer and the downloading of the data from those devices, the Court cannot say that Salloum's allegations are the kind of "threadbare" allegations identified as insufficient in *Twombly* and *Iqbal*. Salloum's First Amended Complaint provides sufficient notice to Defendants of the nature of Salloum's seizure claim arising out of the alleged downloading and dissemination of his personal data.

Salloum has also sufficiently pleaded that the alleged seizures, downloading, and dissemination of his personal data violated the Fourth Amendment. Searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate," like those challenged by Salloum here, "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established… exceptions." *Katz v United States*, 389 U.S. 347, 357. Thus, Salloum's Fourth Amendment claim is plausible unless the seizures and downloading of data from his computer and cell phone fell within an exception to the warrant requirement.

Defendants insist that the seizures and downloading fell within the "border-crossing exception." "Under that exception, searches of people and their property at the borders are *per se* reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013). But this exception authorizes only searches and seizures that are "routine," *United States v. Ramsey*, 431 U.S. 606, 619 (1977), and not "highly intrusive." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Simply put, "at a border or its functional equivalent, like an international airport[,] government agents may conduct *routine* searches and seizures of persons and property without a warrant or any individualized suspicion." *United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019) (internal punctuation omitted; emphasis added).

Several courts have concluded that downloading and reviewing a substantial amount of data from a person's cell phone and/or computer at a border crossing is not routine and is highly intrusive.  The Fourth Circuit's decision in *United States v. Kolusuz*, 890 F.3d 133 (4th Cir. 2018), is instructive.  The defendant in *Kolusuz* "was detained at Washington Dulles International Airport while attempting to board a flight to Turkey." *Id*. at 136.  Officials then confiscated the defendant's cell phone and "subjected it" to a "forensic analysis." *Id*.  The defendant moved to suppress the findings from that search. *See id*.  On appeal, the Fourth Circuit reviewed how the border-search exception applied to the forensic search of a cell phone.  It concluded that because "[s]martphones and laptops contain the most intimate details of our lives" such as "financial records, confidential business documents, medical records and private email," that could "reflect[] a wealth of detail about [a person's] familial, political, professional, religious and sexual associations," a "forensic search of a digital phone must be treated as a nonroutine border search." *Id.* at 145-146 (internal quotation marks omitted). *See also Aigbekaen*, 943 F.3d at 721 (affirming conclusion from *Kolusuz* that forensic search of a cell phone at the border is "intrusive" and "nonroutine").

The Ninth Circuit recently reached the same conclusion in *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).  In *Cano*, an agent of the Department of Homeland Security conducted a warrantless forensic search of the defendant's cell

phone when he crossed the border into this country. The government argued that the search fell within the border crossing exception to the warrant requirement, but the Ninth Circuit disagreed. It held that the exception did not apply because the search was "highly intrusive" and not routine. *Id.* at 1019-20. The court stressed that modern cell phones 'carry a cache of sensitive personal information – the sum of an individual's private life," and thus "a search of a cell phone may give the government not only sensitive records previously found in the home, but a broad array of private information never found in a home in any form—unless the phone is." *Id.* at 1020 (internal quotation marks omitted).

Finally, the United States District Court for the District of Massachusetts also recently concluded that even a "basic search" (as defined in policies promulgated by United States Customs and Border Protection and United States Immigrations and Customs Enforcement) of a person's personal electronic devices is "non-routine" because such a search can "reveal a wealth of personal information":

> Under the CBP and ICE policies, a basic search and an advanced search differ only in the equipment used to perform the search and certain types of data that may be accessed with that equipment, but otherwise both implicate the same privacy concerns. Basic searches, defined only as any search of an electronic device that is not an advanced search, can access content from space physically resident on a device using the devices' native operating system. D. 99-1 at ¶ 67. That is, even a basic search alone may reveal a wealth of personal information. Electronic devices carried by travelers, including smartphones and laptops, can contain a very large volume

of information, including "sensitive information." D. 99-1
at ¶¶ 63, 65-66. Such devices can contain, for some
examples, prescription information, information about
employment, travel history and browsing history. D. 99-1
at ¶ 64. Such information can be accessed during not just
the forensic searches under the CBP and ICE policies, but
also under a basic search. D. 99-1 at ¶¶ 67-71. Using a
device's native operating system, a basic search can access
content from the allocated space physically present on the
device, it can extend to any allocated file or information
on the devices and, for devices that contain metadata, it
can reveal "the date/time associated with the content,
usage history, sender and receiver information or location
data." D. 99-1 at ¶¶ 67-69. Even in a basic search, agents
can peruse and search the contents of the device, using the
native search functions on the device, including, if
available, a keyword search. D. 99-1 at ¶ 70. An agent
conducting a basic search may use the device's own
internal search tools to search for particular words or
images. D. 99-1 at ¶ 71. Accordingly, even a basic search
allows for both a general perusal and a particularized
search of a traveler's personal data, images, files and even
sensitive information.

*Alassad v. Nielsen*, 419 F.Supp.3d 142, 163 (D. Mass. 2019) (declining to grant

defendants summary judgment on plaintiffs' Fourth Amendment claim that arose

out of seizure and searches of personal electronic devices at border crossings).

Like the courts in *Kolsuz*, *Cano*, and *Alassad*, the Court concludes that the

downloading of computer and cell phone data alleged by Salloum was "nonroutine"

and "highly invasive." He pleads that each and every time he flies, federal agents

seize his computer and phone, download *all* of the data on both devices, and

disseminate at least some of the data to "all of the individuals whom the [TSDB] is

38

made available to" such as "federal agents, private contractors, businesses, state and local police, the captains of sea vessels, and foreign governments." (First Am. Compl. at ¶¶ 47, 66, 121, ECF No. 10, PageID.436, 438, 449.)    Because it is a reality of modern life that cell phones and computers contain a significant amount of personal and sensitive information, the seizure, downloading, and dissemination of all data stored on a traveler's phone and computer can hardly be considered routine or anything other than highly intrusive.   Therefore, the broad seizure and downloading of data alleged by Salloum falls outside of the border-crossing exception.[6]

Defendants counter that this Court's decision in *United States v. Feiten*, 2016 WL 894452 (E.D. Mich. Mar. 9, 2016), compels the opposite conclusion.  While there is some language in *Feiten* that supports the Defendants' position that the border-crossing exception applies here, a careful analysis of *Feiten* reveals that it is distinguishable.

In *Feiten*, a criminal defendant left Cancun, Mexico on a flight bound for Detroit, Michigan on February 15, 2005. *See id.* at \*1.  As he waited to clear customs,

---

[6] In any event, even if the border-crossing exception applied, it would not require dismissal of Salloum's entire Fourth Amendment claim because not all of the seizures that form the basis of that claim took place at the border.  Salloum alleges that the "taking of his electronic devices …. happens when [he] attempts [to] travel[] *both* domestically and to foreign countries." (First Am. Compl. at ¶¶ 67-68, ECF No. 10, PageID.438; emphasis added.)

he was "act[ing] nervously and avoid[ed] eye contact" with Customs officers. *Id.*
"This behavior, combined with other facts including that he was traveling from an
area known for the production of contraband and as a destination for child sex
tourism, prompted the officials to refer the [d]efendant to the secondary inspection
area for further inquiries." *Id.* "Once in the secondary area," the defendant
"continued" to "appear[] nervous." *Id.* A Customs officer then asked the defendant
for "permission" to search the defendant's laptop computer, camera, and cell phone,
and the defendant consented to those searches. *Id.* "While the latter two devices
yielded nothing suspicious, [the officer] discovered on [d]efendant's computer one
image, or possibly two, that he suspected to be 'child erotica.'" *Id.* The officer then
contacted a special agent who was a "specialist on child pornography" to come to
the airport and examine the defendant's computer. *Id.*

That special agent arrived approximately two hours later. *See id.* He
"confirmed that the discovered images were 'child erotica,'" and he attempted to
conduct a second search of the computer using a program called "OS Triage." *Id.*
"The OS Triage [search] is actually less invasive of personal privacy than is a search
done by hand. A border agent inspecting a computer manually, 'page-by-page' in an
electronic format, would access any document or program stored on the device, but
a forensic preview using OS Triage merely 'allows a 'thumbnail' preview of pictures
and videos on a computer and can identify which of those pictures and videos have

file names that match known file names of child pornography." *Id.* at *6.  When the special agent attempted to use the OS Triage software to search the defendant's computer, the OS Triage software malfunctioned and would not allow the special agent to conduct this additional search. *See id.*  At that time, the special agent "detained the laptop at the border but allowed [d]efendant himself to clear customs." *Id.*

The next business day, the special agent "again searched the laptop for child pornography using the OS Triage program." *Id.* at *2. "The preview search took just under two hours, and [it] produced 178 known images of child pornography." *Id.* The special agent then turned the laptop over to a "certified forensic examiner." *Id*. That examiner copied the entire hard drive and, over the next month, found hundreds of additional pornographic images. *See id.*

The defendant in *Feiten* was ultimately indicted on multiple charges related to possession of the child pornography found on his laptop.  He then moved to suppress the images found during the search of his laptop by the forensic examiner. In the motion, the defendant conceded that the initial search of his computer at the airport was lawful, but he argued that the final search by the examiner violated the Fourth Amendment.  The court disagreed and denied the motion to suppress.

In its analysis, the court highlighted the defendant's concession that the initial search of his laptop at the airport was lawful. *See id.*  Given that concession, the

court concluded that the defendant "must also concede that the forensic preview using the OS Triage software was permissible" because that preview was "less invasive of [his] personal privacy than [the] search done by hand" at the airport. *Id.* at *6. Critically, the concededly lawful search with the OS Triage software uncovered additional images of child pornography *before* the forensic examiner conducted the search challenged by the defendant. Thus, *at the time of the challenged comprehensive search of the defendant's laptop, the investigating officers already had reasonable suspicion to believe that the defendant had committed a crime*. And the court stressed that this suspicion justified the search: "By the time [the examiner] began his 'complete forensic analysis,' border agents had already discovered 178 images of child pornography, not mere "erotica," on [d]efendant's laptop. The agents had at least 178 valid reasons to suspect that more contraband might be contained therein." *Id.* at *7.

In sharp contrast to *Feiten*, given Salloum's allegations, at the time officers downloaded all of the data on Salloum's computer and phone, they had no basis for reasonably suspecting that contraband or evidence of any criminal activity would be found on those devices. Thus, *Feiten* does not justify the seizure and downloading of all of Salloum's data.

Defendants counter that the seizure of Salloum's phone and computer and the downloading of data from those devices was in fact supported by reasonable

suspicion and were lawful for that reason. Defendants say that reasonable suspicion arose from Salloum's presence in the TSDB. Defendants remind the Court that an individual is included in that database only if the TSC has found reasonable suspicion to believe that the person is a known or suspected terrorist. (*See* Defendants' Supp. Br., ECF No. 19, PageID.979-984.) However, Salloum's allegations call into question the reliability of the TSC's TSDB determinations in general and of its specific decision to include him in the database. Indeed, Salloum's allegations, if true, suggest that there is no reasonable basis for suspecting him to be a terrorist or supporter of terrorism. In light of Salloum's allegations, the Court declines to hold as a matter of law that Salloum's inclusion in the TSDB, standing alone, provided reasonable suspicion to justify the seizure and downloading of the data on his phone and computer.

Finally, Defendants assert that "to the extent that [Salloum] challenges TSA's searches, the warrantless and suspiciousness screening of passengers at airports has been upheld as a reasonable administrative search under the Fourth Amendment." (Mot. to Dismiss, ECF No. 12, PageID.760-761.) In support, Defendants rely upon the Eleventh Circuit's decision in *Corbett v. TSA*, 767 F.3d 1171 (11th Cir. 2014). In *Corbett*, the plaintiff challenged the TSA's use of body scanners and pat downs of passengers during airport security checks. *See id.* at 1175. The court dismissed the plaintiff's challenge as untimely. *See id.* at 1174. As an alternative ground for

dismissal, the court noted in *dicta* that even if the plaintiff's challenge was timely, it would still fail because the use of body scanners and the administration of pat downs are "reasonable administrative searches" that "promote" the government's interest in "preventing terrorism." *Id.* at 1179-1182.

At this stage in the proceedings, the Court cannot conclude as a matter of law that the downloading of all of the data from Salloum's phone and computer must be upheld as an administrative search under *Corbett*. The searches at issue in *Corbett* involved only a "slight intrusion on an individual's privacy." *Id.* at 1181. Those searches hardly resemble the downloading of Salloum's private data from his cell phone and computer. Whether the alleged extensive downloading of data from Salloum's devices may ultimately be upheld as a lawful administrative search and/or seizure will depend upon the development of a factual record during discovery concerning, among other things, the degree to which the downloading of data actually protects the public's interest in air travel and whether the downloading of that data is reasonably necessary to achieve that goal. *See id.* at 1180-82 (outlining factors that courts should consider in determining whether to uphold a warrantless search under the administrative search exception). Defendants may renew their administrative search arguments at summary judgment.

For all of these reasons, the Court **DENIES** Defendants' motion to dismiss Salloum's Fourth Amendment claim arising out of the searches of his laptop and computer.[7]

## VIII

In Count IV of the First Amended Complaint, Salloum claims that the Defendants violated his Fourth Amendment rights by seizing him and subjecting him to hours of interrogation each time he flies. Salloum insists that "the repetitive nature of being asked the same three questions by multiple agents, each and every time, for three to four hours, does not and cannot meet any standard of evidence/suspicion requirement as it is unnecessary, non-routine, harassment *per se*." (First Am. Compl. at ¶127, ECF No. 10, PageID.450.) Defendants argue that this claim fails because Salloum's "Complaint is devoid of facts supporting his

---

[7] Defendants also contend that the Court lacks subject matter jurisdiction over at least some portion of Salloum's Fourth Amendment claims. They argue that "to the extent that [Salloum's] Fourth Amendment [claim] may challenge TSA's delays or screening, those claims also belong in the court of appeals, since TSA conducts its security screening pursuant to standard operating procedures that are final orders within the meaning of 49 U.S.C. § 46110." (Mot. to Dismiss, ECF No. 12, PageID.747.) It is not clear Salloum's Fourth Amendment claims challenge the terms of a TSA order. To the extent that the claims do so, they are **DISMISSED WITHOUT PREJUDICE**. However, the Court does have jurisdiction to hear Salloum's Fourth Amendment claims to the extent that Salloum challenges practices that are not specifically codified in a final order of the TSA. The Defendants have not yet persuaded the Court that the seizures described and analyzed in text above (and in Section VIII of this Opinion and Order) are specifically codified in a TSA order and are thus beyond this Court's jurisdiction to review. They may attempt to make that showing at summary judgment.

allegation that alleged seizures of his person were excessively intrusive or constituted anything other than a routine border inspection or reasonable airport screening." (Mot. to Dismiss, ECF No. 12, PageID.761-762.)  The Court disagrees.

Salloum has plausibly alleged a Fourth Amendment violation arising out of the seizure of his person.  While some degree of passenger screening is certainly routine, ordinary, and (most importantly for Fourth Amendment purposes) reasonable, Salloum describes screening that could fairly be regarded as unusual and unreasonable.  For instance, he alleges that officials detained him on three out of four consecutive travel days for several hours each day and repeatedly asked him the exact same series of intrusive questions each and every day. (*See* First Am. Compl. at ¶66, ECF No. 10, PageID.438 (alleging that "[w]hen [he] attempts to travel … he is detained and interrogated every single time, for up to three to four hours"); *id.* at ¶¶ 70-71, PageID.438-439 (identifying the "same questions" that he is "repeatedly" asked "every time he has travelled"); Salloum flight log, ECF No. 10-10, PageID.718 (identifying dates of travel, and thus dates of seizures and interrogations, including travel on January 27, 2019, January 28, 2019, and January 30, 2019).) Even if the first of these seizures was arguably part of a reasonable screening process, Salloum plausibly alleges that the latter two seizures (involving the exact same interrogation a day or two later) added nothing to any legitimate security efforts and were therefore unreasonable.  Likewise, Salloum plausibly alleges that other,

close-in-time, repetitive, and identical interrogations added essentially nothing to any legitimate screening effort and therefore amounted to unreasonable seizures. The Court cannot say as a matter of law that Salloum has failed to plead a viable Fourth Amendment claim arising out of his seizures at airports.

Defendants counter that several other courts have held that "intrusive questioning and detentions lasting up to 4-6 hours [are] routine." (Mot. to Dismiss at n.24, ECF No. 12, PageID.762.)  But nearly all of those cases involved a single detention or search, not the repeated seizures and close-in-time, repetitive interrogations that Salloum claims to have experienced. *See, e.g., Tabba v. Chertoff*, 509 F.3d 89, 95 (2d Cir. 2007) (plaintiffs brought claims after they were detained one time "for between four and six hours" when travelling to the United States for a conference); *Abidor v. Napolitano*, 990 F.Supp.2d 260, 267-269 (E.D.N.Y. 2013) (describing claim that arose out of single search of a laptop); *Feiten*, 2016 WL 894452, at *3 (challenging admission of evidence discovered on laptop that was seized following a single, four-hour border detention).  And while Defendants do rely upon one case involving multiple seizures, *Raham v. Chertoff*, 2010 WL 1335434 (N.D. Ill. Mar. 31, 2010), there is no indication that the plaintiffs in that case were seized on consecutive days and subjected to repetitive interrogations that allegedly added little, if any, to legitimate security efforts.

Finally, Defendants argue that the warrantless seizures of Salloum were justified under the border-crossing and administrative search exceptions to the warrant requirement discussed above.   (*See* Mot. to Dismiss, ECF No. 12, PageID.762-764.)   The Court rejects this argument for the same reason that it rejected Defendants' reliance on those exceptions to justify the seizure of Salloum's computer and phone and the downloading of Salloum's data on those devices. Salloum has plausibly alleged that the repeated seizures of him personally – which, again, involved identical, probing interrogations (at times on consecutive days) – were not routine, were highly intrusive, and were not sufficiently justified under the circumstances.   Given Salloum's allegations, the Court cannot hold as a matter of law that the seizures of his person were permissible under either the border-crossing or administrative search exceptions to the warrant requirement.

For all of these reasons, the Court **DENIES** Defendants' motion to dismiss Salloum's Fourth Amendment claim arising out of his repeated seizures when he flies.

## IX

The Court next addresses Salloum's claim that Defendants violated his rights under the Equal Protection Clause when they placed him in the TSDB based on his race, religion, ethnicity, and nationality.   Salloum insists that Defendants' "actions were motivated by [his] religious status," and that these actions "have had a

discriminatory effect upon, and have disparately impacted, [him] and other similarly situated American citizens who are Lebanese-American or Muslim-American travelers, and not travelers of other national origins, ethnicities, and faiths and/or religious affiliations." (First Am. Compl. at ¶¶ 138-139, ECF No. 10, PageID.452.) The Court agrees with Defendants that this claim fails as a matter of law.

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal citations and quotation marks omitted). And the disparate treatment must be intentional. Indeed, "proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause on the basis of race discrimination." *In Re Flint Water Cases*, 384 F.Supp.3d 802, 846 (E.D. Mich. 2019) (internal quotation marks omitted). Thus, allegations of disparate impact, standing alone, are generally not sufficient to state a plausible Equal Protection claim. "Even when a government 'action disparately impacts members of a particular [protected] group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an invidiously discriminatory intent." *Elhady v.*

*Piehota*, 303 F.Supp.3d 453, 467 (E.D. Va. 2017) (internal quotation marks omitted) (discussing Equal Protection challenge arising out of placement in the TSDB).

Salloum makes two allegations directly accusing the Defendants of intentional discrimination, but they do not pass the plausibility threshold. First, Salloum asserts that Defendants "target people who are racially Lebanese, of Lebanese ethnicity and/or national origin, and/or people of Muslim religious affiliation for distinctive, disparate, treatment." (First Am. Compl. at ¶134, ECF No. 10, PageID.451.) Second, Salloum says that Defendants "were motivated by the religious status of Plaintiff and other similarly situated American citizens and on the basis of constitutionally-protected free exercise of religion of Plaintiff and other similarly situated American citizens." (*Id*. at ¶138, PageID.452.) But "bald allegations" of discrimination like these are insufficient to support a viable Equal Protection violation. *El Ali*, 2020 WL 4051866, at *21 (highlighting insufficiency of allegations like "[t]he disparate treatment between Muslims and non-Muslims is the result of [d]efendants' intentional and purposeful discrimination").

Salloum also attempts to rely on press reports to support his claim that the Defendants acted with a discriminatory intent. He alleges that "[m]edia accounts have made clear that the federal TSDB is the result of bigotry and overzealousness on the part of the government and its agents" (First Am. Compl. at ¶48, ECF No. 10, PageID.434), But Salloum has not specifically identified those "media accounts,"

has not provided the Court with any basis to assess the credibility of those accounts, and has not specifically connected *his* placement in the TSDB to anything mentioned in those reports.  The reports thus add little to his claim of intentional discrimination.

Salloum also claims that the Defendants' discriminatory intent may be inferred from the disparate impact that the TSDB has on Muslim Americans.  But Salloum's disparate impact allegations are not sufficient to support an inference of intentional discrimination. For instance, Salloum claims that he "knows many other businessmen and international businessmen, none of who are subjected to such harassment by federal agents working in United States airports, unless they are Muslim-American or Lebanese-American." (*Id.* at ¶74, ECF No. 10, PageID.439.) But allegations about an unknown number of unidentified "businessmen and international businessmen" are insufficient to warrant an inference that the TSDB was established and/or is operated with a discriminatory intent.[8]  Salloum also pleads that his "business partner who was born in the United States and is a United States citizen has virtually all of the same business ties and associations as [Salloum], including bank accounts and businesses in the same foreign countries, yet he is

---

[8] Salloum refers to "many" businessmen, but he does not identify a specific number of businessmen.  The meaning of the word "many" – a critical component of Salloum's allegation of disparate impact – is vague.  And even though the Court gave Salloum an opportunity to clarify his allegations in an Amended Complaint, Salloum has not provided the Court with any basis on which to conclude that the "many" businessmen in question amount to a statistically significant number of businessmen.

evidently not [in] the [TSBD] as he does not suffer the extreme burden of being interrogated for hours each time he flies." (*Id.* at ¶81, PageID.440.)  However, the identification of one person who is not subjected to enhanced screening at airports does not say much about whether the operation of the TSDB is tainted by a discriminatory animus.  Finally, Salloum claims that "[o]n one occasion, one of [his] interrogators stated that because his family was from Germany, they were questioned after World War II, implying that [Salloum] was being questioned because he was from Lebanon." (*Id.* at ¶79, PageID.440.)  And he says that certain unidentified officers expressed concerns that Salloum "could be recruited by Hezbollah." (*Id.* at ¶76, PageID.439.)   But these alleged stray, off-hand statements from unidentified interrogators do not support an inference that the TSDB was established and is implemented with discriminatory intent.  For all of these reasons, Salloum has failed to plausibly allege an Equal Protection violation.[9]

The court in *Kovac v. Wray*, 363 F.Supp.3d 721 (N.D. Tex. 2019), concluded that a similar set of allegations failed to state a plausible Equal Protection claim.  In *Kovac*, a group of Muslim Americans alleged, among other things, that "their alleged inclusion [in the TSDB] and the lack of an adequate process of redress for those

---

[9] To the extent that Salloum argues that he could allege additional and more detailed facts supporting his Equal Protection claim, the Court already granted Salloum the opportunity to file an Amended Complaint.  Thus, Salloum has already had a full and fair opportunity to allege any and all facts that could support his claims.

individuals placed erroneously on the watchlist violate[d] their rights to due process and equal protection." *Id.* at 731. With respect to their Equal Protection challenge, the plaintiffs asserted that the court could infer "intentional discrimination based on the disproportionate number of Muslims [in the TSDB]." *Id.* In addition, like *Salloum* here, the plaintiffs also argued that discriminatory intent could be inferred because the TSC uses "travel to Muslim-majority countries—'travel that Muslim Americans are very likely to engage in'— [as] a factor for inclusion" in the TSDB. *Id.* at 760. Finally, the plaintiffs in *Kovac* also "refer[red] to the '2013 Watchlisting Guidance' attached as Exhibit 1 to [their] Complaint, contending that it indicates that travel for no known lawful or legitimate purpose to a 'locus of terrorist activity' can be a basis for being listed" in the TSDB. *Id.* Salloum relies upon and has attached that same "2013 Watchlisting Guidance" document to his Amended Complaint. (*See* ECF No. 10-3.)

The court in *Kovac* recognized that "disparate impact can evidence discriminatory intent in certain circumstances," but it concluded that the plaintiffs had "failed to allege plausibly facts sufficient to support that [the TSDB] was created based on, or operates through, intentional discrimination." *Kovac*, 363 F.Supp.3d at 760. And the court noted that several other courts from across the country had similarly dismissed Equal Protection claims based upon similar allegations. *See id.* (collecting cases). Likewise here, Salloum has failed to plead sufficient facts to state

a plausible Equal Protection claim. *See also Kadura*, 2017 WL 914249, at *9 (dismissing claim that plaintiffs' "equal protection rights were violated based on their status as Muslim-American travelers"); *Elhady*, 303 F.Supp.3d at 467 (dismissing Equal Protection claim and holding that "Plaintiffs have failed to allege facts sufficient to plausibly allege that the [TSDB] was created based on, or operates through, intentional discrimination").

Finally, Salloum's allegations fall short of those that have been deemed sufficient to state a viable Equal Protection claim based on the creation and operation of the TSDB. In *El Ali*, for instance, the court held that a comprehensive set of factual allegations, taken together, "nudge[d] the claim of purposeful discrimination across the line from conceivable to plausible." *El Ali*, 2020 WL 4051866, at *22. But Salloum's Amended Complaint does not contain several of the key allegations that supported an inference of intentional discrimination in *El Ali*. For instance, the plaintiffs in *El Ali* alleged that they were included in the TSDB because of their particular "answers [during interrogations before they were placed into the TSDB] regarding [their] religious and cultural practices." Salloum makes no similar allegations about his inclusion in the TSDB. The plaintiffs in *El Ali* also alleged that during the additional, pre-flight screening they were asked about "religious pilgrimages, learning Arabic, attending mosques, affiliations with Muslim organizations, [and their] religious donations." *Id.* Salloum, in contrast, vaguely

alleges that he is asked "personal, and unique questions regarding his friends and family, his personal dispositions, his relations, his friends and family's relations and dispositions," and he makes the conclusory allegation that these questions "all relat[ed] tangentially to his Muslim faith." (First Am. Compl. at ¶75, ECF No. 10, PageID.439.)  Finally, the plaintiffs in *El Ali* "provide[d] specific instances of white Christians not in the TSDB whose conduct would likely have led to TSDB inclusion if they were Muslim." *El Ali*, 2020 WL 4051866, at *22.   Salloum has not done that here.  That Salloum's First Amended Complaint omits several of the critical factual allegations that "nudge[d]" the Equal Protection claim in *El Ali* just over the plausibility threshold underscores that Salloum has failed to allege a viable Equal Protection claim here.

For all of these reasons, the Court concludes that Salloum has failed to plausibly allege an Equal Protection violation.  The Court therefore **GRANTS** Defendants' motion to dismiss that claim.

## X

In Count VI of the First Amended Complaint, Salloum claims that his placement in the TSDB violates his First Amendment right to familial association. Salloum says that his placement on the TSDB has prevented him from seeing his brother, who lives in the United States, and from conducting business with "Lebanese and/or Lebanese-Americans" businesspeople who may reside in the

United States. (*See* First Am. Compl. at ¶¶ 146-147, ECF No. 10, PageID.453-454.) The Court concludes that this claim should be dismissed.

As noted above, Supreme Court has held that its "decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore*, 431 U.S. at 504. But Salloum has not identified a single decision in which any court has found a violation of this right under circumstances like Salloum alleges here. Indeed, Salloum candidly acknowledges that his First Amendment theory is "novel." (Resp. to Mot. to Dismiss, ECF No. 14, PageID.871.) In support of this claim, Salloum relies upon the Sixth Circuit's decision in *Muhammad v. Pitcher*, 35 F.3d 1081, 1084 (6th Cir. 1994). Salloum says that he has been prevented from associating with his family "by the overwhelming harassment he receives as the hands of the government when he attempts to fly," and he insists that *Muhammad* stands for the proposition that "[i]t is well settled that a chilling effect on one's constitutional rights constitutes a present injury in fact." (Resp. to Mot. to Dismiss, ECF No. 14, PageID.871, quoting *Muhammad*, 35 F.3d at 1084.) But the claim in *Muhammad* did not resemble the First Amendment claim that Salloum seeks to raise here. Instead, *Muhammad* involved a First Amendment claim raised by a prisoner arising out of the opening of his mail by prison officials. *Muhammad* does not support Salloum's First Amendment claim.

The Court is not persuaded that Salloum has pleaded a plausible violation of the First Amendment based on his placement in the TSDB. The Court therefore **GRANTS** Defendants' motion to dismiss Salloum's First Amendment claim.

## XI

Finally, in Count VII of the First Amended Complaint, Salloum claims that the creation of the TSDB is illegal under the non-delegation doctrine because "Congress has not authorized the Executive Branch to utilize the federal terror watch list to encourage federal law enforcement to detain individuals such as [Salloum] based on their watch list status." (First Am. Compl. at ¶157, ECF No. 10, PageID.456.) The Court dismisses this claim.

Another Judge of this Court dismissed a nearly identical non-delegation claim in *Kadura*, *supra*. As the court explained in that case:

> The non-delegation doctrine prevents Congress from delegating its legislative power to another branch of government. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Congress is allowed to request assistance from other branches. *Id.* at 372. "[Congress] must provide an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *United States v. Lawrence*, 735 F.3d 385, 419 (6th Cir. 2013) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, (1928)) (internal quotation marks omitted)). To pass the "intelligible principle" test, Congress must "clearly delineate[ ] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). The Supreme Court has

invalidated a statute on non-delegation grounds only twice in our nation's history, doing so for the first and last time in 1935. *See Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). In the Court's words, it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Am. Trucking Assns., Inc. v. Whitman*, 531 U.S. 457, 474-75 (2001) (internal quotation omitted).

Congress authorized TSA with overseeing airline security in 49 U.S.C. § 114(d):

> (d) Functions.—The Under Secretary [of TSA] shall be responsible for security in all modes of transportation, including—
>
> (1) carrying out chapter 449, relating to civil aviation security, and related research and development activities; and
>
> (2) security responsibilities over other modes of transportation that are exercised by the Department of Transportation.

In 49 U.S.C. § 44904, Congress authorized TSA and the FBI to jointly "assess current and potential threats to the domestic air transportation system." 49 U.S.C. § 44904(a). This provision provides more guidance in assessing threats:

> The assessment shall include consideration of the extent to which there are individuals with the capability and intent to carry out terrorist or related unlawful acts against that system and the ways in which those individuals might carry out those acts. The Under Secretary and the Director jointly shall decide on and carry out the most effective method

58

>       for continuous analysis and monitoring of security
>       threats to that system.
>
>   *Id.*
>
>       Plaintiffs contend that Congress is required to provide
>       "guidance as to when Defendants should list a person" in
>       order to satisfy the "intelligible principle" requirement.
>       (ECF No. 48 at Pg ID 957.) However, the Supreme Court
>       has not held that Congress needs to provide detailed
>       guidelines—Congress need only "delinate[ ]
>       the *general* policy." *Mistretta*,   488   U.S.   at   372-
>       73 (emphasis added).

*Kadura*, 2017 WL 914249, at *10 (dismissing non-delegation claim). *See also*

*Elhady*, 303 F.Supp.3d at 467-68 (dismissing non-delegation claim arising out of

creation of the TSDB).

For all of the same reasons explained in *Kadura* and *Elhady*, this Court

concludes that Salloum has failed to state a non-delegation claim.  Salloum has not

persuaded the Court that *Kadura* and *Elhady* were wrongly decided, and Salloum's

counsel candidly acknowledged at the hearing on Defendants' motion to dismiss that

he was unaware of any court that had found viable a non-delegation attack on the

creation of the TSDB. (*See* 9/24/2020 Hr'g Tr., ECF No. 18, PageID.959.)  The

Court therefore **GRANTS** Defendants' motion to dismiss Salloum's non-delegation

claim.

## XII

For all of the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss (ECF No. 12) as follows:

- The motion is **GRANTED** with respect to: (1) Salloum's procedural due process claim arising out of harm to his reputation, (2) Salloum's procedural due process claim challenging the adequacy of the DHS TRIP redress process, (3) Salloum's substantive due process claim arising out of harm to his reputation, (4) Salloum's Equal Protection claim, (5) Salloum's First Amendment claim, and (6) Salloum's non-delegation claim.

- The motion is **DENIED** with respect to: (1) Salloum's procedural due process claim arising out the denial of his right to travel, (2) Salloum's substantive due process claim arising out of the denial of his right to travel, (3) Salloum's Fourth Amendment claim arising out of the seizures of his computer and phone; and (4) Salloum's Fourth Amendment claim arising out of his detention at airports.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  December 18, 2020        UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 18, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764