# PAR 20

UNCLASSIFIED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| ANAS ELHADY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-375 |
| | ) | |
| CHARLES H. KABLE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF TIMOTHY P. GROH

I, Timothy P. Groh, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am the Deputy Director for Operations of the Terrorist Screening Center ("TSC") and have been in this position since May 2016. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since February 1996 and have served in a variety of criminal investigative, counterterrorism, and senior management positions. In my capacity as the Deputy Director for Operations of the TSC, I supervise nine units and approximately three hundred individuals (including both government employees and contractors). I am responsible for the overall operations of the TSC, including maintaining the Terrorist Screening Database (TSDB), managing encounters, and sharing intelligence with domestic and foreign partners.

2. I submit this declaration in support of the motion for summary judgment filed by the government in *Elhady v. Kable*, 16-cv-375 (E.D.V.A.). The matters stated herein are based on my personal knowledge, my background, training and experience relating to terrorist watchlisting and counterterrorism investigations, and my review and consideration of information available to me in my official capacity, including information furnished by FBI and

1

SALLOUM-TSC-00265

JRDH-TSC-0003032

UNCLASSIFIED

TSC personnel in the course of their official duties; my conclusions have been reached in accordance therewith.

3. As set forth below, in support of the Government's summary judgment motion, this declaration will address various topics concerning the function and operation of the Government's terrorist watchlisting system, including an overview of the TSDB and its history, nominations to the TSDB and its subsets, interagency information sharing, encounters, quality assurance, the removal process, oversight, and redress. Finally, this declaration will describe the risks associated with disclosing TSDB status, including the risks to national security and law enforcement interests.

## OVERVIEW OF THE CONSOLIDATED U.S. TERRORIST WATCHLIST

4. Following the attacks of September 11, 2001, to further protect the homeland, the President through Homeland Security Presidential Directive-6 (HSPD-6), September 16, 2003, directed the USG to consolidate its approach to terrorism screening and watchlisting, facilitate information sharing, and protect privacy and civil liberties while managing the process. Thereafter, Congress likewise mandated greater sharing of terrorist information among federal departments and agencies, while still protecting privacy and civil liberties.[1]

5. As part of this effort, to facilitate information sharing, the USG integrated terrorist identity information from federal departments and agencies into a single database – the Terrorist Screening Database (TSDB) - for use by various government agencies in support of their screening and vetting activities. The TSC was established to manage the TSDB. The TSC was created by the Attorney General, Secretaries of Homeland Security and State, and the Director of Central Intelligence pursuant to Homeland Security Presidential Directive-6 (HSPD-6) of

---

[1] Intelligence Reform and Terrorism Prevention Act, Pub. L. No. 108-458 § 1016 (2004) (codified at 6 U.S.C. § 485).

2

SALLOUM-TSC-00266

JRDH-TSC-0003033

UNCLASSIFIED

September 16, 2003. The TSC is a multi-agency center that consolidates the USG terrorist watchlists into a single database and provides for the appropriate and lawful use of terrorist information in screening and vetting processes. Prior to the creation of the TSC in 2003, nine USG agencies maintained twelve different terrorist watchlists. The TSC is administered by the Federal Bureau of Investigation (FBI) in coordination with the Department of Homeland Security (DHS), the Department of State (State), the Department of Justice (DOJ), and the Office of the Director of National Intelligence (ODNI).

6. Effective and timely information-sharing is crucial to preventing terrorist attacks. In recent years, through the information sharing system supported by the TSDB, the United States has been able to track potential terrorist plots by coordinating derogatory information from the intelligence community with encounter information from law enforcement or other screening partners.[2] As was noted by the 9-11 Commission, this was not possible before 9-11 when, for example, the CIA might have known an individual had ties to terrorism--but did not know the individual was in the United States, while local law enforcement knew the individual was in the United States--but did not know the individual had ties to terrorism. The common operating picture afforded by the information sharing system (as supported by the TSDB) is absolutely critical to preventing such terrorist plots from coming to fruition in the future.

7. The overall watchlisting processes and procedures are the subject of continual internal reviews by agency officials charged with ensuring overall fairness and effectiveness, a process that includes review by legal counsel and agency privacy and civil liberties officers. In addition to these internal agency reviews, the overall watchlisting processes and procedures are also evaluated by external authorities on a regular basis, to include the Offices of Inspectors General,

---

2 See Paragraph 37 for the definition of "encounter" in the watchlisting context.

SALLOUM-TSC-00267

JRDH-TSC-0003034

UNCLASSIFIED

the Government Accountability Office, Congress, and independent bodies, such as the Privacy and Civil Liberties Oversight Board. The U.S. Government (USG) is committed to protecting the United States from terrorist threats and attacks and seeks to do this in a manner that protects the freedoms, privacy, and civil rights and liberties of U.S. persons and other individuals with rights under U.S. law.

8. The TSDB, commonly referred to as the "Terrorist Watchlist", contains both biographic and biometric identifying information (e.g., name, date of birth, photographs, iris scans, and/or fingerprints) of known or suspected terrorists.[3]

9. The TSDB does not contain classified national security information, although much of the information in the TSDB is derived from classified sources. As a result, some information in the TSDB is deemed unclassified only for watchlisting and screening purposes.

10. TSDB information is "For Official Use Only//Law Enforcement Sensitive," which means the information is protected from disclosure and is accessible only to persons who have an official "need to know," such as federal law enforcement officials for their screening and vetting activities. Moreover, it is my understanding that the Transportation Security Administration (TSA) has determined that an individual's status on the subsets of the TSDB that TSA uses for passenger pre-board screening constitutes Sensitive Security Information (SSI). Generally, prohibited disclosure of internal government information--let alone information marked for official use only or protected by statute and privilege--constitutes a serious breach of official duties.[4]

---

3 Additionally, the TSDB includes identifying information of certain individuals who are not categorized as known or suspected terrorists. These limited exceptions are more fully described in FN 7.
4 For example, for an FBI employee, unauthorized disclosure of information obtained as an employee would be a violation of his or her employment agreement, which could result in loss of security clearance or subject the employee to disciplinary sanctions.

SALLOUM-TSC-00268

JRDH-TSC-0003035

UNCLASSIFIED

11. The TSDB includes subset categories of known or suspected terrorists who may be subject to additional security screening before being permitted to board an aircraft or who are prohibited from boarding flights on US carriers as well as flights into, out of, over or within US airspace. These categories are used by the TSA to secure commercial air travel against the threat of terrorism.[5] Individuals may be required to undergo additional security screening for reasons other than a match against a TSDB record. For example, passengers may be designated for additional security screening by virtue of random selection.

12. As a result of the dynamic intelligence environment, regular reviews of the data, and the redress process, the TSDB is almost constantly changing. The TSDB is continuously reviewed and updated. Identities are added, have their status changed, or are removed. In fact, information in the TSDB is commonly updated more than one thousand times per day and updated information is made available to screening partners at intervals consistent with each individual partner's ability to ingest that information, which is often in real or near-real time.

13. There are no quotas or numerical goals for the TSDB.

14. The vast majority of the identities in the TSDB are foreign nationals who are not located in the United States and have no known nexus to the United States. In fact, US persons (citizens and lawful permanent residents) make up less than .5 percent (i.e., one two-hundredth) of the identities in the TSDB.

15. The applicable procedures and standards for the TSDB are memorialized in an interagency document called the Watchlisting Guidance. It includes a comprehensive overview

---

5 The categories are commonly referred to as the Expanded Selectee, Selectee, and No Fly Lists. The Expanded Selectee List consists of individuals who meet the reasonable suspicion standard for TSDB inclusion and for whom the TSDB record contains a full name and a full date of birth. Inclusion on the Selectee List or No Fly list requires additional substantive derogatory criteria.

SALLOUM-TSC-00269

JRDH-TSC-0003036

UNCLASSIFIED

of the TSDB watchlisting enterprise and is not publicly available.[6]

16. As further described below, inclusion in the TSDB is subject to multiple levels of review. These processes are intended to ensure that TSDB information is thorough, accurate, and current and to protect the privacy and civil liberties of all travelers. First, before any individual is added to the TSDB, the nominating agency assesses the available, relevant information, including any exculpatory information, to determine whether the applicable standard is met, and the TSC completes a de novo review of available, relevant information to make the same assessment before the individual is included in the TSDB. In addition, TSC conducts biannual reviews of all US citizens and lawful permanent residents in the TSDB to ensure continued placement is warranted based on available, relevant information. Further, individuals who experience travel-related screening difficulties such as delayed or denied boarding may seek redress through the DHS Traveler Redress Inquiry Program (DHS TRIP) and, if the individual is a match to the TSDB, the TSC Redress Unit and the nominator will consider the individual's inquiry and other available, relevant information to make a determination as to whether continued placement is warranted.

**NOMINATIONS TO THE TSDB**

17. The procedure for submitting information about individuals for inclusion in the TSDB is referred to as the nomination process. Inclusion on the watchlist results from an assessment based on analysis of available intelligence and investigative information that the individual meets the applicable criteria for inclusion on the watchlist. The standard for inclusion in the TSDB is generally one of **reasonable suspicion** which is defined later in this declaration.

18. Nominations to the TSDB are made by USG agencies based on credible information

---

6 The WLG is updated on a periodic basis. It was drafted and approved by all affected agencies and ultimately went into effect only after consideration by the Deputies Committee of the National Security Council (NSC).

6

SALLOUM-TSC-00270

JRDH-TSC-0003037

UNCLASSIFIED

from law enforcement, immigration records, homeland security, and intelligence communities. Additionally, foreign partners may submit identities to be considered for nomination to the TSDB.

19. Nominating agencies provide identities which meet the standard for inclusion in the TSDB to the National Counterterrorism Center (NCTC), for identities with a nexus to international terrorism, and the FBI, for identities with a nexus to domestic terrorism.

20. Before an individual is added to the TSDB, the nomination undergoes a careful and precise multi-step review process at the nominating agency, at the NCTC or FBI (as appropriate), and then again at the TSC to ensure compliance with interagency standards for inclusion. If the nomination has an international nexus to terrorism it is reviewed by NCTC, otherwise it is reviewed by the FBI.

21. The NCTC maintains classified national security information concerning international terrorists within its Terrorist Identities Datamart Environment (TIDE). Pursuant to Section 1021 of the Intelligence Reform and Terrorism Prevention Act of 2004, the NCTC serves as the primary organization in the USG for analyzing and integrating all intelligence possessed or acquired by the USG pertaining to terrorism and counterterrorism, excepting intelligence pertaining exclusively to domestic terrorists and domestic counterterrorism.

22. To include a known or suspected terrorist nomination in the TSDB, the nomination must include sufficient identifying information to allow encountering agencies to be able to determine whether the individual they are encountering is a match to a record in the TSDB, and enough information to establish a reasonable suspicion that the individual is a known or suspected terrorist.[7] Specifically, to meet the reasonable suspicion standard for inclusion in the

---

7 Limited exceptions to the reasonable suspicion standard exist for the sole purpose of supporting certain special screening functions of DHS and State (such as determining eligibility for immigration to the U.S.). Individuals

SALLOUM-TSC-00271

JRDH-TSC-0003038

UNCLASSIFIED

TSDB as a known or suspected terrorist, the nominator must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities.

23. The USG continuously evaluates its standards for inclusion in the TSDB and its subset lists.

24. Mere guesses or "hunches" or the reporting of suspicious activity alone are not sufficient to establish reasonable suspicion.

25. Nominations must not be based solely on the individual's race, ethnicity, or religious affiliation, nor solely on beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances.

## NOMINATIONS TO THE NO FLY AND SELECTEE LISTS

26. Nominations to the No Fly or Selectee Lists (which are subsets of the TSDB) must satisfy additional distinct criteria, in addition to meeting the reasonable suspicion standard for inclusion in the TSDB as a known or suspected terrorist.[8] The TSC is responsible for

included in the TSDB pursuant to such exceptions are not considered "known or suspected terrorists" and are not screened as such. As a result, any U.S. person who is in the TSDB pursuant to an exception to the reasonable suspicion standard would not be required to undergo heightened aviation security screening at airports on that basis (but could be selected for other unrelated reasons, such as random selection).

8 Any individual, regardless of citizenship, may be included on the No Fly List when the TSC determines the individual meets additional criteria. at least one of the following criteria, where the individual poses:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any US Government facility abroad and associated or supporting personnel, including US embassies, consulates and

8

SALLOUM-TSC-00272

JRDH-TSC-0003039

UNCLASSIFIED

determining if the underlying information meets the criteria for inclusion. The TSA Administrator has final authority over implementation of the No Fly and Selectee Lists and makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP.

27. For security reasons, the criteria for inclusion on the Selectee List are not public. This is because disclosure of the Selectee criteria could give known or suspected terrorists information that may assist in developing strategies to circumvent security screening. Additionally, in some instances, disclosing the criteria for inclusion on the Selectee List might provide an individual who believes he is on the Selectee List enough additional information to deduce the nature or content of the underlying derogatory information the intelligence community has collected on him. This additional context would allow the individual to identify the nature of investigative interest in him and to alter his behavior, destroy evidence, take new precautions against surveillance, and change the level of any terrorism-related activity in which he or she is engaged.

28. The TSC reviews each nomination to determine whether it complies with standards for inclusion. At the conclusion of the TSC's review, TSC personnel either accept or reject the nomination for inclusion in the TSDB and, if appropriate, inclusion on either the Selectee or No Fly subsets.

29. Being subject to additional screening at an airport or inspection at the U.S. border (or its functional equivalent) does not necessarily mean a person is in the TSDB. To ensure the safety and security of the traveling public, TSA may require individuals to undergo additional

---

missions, military installations (as defined by 10 U.S.C. 2801(c)(4)), US ships, US aircraft, or other auxiliary craft owned or leased by the US Government; or,
(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

9

SALLOUM-TSC-00273

JRDH-TSC-0003040

UNCLASSIFIED

security screening before they are permitted to enter the sterile area of an airport or to board an aircraft for a variety of reasons, as further explained in the Declaration of Hao-y Tran Froemling.

## INTERAGENCY INFORMATION-SHARING

30. Pursuant to HSPD-6, agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective public missions.

31. TSC exports subsets of TSDB data to partner agencies and foreign partners for use by those partners in a variety of lawful terrorist screening functions.

32. TSC exports subsets of TSDB information to the following federal government entities: DHS, Department of State (State), FBI (including the National Crime Information Center, NCIC), and the Department of Defense. For other agencies (specifically the Nuclear Regulatory Commission, the Overseas Private Investment Corporation, the U.S. Agency for International Development, the Special Investigator General for Afghanistan Reconstruction, and the National Institute for Occupational Safety and Health), TSC runs lists of names against the TSDB and reports the results to the agency requester. Agencies and officials authorized or required to conduct terrorist screening or to use information for diplomatic, military, intelligence, law enforcement, immigration, transportation security, visa, and protective processes are given access to terrorism information to facilitate their respective missions, and use it in accordance with their own legal authorities. TSC does not have authority to manage or oversee the screening functions of its partner agencies, but TSC is fully aware of the terms under which such information may be shared and the restrictions upon access, disclosure, and use of that

10

SALLOUM-TSC-00274

JRDH-TSC-0003041

UNCLASSIFIED

information.  Memoranda of understanding (MOUs) between TSC and its screening partners

specify the terms by which TSDB information is shared and used.  As a result, TSC can attest

that its screening partners use TSDB information for lawful screening purposes, in accordance

with their own legal authorities, and subject to the restrictions specified in relevant MOUs.

Prohibited disclosure of internal government information, let alone information protected by

statutory law and privilege (such as TSDB information), constitutes a serious breach of official

duties.

33. TSC exports subsets of TSDB data to foreign partners (including all Visa Waiver

Program countries) with which TSC has entered into foreign partner arrangements.  As with

domestic screening partners (described above), TSC reasonably expects foreign partners to use

TSDB information for lawful screening purposes, in accordance with their own legal authorities,

and subject to the restrictions specified in relevant arrangements.[9]

34. TSC exports a subset of TSDB data to NCIC, a database administered by the FBI for

use by law enforcement.  This export from TSC to the NCIC is referred to as the Known or

Suspected Terrorist (KST) File.  Detailed information about the NCIC can be found at

https://www.fbi.gov/services/cjis/ncic, and it is further addressed in the Declaration of Michael

A. Christman.

35. TSC is aware that DHS may share certain information with private entities in certain

limited circumstances, when necessary to facilitate its mission and subject to limitations on use

and disclosure of this information.

---

9 For examples of such restrictions upon foreign partner use and dissemination of TSDB information, please see the
following information sharing agreements, which are publically available at the State website:
Albania (https://www.state.gov/documents/organization/264334.pdf);
Bulgaria (https://www.state.gov/documents/organization/264667.pdf);
Hungary (https://www.state.gov/documents/organization/278373.pdf);
Slovenia (https://www.state.gov/documents/organization/197956.pdf).

SALLOUM-TSC-00275

JRDH-TSC-0003042

UNCLASSIFIED

36. TSC does not provide TSDB information or access to the TSDB directly to any private company, and TSC is not aware of any mechanism, policy or practice that would permit it to be shared with entities such as car dealerships, banks, financial institutions, or gun dealers.

**ENCOUNTERS**

37. In the context of watchlisting, an "encounter" is an event in which an individual is identified during a screening process or law enforcement stop to be a potential match to an individual who is in the TSDB ("a TSDB identity"). An encounter can be a face-to-face interaction (e.g. inspection at a U.S. port of entry, visa interview, or traffic stop by local law enforcement), electronic (e.g., Electronic System for Travel Authorization (ESTA) application or a visa application), or paper-based (e.g. review of visa petition).

38. When an encounter occurs, the agency and/or the encountering officer may contact the TSC to confirm whether the individual matches the TSDB identity.[10] TSC's identity resolution process is performed in real time and is usually completed in a few minutes.

39. If the individual is confirmed to match the TSDB identity, the encounter is considered a "positive encounter." Only after the encounter is determined to be "positive," will the encountering agency take appropriate action according to internal procedures and policies and consistent with the application of its regulatory and statutory standards. In other words, if internal procedures require the encountering officer to conduct additional screening of a TSDB identity, that additional screening is conducted only after the encounter is confirmed as a positive encounter.[11]

---

10 It is my understanding that certain encountering agencies, such as the Transportation Security Administration (TSA), perform internal identity resolution before seeking final confirmation from the TSC.

11 In cases where a traveler's biographic information (name, date of birth, etc.) is the same or similar to the biographic information of a TSDB identity, the DHS TRIP process can provide assistance in distinguishing the traveler from the TSDB identity and thus expedite the identity resolution process.

12

SALLOUM-TSC-00276

JRDH-TSC-0003043

UNCLASSIFIED

40. Thus, the identity confirmation process is meant to ensure accuracy in matching encountered individuals to TSDB identities and ensuring the encountering agency will take appropriate action for properly matched individuals (such as enhanced screening). In the case of an encounter that is determined not to be a positive match to a TSDB identity, the encountered individual should not experience any additional screening or inconvenience on the basis of possible TSDB inclusion, beyond the few minutes it may take to complete the identity resolution process (generally noticeable only in the case of face-to-face interaction with an encountering agent, as opposed to electronic or paper-based encounters).

## QUALITY ASSURANCE REVIEWS

41. To maintain thorough, accurate and current terrorism information, the TSDB is subjected to rigorous and ongoing quality control measures to ensure nominations continue to satisfy the criteria for inclusion; and information offered in support of the nomination is reliable and up-to-date.

42. Quality control measures include reviews and evaluations by the 1) nominating agency, 2) NCTC or FBI, and 3) TSC to verify that each nomination meets the appropriate criteria for inclusion in the TSDB and any appropriate subset list prior to an identity being added to the TSDB. These reviews and evaluations also provide a means to identify any changes to the information over time that could affect inclusion.

43. For example, nominating agencies conduct annual reviews of all their nominations of US persons to the TSDB. Nominations of non-US persons receive reviews, as well. Each nominating agency must have internal procedures to prevent, identify, and correct any errors. These procedures include the review of retractions and/or corrections of information that may have been used to support a nomination.

13

UNCLASSIFIED

44. In addition to the nominating agencies' review prior to nomination, the TSC regularly reviews data in the TSDB to ensure that the underlying information supports the nomination and performs audits to confirm the data in the TSDB is thorough, accurate, and current. The TSC also conducts a biannual review for all US person records in the TSDB. Additionally, for all persons, there is a review at the time of each encounter when there is a potential match to a TSDB identity. Available, relevant information, including any exculpatory information, is carefully reviewed to evaluate whether the record still meets the standard for inclusion.

45. At any time, a USG agency (whether or not it is the nominator) that identifies new or updated information about a watchlist record, is expected to make a request to NCTC/TSC to modify or remove that record.

46. The multiple reviews described above conducted by the nominating agencies, NCTC, and TSC help ensure that terrorist identity information used to support law enforcement and screening functions is thorough, accurate, and current.

**REMOVAL PROCESS**

47. If it is determined during the quality assurance reviews that a change should be made to a record in the TSDB, the TSC, coordinating with the nominating agency and any other relevant agencies, takes steps to clarify the record. Additions, modifications, and removals are executed to ensure that the watchlisting process and procedures remain compliant with applicable law and to ensure that only those individuals for whom there is sufficient information to meet the applicable standards are included in the TSDB. Examples of situations where a record may be removed from the TSDB in the normal course of business include:

(1) To promptly adjust or delete erroneous information,

14

SALLOUM-TSC-00278

JRDH-TSC-0003045

UNCLASSIFIED

(2) When new information becomes available to update the record including information that refutes or discredits the original information that supported the individual's watchlist status.

## OVERSIGHT

48. Relevant USG departments' and agencies' Inspectors General and the U.S. Government Accountability Office regularly review terrorist watchlist, screening, and redress processes. Such reviews have resulted in additional quality assurance mechanisms at TSC, which have improved accuracy and efficiency.

49. The Privacy and Civil Liberties Oversight Board (an independent bipartisan agency within the Executive Branch) and Congress also provide oversight.

50. Congress conducts oversight through its committees including, but not limited to, the House and Senate Intelligence Committees, the House and Senate Homeland Security Committees, the House and Senate Appropriations Committees, and the House and Senate Judiciary Committees.

51. The TSC also has both an embedded legal unit and a dedicated privacy and civil liberties attorney to provide continuous advice and counsel.

## REDRESS PROCESS

52. The DHS Traveler Redress Inquiry Program (DHS TRIP) is a resource for individuals to resolve travel-related screening difficulties, including for those who believe they have been unfairly or incorrectly delayed, denied boarding, or identified for additional screening or inspection at airports or US ports of entry. The DHS TRIP website http://www.dhs.gov/dhs-trip, provides a single point of contact for travelers.

53. As part of the redress process, DHS TRIP provides the traveler with an opportunity to

15

UNCLASSIFIED

submit any relevant information. The DHS TRIP process provides additional information that assists the USG in determining whether TSDB placement is warranted.

54. To resolve redress inquires, DHS TRIP works with DHS component agencies and other USG agencies such as State, and the Department of Justice (including the FBI and TSC).

55. The TSC supports DHS TRIP by helping to resolve inquiries of travelers who are an exact or possible match to an identity in the TSDB.  Approximately 98% of DHS TRIP inquiries have no connection with any identity in the TSDB.

56. In the few cases where a traveler is an exact or possible match to an identity in the TSDB, DHS TRIP works with the TSC's Redress Office, a separate component within the TSC that processes inquiries related to the use of TSDB data by screening agencies.

57. Upon receipt of an inquiry from the DHS TRIP program office, the TSC Redress Office independently reviews the available information about the traveler and documentation provided by the traveler to determine whether the traveler is a positive match to an identity in the TSDB.

58. If the traveler is a positive match to an identity in the TSDB, a TSC Redress Office analyst will review, whether the identity in the TSDB continues to satisfy the criteria for inclusion or should be removed or have its status otherwise modified.  The TSC's Redress Office will also contact the nominating agency and NCTC or the FBI to assist in the resolution of the complaint. Part of that process includes the nominator participating to ensure that any new or exculpatory information is considered as part of the redress review.

59. After reviewing the available information, to include any information submitted by the traveler, the TSC's Redress Office determines whether the traveler's record should remain in the TSDB, be modified, or be removed, unless the legal authority to make such a determination

SALLOUM-TSC-00280

JRDH-TSC-0003047

UNCLASSIFIED

resides, in whole or in part, with another government agency.[12] In such cases, the TSC Redress Office will implement the decision-making agency's determination.

60. When changes to a record's status are warranted, TSC's Redress Office ensures such corrections are made and verifies that such modifications or removals are carried over to the various screening systems that receive TSDB data. DHS TRIP sends a determination letter advising the traveler of the results of the adjudication of the redress inquiry.

61. Because of security concerns, the USG's general policy is neither to confirm nor deny a person's watchlist status. Accordingly, an individual who files an inquiry with DHS TRIP is not advised of their current or past watchlist status.

62. Additional process is available to a US person (defined as a US citizen or US lawful permanent resident) denied boarding because of their presence on the No Fly list. If certain requirements are met, they will be apprised of their status on the No Fly List through the DHS TRIP process, and will be provided an opportunity to request and receive additional information regarding their status and an opportunity to respond. This No Fly list redress process for U.S. persons culminates with the TSA Administrator reviewing the available information, including a recommendation from TSC, and either issuing a final order maintaining the person on the No Fly List or removing the person from the No Fly List, or remanding the case back to TSC with a request for additional information or clarification.

63. The U.S. Government is committed to ensuring that the redress process is fair and responsive, as part of its commitment to protect the American public from terrorist threats, while

---

12 As described in Paragraph 62, the TSA Administrator or his/her designee, in coordination with other relevant agencies, makes final determinations concerning inclusion on the No Fly List for U.S. persons seeking redress through DHS TRIP.

17

SALLOUM-TSC-00281

JRDH-TSC-0003048

UNCLASSIFIED

at the same time, safeguarding privacy and civil liberties.  The Declaration of Deborah Moore contains more information about the DHS TRIP redress process.

## RISKS OF HARM TO NATIONAL SECURITY OF DISCLOSING TSDB STATUS AND UNDERLYING INFORMATION

64. Disclosure of TSDB status of specific individuals, or disclosure of the underlying information supporting placement on the TSDB, could reasonably be expected to risk circumvention of the law and cause harm to national security.

65. It is the policy of the US government not to disclose any individual's status in the TSDB or a subset, beyond the limited disclosures contemplated by the Government's DHS TRIP procedures.  Disclosure of an individual's TSDB status outside of this narrowly-defined exception could reasonably be expected to risk circumvention of the law and cause harm to law enforcement and counterterrorism investigations.  More specifically, disclosure of this information would facilitate terrorists and terrorist groups in their operations and planning by assisting them in determining which of their potential operatives are listed in the TSDB and which are not.  Additionally, such knowledge could compromise ongoing counterterrorism investigations by giving members of terrorist groups the opportunity to gauge whether a particular individual is the subject of an FBI counterterrorism investigation, causing the person to alter his or her behavior, destroy evidence, take new precautions against surveillance, or change the level of any terrorism-related activity in which he or she is engaged.  Terrorists would then be able to exploit the information to piece together how their activities might go undetected.[13]

---

13 The possible consequences of disclosing TSDB status were discussed in greater detail in the Declaration of Timothy P. Groh submitted in opposition to Plaintiffs' first motion to compel production of various documents and interrogatory responses.

18

SALLOUM-TSC-00282

JRDH-TSC-0003049

UNCLASSIFIED

66. Similarly, if, in addition to the disclosures contemplated by the Government's DHS TRIP procedures, the government were required to disclose that an individual is *not* in the TSDB, this would necessarily confirm the TSDB status of any individual not eligible for such a disclosure. It would also be of considerable value to terrorist groups to confirm which individuals are not the likely subject of ongoing investigations and who are more likely to evade detection and escape scrutiny.

67. Even where an individual has been subject to enhanced screening, the lack of confirmation of TSDB status is still valuable to the Government in its watchlisting and screening efforts. Because there are many reasons an individual might be required to undergo enhanced screening (or even repeated enhanced screening) unrelated to TSDB status, the ambiguity left open by the absence of official confirmation denies important operational information to terrorist adversaries.[14]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of March 2019.

Timothy P. Groh
Deputy Director for Operations
Terrorist Screening Center

---

14 An individual who is not in the TSDB may be required to undergo additional screening or inspection for a wide variety of reasons unrelated to the terrorist watchlist. Thus, it cannot be argued that a known or suspected terrorist will necessarily be able to deduce his or her own status in the TSDB based upon his experiences at airports or at the border.

19

SALLOUM-TSC-00283

JRDH-TSC-0003050