# PAR 26

# Exhibit 51

SALLOUM-TSC-00369

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANAS ELHADY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-375 (AJT/JFA) |
| ) | |
| CHARLES H. KABLE, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF RANDY HOWE

I, Randy Howe, hereby state as follows:

1. I am the Executive Director for Operations, Office of Field Operations (OFO), U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS).

2. I was deposed in this action on March 22, 2018 and provided testimony on behalf of CBP regarding CBP's policies and procedures in conducting searches and inspections at the border, among other topics.

3. I executed Declarations on April 27, 2018 and June 14, 2018, to provide additional information which CBP determined could be disclosed and/or to clarify my deposition testimony.

4. I am making this Declaration in support of the motion for summary judgment filed by the government in *Elhady v. Kable*, 16-cv-375 (E.D.V.A.), and to provide additional information which CBP has determined can be disclosed and/or to clarify my deposition testimony. As set forth below, I address several topics concerning CBP's law enforcement mission and the use of the Terrorist Screening Database (TSDB) in executing that mission, that

1

SALLOUM-TSC-00370

are raised or implicated by the claims raised by the Plaintiffs, including (1) CBP's nominations to the TSDB, (2) CBP's access to the TSDB, (3) CBP's use of the TSDB in connection with the inspection of international travelers, (4) CBP's use of the TSDB in CBP vetting, and (5) CBP's role in the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) process.

5. This declaration is based on my personal knowledge, my personal review of information, and other information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties and responsibilities.

**CBP Nominations to the Terrorist Screening Database**

6. A limited number of CBP officials may nominate an individual for inclusion in the TSDB or propose removing someone from the TSDB. These nominations are made by CBP officials who, taking into account all available information, assess whether the applicable standard for inclusion in the TSDB or one of its subsets has been met.

7. To meet the reasonable suspicion standard for inclusion in the TSDB as a known or suspected terrorist, the nominator must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities. The TSDB also includes certain limited records that do not meet the reasonable suspicion standard. CBP uses certain limited records in the TSDB of foreign nationals who do not meet the reasonable suspicion standard in connection with CBP's administering and enforcing the Immigration and Nationality Act (INA). These TSDB records are used to alert CBP that additional information is available that may be considered with

2

Case 1:19-cv-13505-MFL-RSW ECF No. 37-30, PageID.1660 Filed 06/24/21 Page 5 of 12
Case 1:16-cv-00375-AJT-JFA Document 301-3, Filed 03/11/19 Page 4 of 11 PageID# 12030

all available information, for example, to determine admissibility to the United States under the INA. As previously explained in my April 27, 2018 declaration, additional details regarding CBP's use of these records is protected from disclosure by the law enforcement privilege.

**CBP's Access to Terrorist Screening Database Information**

8. As I explained in my deposition, the Terrorist Screening Center shares TSDB information with CBP through the DHS Watchlist Service (WLS). CBP maintains information that is exported from the TSDB via the DHS WLS, including in TECS. TECS is the principal system used by CBP officers at the border to assist with inspections and determinations regarding admissibility of arriving persons. While TSDB information is maintained in TECS, TECS generally does not contain the underlying derogatory information that is the basis for the individual's inclusion in the database.[1]

9. CBP treats TSDB information as law enforcement sensitive, and handles TSDB information accordingly, including by limiting access to personnel who have a need to know the information, have a job function requiring access to the information, and are required to access the information in a manner consistent with the law and DHS and CBP policies. Such CBP personnel may access TSDB information through CBP systems such as TECS.[2] All users of CBP systems, including TECS, must undergo a background investigation prior to obtaining access, and CBP has further access requirements including training, review, and access controls. Furthermore, access to CBP systems is monitored and audited to ensure that data is accessed

---

[1] As explained during my deposition, access to this underlying derogatory information is limited to certain CBP personnel and is generally not accessible by frontline CBP officers.
[2] Contractors working on behalf of CBP to accomplish a CBP mission may also access TSDB information if they have a need to know the information in furtherance of their work responsibilities. The same rules regarding access to and handling of TSDB information which apply to CBP personnel also apply to CBP contractors with access to TSDB information.

3

only by those who have a need-to-know and appropriate authorization to access the data, and to ensure that users are not inappropriately accessing or using the data. CBP continuously monitors the use of TECS, including reviews of the extensive audit logs that TECS maintains, which identifies the users who have accessed records.

10. CBP does not provide information from the TSDB or direct access to the TSDB to any private company.

**CBP Use of TSDB Information in Connection to the Inspection of International Travelers**

11. As explained in my prior Declarations, as Executive Director for Operations, I am familiar with CBP's administration and enforcement of federal law at the border. These requirements include the enforcement and administration of customs, immigration, and agriculture laws and the inspection, processing, and admission of persons who seek to enter or depart the United States. Among other things, OFO is responsible for coordinating the enforcement activities of CBP personnel at ports of entry (POEs) to deter and prevent terrorists and terrorist weapons from entering the United States and to develop and implement targeting capabilities to identify travelers and cargo which may need additional scrutiny. See 6 U.S.C. § 211(g).

12. In order to accomplish its mission responsibilities and enforce legal requirements at the border, CBP considers all available information to assess potential threats to border security, including TSDB information. This requires using a variety of investigative and law enforcement techniques. It also entails the exercise of border search authority, which permits CBP officers to detain and search all persons and property at the border without suspicion or a warrant.

4

13. All travelers, including U.S citizens, attempting to enter the United States are required to present themselves and their effects for inspection at a POE to ensure that they are legally eligible to enter (as a U.S. citizen or otherwise) and that their belongings are not being introduced into the United States contrary to law. It is not until those processes are complete that a traveler, with or without his/her belongings, is permitted to enter the United States. Among other things, this process includes verifying the identity of the individual, asking questions about the nature of their trip, asking questions about what they are bringing into the United States, and, in the case of foreign nationals, asking questions to ensure that they are admissible to the United States. This may also include searching the traveler, their baggage or their vehicle. In addition, as part of the inspection and/or admissibility process, CBP performs law enforcement system queries regarding travelers prior to and/or at the time of performing an inspection, including querying TSDB information.

14. CBP officers inspecting international travelers are law enforcement officers advancing the agency's law enforcement mission, and they have discretion in conducting their inspections, subject to legal and policy requirements and in accordance with their training and experience. As part of that discretion a CBP officer may refer a traveler for additional scrutiny, sometimes referred to as secondary inspection. A secondary inspection is a continuation of the border inspection and an officer may refer any traveler to secondary inspection. Examples when an officer may exercise their discretion to refer a traveler for additional scrutiny include circumstances in which there is a question about the documentation presented, an indication that the traveler may have exceeded his duty exemptions and may therefore need to pay duties, or a concern regarding the traveler's merchandise. An alert in TECS that notifies the CBP officer that the traveler is a confirmed or suspected match to a TSDB identity or has a prior conviction

SALLOUM-TSC-00374

or offense, may also indicate additional scrutiny is warranted. In addition, one technique CBP employs is the random referral of a percentage of travelers for additional scrutiny.

15. Consideration of TSDB information, along with other available law enforcement data, is an important step taken by CBP to effectively carry out its border security responsibilities. On a typical day in FY2018, CBP processed approximately 1,133,914 travelers, 285,925 privately owned vehicles and 81,438 truck, rail and sea containers. CBP's access to information from the TSDB assists CBP in effectively allocating its finite resources by identifying people who, or merchandise which, may require additional scrutiny during the inspection process. This is particularly true in the land border environment where CBP generally does not require advance information regarding individuals seeking to cross the border (in conveyances or as pedestrians), which is unlike the air and sea environments where CBP requires information from commercial air and sea carriers on all passenger and crew members who arrive in or depart from the United States.

16. As noted above, a traveler may be referred to secondary inspection for numerous reasons unrelated to the TSDB and, therefore, the fact that a traveler is referred to secondary inspection does not inherently indicate that the traveler is a match to a TSDB identity.

17. Once a traveler is referred for additional scrutiny, the specific actions taken during the secondary border inspection vary depending on the officer's evaluation of each traveler's situation. For example, an officer may choose to conduct further questioning of the traveler or search that traveler's luggage or other belongings, subject to legal and policy requirements. CBP conducts personal searches in accordance with its publicly available Personal Search Handbook, and CBP conducts border searches of electronic devices in accordance with its publicly available

CBP Directive No. 3340-049A, Border Search of Electronic Devices (January 4, 2018). The inspection process also varies based on geographical and logistical circumstances at specific POEs.

18. Furthermore, as I noted in my April 27, 2018 declaration, CBP does not have policies that require its officials to draw a weapon or use handcuffs whenever they encounter a traveler who is a potential or confirmed match to a TSDB identity. CBP also does not have a policy which dictates that all individuals who are potential or confirmed matches to a TSDB identity be designated as "armed and dangerous." Any determination of the propriety of a CBP official's use of such actions during the inspection of any person, including but not limited to a person who is a potential or confirmed match to a TSDB identity, is based upon the totality of the circumstances of each individual encounter.

19. There is no set amount of time an inspection might take in order for CBP to fulfill its border responsibilities. The amount of time any individual inspection takes will depend on many factors, such as the traveler's individual circumstances and the conditions of the POE at that time. CBP endeavors to treat all travelers courteously and professionally and may provide food and water or seek medical attention for a traveler, as appropriate, in each individual circumstance.

20. Additional details regarding the ways in which CBP's inspection process may vary implicates the law enforcement privilege. As I explained in my April 27, 2018 Declaration, the effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative techniques and methods that are not known to the general public. The disclosure of these techniques and methods, including specific techniques and procedures employed by CBP officials when inspecting individuals who are potential or confirmed matches to a TSDB identity, would seriously compromise CBP's ability to perform its law enforcement mission to safeguard the borders of the United States. In addition, disclosure of an individual's TSDB status -- beyond

those circumstances contemplated by the Government's TRIP procedures -- would similarly harm CBP's law enforcement mission. Advance knowledge of the process to be employed in connection with a specific border inspection – including the likelihood that a specific individual will undergo additional scrutiny or the reason additional scrutiny is applied – would enable those seeking to harm U.S. interests to take evasive measures. Such measures could include, for example, obscuring or failing to disclose information regarding the nature and purpose of the international travel or asking a co-traveler to carry merchandise across the border. Such evasive actions would negatively impact CBP's border security mission by undermining CBP's ability to evaluate who and what is crossing the border.

**CBP's Use of TSDB Information for CBP Vetting**

21. CBP also uses TSDB information to assist in vetting activities, including, for example, vetting of applicants for customs seals.

22. Aside from certain enumerated exceptions, an approved access or "customs seal" is required for all personnel who have unescorted access to the CBP security area in furtherance of their employment. 19 C.F.R. § 122.182.

23. Pursuant to applicable regulations, "[a]ccess to the Customs security area will not be granted, and therefore an approved Customs access seal will not be issued, to any person whose access to the Customs security area will, in the judgment of the port director, endanger the revenue or the security of the area or pose an unacceptable risk to public health, interest or safety, national security, or aviation security." 19 C.F.R. § 122.183(a).

24. The regulations set forth the grounds for denial, revocation or suspension of access. 19 C.F.R. §§ 122.183(a), 122.187(a). The regulations also provide procedures for notice and appeal. 19 C.F.R. §§ 122.183(b)-(d), 122.187(c).

8

25. CBP considers all available information when making a determination to grant, revoke or suspend a customs seal. While not dispositive, TSDB status is one of many factors considered in making a determination to grant, revoke or suspend a customs seal. Inclusion on the TSDB may indicate that additional research regarding an individual's eligibility for a custom's seal is needed and the derogatory information supporting TSDB status is one of many factors considered in making a determination to grant, revoke or suspend a customs seal. CBP's determinations are based upon all available information, including derogatory information supporting TSDB status.

**CBP's Role in the DHS TRIP Redress Process**

26. As I explained during my deposition, DHS TRIP is a single point of contact for individuals who have any complaints or concerns about travel difficulties with CBP. When a DHS TRIP inquiry pertains to a CBP inspection, DHS TRIP sends the inquiry to CBP and CBP conducts research into the encounter at issue and provides the results of that research to DHS TRIP, which responds to the inquiry.

9

SALLOUM-TSC-00378

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on the 6 day of March, 2019.

*[signature]*

Randy Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protection

10