# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**SAMUEL SALLOUM,**

*Plaintiff,*

Vs.

Case No.: 4:19-cv-13505
Hon.: Judge Matthew F. Leitman

**CHARLES H. KABLE**, IV, Director
of the Terrorist Screening Center,
in his official capacity;

**RICK KOPEL**, Principle Deputy
Director of the Terrorist Screening Center,
in his official capacity;

**G. CLAYTON GRIGG**, Deputy
Director of Operations of the Terrorist
Screening Center, in his official capacity;

**RUSSELL TRAVERS**, Director
of the National Counterterrorism
Center, in his official capacity;

**CHAD F. WOLF**, Secretary
of United States Department of
Homeland Security, in his official capacity;

**DAVID P. PEKOSKE**, Administrator
of Transportation Security
Administration (TSA), Deputy Secretary
of United States Department of Homeland
Security (DHS), in his official capacity;

**CHRISTOPHER A. WRAY**, Director
of the Federal Bureau of Investigation
(FBI), in his official capacity;

**MARK A. MORGAN**, Commissioner
of United States Customs and Border
Protection, in his official capacity;

and

**JOHN and JANE DOES**, Multiple
governmental employees to be
identified through discovery,
 in their individual capacities;

*Defendants.*

---

AYAD LAW, PLLC
Nabih H. Ayad (P59518)
Attorney for Plaintiff
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
filing@ayadlawpllc.com

CHRISTOPHER HEALY
SOPHIE KAISER
Trial Attorneys for Defendants
United States Department of
Justice. Civil Division, Federal
Programs Branch.
1100 L Street, NW
Washington, DC 20005
P: 202.307.2092
F: 202.616.8470
Christopher.healy@usdoj.gov
Sophie.b.kaiser@usdoj.gov

---

## PLAINTIFF, CAPTAIN SAMUEL SALLOUM'S
## MOTION FOR SUMMARY JUDGMENT PERSUANT TO FRCP 56

NOW COMES Plaintiff, Captain Samuel Salloum, through his attorneys at

Ayad Law, PLLC, and pursuant to Fed. R. Civ. P. 56, along with the brief in

support of the motion included herein, hereby motions this Honorable Court for

summary judgment as to the remaining claims in the case stating the following:

Plaintiff initiated this suit because of his wrongful inclusion on the TSBD has caused him continuously to be detained and interrogated when he travels internationally, significantly negatively impacting his business and business relationships, not to mention the personal inconvenience of being held up and questioned for hours at a time, ECF No. 10. Plaintiff is treated differently than his white business partner who has the same business background and practices as the Plaintiff, ECF No. 10. In addition to the strained business and personal inconvenience, of great significance, is the risk to Plaintiff Salloum's personal well-being and safety. As an international businessman, Plaintiff's business takes him to many countries such as the United Arab Emirates, Saudi Arabia, Qatar, and Jordan, where those labeled as "terrorists", or "potential threats" are not treated with due process and are not always afforded basic human rights. Plaintiff's inclusion in the TBSD is shared with these countries, causing Plaintiff to be rightfully afraid for his life when his business mandates his travel to such countries. Not only is Plaintiff's business and his life affected, but so that of his fiancé, and two United States Citizen daughters, who are unable to enjoy their rights as US Citizens because of how difficult and burdensome it is for their family to travel, something that is necessary for Plaintiff's business, **Exhibit A**. Defendants' actions in 'Watch-Listing' Plaintiff have and continue to violate Plaintiff's constitutional rights.

Defendants initially filed a motion to dismiss, which this Court denied in part, stating that Plaintiff has alleged substantial interference with his right to travel, ECF No. 23. When the case reached the discovery phase, Plaintiff requested that Defendant's turn over documents and other related discovery demands as to why Plaintiff was placed on the watchlist. Defendants refused to turn over such information claiming the law enforcement privilege. Plaintiffs filed a motion to compel discovery, ECF No. 46, which this Court granted in part, and ordered for an in-camera review of the documents that Defendant's claimed law enforcement privilege on. This Court upheld the law enforcement privilege and found that Defendants did not have to disclose the documents and information due to risks to national security. Plaintiff now asks that this Court grant this motion and Declare that Plaintiff be removed from the TBSD watchlist because Plaintiff's inclusion on this watchlist violates his procedural and substantive due process rights, and his Fourth Amendment rights against unlawful searches and seizures.

Plaintiff's placement on the TBSD watchlist, is akin to arresting him, throwing him in a jail cell, and not telling him the reason for doing so. If Plaintiff was a risk to national security, then the government would have other avenues to subdue this risk, such as indicting him for a crime on the low probable cause threshold. Indeed, Plaintiff and his Counsel have offered Plaintiff to Defendants for

unconstitutional questioning, surprisingly Defendants have refused to address any concerns they may have that led Plaintiff to be placed on the list.

Wherefore, Plaintiff respectfully requests that this Honorable Court grant summary judgement as to the remaining claims and grant judgement in Plaintiff's favor holding the Watch List unconstitutional and order the following relief:

a) Place a permanent injunction on Defendants requiring them to remove Plaintiff from any and all of their watch lists, including the TSDB, and notify all agencies, domestic and foreign of this removal, including foreign governments and any business entities that the list was shared with.

b) Give Plaintiff written verification that his name has been removed from any and all of their watch lists, including the TSDB confirming that all foreign governments and business entities have been notified of Plaintiff's removal from the watchlist.

c) Place a permanent injunction on Defendants requiring them to destroy all data downloaded from Plaintiff's phones or computers, at any time, however and wherever stored.

d) d) Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 28 USC § 2412; and

e) Award any and all other relief which this Court deems just and equitable.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………………viii

ISSUES PRESENTED………………………………………….……….x

BRIEF IN SUPPORT………………………………………….……...1

PRELIMINARY SATEMENT………………………………….……….....1

INTRODUCTION………………………………………………...……...2

RELEVANT BACKGROUND…………………………………...……...5

LEGAL STANDARDS……………………………………….…………7

LAW AND ARGUMENT………………………………………...….…9

    I.    **Although this Court has ruled that the law enforcement privilege stands as to the discovery requested by Plaintiff, this Court can still grant motion for summary judgement on Plaintiff's Constitutional deprivation claims.** …………………………………….……..9

        A. **Plaintiff's Procedural Due Process Rights have been violated by the government in the clearly established facts of this case…..**10

        B. **Plaintiff's Substantive Due Process rights have clearly been violated by the government as established by the facts of this case.** …………………………………………...……..18

        C. **Plaintiff's Fourth Amendment rights have been violated as to him personally and as to the seizure of his electronic data.** ….20

            1. **Plaintiff's Fourth Amendment rights have clearly been violated when the government took and downloaded the information on Plaintiff's cellphone and laptop**…………..20

            2. **Plaintiff's Fourth Amendment rights have clearly been violated when he was subjected to hours long delays constituting unlawful seizure of Plaintiff.** …………………22

**II.     This Court should grant Plaintiff's motion for summary judgement based on the federal rules of evidence 403 and its inherent equitable powers.** ……………………………………………………………….25

**III.    This Court should set precedence and order that a case can be made by the Plaintiff even though the law enforcement privilege was upheld.** ……………………………………………………………….26

CONCLUSION………………………………………………………………28

CERTIFICATE OF SERVICE ………………………………….……....32

INDEX OF EXHIBITS………………………………………………....33

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018).

*Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 843 (E.D. Mich. 2003).

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Grand Trunk R. Co. v. Consol. R. Co.*, 746 F.2d 323, 325 (6th Cir.1984).

*Omaha Property & Cas. Ins. Co. v. Johnson,* 923 F.2d 446, 447–48 (6th Cir.1991).

*Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010).

*Mathews v. Eldridge*, 424 U.S. at 332, 96 S.Ct. 893

*Mohamed v. Holder* No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015).

*Kent v. Dulles,* 357 U.S. 116, 125 (1958).

*Zemel v. Rusk,* 381 U.S. 1, 15 (1965).

*Kerry v. Din,* 135 S.Ct. 2128, 2133 (2015).

*Latif v. Holder Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014).

*DeNieva v. Reyes,* 966 F.2d 480, 485 (9th Cir.1992).

*El Ali v. Barr* 473 F. Supp. 3d 479, 492 (D. Md. 2020).

*Wilal v. Nielsen* 346 F. Supp. 3d 1290 (D. Minn. 2018).

*Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

*Jones v. United States*, 357 U.S. 493, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958).

*Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

*United States v. Kolusuz*, 890 F.3d 133 (4th Cir. 2018).

*United States v.Cano*, 934 F.3d 1002 (9th Cir. 2019).

*Alassad v. Nielsen*, 419 F.Supp.3d 142, 163 (D. Mass. 2019).

*Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015).

## Constitutional Amendments

U.S.C.A.Const. Amend. 4.

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 56(a)

Fed. R.Civ. P. 56(c)

## Federal rules of Evidence

FRE 403

## <u>ISSUES PRESENTED</u>

1. Should this Court order that Defendants violated Plaintiff's procedural, substantive, and fourth amendment rights and therefore order Defendants to remove Plaintiff's name from any watchlist and notify all foreign governments and business entities of Plaintiff's removal from the watchlist?

Yes. Caselaw will show that although this Court has ruled that the law enforcement privilege stands as to the discovery requested by Plaintiff, this Court can still grant motion for summary judgement on Plaintiff's Constitutional deprivation claims.

Plaintiff has shown that his procedural due process, substantive due process, and fourth amendment rights have been violated by the Defendants.

2. Should This Court grant Plaintiff's motion for summary judgement based on the federal rules of evidence 403 and its inherent equitable powers?

Yes, This Court can set precedence and order that a case can be made by the Plaintiff even though the law enforcement privilege was upheld.

x

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**SAMUEL SALLOUM,**

*Plaintiff,*                              Case No.: 4:19-cv-13505

                                          Hon.: Judge Matthew F. Leitman

Vs.

**CHARLES H. KABLE, IV**, et al.,

*Defendants.*

---

## <u>PLAINTIFF, CAPTAIN SAMUEL SALLOUM'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT PERSUANT TO FED. R. OF CIV. PROC. 56</u>

### PRELIMINARY STATEMENT

With the extensive research this Counsel conducted, there was not an

extensive list of cases addressing the law enforcement privilege once held to stand,

and the result of finality of the case. However, it is Plaintiff's position that the law

enforcement privilege is an evidentiary tool in discovering and disclosing

documents. That is not the entire case. Plaintiff bestows on this honorable Court to

grant his motion on summary judgment based on the existing and knowable facts

and circumstances that led to this lawsuit.

Your Honor dismissed counts V-VII in Plaintiff's amended complaint, ECF

23. Plaintiff's remaining claims are, Count I- Procedural Due Process, Count II-

Substantive Due Process, Count III- Fourth Amendment Violation as to the Illegal

Sizing of Data on Plaintiff's cell phone and computer, and Count IV- Fourth

Amendment Violation as to the Illegal Seizure of Person.

Plaintiff feels your honor could rule in favor of Plaintiff based on the

information presented in Plaintiff's Complaint, ECF 10 and Plaintiff's affidavit,

attached as **Exhibit A,** and based on Federal Rules of Evidence 403 and this Courts

inherent equitable powers.

## INTRODUCTION

Plaintiff Captain Samuel Salloum is a United States citizen of Lebanese

decent. Defendants are the heads of the several United States government agencies,

the Terrrorist Screening Center (TSC), National Counterterrorism Center,

Department of Homeland Security (DHS), Transportation Security Administration

(TSA), and Customs and Border Patrol (CBP), responsible for depriving Plaintiff

of his constitutional rights under the pretext of national security by, among other

things, wrongfully placing Plaintiff on their Terrorist Screening Database

("TSDB"). As a result of listing him on the government TSDB, Plaintiff's

constitutional rights are being violated and, as a consequence of the feigned

secrecy with which the government is taking action against Plaintiff, he is being

left without recourse to protect his rights.

Plaintiff has suffered an altered legal status, (his name being placed on the

Watch List), has been defamed and stigmatized by the government (for all intents

2

and purposes, Defendants are telling every public airport employee Plaintiff encounters that Plaintiff is a 'known or suspected' monster), and has suffered severe injuries because of it (loss of many business opportunities and inability to live in the United States with his wife). Plaintiff's businesses have been audited four times by the Internal Revenue Service with no wrongdoing found, ECF No. 10. In 2008 Plaintiff moved his home from the United States to Lebanon because of the extreme burden of the enhanced screening whenever Plaintiff attempted to travel, something that is necessary for his businesses, however due to the extreme burden placed on Plaintiff while traveling, by Defendants, has caused him to not pursue appointments to secure $300,000,000 in capital to expand his business, which resulted in approximately $50,000,000 of additional operating costs to Plaintiff businesses. *Id.* During one incident, Plaintiff was traveling to Kuwait to attend a high level business meeting as he was leading an executive delegation to meet with a large regional development finance institution to secure 300 million US Dollars to deploy his technology platform designed to spur economic growth and provide the necessary data for officials to secure national borders against cargo terrorism, whereupon the Kuwaiti authorities refused Plaintiff Salloum entry. Plaintiff was prevented from attending the meeting, **Exhibit A.** Not only was Plaintiff significantly embarrassed but his reputation and business with th e financial institution was damaged because Plaintiff did not attend the meeting.

3

Plaintiff could not attend the meeting because he was being detained by the Kuwait authorities for 9 hours, due to and as a result of being on Defendant's watchlist **Exhibit A.**

Plaintiff's fiancée, the mother of Plaintiff's two daughters, cannot live in the United States as the Lebanese Consulate denied her United States visa owing to Plaintiff's label as a "known or suspected terrorist." Plaintiff's fiancée was formerly his wife, but because she was denied her visa while married to Plaintiff for Plaintiff's inclusion on the Watch List, Plaintiff and his wife divorced, and she is now his fiancée. **ECF No. 10, Exhibit A.** Because Plaintiff's fiancée cannot live in the United States with her two daughters, Plaintiff's oldest daughter cannot attend the United States university which she dreamed of. **ECF No. 10, Exhibit A**. Plaintiff's youngest daughter is in need of a medical procedure which was to be performed in the United States, but, because her mother cannot be with her in the United States owing to the Lebanese Consulate denying her visa, their daughter must be treated in a suboptimal location outside the United States. **ECF No. 10, Exhibit A.** Finally, Plaintiff's inability to maintain a domicile, let alone a frequent presence, in the United States has unfortunately devastated his relationship with his brother, a United States citizen and resident. **ECF No. 10, Exhibit A.**

Plaintiff wishes to have his name removed from the TSDB so that he may stop being punished for something he has no knowledge of. That is not to say that

the government cannot place Plaintiff on any 'list' or can no longer lawfully surveille Plaintiff, but that it merely cannot place him on any list that 1) deprives Plaintiff of a constitutional right and 2) affords Plaintiff no due process in disputing his placement on such list.

## RELEVANT BACKGROUND

The Terrorist Screening Database ("TSDB") is the central terrorist watchlist compiled and maintained by the FBI's Terrorist Screening Center ("TSC") and disseminated to many agencies of United States and foreign governments, State and local law enforcement, and private corporations. Approximately 1600 individuals are "nominated" to be on the TSDB every single day and, as of June 2016, the list was estimated to contain the records of over 1,877,133 individuals. The TSDB is compiled from two major sources, the Terrorist Identities Datamart Environment, a list maintained by the National Counterterrorism Center ("NCTC"), supplies identities of suspected international terrorists and the Federal Bureau of Investigation ("FBI") supplies identities of suspected domestic terrorists.

The TSDB is then used by more than 60 foreign governments, more than 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities to create their own lists and databases which they use to screen and often deny travelers or applicants

for visas, permits, licenses, financial transactions, and/or employment positions, etc.

The standards used for placing individuals on the list are exceptionally low and it is only required that the TSC find a "reasonable suspicion," not that one has or is about to commit a crime, but that one may have or may intend to engage in the loosely defined "terrorism-related activity."

The TSDB is demonstrably ineffective, audits have shown that it is highly inaccurate, and has been broadly criticized in the media and the federal courts. One never receives notice that they have been nominated for placement on the TSDB nor notice that they have actually been placed on the TSDB. Individuals are never given notice that they have been nominated for inclusion on the Watch List and individuals are never informed that they have been accepted for inclusion on the Watched List. Although it is simple to find out that they are on the list based on how they are treated at the airport.

An individual's inclusion in the TSDB has permanent, far-reaching, and life-altering negative consequences, many of which are harms to their constitutionally protected rights, such as the right to travel, as is Plaintiff's situation. Owing to Plaintiff's inclusion on the TSDB, he has and continues to suffer harassment at being asked the same questions (of which the answers do not change) over and over again every time he flies. He is delayed for hours on end to

the point of missing flights and meetings. He is subject to illegal searches and seizures. He, as a United States citizen, is robbed of immigration benefits that other US citizens are not, as other governments will not cooperate in procedures required to gain lawful US residency for his Wife, the mother of his 20- and 13-year-old children, ECF No. 10. He has been subjected to much more dangerous interrogations by foreign governments (here, Jordanian authorities) owing to his inclusion on the list, **Exhibit A**. Plaintiff has now been even subject to more scrutiny and foreign government onslaught due to U.S. having him on a terrorist list.

## LEGAL STANDARDS

The Sixth Circuit review a district court's grant of summary judgment *de novo*. *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Pursuant to Fed. R.Civ. P. 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).*Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 843 (E.D. Mich. 2003). A fact is material if it "might affect the outcome of

the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because a motion for summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial," courts must determine "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252, 106 S.Ct. 2505. Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and emphasis omitted). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586, 106 S.Ct. 1348. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

The Sixth Circuit applies the following criteria to determine whether it is appropriate for a district court to issue a declaratory ruling: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relationship in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these

results can be accomplished, the court should decline to render the declarations

prayed. *Grand Trunk R. Co. v. Consol. R. Co.*, 746 F.2d 323, 325 (6th Cir.1984),

*Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 846

(E.D. Mich. 2003).

In assessing whether to exercise its discretion to accept jurisdiction in

a declaratory judgment action, a district court considers five specific factors: (1)

whether the judgment would settle the controversy; (2) whether

the declaratory judgment action would serve a useful purpose in clarifying the

legal relations at issue; (3) whether the declaratory remedy is being used merely for

the purpose of "procedural fencing" or "to provide an arena for a race for res

judicata"; (4) whether the use of a  declaratory action would increase the friction

between our federal and state courts and improperly encroach on state jurisdiction;

and (5) whether there is an alternative remedy that is better or more

effective. *Omaha Property & Cas. Ins. Co. v. Johnson,* 923 F.2d 446, 447–48 (6th

Cir.1991). *Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp.

2d 837, 846–47 (E.D. Mich. 2003).

## LAW AND ARGUMENT

**I.**    **Although this Court has ruled that the law enforcement privilege stands as to the discovery requested by Plaintiff, this Court can still grant motion for summary judgement on Plaintiff's Constitutional deprivation claims.**

Of the cases that dealt with law enforcement privilege used by the defendant government, courts have still been able to rule in favor of Plaintiff in defendant violating Constitutional protections even though holding the privilege to stand.

### A. Plaintiff's Procedural Due Process Rights have been violated by the government in the clearly established facts of this case.

The Sixth Circuit has stated that "To establish a procedural due process violation under 42 U.S.C. § 1983, a plaintiff is required to demonstrate three elements: (1) that [he] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [he] was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [him] adequate procedural rights before depriving [him] of its protected interest." *Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. at 332, 96 S.Ct. 893. Here, Plaintiff Salloum, claimed that his due process rights were violated when his ability to travel internationally was restricted and that he was constructively precluded from international travel for a number of hours. Plaintiff meets all three requirements as set out in *Wedgewood* because 1) he has a protected right to international travel, 2) he was deprived of that protected interest by the level of harassment he encountered when attempting to

10

travel, and 3) the government did not afford him adequate procedural rights before depriving him of his right to travel because they did not inform him that he was on a watchlist that would subject him to such harassment and scrutiny when traveling and because he was not given any adequate measures in having his name removed from the list.

Plaintiff was deprived of his rights in a similar manner as the plaintiff in *Mohamed v. Holder* No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015), a 2015 case out of the Eastern District of Virginia attached as **Exhibit B**, in which the court ruled that Plaintiff had a constitutional right to travel and that while the state secrete privilege applied to some documents and discovery, it did not bar Mohamed's procedural due process claim, ruling "after a review of documents and information submitted by the defendants in camera and ex parte, the Court concludes that there is no information protected from disclosure under the state secrets privilege that is necessary either for Mohamed to establish liability under his procedural due process claims or for the defendants to establish an available defense to that claim." *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *2 (E.D. Va. July 16, 2015). In *Mohamed v. Holder*, Mohamed, a U.S. citizen from Somalia alleged that at the age of 16, in 2009, he temporarily left the United States to travel to Yemen, Somalia, and Kuwait to meet family, study Arabic, and attend School. In December of 2010, Mohamed stated

that he was detained by Kuwait authorities at a deportation facility where they interrogated, beat, and tortured Mohamed. FBI agents visited Mohamed twice at the deportation center. On January 16, 2011, Mohamed's family had purchased a ticket for him to return to the United States at the suggestion of Kuwaiti officials, who delivered the ticket to Mohamed and transported him to the airport, where he was denied boarding. On January 18, 2011, Mohamed filed suit against numerous governmental agencies including the FBI, DOJ, TSC, DHS, and TSA seeking emergency relief to return to the United States. *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015). The court found that Mohamed had a liberty interest in international travel. The court in *Mohamed* found that Mohamed did have a protected interest in travel citing to *Kent v. Dulles,* 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment"); *Zemel v. Rusk,* 381 U.S. 1, 15 (1965). *See also Kerry v. Din,* 135 S.Ct. 2128, 2133 (2015) (plurality opinion, Scalia, J) (referencing Blackstone's recognition that "the "personal liberty of individuals" protected under the Magna Carta "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint.") *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015).

12

Although *Mohamed v. Holder* dealt with the no-fly list, which is a complete

bar to flying it dealt, this Court should allow the case to offer guidance as it dealt

with the same arguments by the same governmental entities making the same

privileged defenses as this case. The parties are the same, Arab Muslim men, both

U.S. Citizens filing suit against governmental agencies alleging the same claims of

due process and fourth amendment violations each alleging the same situation of

harassment and embarrassment at airports. Although the no-fly list discussed in

*Mohamed v. Holder* is a more severe deprivation of rights, the overall

consequences and effects are the same, as both the plaintiff in *Mohamed* and

Plaintiff in this are being associated with terrorism and being prevented from flight

for considerate time. *Mohamed v. Holder* laid out a criteria that must be met when

including someone on the no-fly list or the TSDB and states:

> To be included on the No-Fly List subset, there must be a reasonable
> suspicion that the individual meets additional, heightened derogatory
> criteria beyond that required for inclusion in the TSDB, namely,
> **reasonable suspicion that the individual is a known or suspected**
> **terrorist based on meeting one of the following criteria**:
>
> The individual poses a threat of (1) committing an act of international
> terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic
> terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an
> aircraft; (2) committing an act of domestic terrorism (as defined in 18
> U.S.C. § 2331(5)) with respect to the homeland; (3) committing an act
> of international terrorism (as defined in 18 U .S.C. § 2331(1)) against
> any U.S. Government facility abroad and associated or supporting
> personnel, including U.S. embassies, consulates and missions, military
> installations, U.S. ships, U.S aircraft, or other auxiliary craft owned or

leased by the U.S. Government; or (4) engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

*Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015).

The court also stated, "Given the wide ranging impact on a person, previously discussed in this case, *see* 995 F.Supp.2d at 528, the rights implicated by Mohamed's presumed placement on the No Fly List are strong and deserving of strong protections against unnecessary governmental restrictions." *Id.* Likewise, Plaintiff Salloum's rights have also been implicated in similar way with similar consequences as the Plaintiff in *Mohamed.*

Similarly, in *Latif v. Holder Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014), attached as **Exhibit C,** the Ninth Circuit found that "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). *See also Eunique v. Powell,* 302 F.3d 971, 976–77 (9th Cir., 2002). "[T]he [Supreme] Court has consistently treated the right to *International* travel as a liberty interest that is protected by the Due Process Clause of the Fifth Amendment." *DeNieva v. Reyes,* 966 F.2d 480, 485 (9th Cir.1992) (emphasis added). *See also Eunique,* 302 F.3d at 973. *Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014). The *Latif* Court also ruled that the Plaintiff's also had a constitutionally protected interest in their reputation as well. *Latif v.*

14

*Holder Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014). The Court in *Latif* also dealt with the law enforcement privilege and reviewed materials submitted to the Court by the Defendant ex parte and in camera and still granted Plaintiffs' cross motion for summary judgment as to their procedural due process claim. *Latif v. Holder*, 28 F. Supp. 3d 1134, 1141 (D. Or. 2014).

The plaintiffs in *Latif,* were a number of U.S. citizens and lawful permanent residents of the U.S (including four veterans of the United States Armed Forces) who were not allowed to board flights to or from the United States or over United States airspace. *Latif v. Holder*, 28 F. Supp. 3d 1134, 1140 (D. Or. 2014). Each Plaintiff submitted applications for redress through the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP). Despite Plaintiffs' requests to officials and agencies for explanations as to why they were not permitted to board flights, explanations were not provided. Plaintiffs alleged in their Complaint that Defendants violated their Fifth Amendment right to procedural due process because Defendants have not given Plaintiffs any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No–Fly List. *Id.*

The court in *Latif* ruled that Plaintiffs have constitutionally-protected liberty interests in traveling internationally by air and in their reputation, which are significantly affected by being placed on the No–Fly List in finding that Plaintiffs'

15

inclusion on the No–Fly List constitutes a significant deprivation of their liberty interests in international travel. And that even after reviewing materials submitted by the Defendant ex parte and in camera, granted Plaintiff's cross motion for summary judgement as to their procedural due process claim. *Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014). Although a no-fly case, Plaintiff Salloum's case is similar to that of the Plaintiff's in *Latif* because Plaintiff Salloum has shown a significant deprivation of his liberty interests in international travel, by the mere fact that he is humiliated at airports, delayed for hours at a time and even made to miss his flights, and interrogated, see **Exhibit A, Affidavit of Plaintiff.**

Similar to Plaintiff Salloum's situation, the group of Plaintiffs in *El Ali v. Barr* 473 F. Supp. 3d 479, 492 (D. Md. 2020)*,* a watchlist case, attached as **Exhibit D**, which comprised of 37 U.S. citizens and 2 lawful permanent residents, also claimed to have been included in watchlists and the TSDB which caused their international travel to be impeded as they were subjected to constitutionally impermissible detentions, searches, and invasive screening at airports, and in some cases denial of air travel altogether burdening their families, business, and reputations. *El Ali v. Barr*, 473 F. Supp. 3d 479, 492 (D. Md. 2020). The *El Ali* Plaintiffs, as in this case, also claimed that their inclusion in the TSDB and watchlists violated their procedural due process. The court ruled:

> "When Watchlist status results in repeated, prolonged delays
> that **"actually deters travel, when impeding travel is its**

> **primary objective, or when it uses a classification that serves
> to penalize the exercise of the right," an individual suffers a
> deprivation of constitutional dimension**. See generally
> *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903, 106
> S.Ct. 2317, 90 L.Ed.2d 899 (1986); see also *Elhady v. Piehota*,
> 303 F. Supp. 3d 453, 464 (E.D. Va. 2017) (deprivation of right
> where plaintiffs avoided travel because of "invasive additional
> screening and other liberty-constraining activities" such as
> hours-long detentions and interrogations)."

> *El Ali v. Barr*, 473 F. Supp. 3d 479, 508 (D. Md. 2020).

The court in *El Ali* cited to specific Plaintiffs and their fears of traveling again after

being detained and interrogated with their minor children and found that Plaintiff's

had adequately alleged deprivation of a liberty interest. In this case, Plaintiff

Salloum, has plead facts similar to those Plaintiffs in *El Ali,* he has been deprived

of his right to travel because of the interrogations, hour long delays even causing

him to miss flights, and humiliation he has endured at airports when attempting to

travel for business or with his family, so much so, that Plaintiff Salloum had to sell

his house in the U.S. at a great loss because his travel which he has to take for his

business was so significantly impeded, that he was losing business and business

relationships, **Exhibit A**. Plaintiff Salloum's rights are being deprived, and he had

no avenue to question or dispute his placement on the watchlists. The TRIP

application process, which Plaintiff completed failed to provide Plaintiff with any

adequate opportunity to be heard.

17

In *Wilal v. Nielsen* 346 F. Supp. 3d 1290 (D. Minn. 2018), a case from District Court in Minnesota, dealing with the Watchlist, in which a couple and their children were seized for over 10 hours while trying to reenter the U.S after visiting family in Canada. Mr. Wilwal was handcuffed and questioned on suspicion of terrorist activity and ties, when one of the detaining officers told him "we have information" as to Mr. Wilwal, similarly as Plaintiff in this case which is detained for hours on end while attempting to travel internationally, the court also found that the Plaintiffs had stated procedural due process claim as they had a right to travel without being unconstitutionally seized. *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290 (D. Minn. 2018).

Therefore, Plaintiff requests that this court grant his motion for summary judgement and grant his relief requested by ordering that he be removed from all watchlists and TSDB, as he has been deprived of his constitutional recognized right to travel.

### B. Plaintiff's Substantive Due Process rights have clearly been violated by the government as established by the facts of this case.

The substantial hardship that Plaintiff Salloum faces when traveling has significantly deprived him of his right to travel. Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). *El Ali v. Barr*, 473 F.

Supp. 3d 479, 514 (D. Md. 2020). Plaintiff has had strained business relationships, missed flights, routinely interrogated, and asked the same questions, delayed for hours on end and humiliated at airports, **Exhibit A.** The courts in *Mohamed v. Holder*, *Latifi v. Holder*, and *El Ali v. Barr* each found that the right to travel and international travel are fundamentally protected constitutional rights and holding or delaying for hours triggered constitutional deprivations. Plaintiff requests this court grant his motion for summary judgment and afford him his relief by removing his name from any watchlist and TSDB. Plaintiff also has a substantive due process rights to his life and liberty, but his placement on any watchlist puts him and his life at great risk when traveling for his business to countries such as Saudi Arabia and Jordan, which are not known for the same human and civil rights protections as the United States. During one instance Plaintiff was denied entry in Kuwait and detained and questioned in a small room for 9 hours, **Exhibit A**. Upon his return to Lebanon from Kuwait, Plaintiff's passport was taken and the Lebanese authorities investigated Plaintiff for two days, **Exhibit A**. Continuing to leave Plaintiff's name on any watchlist or TSDB is essentially putting a target on Plaintiff's back. Plaintiff when traveling to these countries labeled as a "suspected terrorist" or as having "terrorist associations" may be tortured or killed for his "suspected associations." Plaintiff fears traveling to these countries for he may not leave alive, due to the government action placing his name on these lists, he is basically unable

to travel to some countries, even though his business mandates he does. Either

Plaintiff's business or his life, or both suffer the consequences.

### C. Plaintiff's Fourth Amendment rights as to him personally and as to the seizure of his electronic data.

Plaintiff's last claims are Fourth amendment violations as to the illegal

seizing of data on his cellphone and laptop and illegal seizure of his person.

Plaintiff has plead in his complaint, ECF 10 and stated in his affidavit, **Exhibit A**

that he has been subject to Fourth amendment violations. Plaintiff is constantly and

continuously harassed at airports where he is detained for 3-4 hours at a time,

**Exhibit A.** The essential purpose of the Fourth Amendment relating to

unreasonable searches and seizures and the issuance of warrants is to shield the

citizen from unwarranted intrusions into his privacy. U.S.C.A.Const. Amend. 4.

*Jones v. United States*, 357 U.S. 493, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958).

Plaintiff has constantly had his privacy intruded by the invasive questioning at

airports when attempting to travel. At times, humiliatingly so, Plaintiff has been

questioned in front of other travelers, **Exhibit A.**

### 1. Plaintiff's Fourth Amendment rights have clearly been violated when the government took and downloaded the information on Plaintiff's cellphone and laptop.

This Court should grant Plaintiff's relief and order his name removed from

any watchlist or TSDB because Plaintiff's Fourth Amendment right against illegal

search and seizure was violated when his phone, laptop, and the data contained

therein were seized and disseminated to domestic and foreign, private and public,

organizations and individuals. Plaintiff suffered an irreversible harm in that the

information seized and disseminated, and which continues to be disseminated, is

private, personal, and/or proprietary as Plaintiff, a United States citizen, does not

check his constitutional rights at the border when Plaintiff travels abroad. The

Supreme Court in *Katz,* stated that "Government's activities in electronically

listening to and recording defendant's words spoken into telephone receiver in

public telephone booth violated the privacy upon which defendant justifiably relied

while using the telephone booth and thus constituted a "search and seizure" within

Fourth Amendment, and fact that electronic device employed to achieve that end

did not happen to penetrate the wall of the booth could have no constitutional

significance. U.S.C.A.Const. Amend. 4. *Katz v. United States*, 389 U.S. 347, 88 S.

Ct. 507, 19 L. Ed. 2d 576 (1967). Plaintiff in this case has a constitutionally

protected right against unlawful searches and seizures, that the government is

denying him by downloading his personal data from his cell phone and computers

during his detention at airports. *United States v. Kolusuz*, 890 F.3d 133 (4th Cir.

2018), *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019), and *Alassad v.

Nielsen*, 419 F.Supp.3d 142, 163 (D. Mass. 2019), have all held that situations

similar to Plaintiff Salloum's that involve government agents downloading

electronic data are "non routine and highly intrusive." The delays and constant

harassment are substantial, therefore, Plaintiff's name should be removed from the watchlist and TSDB, as his inclusion deprives him of his fourth amendment rights.

**2. Plaintiff's Fourth Amendment rights have clearly been violated when he was subjected to hours long delays constituting unlawful seizure of Plaintiff.**

In addition to Plaintiff's electronic data unconstitutionally being seized, Plaintiff's person was and will continue to be unconstitutionally seized during his air travel in and through the United States. Plaintiff is presumably seized so that he may be asked questions relating to a legitimate government interest, but the repetitive nature of being asked the same three questions by multiple agents, each and every time, for three to four hours, does not and cannot meet any standard of evidence/suspicion requirement as it is unnecessary, non-routine, harassment *per se*.  Defendants' seizure of Plaintiff's person has been and will be for unreasonable lengths of time, unnecessary even to fulfil the government's illegitimate interest, and has been and will be witnessed by, or become known to, potential customers or business partners of Plaintiff's. Plaintiff's injury by Defendants continues to grow every time Plaintiff attempts to exercise his right to freely travel in and through the United States without suffering an undue burden from the government. In *Wilwal v. Neilson*, the court found that Plaintiff's and his family's 10-hour detention was an unconstitutional violation of their fourth amendment right against unlawful seizure, rejecting the government's argument of the border-search exception.

Because the Government has a "longstanding right ... to protect itself by stopping and examining persons and property crossing into this country," such searches "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152-53, 124 S.Ct. 1582 (quoting *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). Although the Supreme Court has declined to decide whether non-routine border searches—those that highly intrude upon a person's dignity and privacy or involve the destruction of property—require some level of suspicion, numerous lower courts have concluded that such searches must be supported by reasonable suspicion. *See id.* at 152, 155-56, 124 S.Ct. 1582; *Montoya de Hernandez*, 473 U.S. at 541 n.4, 105 S.Ct. 3304 ("[W]e suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches."); *United States v. Molina-Gomez*, 781 F.3d 13, 19 (1st Cir. 2015) (explaining that non-routine border searches, such as those that are highly intrusive or destructive, require reasonable suspicion);

**Whether a border search qualifies as routine or non-routine "often depends on the degree of invasiveness or intrusiveness associated with the search**." *Molina-Gomez*, 781 F.3d at 19 (quotation omitted). As with Terry stops, the duration and force involved in a detention are two factors in evaluating whether a detention at the border is non-routine. See *Montoya de Hernandez*, 473 U.S. at 541-42, 105 S.Ct. 3304; see also United States v. Place, 462 U.S. 686, 709 (1983); *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) ("[A]n investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force."). **Courts also consider "the degree of fear and humiliation that the police conduct engenders," whether law enforcement "isolat[ed] [the suspect] from others,**" and whether the suspect was handcuffed. See *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994)

*Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1305 (D. Minn. 2018).

In this case, Plaintiff Salloum, is unreasonably detained every time he travels

abroad. **Exhibit A**. He is detained for hours on end, to the point where he has

missed flights. *Id.* Plaintiff Salloum is questioned around other people in the

airport, sometimes while in line at customs, and other times he is isolated from others and questioned in a separate room, ECF No. 10. When traveling for business, Plaintiff is humiliated when he is questioned and detained in front of potential clients or partners and treated like a criminal even though he has never been accused or charged with any crime.  When traveling alone or with his family, Plaintiff is humiliated, when he is asked questions outside of his reasons for travel or why he is traveling, but he is asked personal and unique questions about his friends and family, his personal dispositions, his relations, and his friends and family's relations and dispositions, all relating tangentially to his Muslim faith or (unrelatedly) Islamic Extremism, ECF No. 10, and when his children see him taken away to be interrogated.

This honorable Court has already ruled that Plaintiff's pled injuries, can move forward, if unjustified by Defendants, will equate to violations of Plaintiff's constitutional rights . "Salloum has plausibly alleged a substantial interference with his right to travel.  And that right – at least with respect to domestic travel – has long been recognized as fundamental." ECF No. 23, PageID 1083.

> Salloum has plausibly alleged that the repeated seizures of him personally [as well as the seizing and downloading of his electronic devices] – which, again, involved identical, probing interrogations (at times on consecutive days) – were not routine, were highly intrusive, and were not sufficiently justified under the circumstances.

> ECF No. 23, PageID 1098 (brackets added, parenthesis in original).

Therefore, Plaintiff's name should be removed from any watchlist or TSDB, because not doing so will only cause Plaintiff to be unconstitutionally deprived of his Fourth Amendment rights.

## II.     This Court should grant Plaintiff's motion for summary judgement based on the federal rules of evidence 403 and its inherent equitable powers.

Plaintiff Salloum has met his burden in making prima facie showing that his procedural due process, substantive due process, and fourth amendment rights were violated. It is now the Defendants' burden to show that they are within the standards of the law, and they are unable to do that because they are unable to show a jury any evidence as to why Plaintiff has been placed on any list or TSDB. By claiming the law enforcement privilege, Defendants are unable to offer up any evidence supporting their actions, therefore Plaintiff's requests must prevail.

In the alternative, Plaintiff prevails on Federal Rules of Evidence 403. Federal Rules of Evidence 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403. Plaintiff in this case is prejudiced by the government's refusal to produce evidence. Therefore, this evidence should be excluded because it prejudices the Plaintiff who is unable to exam it. Prejudicial evidence should be excluded and neither party should use it.

With or without the privileged evidence, Plaintiff has clearly pled sufficient facts that he has been and is being deprived of his rights. Therefore, this Court should grant Plaintiff's motion for summary judgment and rule that his name be removed from any watchlist including TSDB.

### III. This Court should set precedence and order that a case can be made by the Plaintiff even though the law enforcement privilege was upheld.

It is fundamentally wrong to take a law-abiding citizen and tarnish his name and reputation by treating him as a terrorist, not simply a criminal, but a terrorist, the worst kind of act one can commit. The stigma of being labeled a "terrorist" or "associated with terrorism" is not something that goes away lightly. This label on Plaintiff has far reaching consequences, beyond the government's contention of basic inconvenience at the airport. The stigma of being labeled a terrorist or having terrorist associations would affect many facets of everyday life. For example, a person traveling with his boss for his employment would have to face the humiliation of having to explain to his employer why he was held up for 4-5 hours and interrogated or missed his flight due to the long detention. Or the humiliation of being in line at the airport before customs and being asked in front of one's employer about his and his families political ties and ideations. These scenarios are reality for Plaintiff Salloum, who must routinely travel for his business. Plaintiff has been forced to face the humiliation of being singled out from groups he travels with

to be treated like a second-class citizen. Because of the extreme burden placed on Plaintiff's travel by Defendants, Plaintiff cannot travel within or through the United States with employees, to work while travelling, not only because of the added expense and inefficiency of his employees being delayed for hours each boarding, but also because of the extreme embarrassment and stigma of being labelled a "known or suspected terrorist" by the United States government which would have devastating effects on his businesses' moral and no doubt cost him valuable employees.

Even when traveling with his family. Plaintiff is detained for hours and has to explain to his young children why he is treated differently. Plaintiff's international travel has been so incredibly burdened, that even though he is a United States citizen, he is unable to reside in the U.S. and enjoy the opportunities U.S. citizens have because of how his ability to travel is so negatively impacted. Plaintiff's business requires him to often travel abroad, but due to his long delays and having his private electronic data downloaded and shared with others, Plaintiff's business and business relationships suffer. Plaintiff has found it easier to just live abroad and not be treated like a criminal at the airport when traveling for work, until recently. Recently, Plaintiff has feared for his safety when traveling to certain countries for work. Some of the countries that Plaintiff must travel to for work such as Saudi Arabia and Jordan, are not known for treating people with the same level of rights

as for example in the United States. Plaintiff travels to these countries with a target on his back by being labeled as a terrorist or associated with terrorism by the United States. Plaintiff fears upon traveling to these countries that he may be tortured or killed for information, information that he does not have, such as why he is considered a terrorist/having terrorist ties by the United States?

Lastly, how can national security reasons be stated when placing an innocent citizen on these watchlists who has no criminal record of any wrongdoing, when the person essentially knows they are being watched based on their treatment at airport security? This tactic would only put the person being surveilled on notice of the government's suspicion and lead them to destroy any evidence. There are tools available to Defendants to protect the national security without constant degrading, humiliating, and burdensome treatment at the airport. Therefore, Plaintiff is requesting this court grant summary judgment as to the remaining four claims in this case in favor of Plaintiff and order Plaintiff's name removed from all watchlists and TSDB.

## CONCLUSION

In conclusion, for the reasons stated above, Plaintiff is requesting that this Court grant his motion for summary judgement in his favor and grant plaintiff's relief by ordering Defendants to remove his name from any watchlist including the TSDB. As the few cases on this issue have shown, the right to international travel is

a fundamentally recognized and constitutionally protected rights afforded to United States citizens. In *Mokdad v. Lynch, 804 F.3d 807 (6th Cir. 2015),* a case this Counsel successfully argued before the Sixth Circuit Court of Appeals, found that there is a constitutional right to international travel. Plaintiff Salloum has made a prima facie showing that he is being deprived of this constitutional procedural due process and substantive due process right to travel, *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *12 (E.D. Va. July 16, 2015). As to Plaintiff's Fourth Amendment violations, case law made clear that the seizure described by Plaintiff such as the fact that data is downloaded from his electronics when he is traveling and that he is held up for 4-5 hours, are non-routine and highly intrusive,  *United States v. Kolusuz*, 890 F.3d 133 (4th Cir. 2018), *United States v.Cano*, 934 F.3d 1002 (9th Cir. 2019), *Alassad v. Nielsen*, 419 F.Supp.3d 142, 163 (D. Mass. 2019).

This court must not take away from the significant dehumanizing and humiliating effect of calling someone a terrorist or labeling them as being associated with terrorism, when someone is a good law-abiding citizen only trying to work to provide for his family. This Court should take the lead on where the future is headed in these types of cases around the country.

Wherefore, Plaintiff respectfully requests that this Honorable Court grant summary judgement as to the remaining claims and grant judgement in Plaintiff's favor holding the Watch List unconstitutional and order the following relief:

a) Place a permanent injunction on Defendants requiring them to remove Plaintiff from any and all of their watch lists, including the TSDB, and notify all agencies, domestic and foreign of this removal, including foreign governments and any business entities that the list was shared with.

b) Give Plaintiff written verification that his name has been removed from any and all of their watch lists, including the TSDB confirming that all foreign governments and business entities have been notified of Plaintiff's removal from the watchlist.

c) Place a permanent injunction on Defendants requiring them to destroy all data downloaded from Plaintiff's phones or computers, at any time, however and wherever stored.

d) Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 28 USC § 2412; and

e) Award any and all other relief which this Court deems just and equitable.

Respectfully submitted,

AYAD LAW, PLLC

<u>/s/Nabih H. Ayad</u>
Nabih H. Ayad (P59518)
645 Griswold St., Ste.
2202 Detroit, MI 48226
P: 313.983.4600
filing@ayadlawpllc.com

Dated: March 3, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this date I filed the foregoing documents and any attachments on the Clerk of Courts for this Court via the ECF system which will send notice of the same to all parties of record.

Respectfully submitted,

AYAD LAW, PLLC

/s/Nabih H. Ayad
Nabih H. Ayad (P59518)
645 Griswold St., Ste.
2202 Detroit, MI 48226
P: 313.983.4600
filing@ayadlawpllc.com

Dated: March 3, 2023

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**SAMUEL SALLOUM,**

*Plaintiff,*                                  Case No.: 4:19-cv-13505
                                              Hon.: Judge Matthew F. Leitman
Vs.

**CHARLES H. KABLE, IV**, et al.,

*Defendants.*

---

## INDEX OF EXHIBITS

**Exhibit A-** Affidavit of Plaintiff Samuel Salloum

**Exhibit B-** *Mohamed v. Holder* No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015)

**Exhibit C-** *Latif v. Holder Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014)

**Exhibit D-** *El Ali v. Barr* 473 F. Supp. 3d 479, 492 (D. Md. 2020)

33

# EXHIBIT A

## <u>AFFIDAVIT OF SAMUEL SALLOUM</u>

I, Samuel Salloum, born on August 13, 1965 residing at 290 Town Center Dr. #420, Dearborn, Michigan 48126, hereby depose and state the following under oath:

1. That I make this affidavit of my own free will.

2. That I have personal knowledge of the facts herein.

3. That if called to testify in open court to the facts herein I am able and competent to do so.

4. I am a United States Citizen.

5. I am the Chairman of Axiolog Group LLC and the World Logistics Council Limited, a semi-governmental organization involving 28 countries from around the world, that are supporting the Global Coalition for Efficient Logistics (GCEL) in its Digital Economy trade efficiency initiative to grow global trade as well as enhance cargo security against acts of terrorism, reduce the world's carbon footprint, speed disaster relief response and improve food safety for the benefit of global humanity.

6. I am also the Co-Chairman of GCEL, a Swiss-based nonprofit public/private partnership, focused upon the creation of global prosperity including the creation of millions of jobs worldwide through increased digital trade efficiency. Under his leadership, GCEL has gained the support of more than 150 countries through their pan regional representatives and 26 IGOs/NGOs worldwide including the United Nations, World Bank and the Organization of American States. Its private-sector member companies alone exceed 2.7 million personnel and serve approximately 60% of global GDP.

7. I travel often for my work.

8. Every time I travel I have to go through increased screening at airport security and customs.

9. Both my domestic and foreign travel has been hindered as I am questioned and / or detained upon airline check in, boarding an airplane within the USA as well as prior to and upon entry into the USA. The issuance of my boarding passes to the USA on connecting flights have been delayed by up to 2 hours.

10. I am detained by airport security and customs every time I travel to and from the United States.

11. I am detained anywhere from 1 to 5 hours by airport security every time I travel to and from the United States.

12. Every time I am delayed and detained my laptop computer and cell phone are taken from me and all of the data on them is downloaded by airport security.

13. The prolonged questioning and detainment deters me from traveling due to the time involved and the embarrassment when such travel involves employees and business associates.

14. The screening discourages me from traveling due to the examination of my personal computer and phone as well as the long time it takes to undergo the search process.

15. Every time I am delayed and detained, I am asked similar questions. The questions I have been asked include:
   - What is my business?
   - Why do I travel to countries such as Lebanon, Indonesia, Malaysia, Turkey, China?
   - Who is my family/ where do they live?
   - Have I been approached by members of Hezbollah?
   - Have I donated to Hezbollah?
   - Why do I have multiple companies and bank accounts around the world?
   - Have you visited Iran?

16. I have received comments from meeting with the FBI to understand the reasons for my constant delays and detentions, have included, "We are concerned that you could be recruited by Hezbollah" and "You said that Hezbollah tried to recruit you when you were at sea."

17. The above statements by the FBI are incorrect, I have never stated that Hezbollah tried to recruit me.

18. Hezbollah has never tried to recruit me.

19. The questioning at airports takes place both beside the line in front of other travelers and in a separate room.

20. When I am detained at the airport, my electronic devices have been searched and the download of data took several hours. Based on the request from officials, I have always presented my devices for search.

21. The travel of my employees has been affected since when I do not travel, my employees do not travel to accompany me and conduct business as a team. This negatively impacts the productivity of my business towards conducting commercial activities.

22. I do not travel with corporate executives or business associates due to the extended time and embarrassment of the searches.  This negatively impacts my ability to expand business relationships.

23. The detainment and search process plus the inability to establish a family residence (see below) has caused me to postpone and cancel visits to the USA for the conduct of business therefore, I have not been able to expand business activities in the USA.

2

24. The burden of the enhanced screening and inability to establish a family residence has caused me not to pursue appointments to secure USD 300 million of capital to expand my business, resulting in more than USD 50 million in additional operating costs that would have been offset through millions of dollars of revenues to be generated through the business expansion.

25. My fiancé (who is the mother of my 2 daughters) had her USA visa approved in the USA but it was denied by the USA Lebanese consulate because of my being on the watch list.

26. This prevents me from establishing a residence in the USA with my fiancé and my daughters who are USA citizens. Hence, since the mother of my children cannot live with me and my daughters in the USA, I must live overseas with my family.

27. My youngest daughter requires a medical procedure which was to be performed in the USA, however, an alternative country has been sought due to their mother not being able to be with her since I am on the watch list.

28. My eldest daughter initially intended to attend a USA university; however, this has been deferred because their mother cannot enter the USA to live with our daughters.

29. My brother is a USA citizen and lives in the USA, however, I have not been able to maintain a relationship with him due to not being able to establish a family residence with my fiancé and our daughters.

30. The renewal of my USA passport has taken an extended period of time to approve.

31. I have provided expert testimony to a Select U.S. House of Representatives Sub-Committee, Best Practices to Secure USA Borders, which influenced 7/10 USA Presidential security objectives (NSPD #41 and HSPD #13**). See Exhibit 1-  21st Century Customs Framework Submission – presented to the Department of Homeland Security to protect the security of the USA and its allies.**

32. I was recognized by USA Today as one of several Muslim executives to protect USA borders.

33. My businesses have been audited by the IRS where no illicit activities were found.

34. I have registered patents and trademarks with the WIPO and the USA under my name.

**35.** I am a recognized global opinion leader on economic development and other topics having co-authored articles in official G20/ B20 publications with notable officials including H.E. Joko Widodo, President of Indonesia, H.E. Yves Leterme, former Prime Minister of Belgium, H.E. Dirk Niebel, former German Minister of Economic Development, Mr. Donald Johnston, former OECD Secretary General and Dr. Merza Hasan, Dean of the World Bank Executive Board. **See Exhibit 2- Secure Cargo Anti-Terrorism Coalition Report.**

3

36. My business partner is a USA born citizen that also travels internationally to the same countries and is not faced with the same level of scrutiny that I undergo.

37.  The U.S. authorities are sharing their incorrect, un-corroborated information with foreign countries, damaging m reputation and causing fear for my personal safety, and injuring my business.

38. I met with a Jordanian Intelligence General who stated the Jordanian authorities had received information challenging my activities and reputation from the U.S. authorities.

39. In one recent instance, I had to travel to Kuwait because I was leading an executive delegation to meet with a large regional development finance institution to secure USD 300 million to deploy his technology platform designed to spur economic growth and provide the necessary data for officials to secure national borders against cargo terrorism and I was denied entry in Kuwait by Kuwaiti authorities. I was prevented from attending the high level business meeting which was humiliating for me. These actions also damaged my reputation and business with the financial institution, which was displeased that I, as the Founder and CEO, did not attend the high-level meeting.

40. I was detained in Kuwait for more than 9 hours where I was forced to stay in a locked room in a foreign country which created fear for my personal safety, not knowing what physical actions the foreign authorities might take to extract additional information based on the false allegations provided by the U.S. Authorities or if I would be able to leave the country alive. It is well known countries are not bound by the USA or international laws for treating individuals

41. Upon my return to Lebanon from Kuwait, my passport was taken, and the Lebanese authorities investigated me for two days.

42. The U.S. Government's sharing of its uncorroborated information with foreign authorities is damaging my reputation, injuring my business, and inflicting emotional distress.


I declare under penalty of perjury that the foregoing is true and correct. (28 U.S. Code § 1746)


Executed on March 3, 2023.


Samuel Salloum

# Plaintiff's Affidavit - EXHIBIT 1

# 21st Century Customs Framework

## U.S. Department of Homeland Security: Customs and Border Protection

### Public Comments and Hearing
### March 1, 2019

**Docket No. USCBP-2018-0045**

**Submission by:**
**Captain Samuel Salloum**
**Co-Chairman**
**January 24, 2019**



**GLOBAL COALITION**
**FOR EFFICIENT LOGISTICS**

*GCEL Copyright 2019  Confidential*



## A. Introduction

### I. Background Information

The Global Coalition for Efficient Logistics (GCEL) is a Swiss based public-private partnership that was originally founded in Michigan by Captain Samuel Salloum, supported by the Governors of Michigan, Illinois and Nebraska. GCEL's members and supporters now include more than 150 countries through their pan regional organizations, 26 IGO/NGOs as well as the world's leading information technology firms.[1]

Through 15 years of R&D, GCEL's coalition of public and private sector organizations are deploying the world's first Digital Economy Platform (DEP) that provides thousands of e-Logistics integrated Apps, free of cost to the end user, with a collection of communication tools and utilities, plus dynamic news monitoring of the B2B marketplace. The DEP delivers new features empowering existing e-Commerce, e-Finance, and e-Insurance platforms to reach a new level of performance.  The DEP also empowers SMEs through an e-Grant platform providing access to a USD 1 trillion fund to build capacity.   In all, the DEP digitizes the global value chains in the USD 150 trillion B2B marketplace delivering greater trade efficiency and cargo security.

In recognition that security and efficiency must go hand in hand, Captain Salloum was asked to provide expert  testimony in 2003 before a Select Sub-Committee of the U.S. House of Representatives, "Best Practices to Secure U.S. Borders", which contributed to National Security Presidential Directive (NSPD) #41 and Homeland Security Presidential Directive (HSPD) #13.[2]

It is worth to note that the late Mr. George Rodriguez, Director for Cargo Security at the Transportation and Security Administration, was a GCEL Advisory Board member. Mr. Rodriguez worked with GCEL to actively advocate for enhanced cargo security globally.

### II. Proven in Practice – USA- Canada Northern Border Pilot Project

The DEP's capabilities were successfully demonstrated during 2003 over the Windsor, Canada – Detroit, Michigan border crossing involving Ford Motor Company, Magna International, TNT Logistics, Bell Canada and Oracle, among others, to provide advanced traffic visibility, enhanced customs compliance and heightened cargo security intelligence.

The demonstration received commendations from the Department of Transportation-MARAD as well as from Congressional and Intelligence officials presented to the Department of Homeland Security.[3]

---

[1] Empowering the Digital Economy -  GCEL Times Video

[2] Captain Salloum Testimony, pp 11-18, Best Business Practices for Securing Americas Borders, Hearing of the  Subcommittee on Infrastructure and Border Security, Select Committee on Homeland Security, House of Representatives, July 23, 2003, Serial No. 108–20

[3] Secure Cargo Anti-Terrorism Coalition (SCAC) Report, Proven in Practice: Phase One, Midwest Pilot Project / Northern Border Project, 2003

**GCEL Americas**
Canada

**GCEL Asia**
Malaysia

**GCEL Europe**
Belgium

**GCEL MEA**
Lebanon

**GCEL Headquarters**
Switzerland

*GCEL Copyright 2019  Confidential*                    1



### III.   Summary of GCEL's Recent Activities

GCEL's Digital Economy Platform (DEP) has been recognized by global experts as being a breakthrough innovation that will have a profound impact on the global economy by creating greater trade efficiency and enhanced cargo security resulting in reduced trade costs, increased trade, expansion of the financial and insurance markets as well as new job creation.

- *Global Policy Adoption* - GCEL's active engagement in the G20/B20 Forums during the past 4 years has contributed to the Digital Economy being adopted by the G20 Leaders as a key policy directive towards achieving sustainable economic growth.

- *G20 B2B Participants Demand the Digital Economy Platform* - GCEL recently completed the G20 Nations Case Study, a diagnostic assessment of trade efficiency, that included the participation of 90 G20 ministries, industry associations, academia and private sector experts including Deloitte, Frost & Sullivan and the Nielsen Company, representing nearly 80% of the global GDP. The findings yielded: 90.4% of B2B participants do not have an integrated system and 94.5% want the Digital Economy Platform (DEP) to reduce costs, ease access to finance and insurance as well as grow trade.[4]

- *Technology Industry Commitment to Deploy the DEP* – To date, 30 information technology firms, including the world's top companies, with more than USD 350 billions of revenues and USD 900 billion market capitalization have signed exclusive agreements with GCEL towards selection under an equal opportunity process to deploy the DEP globally.

- *E-Hub of the World* - With the support of India's Prime Minister Office and 9 Union Ministries, Telangana State and 4 of India's top 5 technology firms have signed strategic agreements for selection to host, maintain and enhance the DEP in cooperation with the world's top 12 technology firms  at a Tier 4 Data Center in Hyderabad, the "Silicon Valley of the East". [5]

  The E-Hub of the World will be under the protection of the United Nations to ensure uninterrupted use of the DEP and governed by 28 semi-government organizations across the Americas, Asia, Europe and MEA to offset monopolistic, geopolitical and data privacy concerns.  The E-Hub, through the world's top technology firms, will deploy the DEP providing thousands of integrated e- Logistics Apps, free of cost to the end users, enabling new e-Commerce, e-Finance, and e-Insurance features for the B2B marketplace.

---

[4] Voice of the G20 Citizens Report, G20 Nations Case Study, 2018
[5] E-Hub of the World Video

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*                    2



These Apps will generate validated Big Data with "Ultimate Data Quality" for use with Artificial Intelligence and Big Data Analytics to power a trust-based scoring mechanism for DEP users to de-risk doing business, reduce costs, ease access to finance and insurance, gain greater access to distant markets and grow trade.

- **National Deployment Agreements Executed** - The Organization of Islamic Cooperation, Organization of American States, League of Arab States and the African Union, among others, have signed strategic agreements with GCEL to deploy the DEP through a Benchmark Trade Lane (BTL) within their regions. Agreements have also been executed to deploy the Asia BTL between Indonesia and India as well as the Europe BTL between Italy and Germany (the perennial #1 in trade efficiency). [6] [7] [8] [9] [10]

IV. **Overview of Digital Economy Platform Benefits, including:**

- Reduce international and domestic trade costs by USD 3.7 trillion
- Increase global trade by USD 7.7 trillion
- Create a new USD 5.5 trillion service market opportunity for the finance, insurance and commerce industries
- Protection of international borders and improved flow of commerce through multilayers of cargo security defense
- Meet international cargo security mandates by reducing the costs and efforts of cargo security compliance, thus increasing national and regional cargo security participation
- Provision of advance dynamic global data visibility, validated by multiple sources, to confirm source of goods for proper customs duties, flag counterfeit goods and expedite advance clearance for inbound, outbound and transit
- Delivery of point-to-world integration that provides customs-to-customs and customs to- business interactive, real-time data visibility

V. **Invitation**

GCEL invites CBP to explore participation in the global deployment of the Digital Economy Platform with other public and private sector organizations to increase the efficiency and security of global trade.

[6] Press Release, AFP, EU Parliament, GCEL Releases G20 Nations Case Study, MOU Between GCEL and BVMW (Germany) and CONFAPI (Italy), 2018
[7] Press Release, Boston.com, MOU Between GCEL and China's Top 500 Foreign Trade Enterprises Club, 2014
[8] Press Release, Arab News, MOU Between GCEL and Islamic International Trade Finance Corporation, 2013
[9] Press Release, AME Info, MOU Between GCEL and African Union, 2012
[10] Press Release, OAS, GCEL Signs Cooperation Agreement with Organization of American States, 2011

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

GCEL Copyright 2019  Confidential                3



**B.  Response to CPB Public Comment Questions**

  **I.  Emerging Rules in the Global Supply Chain:**

- What new roles in the global supply chain are unaccounted for in CBP's current legal framework?
- How should the agency account for these roles?
- How can CBP work with ecommerce platforms and carriers to identify and deter illicit shipments?
- How can new actors in the global supply chain work with CBP to improve trade security?

The global economy demands efficient and secure global logistics in the value chains. For any security system to be embraced worldwide, it must include commercial benefits. In other words, efficiency and security must go hand in hand. Efficiency by itself may compromise security. In contrast, overarching cargo security rules and regulations could damage the economy. Therefore, a comprehensive public/private sector solution must be implemented in order to economically and effectively deal with cargo security challenges.

 To encourage maximum private-sector involvement, the overall solution must deliver commercial benefits. To effectively address cargo security whether domestically or internationally, a holistic system must be enabled that takes the entire flow of global shipments into account, from the empty container in a depot to the final receiver. Such a comprehensive approach must strive to meet two core objectives;

1. Encourage widespread private sector involvement by improving the process efficiency and profitability of all parties involved in shipment flows, and

2. Deliver cargo security improvements from the private sector that complement and reinforce official rules and regulations

The establishment of a Digital Economy Platform (DEP) that integrates all B2B participants in   e-commerce, e-finance, e- insurance and e-logistics provides the foundation to establish a solid Cargo Security platform that will  allow CBP to continually enhance  security measures, thus greatly reducing the probability of illicit shipments and increasing cargo security.

The DEP must be provided free of cost to all end users and provide a value proposition to reduce excess trade costs, ease access to finance and insurance and create better connections to distant markets to grow trade which will facilitate the participation by all organizations involved in the global value chains.

Cargo Security initiatives require a balanced economic approach that seeks to enhance security while increasing trade efficiency. Safety must be the first priority, but overly stringent requirements stand to cause significant harm by restricting commerce and

**GCEL Americas**
Canada

**GCEL Asia**
Malaysia

**GCEL Europe**
Belgium

**GCEL MEA**
Lebanon

**GCEL Headquarters**
Switzerland

*GCEL Copyright 2019  Confidential*          4



discouraging trading activity. Within this balanced framework, there are two primary reasons why Cargo Security is an essential element of trade efficiency:

1. *Enhanced Supply Chain Security* - Real-time dynamic validation of participant-related and shipment-related data against domestic and foreign security databases aids in the proactive analysis of deviations, mismatches, or other anomalies to flag dangerous or suspicious shipments. The heightened security protects both the physical well-being of participants in the shipment pipeline and the supply chain itself from costly or even catastrophic disruptions.

2. *Expedited Clearance* - Automatic electronic submission of pre-populated security data enables faster movement through customs and border crossings by ensuring that security information is accurate, complete, formatted, and delivered in the most effective and efficient manner to all appropriate participants in the shipment process, including governments and Customs organizations. Point-to-world integration helps a shipper to be Cargo Security compliant on a global basis, thus minimizing the possibility of cargo flow disruption.

This Cargo Security platform can leverage the DEP to simplify and optimize the B2B marketplace compliance. The implementation strategy for this security platform consists of three tiers: Compliance, Trade Lane Monitoring, and Proactive Response. CBP can leverage the DEP with its integrated e-Commerce, e-Finance, e-Insurance and e-Logistics platforms to identify and deter illicit shipments as summarized below.

**Tier 1: Compliance**
Compliance consists of two components: Regulatory Compliance and Adherence to Voluntary Initiatives. Regulatory Compliance consists of activities conducted in accord with government security regulations, such as documentation and advance manifesting. Voluntary Initiatives to promote and enhance Cargo Security have emerged at both the national/regional and international levels. Compliance of present Cargo Security data must be enhanced and compliance processes must be simplified.

**Tier 2: Trade Lane Monitoring**
Monitoring is achieved through access to validated, real-time data visibility of the global flow of commerce. The data owner must authorize the visibility to their proprietary data generated during the normal course of business activities. Data must be dynamically checked against official sources. The real-time monitored information enables implementation of:

*Enterprise Monitoring Processes*: The ability to monitor and dynamically flag suspicious shipments based on a trade lane participant's historic and current behavior.

*Shipment Monitoring Processes:* The ability to track shipments based on shipment events, combined with GPS, RFID, and DEP tracking from shelf to shelf, allowing dynamic flagging of suspicious shipments based on data anomalies, errors, and shipment flow deviations.

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019 Confidential*                    5



**Tier 3: Proactive Response**
Validated, real-time visibility of shipment data must provide the capability to:

A. Dynamically synchronize and coordinate Cargo Security activities between security agencies from around the world, amplifying the effectiveness of Cargo Security response.

B. Detect and eliminate threats as far away as possible from the borders of the targeted country.

C. Eliminate single point of security failure by creating four synchronized layers of security as follows:

1. ***Intelligence -*** Must dynamically flag suspicious shipments based on preset criteria, alerting of origin port authorities to re-inspect shipments prior to loading

2. ***Coast Guard*** - Must enable coast guards to create "virtual fencing" around a nation's borders, whereby the approach of a single suspicious conveyance automatically provides authorities with the means to pinpoint and inspect potential threats while the conveyance is still good off-shore

3. ***Border Crossing -*** Must dynamically provide border crossing authorities with all necessary real-time information regarding the history of the clusters involved in the flow of the shipment from shelf to shelf and regarding the contents and movements of each shipment, enabling rapid interception of suspicious shipments

4. ***In-Country*** - Must dynamically monitor every shipment within the country (national cargo visibility), alerting local authorities to any deviation from manifested routing, stoppage, or destinations, thus enabling their rapid interception or investigation of wayward shipments and vehicles



## II. Intelligent Enforcement

- What technologies are useful in predicting violative activities and an entity's potential for violations?
- What tools or sources of information regarding CBP's compliance requirements have you found the most useful?
- What other resources can CBP provide to ensure that trade stakeholders understand CBP requirements?
- How can CBP improve violation referral systems and allegation processing?

The DEP facilitates multi-layers of Cargo and Data Security by providing the following tools and technical capabilities:

- **Global Dynamic Shipment Flagging (GDSF) –** The DEP provides real-time advanced global shipping activity data to government officials that can apply artificial intelligence to flag suspicious shipments and enterprises for data anomalies, shipment deviations, etc. based on contracted, forecast vs. actual activities. As a result, two monitor lists are established: The Enterprise Monitor List (EML) and the Shipment Monitor List (SML), thus providing the authorities with new capabilities to flag suspicious enterprises involved with a shipment and/ or the shipment itself.

  EML will provide authorities the ability to flag a shipment based on any participant's historic and real time activities. SML will allow authorities to dynamically monitor shipment flow, beginning with the empty container usage and check for data mismatches, data anomalies and shipment flow deviations based on a 3 Dimension Monitoring System (3DMS)- contracted, forecasted and actual activities. The combination of RFID, GPS and 3DMS will provide an optimal shipment monitoring process compared to traditional tracking.

- **Global Advanced Dynamic Data Visibility (GADDV) –** The DEP dynamically provides advanced shipment scheduling information, with continual confirmations of activities from shipment release, to loading, to import declaration, etc. so country officials can apply artificial intelligence for cross checking with official source data.

- **Data Integrity & Consistency (DI & C) -** Allows shipment participants to reduce workload through automated data population thus minimizing keystrokes and potential errors. Shipment information is input into the DEP as part of the shipping process. Data collected is not solely dependent on the integration or capability of a particular data source or in the point of origin country, rather it is collected as part of the shipment process and confirmed by multiple parties.

- **Minimal Requirement for Global Tracking (MRGT) -** The DEP represents an open platform that allows multiple tracking technology providers to plug-in. This open platform strategy is important since one shipment flow can be subject to multiple tracking devices or tracking technology providers. Moreover, containers on board a

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

GCEL Copyright 2019  Confidential                    7



ship can be subject to multiple tracking technologies and providers. This strategy allows tracking technology providers to provide their customers global access to the DEP value-added services at no cost, while increasing tracking technology providers' market share through the DEP global market network. Authorities are then provided with the continuous global visibility of shipment flows.

- **5Cs of Data Security - Global Data Security Standard (GDSS)[11] -** Since trade data is of national security importance, it must be securely exchanged. In order to achieve this, it is recommended to establish a Global Data Security Standard (GDSS), as a comprehensive and global solution involving multiple layers of governance within a true public/private partnership, in a geopolitically balanced and non-monopolistic manner, thereby garnering acceptance by all the regions of the world. Accordingly, the GDSS can provide an effective mechanism to safeguard the data privacy and information security of public and private organizations, enabled by:

  o Consortium of globally balanced ownership
  o Council of worldwide fiduciary governance board
  o Committee of technology governance board experts
  o Controlled segregated technology development
  o Continuous and comprehensive data security and data privacy compliance audits

The DEP provides seamless integration of Shipment Information with Official Country Systems through:

- ***Use of Platform at No Cost*** – By shippers, logistics services providers, customs and receivers maximizing participation and information flow.

- ***Point-to-World Integration*** - Seamless ('plug in' or 'portal in') access allowing shipment related information to be automatically integrated with government systems.

- ***Universal Data Elements (UDE)*** – Dynamically capturing the minimal amount of information required (UDE) to move a shipment from shelf-to-shelf to achieve increased shipment efficiency and security

- ***Integrated Technology Providers –*** Several GPS Tracking Providers and Data Systems Integrators leveraging the global reach of the platform, maximizing the amount of shipment tracking information captured.

- ***Remote IPACD Query System (RIQS)*** - A country specific server connecting the DEP to a national dashboard of interfaces to analyze, manage and control data related to the country: cargo security, shipment visibility, disaster recovery, and food disease containment, among others

---

[11] The 5Cs for Data Security, China B20 Task Forces, Global Data Security Standard, 2016

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

GCEL Copyright 2019 Confidential                    8



### III. Cutting-Edge Technology

- What emerging technologies are most important for CBP to monitor or adopt?
- What technologies are being adopted by the private sector that are incompatible with CBP's current legal or policy frameworks?
- What technologies on the horizon have the potential to be a disruptive force (enabling or challenging) within the trade ecosystem?

The technology landscape is rapidly changing and transforming our lives in new ways that were unheard or unimagined before. Organizations and industries are creating increasingly innovative products and services by leveraging rapid advancements in technology. The global B2B marketplace is no exception as private industries are trying to keep pace with the rapid changes in technology landscape leaving no choice to the public sector like CBP other than catching up with the pace of technology and rapid digital transformation.

The 21st Century Customs Framework should plan and leverage a 21st Century Customs *Technology* Framework and constantly monitor and adopt emerging technologies as they impact its operations. CBP should keep pace with the rate of new technology adoption by private sector, and be constantly monitor and embrace potentially disruptive technologies as needed in its domain.

For the CBP to be digitally ready for 21st Century, it should adopt a comprehensive and all-inclusive process, people, and technology framework and drive transformations through a harmonious, and well-orchestrated enterprise  change to reap the benefits that 21st century technology offers.  The technology approach should be one of "business need driven" rather than "technology driven." This requires a well-thought out Digital Economy Platform with a carefully laid out business and technology transformation roadmap. Several currents of change are underway in CBP's environment and the digital transformation is inevitable as it is part of the  global value chains being impacted.

1. Customs is an important industry cluster as part of global value chains and plays a key role in ensuring the smooth and efficient flow of goods through logistics pipe line crossing the country borders.

2. New and emerging technologies are going to disrupt the private industry and governments alike and the private industry and citizens will embrace them at a more rapid pace and expect seamless digital experience in their interactions with the government service.

3. Not keeping pace with the rate of technology change will cause friction in CBP's interaction and service delivery to the private industry and citizens.

4. CBP should embrace digital transformation to provide frictionless interaction from both system and process perspective with its value chain partners .

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*          9



5. CBP should pursue a two-pronged strategy upgrading its current legacy systems through IT modernization investment programs and build necessary bridges to interface with the new and emerging technologies as part of transition as it embraces a digital transformation roadmap to implement new and emerging technologies.

The following examples provide a comprehensive digital transformation approach that combines the process innovation and emerging technologies in the design, development and deployment of new and emerging technologies in a global value chain.

1. **Distributed Ledger Technologies**
   Blockchain and Distributer Ledger Technology (DLT) is an area that can bring tremendous value to digitization and automation of global value chains. This requires a matching supply chain process innovation that is ripe for the implementation of DLT such as Blockchain to harness its full potential. One such process innovation is an e-Logistics Virtual Value Stream application that is one of several thousand free apps offered through a Digital Economy Platform.

   The Virtual Value Stream (VVS) App of an e-Logistics dimension is an innovative and powerful logistics service management tool that provides much needed horizontal integration of the global value chain from shipper to receiver shelf-to-shelf across all the industry clusters offering the following benefits:

   a. Achieves higher levels of operational efficiencies through route, load, cost and delivery optimization.
   b. Seamlessly integrates the industry clusters and enables frictionless and smooth flow of goods.
   c. Provides real-time tracking and visibility of shipment shelf-to-shelf.
   d. Offers powerful tools to help monitor real-time performance of Logistics Service Providers based on UCT (Units, Cost, Timetable) service agreement framework.
   e. Helps plan and build related virtual value streams for procurement of products and components in a fraction of the time compared with several months using traditional methods.

   This e-Logistics VVS process innovation of the DEP is a perfect candidate for the implementation of Blockchain technologies. This new process innovation of building virtual value streams of global value chains representing the shipment of products and product components and leveraging DLT can revolutionize the supply chain processes in several ways.

   This includes significantly enhancing the cargo security including the ability to tracing to the origin and all the changes in transit, implementation of distributed ledgers, smart contracts and automated payments using blockchains, tracking and monitoring of shipments and business enterprises for any security related deviations, and data anomalies through implementation of Enterprise Monitoring List (EML) and Shipment Monitoring List (SML) as discussed earlier. The data security, integrity, authenticity, and validation are significantly enhanced through the implementation



of appropriate high strength digital encryption and cryptography providing a tamper proof and tamper evident ledger of B2B transactions, and enabling reporting and compliance at the border crossing.

2. **Data Science and Data Analytics**

A horizontally integrated e-Logistics Platform can interconnect all the industry trade clusters within its global value chain and share digital data that is dynamically validated in real-time by its trading partners as the shipments move from shipper to receiver.

 In a well-designed global Digital Economy Platform (DEP) that offers numerous apps for the B2B trade participants, the usage of apps performing commercial transactions on the platform will generate billions of data-points that are logically connected and interlinked and validated by several thousand trading partners. These data points provide an excellent source for data mining and data analysis for monitoring their businesses performance based on their contractual, forecasted, and actual performance measures or provide real-time tracking and visibility of the shipments as they move through the value chain.

This data analytics can be used to calculate the normal business performance and risk profile of the B2B participants or calculate a Shipment Security Risk Index or Enterprise Security Risk Index based on EML and SML and comparing the data against any domestic and international security databases to provide advance intelligence to corresponding security authorities in multiple layers, as discussed earlier, for appropriate remediation of or response to security threat.

3. **Artificial Intelligence (AI) and Internet of Things (IoT)**

As the private industry is embracing more and more technology advancements in the area of AI and IoT, more and more warehouse and logistics equipment, containers, trucks, cargo shipments and vessels will be fitted with smart monitoring and tracking devices and smart sensor systems connected through the internet and monitoring centers for remote control and management of shipments. This enables building of smartly interconnected logistics network to provide advance information in real-time about the status of shipment and its condition and its geo coordinates using GPS and RFID technologies as the shipments move through scheduled routes and transshipment points.

Standard Predictive Models can be built using scheduled itinerary and shipment routes generating virtual security corridors for detecting any deviations. By applying AI, standard models can be compared with actual routes of shipment movement based on live tracking data and generate security alerts triggered by any deviations outside the designated security corridors. These real-time alerts can then be provided to various security and intelligence officials and Border Crossing personnel within the jurisdiction alerting them of impending security threats from the approaching cargo vehicles for appropriate security.

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*                11



**IV. Data Access and Sharing**

- What data would you like CBP to share with importers, and vice versa, to improve trade facilitation and enforcement?
- How can CBP's overall data sharing with trade stakeholders be improved?

To improve trade facilitation and enforcement, CBP's 21st Century Customs Framework would require a new generation Digital Economy Platform and 21st century E-Documentation standard to facilitate easy and seamless cross-border data access and sharing mechanisms among the countries for export and import data filing and compliance requirements.  As trade is a global phenomenon, CBP's overall data sharing process and framework can be significantly  improved by digitally connecting CBP's ACE with a Digital Economy Platform through point-to-world integration that interconnects USA as the trade hub with all its trading partners through public and private partnership.

The current challenges, recommended solution and resulting benefits of DEP for the implementation of new data sharing framework are summarized below.

**1. Current Challenges**

a. Most of the current data is manifested in the form of paper-based documentation among multiple industry trade clusters in the global value chain.

b. In a recent G20 Case Study conducted by GCEL, the aggregate average E-Documentation score achieved by all the G20 countries understudy, was 1.94 on a scale of 1 to 5. This represents a huge opportunity to increase electronic transfer of shipment data between trade participants across the G20 Countries.

c. Presently, E-Documentation is not used to its full potential. It is limited to a point-to-point environment where information is shared only from one data provider to one data receiver at a time.

d. The number of days for customs clearance across G20 Nations varies significantly between high, mid and low-income countries.

e. Digitization of one Customs cluster alone in the global value chain will not be able to sufficiently offset the trade inefficiencies caused by the bottlenecks in the downstream supply chain processes.

f. This requires a comprehensive for digitization or E-Documentation plan concurrently for all of the trade data in the entire global value chain that can be achieved only through the implementation of a Digital Economy Platform solution.

**GCEL Americas**
Canada

**GCEL Asia**
Malaysia

**GCEL Europe**
Belgium

**GCEL MEA**
Lebanon

**GCEL Headquarters**
Switzerland

*GCEL Copyright 2019  Confidential*                    12



2.  **Digital Economy Platform Solution**

    a.  One of the key trade efficiency elements is E-Documentation, or electronic documentation, which is one of the defining aspects that distinguish an advanced system of trade from one that relies on less efficient paper-based methods.

    b.  E-Documentation is defined as the creation, storage, and transmittal of necessary data related to a shipment or trade participant in a purely electronic form. E-Documentation is a series of electronic documents created to expedite the flow of a shipment from shelf to shelf by meeting the Buyer, Seller, Country, Industry, Finance and Insurance (BSCIFI) documentation requirements.

    c.  By increasing the use of electronic documentation and leveraging on a Global Single Window (GSW++) across the G20 Nations by connecting all the existing national single windows, trade participants will reduce the level of manual data entry throughout trade activities, thereby minimizing human error as well as the frequency of incomplete or missing documentation. This will facilitate advance customs clearance, thus reducing shipment delays.

    d.  The 21st century E-Documentation standard is based on maximization of point-to-world integration—achieving an accurate, validated, and efficient E-Documentation environment encompassing all the 19 clusters' trade transactions. This results in maximum trade efficiency, thus expediting shipment flow and reducing costs.

3.  **Dimensions of E-Documention**

    The 21st century trade efficiency requirement calls for two dimensions of E-Documentation

    a.  E-Documentation related to BSCIFI requirements.

    b.  E-Documentation exchange related to business transactions between the service providers within the supply chain.

    Once the above is achieved, we will have the following three foundations for data optimization in both categories:

    i.  **Data Accuracy and Validity**
        Data is continuously pre-populated, minimizing keystrokes, thus reducing the chance of human error and maximizing the ability to flag data anomalies. Furthermore, data is continuously validated from multiple sources (19 clusters) in the same trade lane pipeline during the course of their interaction with the shipment. As information is cross-checked against historic data as well as current activity data shared throughout the pipeline, errors or anomalies will be quickly identified and addressed.



**ii. Data Efficiency**
Accurate and validated data is efficiently assembled from different clusters throughout the shipment process and made available in real time throughout the pipeline. This will help accelerate shipment movement to meet the requirements of the real-time environment.

**iii. Rapid New Requirement Response**
The point-to-world environment will reduce the time needed to publish and reinforce new BSCIFI documentation requirements. The wealth of dynamic, validated data, available in the point-to-world environment, will satisfy the majority of new BSCIFI requirements by automatically populating the newly required data elements.

If the new data element does not already exist within the point-to-world environment, end users will be proactively prompted to provide the missing information during the course of doing business on a real-time basis.

**4. E-Documentation Benefits**

The 21st century E-Documentation standard will have significant positive impact on a number of areas in the trade lane pipeline, including the following for CBP:

- Enhanced security and expedient document filing and compliance
- Higher productivity of CBP personnel
- Reduced border crossing delays
- Greater throughput of cross-border traffic
- Reduced carbon footprint
- Increased speed of Customs clearance
- Increased interception of counterfeit products
- Increase Customs duties collection

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*          14



**V. 21st Century Processes**

- What specific import procedures or requirements can be improved or refined, and how?
- What are some international best practices (i.e., processes used by other customs agencies) that CBP should examine?

The 21st Century Customs Framework requires a 21st Century Process Framework that seamlessly integrated with other interacting trade processes. In a recent G20 Case Study conducted by GCEL, the aggregate average process efficiency score for G20 countries was 2.15 on a scale of 1 – 5. While the scores for high income countries were higher based on the efficiency improvements in their vertical trade clusters, the scores for medium and low-income countries were lower.

These process gaps can be closed through successful implementation of a digital economy platform with features and functions to significantly enhance the process efficiencies across the global value chain. Inadequately adopted processes can result in lack of visibility across the supply chain pipelines, increase cargo security risk and decrease the ability to intercept counterfeit goods, in addition to minimized ability to collect proper Customs duties.

1. **Trade Processes and CBP Role**

   Efficient trade processes are defined as the ability to systematically perform routine tasks within a changing and fast-moving environment. In other words, different but interrelated processes performed well by the various industry clusters within the trade pipeline determine the efficiency of the shipment when crossing from shelf to shelf. Since trade is a horizontal process, the 21st century trade efficiency standard requires a horizontal solution as a foundation for achieving trade efficiency. This standard requires cooperation and compatibility among all participants involved in the horizontal flow of a shipment and CBP plays a vital role in this regard through its ACE initiatives and striving towards Global Single Window.

2. **How Can We Improve These Processes?**

   For efficient movement of shipment from shelf-to-shelf, the common denominator among all 19 clusters is the shipment. The shipment requires a minimum number of data elements (UDEs) in order to cross efficiently and securely from shelf to shelf across all 19 clusters' jurisdictions. It has been proven that up to 61-80% of data exchanged between the 19 clusters is redundant. This is why the UDEs are required to maximize the horizontal efficiency of a shipment without any standardization required by the clusters involved. Similar approach can be adopted to identify the UDEs that are required for documentation filing and compliance requirements by standardizing the data elements for a global single window.

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*          15



Processes are a required foundation to achieve optimum performance for both the public and private sectors alike. Optimizing the efficiency of the entire trade pipeline will generate multiple benefits including the following for the Government Agencies like CBP.

- Increase in speed of border crossing and Customs clearance
- Improved speed and accuracy of security measures
- Reduced costs associated with enforcement, document validation, and pass-through times
- Reduced wait time and carbon foot print at the borders

### 3.  Conclusion

The 21st Century Customs Process Framework should be nimble and agile to be able to respond elastically to changing environments and emerging security challenges. They should seamlessly integrate with the trade processes of interacting trade participants and should provide a frictionless process and system integration for seamless interaction while crossing the borders.

This can be made possible through a successful implementation of appropriate Digital Economy Platform solution that digitally interconnects all the trade participants to cooperatively work and collaborate with CBP agency personnel to achieve global trade efficiency and cross-border compliance and security objectives.

**GCEL Americas**
Canada

**GCEL Asia**
Malaysia

**GCEL Europe**
Belgium

**GCEL MEA**
Lebanon

**GCEL Headquarters**
Switzerland

*GCEL Copyright 2019  Confidential*                16



## VI. Self-Funded Customs Infrastructure

- Outside of the annual Congressional appropriations cycle, what mechanisms should CBP explore for consistent and timely funding for ACE enhancements?
- How could the fee collection process be streamlined, improved, or redesigned to more directly fund ACE enhancements?

As noted above, GCEL has achieved a global consensus of the Digital Economy Platform as evidenced by the:  G20 Leaders' Digital Economy Policy Directive, End User Demand per the G20 Nations Case Study, National Deployment Agreements, Technology Industry Commitment and Benchmark Trade Lane Deployment Agreements.

Per the G20 Nations Case Study the global benefits and findings from the DEP are summarized as follows:

- Reduce international and domestic trade costs by USD 3.7 trillion
- Increase global trade by USD 7.7 trillion
- Create a new USD 5.5 trillion service market opportunity for the finance, insurance and commerce industries
- 90.4% of B2B participants do not have an integrated system
- 94.5% want the Digital Economy Platform.

The G20 Nations Case study included the USA Shipment Efficiency Assessment (SEA) report that was prepared by GCEL in cooperation with the USA Small Business Administration, Department of Trade, Bankers Association for Finance and Trade, Alliance for Transportation Innovation, Ocean Carrier Equipment Management Association, George Mason University and the Nielsen Company.

With the collection of nearly 60,000 data points involving 19 industry clusters across every economic zone, the USA SEA report revealed that 77.6% of businesses do not have an integrated system and  98.4% want the DEP to be more competitive.

The USA SEA report also yielded that the DEP will provide the following benefits for  the USA by 2030:

- Reduce  annual domestic and international trade costs by USD 736 billion
- Increase annual trade by USD 480 billion
- Creation of  3.2 million new manufacturing, agriculture and service industry jobs

The foregoing benefits of the DEP will  boost customs duties and income tax revenues, thereby increasing the amount of funds for ACE enhancements.

In addition, the dynamic integration of digitally validated commercial transaction information into the ACE system will reduce document processing and investigation costs. These costs  savings can be reallocated to fund ACE enhancements.

| GCEL Americas | GCEL Asia | GCEL Europe | GCEL MEA | GCEL Headquarters |
|---|---|---|---|---|
| Canada | Malaysia | Belgium | Lebanon | Switzerland |

*GCEL Copyright 2019  Confidential*                    17



Also, this dynamic integration of commercial transaction information will result in improved accuracy of customs dues assessments to generate higher customs revenues which can fund ACE enhancements .

The digital integration of ACE into the finance dimension of the DEP can also create automatic trigger points for payments tied to document submissions and approvals which will reduce Customs billing, collections and reconciliation costs.

The implementation of a Digital Economy Platform will also provide the ability to create a virtual border and digital fence that can dynamically monitor cross border shipment information to reduce labor and physical security costs.

**Respectfully submitted by:**

Captain Samuel Salloum
GCEL Co-Chairman

**Contact information:**

Mr. Gregory D. Bird, CPA
GCEL Deputy Secretary General
g.bird@gcel.net
313-324-6462

Dr. Damodar Konda
GCEL Executive Member
d.konda@gcel.net
313-324-6462

GCEL Americas
Canada

GCEL Asia
Malaysia

GCEL Europe
Belgium

GCEL MEA
Lebanon

GCEL Headquarters
Switzerland

*GCEL Copyright 2019  Confidential*          18

# Plaintiff's Affidavit - EXHIBIT 2



The Global Horizontal E-Logistics System (GHELS)

**PROVEN IN PRACTICE; PHASE ONE**
Midwest Pilot Project/Northern Border

Presented by
Secure Cargo Anti-Terrorism Coalition (SCAC)



SECURE
CARGO
ANTI-TERRORISM
COALITION



SECURE
CARGO
ANTI-TERRORISM
COALITION

535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042 : info@axiolog.com

# INDEX

Pilot Project Premise ................................. 2

Executive Overview .................................. 4

Coalition Formation ................................. 6

Location and Modes of Transport ....... 7

Project Duration and Phases ................. 8

Project Deliverables ................................ 10

System Overview ..................................... 13

Public Response ...................................... 26

Conclusion/Recommendations .......... 34

# APPENDIX

A-Corporate Shipper Data Flow ........... 38

B-Overall Architecture ......................... 39

C-Roles and Participation .................. 40

D-Public Congressional Testimony ......41

## PROJECT PARTICIPANTS:



One Campus Martius
Detroit, Michigan 48226
www.compuware.com



1000, rue de Sérigny,
bureau 600
Longueuil, Québec  J4K 5B1
www.emergis.com



One American Road
Suite 506,
Dearborn, MI 48126-2798
www.ford.com



23330 Cottonwood Prkwy
Suite 333
California, MD 20619
www.mds-inc.com



337 Magna Drive,
Aurora, Ontario,
Canada L4G 7K1
www.magnaint.com



3290 West Big Beaver Rd.
Suite 300
Troy, MI 48084
www.oracle.com



535 Griswold, Suite 2250
Detroit, MI 48226
www.axiolog.com



10751 Deerwood Park Blvd.
Suite nr. 200
Jacksonville, Florida 32256
www.tntlogistics.com



5390 Brendan Lane
Oldcastle, Ontario, Canada
N0R 1L0
www.rekointl.com



## PILOT PROJECT PREMISE



Unlike the ~$500 billion dollar airline passenger industry, which is currently managed by seven global horizontal airline passenger systems (e.g. Sabre, Amadeus, etc.) the $4 trillion global freight industry is currently without a single unified horizontal logistics system. The absence of a common infrastructure lends itself to inefficiency and poor process control. Moreover, following September 11, 2001, the United States and several other countries have launched cargo security programs to protect their borders from terrorist incursions via commercial shipments. However, because of the lack of a Global Horizontal E-Logistics System (GHELS), these initiatives have unfortunately created additional logistics and economic burdens on a global logistics industry already challenged by its fragmented nature.

**The global freight industry must adapt if it is going to meet the demands of the global economy, considering:**

I.   Interdependency of the 21st century global economy requiring efficient global logistics.

II.  The lack of physical infrastructure preparedness for an increasing world freight volume, projected by the World Bank to quadruple by year 2020, reaching ~$14 trillion dollars.

III. Inevitable increasing international cargo security mandates.

IV.  Fragmentation of the global logistics industry resulting in cargo congestion, shipment delays, and slowdowns in supply chain velocity, which consequently force inventory increases to adjust for the increasing delay, as well as other factors.

During our testimony in July 2003 before the U.S. House of Representatives Select Committee on Homeland Security on "Best Business Practices for Securing America's Borders"*, we asserted that in order to effectively address cargo security—either domestically or internationally—a holistic system must be enabled which takes the entire flow of global shipments into account, beginning with the empty container in a depot and culminating in delivery to the final recipient. Such a comprehensive approach must strive to meet two core objectives:

I.   Encourage widespread private sector involvement by improving the process efficiency and profitability of all parties involved in shipment flows.

II.  Deliver cargo security improvements from the private sector that complement and reinforce official rules and regulations.

Moreover, we have indicated that the global logistics industry demands efficiency and security. For any security system or initiative to be embraced worldwide, it must include direct commercial benefits to every entity within the shipment process; in other words, efficiency and security must go hand in hand. Efficiency by itself may compromise security. In contrast, overarching cargo security rules and regulations could adversely impact the industry, and consequently the economy. Therefore, a comprehensive public/private sector solution must be implemented in order to economically and effectively deal with cargo security challenges. The driving force behind maximum private-sector involvement can only be the provision of direct economic benefits to all global logistics industry participants.

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

It is necessary to understand that a truly global solution cannot be tailored to an organization, country or region - it must be both comprehensive and uniform from shelf-to-shelf, since shipments cross multiple organizations and countries. Otherwise, we will fall into the trap of customizing solutions and ending up with another vertical system attempting to manage a horizontal process—precisely the circumstances which created today's fragmented global logistics infrastructure.

### Customized Process

- Customer Identification
- Customer Needs Assessment
- Construct a Specialized Solution
- Charge Fee for Services

### Global  Solution Process

- Identify Root Causality
- Conceptualize Global Solution
- Obtain Global Strategy Consent
- Pilot Project
- Present Value Proposition
- Rapid Global Deployment

We have procured consent from a global constituency of key entities in both the public and private sectors who will define the future of the global logistics industry.** Subsequently, upon receiving an appropriate level of support, we formed the Secure Cargo Anti-terrorism Coalition (SCAC) for purposes of advancing the cause of a holistic solution for the global logistics industry .

For practical purposes, we determined that we would divide the pilot project into two phases:

- **PHASE 1** places its emphasis on Cargo Security to demonstrate the effectiveness of our proposed global cargo security plan as presented to the Congressional Committee in July of 2003.

- **PHASE 2** demonstrates efficiency and economic benefits through a multi-lane approach encompassing the full range of geographic and logistics conditions.

Upon completion of this process, we will implement our rapid global deployment strategy, which will result in worldwide system coverage within eighteen months.



Efficiency and Security Is A Shelf-To-Shelf Process
The Shelf Can Be Anywhere In The World

**The Solution Must Be Global**

\* For further detail consider the attached Public Congressional Testimony
\*\* Global Strategy Consent report overview - Available Upon Request

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph** 313-962-1220 **fx** 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

# EXECUTIVE OVERVIEW

The SCAC has successfully completed the first phase of the GHELS pilot program. Steps undertaken in the Security phase described previously are outlined below, as well as a summary of deliverables. Further detail is included subsequently in this report.

## PROJECT OBJECTIVE
To demonstrate the efficacy of the Cargo Security Plan proposed in congressional testimony in July 2003.

## PROJECT LOCATION
Canada (Windsor Ontario) / USA (Michigan)

## PROJECT MODES OF TRANSPORT
Trucking

## PROJECT DURATION
Four months

## PROJECT PHASES

- **Formation of Coalition**: Secure Cargo Anti-terrorism Coalition (SCAC)
- **Assessment**: Evaluation of participant technology and integration with GHELS system
- **Education**: Training for use of technology for the pilot project
- **Development**: GHELS v2.4
- **Deployment**: Document conversion, RIQS installation and participant integration

- **Pilot testing period**: Quality Assurance
- **Demonstration**: Public and private showcase

## GCEL MEMBERS
The SCAC includes pilot participants from the private sector who have a commercial interest in achieving the project objectives:

| SPECIALTY | COMPANY |
|---|---|
| Software | Oracle |
| Technology GHELS | Axiolog |
| Quality Assurance | Compuware Corporation |
| Integration | BCE Emergis/Messageway |
| Tracking Technology | Insight Mobile Data |
| USA Corporate Receiver | Ford Motor Company |
| USA Receiver | Plastech Corporation |
| Canadian Corporate Shipper | Magna International |
| USA Corporate Trucking Carrier | TNT Logistics |
| Canadian Individual Shipper | Reko Tools |
| USA Individual Receivers | Many US |
| Canadian Individual Trucking | Reko Trucking |
| Passenger Bus | Lakefront Bus lines |

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042





## PROJECT DELIVERABLES

Among system benefits, we have demonstrated the ability to provide the following:

- Visibility beyond door-to-door for corporate and individual shippers

- Multilayer of defense against cargo terrorism:

  - **Layer 1**: Intelligence/Data Integrity Analysis: Legitimize shipment and shippers.

  - **Layer 2**: Coast Guard: "Virtual Fencing"

  - **Layer 3**: Customs Border Protection/ Critical Access Determination

  - **Layer 4**: Domestic Security Agencies/ Shipment Deviation Alert.

- Security compliance without additional efforts from lane participants

- Provided the Detroit tunnel management advanced visibility of regular commercial traffic (buses, etc.) to assist in advance traffic visibility and proactive traffic resource management

- Demonstrated the effectiveness of GHELS global infrastructure architecture that will accelerate rapid global deployment at minimal cost

- Non-intrusive, seamless integration of shipper and carrier

- Demonstrated the ability to track global shipments with minimal technology requirement

- Provide methodology for Data Integrity & Consistency

- Demonstration the ability to provide Global Advanced Dynamic Data Visibility as early as 6 months vs. 4 hours required under 24-AMS (Advance Manifest System)

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## COALITION FORMATION

Even prior to September 11, 2001, Axiolog—the coalition's founding partner—had recognized the looming crisis within the global shipping community, and had endeavored to create proactive solutions designed to increase efficiency.

Consequently, the firm did not hasten to offer a partial solution. Instead, the firm founded the Secure Cargo Anti-Terrorism Coalition (SCAC) in the spring of 2003, an initiative co-convened and supported by the Detroit Regional Chamber of Commerce. The Chamber had long been concerned with delays and security vulnerabilities at Detroit's Ambassador Bridge and Windsor Tunnel, two leading cargo gateways into the United States.

The SCAC is a coalition of technical, business, and political leaders engaged to prove the viability of a software system (Global Horizontal E-Logistics System—GHELS) designed to improve upon official U.S. and international cargo security programs while also providing advanced traffic visibility on a global scale.

**These Coalition members included the following entities:**

| | |
|---|---|
| Software | Oracle |
| Quality Assurance | Compuware |
| Technology GHELS | Axiolog |
| Integration | BCE Emergis |
| Tracking Technology | Insight Mobile Data |
| USA Corporate Receiver | Ford Motor Company |
| Canadian Corporate Shipper | Magna International |
| USA Corporate Trucking Carrier | TNT Logistics |
| Canadian Individual Shipper | Reko Tools |
| USA Individual Receivers | Many U.S. |
| Canadian Individual Trucking | Reko Trucking |
| Passenger Bus | Lakefront Bus lines |

Participants were invited and selected on the basis of their leadership roles within the information technology field, or for their significance as shippers or recipients of shipments. Together, these entities resolved to demonstrate the veracity of the congressional testimony and its proposed guidelines for cargo security enhancement through the creation of a comprehensive electronically-based system and subsequent proof-of-concept through a limited trial program.









© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## LOCATION AND MODES OF TRANSPORT



The Michigan-Ontario border crossings are experiencing significant traffic congestion because of increases in both traffic volume and the number of security inspections. Significantly, a high percentage of cross-border cargo originates from other countries. With the promulgation of the 24 hour advanced manifest rules for ocean carriers and the proposed 30 minute to 4 hour advanced manifest requirements for inland cross border traffic, the commercial short transit routes between Canada and the U.S. could be severely impacted, as shipments often arrive at Customs before the available documentation.

Regulations adopted in 2003 and 2004 have been identified as having the most significant impact on the document compliance process in nearly 30 years, with significant and frequently adverse impacts upon shippers' ability to expedite the transit of goods through border crossings and ultimately to their final destinations. Furthermore, when there is a mixture of legitimate and non-legitimate shipments queuing in line to cross the border, shipments which are stopped for additional inspection ultimately cause unavoidable delays for the legitimate shipments waiting behind them. The lack of advance visibility concerning shipments approaching border crossings is an additional factor, as officials are unable to proactively schedule appropriate manpower levels to manage the flow of traffic and perform necessary documentation and inspection clearances in a timely fashion.

In response to these circumstances, SCAC launched the North Border Demonstration Project to focus on the movement of freight from Ontario, Canada into Michigan, U.S. Large and small trading participants were selected to participate in the program and to demonstrate the attributes of the GHELS system.

**Large corporate trade lane participants included:**

- Supplier—Magna International (Karmax Division)
- National carrier—TNT Logistics
- Industrial customer—Ford Motor Company (Twin Cities Plant)

The shipment activity and trading information between these companies included daily cargo shipments from Magna-Karmax (located in Toronto, Ontario, Canada) and transported by TNT utilizing 53 foot tractor/trailer conveyances over the Ambassador International Bridge through Michigan, Illinois and Wisconsin to the Ford Motor Company receiving location in St. Paul, Minnesota.

**Small to mid-size trade lane participants included:**

- Reko Tools (Individual Supplier/Carrier)
- Plastech (Reko Tools Customer)
- Lakefront Bus Lines

The shipment activity and trading information between Reko Tools and Plastech included shipments from Reko Tools' production facility in Windsor, Ontario, Canada via company-owned trucks through the Detroit/Windsor Tunnel to Plastech locations in Michigan and elsewhere in the Midwest. Transit information related to Lakefront Bus Lines utilizing 42 passenger commercial buses, including routes to and from Detroit/Windsor casinos via the Detroit/Windsor Tunnel from locations in Michigan and Ohio.



SECURE
CARGO
ANTI-TERRORISM
COALITION

# PROJECT DURATION AND PHASES



The pilot project building and showcase occurred over a four-month period from July 2003 through October 2003. The live pilot was demonstrated to various public and private sector audiences during the American/Arab Summit at the Detroit Renaissance Center in September 2003, as well as at the Axiolog corporate headquarters.

The pilot project included 6 phases: Assessment, Education, Development, Deployment, Pilot Testing, and Showcase, the parameters of which are detailed below:

**Assessment**: Upon the initial selection of potential pilot program participants, we conducted outreach initiatives designed to detail the system's benefits and to explain how, given their consent, their data would be transferred to appropriate cargo security personnel in order to ensure compliance with security initiatives. We then conducted a thorough assessment of each potential participant's technological infrastructure for purposes of integration into GHELS.

**Education:** SCAC deployed its own system experts to participant facilities for training sessions intended to familiarize end-users with system operation and functionality. As a supplement to these training sessions, a comprehensive tutorial was provided, as well as online question-and-answer systems and dedicated phone support in order to ensure prompt and accurate response to inquiries.

**Development**: The GHELS Version 2.4 utilized in the pilot was developed by Axiolog software technicians utilizing VBNet as well as the Oracle database. During this time period, Axiolog developed the system through parallel development teams in order to ensure that specifications were met and that quality assurance was maintained throughout the process. The system used incorporated portal access for trucking companies and individual shippers, and integrated the Magna, Ford and TNT vertical systems through BCE Emergis data system integration. A separate security interface designed to display appropriate collected data to regulatory and enforcement-side personnel was implemented in parallel with the shipper/trucker portal.

**Deployment**: Participant information was captured via system integration as well as through internet portal access. Legacy systems integration was performed by BCE Emergis, translating EDI information via XML through a specialized in-house SCAC server. There was no need for verticals to be directly integrated into GHELS, as existing BCE Emergis integration from these firms was sufficient for integration into the pilot system. Document conversions included the shipper's export declaration and bill of lading.

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042





**System Testing**: Each system component and all processes were tested for accuracy and security by the quality assurance team from Compuware, along with personnel from SCAC. The transfer of data from the horizontal system into the security interface was also monitored.

**Showcase**: Public and private showcase demonstrations were held at the Axiolog corporate offices in Detroit, as well as at the Annual American/Arab Summit held in September 2003 at the Detroit Renaissance Center to detail the system's effectiveness. The demonstrations succeeded in illustrating the pilot's success in achieving key objectives – the enhancement of cargo security initiatives and the provision of multiple layers of cargo security while eliminating the need for any effort whatsoever from program participants – in side-by-side comparisons between GHELS and earlier non-integrated methods. These demonstrations were attended by U.S. Federal Agency officials including the U.S. Department of Transportation, U.S. Trade Representative, foreign government ministers and officials and the former Department of Homeland Security Cargo Security Director. As the project's objectives were concerned with vital security matters, the SCAC did not hold public demonstrations; both the project itself and subsequent demonstrations were conducted on an invitation-only basis.



## PROJECT DELIVERABLES

A significant outcome of the pilot project was the resulting proof in practice of the suitability of the system's architecture for global implementation, resulting in uniform, universal availability and applicability. The Northern Border pilot provided a suitable proving ground wherein the system's cost effectiveness, technology platform independence, scalability, and suitability to the broadest possible range of users and user groups could be effectively displayed. The project's outcome provided positive proof that the system's modular, decentralized design was aptly suited to its role as the foundation of a robust and effective global e-logistics system.

Built upon an open platform architecture with minimal dependence upon any external technology beyond internet connectivity, the system was designed for ease of implementation and effective use in any country worldwide, by any shipper large or small. Technology independence renders the system accessible to any shipping lane participant. Uniform, non-customized implementation and the lack of any specialized technology of any kind results in universal compatibility and accessibility coupled with minimized costs.

The system deployment as used in the Northern Border pilot followed a simple, uniform schema designed for ready implementation anywhere (as illustrated in the immediately subsequent diagram). Information culled from separate vertical providers (e.g. carriers, shippers, logistics service providers et. al.) is funneled to a country-specific RIQS server (Remote IPACD Query System), whereupon it is parsed, processed, and provided to end-users through the appropriate application-specific portal interface. For example, pertinent security data is passed into a DHS

program system whereupon suitable analytics are applied – e.g., measurement against historical data and preset security benchmarks—resulting in suitable automated processes such as flagging of suspicious shipments. Similarly, a separate portal provides national freight visibility. This was sufficient to demonstrate Phase 1, described on page 3.



Phase 2 of the global pilot project will demonstrate efficiency and economic benefits to every participant in the flow of a shipment through a multi-lane approach encompassing the full range of geographic and logistics conditions via the deployment of four separate logistics lanes

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

spanning differing environments and conditions across four continents (illustrated in the diagram below).



The GHELS system's modular architecture enables virtually immediate deployment in any given location. Upon its global implementation, it will consist of regional GHELS mirrored databases, each surrounded by a cluster of country-specific RIQS servers (as illustrated in the diagram at right). This distributed redundant model ensures optimal stability.

Upon the successful conclusion of the entire pilot project and the demonstration of efficiency and security gains under a full range of conditions, we will have already established a firm foundation for global system deployment. At this juncture, pre-selected major technology integrators will commence rapid, global system deployment. These multinational organizations are equipped with the network, resources, and the global credibility required to execute global rapid deployment.

This pilot program was not underwritten by any government agency or other third party. SCAC organized and funded the trial for the simple reason that we believed in the solution we proposed to the Congressional Committee in our July 2003 testimony, and wanted to prove its veracity in practice. To date, proposed cargo security initiatives had been initiated as a result of preconceived assessments of what requirements were necessary, usually conceived without appropriate assessments of their impact upon the logistics industry. Such stated needs were subsequently met through the awarding of grants, whose recipients proposed partial solutions that failed to holistically address the real-world logistics situation. Our overriding objective was not to procure a grant, but to provide a comprehensive, global solution to the problem of cargo security. Since grants are basically awarded and fulfilled based upon a grantee's ability to meet previously-established parameters, the Northern Border Pilot Project was necessarily conducted outside of that framework: External parameters to describe a project such as this had not been created.



© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042

## PROJECT DELIVERABLES:

# SYSTEM OVERVIEW

- Efficiency: Every Shipment Participant will increase its operation efficiency, resulting in up to 20% overall savings
- Cargo Security Compliance: Compliance with global cargo security with minimal effort
- No Cost: Shippers, Logistics Service Providers, Points of Entries and Country Officials can use GHELS at no cost
- Ease of Integration: Every Shipment Participant will have access to GHELS Portal-In or Plug-In
- Ease of Use: Minimize work efforts of every shipment participant



MULTI-LAYERS OF DEFENSE



| LAYER 1 | LAYER 2 | LAYER 3 | LAYER 4 | LAYER 3 | LAYER 2 | LAYER 1 |

**L1: DATA INTEGRITY ANALYSIS**

- Intelligence agency based on pre-set flagging criteria will dynamically send shipments to be inspected to the POL customs official
- Shipment can be flagged as early as when a booking is made by shipper, thus providing ample time to POL customs for inspection
- The inspection result by the POL customs to be provided to U.S. authorities prior to loading

**L2: VIRTUAL FENCING**

- Automated Risk Analysis based on EML/SML triggered by proximity to a geographic location during transport
- Alert Notifications Broadcast prior to arrival at national water, sky and land borders
- Drill down capability for investigators with global data visibility

**L3: CRITICAL ACCESS DETERMINATION**

- Global information at customs official finger tips
- Rapid Global Notification System
- Inbound/outbound visibility
- Better management of resources

**L4: SHIPMENT DEVIATION ALERT**

- Domestic Cargo Security System
- Dynamic notification of potential risks to local authorities



SECURE
CARGO
ANTI-TERRORISM
COALITION

## Global Dynamic Shipment Flagging (GDSF) Summary

GHELS provides real-time advanced global shipping activity data to the RIQS server. Government officials can apply their own artificial intelligence to the global commercial data to flag suspicious shipments. As a consequence, two monitor lists are established, the Enterprise Monitor List (EML) and Shipment Monitor List (SML), thus providing authorities with new capabilities to flag suspicious enterprises involved with a given shipment and/or a suspicious shipment itself.

EML will provide authorities the ability to flag a shipment based on any lane participant's historic and current, real-time activities.  SML will allow authorities to dynamically monitor shipment flow, beginning with the empty-container stage, and check for data mismatches, data anomalies and shipment flow deviations. In other words, through integration with GHELS, the SML will dynamically monitor the shipment participants who load, survey and move shipments throughout global supply chains. It is then possible to flag a shipment based on a 3 Dimension Dynamic Monitoring System (3DDMS): How long various events should take  vs. how long they actually took (contracted vs. forecast vs. actual activities). The combination of the global 3DDMS with GPS or RFID tracking systems will provide an optimal shipment monitoring process, more effective than simple tracking.

EML- A shipper is shipping between suspicious countries and ships to the United States, that shipment will be flagged

SML- A warehouse consistently storing books ships furniture, the shipment and warehouse will be flagged

### PRIOR TO PILOT TESTING

- Shipment flagging is dependent upon limited data sources, i.e. 24AMS / 2-4 hours for trucks
- Sovereignty issues with foreign authorities restrict the ability to stop suspicious shipments prior to reaching U.S. soil
- Limited trade partners participation in cargo security initiatives
- No dynamic global data visibility

### RESULTS OF PILOT TESTING                    Global Dynamic Shipment Flagging (GDSF)

- Shipment flagging based on multiple dynamic data sources
- Global flagging capability through minimal resources, achieving maximum security control while addressing sovereignty issues with foreign countries
- Any given time and as early as a USA-destined shipment(s) is quoted, booked or scheduled, U.S. Authorities can dynamically request Canadian officials to stop a shipment before it leaves Canadian soil
- The ease of compliance with cargo security regulations and the potential economic benefit maximize cargo security compliance and participation

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042



## SYSTEM OVERVIEW



SECURE
CARGO
ANTI-TERRORISM
COALITION

## PRIOR TO PILOT TESTING

- Security was based on data feed submission through 2 - 4 hour Advanced Shipment Manifest
- Single source of data limited validation
- Border delays due to delayed documents or improper documents resulting in 2 million lost hours in 2003

## RESULTS OF PILOT TESTING — Global Advanced Dynamic Data Visibility (GADDV)

### Supply Chain
**Data between Magna, Ford and TNT**

- 6 months in advance through Shipment Scheduling
- Confirmed 14 days in advance through Shipment Release
- Confirmed 7 days in advance through ASN
- Confirmed in advance through Dispatch
- Confirmed in advance through ETS / ETA
- Confirmed in advance through B/L instruction + B/L original
- Loading confirmation
- **Shipment Manifest**
- Shipment import declaration
- Shipment physical tracking
- Shipment unloading
- Shipment delivery (job complete)

### Private Market
**Data between Reko Tools and multiple individual shippers**

- 14 days in advance through Quote
- Confirmed 7 days in advance through Booking
- Confirmed hours in advance through Dispatch
- Confirmed hours in advance through ETS / ETA
- Confirmed hours in advance through B/L instruction + B/L original
- Confirmed Loading confirmation
- **Shipment Manifest**
- Shipment import declaration
- Shipment physical tracking
- Shipment unloading
- Shipment delivery (job complete)

## Global Advanced Dynamic Data Visibility (GADDV) Summary

The Global Horizontal e-Logistics System (GHELS) is similar to the horizontal passenger tracking systems familiar in the airline industry. The GHELS system provides the same transition from manual to electronic shipping information management processes. Shipment information is easily input into GHELS as part of normal shipping procedures.

Moreover, based on authorization by the pilot project shipment lane participant, the data is dynamically provided to the Remote IPACD Queries System (RIQS) (the country specific server). This Global Advanced Dynamic Data Visibility (GADDV) allows country officials to cross check the GADDV with Official Source Data (OSD) and apply sophisticated artificial intelligence screening, thus flagging suspicious shipments or enterprises as early as when the shipment is quoted or scheduled.

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042

# SYSTEM OVERVIEW



Enterprise Global Data

visibility

Anticipated Traffic

Shipment missing document.

Enterprise Certification.

Advanced Dynamic alert based on preset flagging criteria

Inconsistent Shipment Patterns

Shipment information flow provided through multiple sources



SECURE
CARGO
ANTI-TERRORISM
COALITION

**Data Integrity & Consistency (DI&C) Summary**

Data Integrity and Consistency allows shipment participants to reduce workload through automated data population, thus minimizing keystrokes and potential errors. Shipment information is input into GHELS as part of the shipping process.  Data collected was not solely dependent on the integrity or capability of a particular data source in the point-of-origin country; rather, it was collected as part of the shipment process and confirmed through multiple-party transactions.

## PRIOR TO PILOT TESTING

- No global data history visibility to legitimize lane participant shipping activities
- No data population; additional work load for compliance with regulatory initiatives
- Border delays due to delayed documents or improper documentation resulting in 2 million lost hours in 2003
- No dynamic data validation
- No consistent dynamic data visibility to identify data anomalies

## RESULTS OF PILOT TESTING — Data Integrity & Consistency (DI&C)

- History of global activities of all shipment participants for the past five years
- Data population minimizing key strokes
- Multiple-party transaction data confirmation for shipment flow
- Automated data feed as part of the shipment process
- Ease to identify data anomalies through cross-referencing data from multiple sources

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042

# SYSTEM OVERVIEW



Every lane participant's history/activity

Multiple-party transaction data confirmation for shipment flow

Ease to identify data anomalies through cross referencing data from multiple sources

Certification

Data as part of shipment process



SECURE
CARGO
ANTI-TERRORISM
COALITION

**Minimal Requirement for Global Tracking (MRGT) Summary**

GHELS represents an open platform that allows multiple tracking technology providers to plug-in. This open platform strategy is important since one shipment flow can be subject to multiple tracking devices or tracking technology providers. Moreover, containers on board a ship can be subject to multiple tracking technologies and providers.

This strategy allows tracking technology providers to provide their customers global access to GHELS value-added services at no cost, while increasing tracking technology providers' market share through the GHELS global market network.

## PRIOR TO PILOT TESTING

- Shipment tracking contingent on tracking device availability and reliability
- No complete coverage on shipment flow since shipments are subject to multiple tracking devices or tracking technology providers
- Lack of open platform to aggregate multiple tracking providers to provide authorities with global visibility

## RESULTS OF PILOT TESTING                    Minimal Requirement for Global Tracking (MRGT)

- Tracking via Shipment Events based on 3 Dimension Dynamic Monitoring System (3DDMS): Contracted Time vs. Forecast Time vs. Real Time
- Shipment Events + Tracking Conveyance through RFID, GPS or any technology approved in the future
- Global shipment tracking with minimal technology requirements
- Provides open platform to include multiple tracking providers and provide global visibility to authorities

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



# SYSTEM OVERVIEW



Shipment tracking via 3DDMS

One flagging criteria is triggered for one shipment on board the ship

This truck was flagged, and upon reaching the 0.5 mile range a message was sent to him via SMS to go to the pre-inspection area.

Virtual Fencing - Sea, Land, and Air

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## PORTAL OVERVIEW

Whether a shipment participant uses the portal
or an in-house proprietary system, shipment data
is input to GHELS through web portal access or
the data system integration process.



© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042

## PORTAL OVERVIEW

Tools to manage private market



© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph** 313-962-1220 **fx**: 313-962-2042

25



SECURE
CARGO
ANTI-TERRORISM
COALITION

## PUBLIC RESPONSE



Amongst cargo security stakeholders in both government and private enterprise, the response to the pilot program results has been uniformly positive and enthusiastic. The program's favorable outcome, assessed in terms of its fully meeting all of its objectives (notably, by providing proof in practice of the feasibility and workability of the principles put forth in the Congressional testimony of July, 2003), has led not only to favorable endorsement from a broad range of public and private sector thought leaders, but in the actual adoption of program principles into public policy. Moreover, enthusiasm for the program has been expressed by representatives of foreign governments and organizations, notably the Deputy Prime Minister of Jordan and the League of Arab States, signifying a readiness to participate in the global deployment of the system in the increasingly-vital Arab world.

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042



Within the United States government, the principle tenets of the program have been embraced by the executive and legislative branches, as well as field agencies:



### NSPD41/HSPD13 (December 2004)

7 elements of the Presidential Directive represent the core emphasis of July 2003 Congressional Testimony



### Chairman, Congressman David Camp

Officially presented SCAC as the "leader in cargo security" to DHS Secretary Tom Ridge



### Field Agencies

Reported the results of Northern Border Pilot project to DHS Undersecretary Asa Hutchinson as "immensely important to protect U.S. borders."



© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042





**Adoption of SCAC precepts into Presidential Directives**

Seven of ten items contained within current presidential directives governing cargo security reflect our July, 2003 Congressional testimony:

## SCAC Contribution to National Security Presidential Directive - 41 (NSPD) and Homeland Security Presidential Directive -13 (HSPD)

### THE PURPOSE OF THIS DOCUMENT
To illustrate that the SCAC global cargo security strategy presented to the House of Representatives in July 2003 represents the core emphasis of the NSPD41/HSPD13 signed by the President of the United States on December 2004. This validates the SCAC strategy and places its execution plan as a priority for our national security.

### CARGO SECURITY BEFORE TESTIMONY

| | | | |
|---|---|---|---|
| **Focus** | U.S. Border Protection | | |
| **Initiatives** | C-TPAT | CSI | 24 AMS |
| **Enforcement** | Voluntary | By Invitation | Mandatory |
| **Objectives** | **S**ecure the supply chain | **P**ush back U.S. borders | **E**lectronic submission of **S**hipment **M**anifest (SM) |
| | **E**stablish "Best Practices" | **S**tation U.S. customs inspectors in selected ports | **G**reater manifest detail |
| | **P**rotect borders | **P**rescreen containers prior to loading | **SM** submission 24 hrs. prior to loading |
| **Reality Check** | **N**o validation process | **S**ame vessel calls on non CSI ports | **L**ogistics and economic burden |
| | **M**ixed cargo within shipment | **C**ompetitive advantage to invited ports | **SM** never intended for security use |
| | **S**hipments still subject to tampering | **D**ata visibility of U.S. bound cargo only | **N**o validation of content description |
| | | | **S**hipments still subject to tampering |

### SCAC TESTIMONY JULY 2003

| | |
|---|---|
| **Focus** | Cohesive global cargo security strategy solution |
| **Existing Cargo security Initiative** | Presented strategy to enhance present cargo security initiatives |
| **Enforcement** | Commercial benefits and security compliance through minimal efforts |
| **Objectives** | Shelf-to-shelf efficient and secure global logistics |
| **Recommendation** | > Efficiency and cargo security must be interdependent to obtain acceptance and to facilitate rapid global deployment |
| | > Solutions must be global in scope and cannot be a tailored solution to specific countries or industries |
| | > Cargo security plan must extend beyond shelf-to-shelf, starting and ending with empty containers |
| | > Plan must provide multiple agency vertical security systems with real time global shipment activities to stop suspicious shipments as early as possible |
| | > Cargo security system must address the supply chain for the corporate shipper and the private market for the individual shipper |
| | > To be proactive we  must collect real-time global shipping activity data in order to identify and flag suspicious shipments |
| | > The work effort required by shipment participants to meet security requirements must be minimized at the same time operational efficiencies are realized |
| | > Plan must have emergency shipment rerouting |

### (NSPD41/HSPD13) AFTER TESTIMONY

| | |
|---|---|
| **Focus** | Cohesive and comprehensive global plan of action involving private and public entities |
| **Existing Cargo security Initiative** | Builds on current efforts and capitalizes on existing strategies, tools and resources. |
| **Enforcement** | Plan to ensure the interest of participation of every entity involved in the shipment flow globally |
| **Objectives** | Comprehensive global strategy to protect all our borders, coasts and interests |
| **Directives** | > Security actions must be undertaken in a manner that facilitates global commerce for legitimate commerce activities |
| | > Public and private global comprehensive outreach strategy to improve global maritime security |
| | > Identify threats as far from our shores as possible |
| | > Seamless coordination of authorities and responsibilities among federal department agencies |
| | > Comprehensive maritime supply chain security plan in coordination with the private sector |
| | > Plan calling to gather global data intelligence to flag suspicious shipments |
| | > Comprehensive national maritime recovery standard plan in coordination with the private sector |

### REMARK
**Seven of ten elements of these Presidential directives represent the core emphasis of the SCAC July 2003 testimony. The forward thinking of SCAC has placed it in a prominent position to execute its strategy thus meeting the objectives of the Presidential directives.**

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : **ph**: 313-962-1220 **fx**: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## ENDORSEMENT BY COMMITTEE CHAIR REPRESENTATIVE



**David Camp**

Chair House Select Committee,
Homeland Security Infrastructure/
Border Security Subcommittee

"A leader in the field of cargo security, Axiolog (SCAC) has approached the problem of securing cargo with the ideals of the Department of Homeland Security in mind."
— **Congressman David Camp**



**Tom Ridge**

Secretary
Department of Homeland Security

---

DAVE CAMP
4TH DISTRICT, MICHIGAN

COMMITTEE ON
WAYS AND MEANS
TRADE
HUMAN RESOURCES
HEALTH

SELECT COMMITTEE ON
HOMELAND SECURITY

INFRASTRUCTURE AND BORDER
SECURITY, CHAIRMAN
EMERGENCY, SCIENCE AND
RESEARCH
MILITARY PREPAREDNESS AND
RESPONSE

## Congress of the United States
### House of Representatives
#### Washington, DC 20515–2204

February 20, 2004

137 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–2204
(202) 225–3561
FAX: (202) 225–9679

WORLD WIDE WEB:
http://www.house.gov/camp/welcome.htm

DISTRICT OFFICES:

135 ASHMAN STREET
MIDLAND, MICHIGAN 48640
(989) 631–2552
FAX: (989) 631–6271

121 EAST FRONT STREET, SUITE 202
TRAVERSE CITY, MICHIGAN 49684
(231) 929–4711
FAX: (231) 929–4724

TOLL FREE: (800) 342–2455

The Honorable Tom Ridge
Secretary
Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, D.C. 20528

Dear Secretary Ridge:

Noting your trip to Detroit, Michigan on February 27, 2004 to address the Detroit Economic Club, I want to bring your attention to Axiolog Group, a Detroit company with homeland security expertise. Should your schedule permit, they would be honored to provide you or your staff with a briefing on their initiatives. For your convenience I have attached a copy of the invitation they sent directly to you.

Axiolog is a Michigan based company that is a leader in its field of cargo security. They have worked extensively on cargo security with the intention of creating a comprehensive solution that involves a partnership of public and private entities. Axiolog has approached the problem of securing cargo with the ideals of the Department of Homeland Security in mind: using all available information to pre-screen cargo to ensure the maximum amount of security, without hindering the flow of goods.

As Chairman of the House Select Committee Homeland Security's Infrastructure and Border Security Subcommittee, I had the opportunity to have Axiolog President and CEO Captain H. Salloum testify before my committee in July 23, 2003. I was pleased at the insightful testimony Mr. Salloum presented on our topic, "Best Business Practices for Securing America's Borders." I am certain that it would be a valuable experience for you to meet with Axiolog.

Thank you for your consideration in this matter.

Sincerely,

DAVE CAMP
Member of Congress

DLC:bds

THIS STATIONERY PRINTED ON RECYCLED PAPER

---



SECURE
CARGO
ANTI-TERRORISM
COALITION

## ENDORSEMENT BY FIELD AGENCIES



**Craig Yaldoo**

President & CFO
Alliance for a Safer Greater Detroit
(Members include federal, state, and local law enforcement field agencies including FBI, DEA, CIA, Customs & Border Protection)

"I am most impressed that you have developed a holistic approach for dealing with cargo security… the Axiolog (SCAC) system is an immensely important contribution, measurably enhancing our ability to protect the homeland and the economy." — **Craig Yaldoo**



**Asa Hutchinson**

Under Secretary
Department of Homeland Security



THE ALLIANCE
For a Safer Greater Detroit

Renaissance Center
200 Renaissance Center, Suite 2655
Detroit, Michigan 48243
PH: 313.567.9393 • Fax: 313.567.9323
www.michiganalliance.org

July 15, 2004

Captain H. Salloum
CEO & President
Axiolog
535 Griswold, Suite 2250
Detroit, Michigan 48226

**Re: Homeland Security, Border and Transportation Issues**

Dear Captain:

As the former Michigan drug czar, a former homicide prosecutor and the CEO of *The Alliance for a Safer Greater Detroit*, I am most impressed that you have developed a holistic approach for dealing with cargo security. We know that the United States, like every nation, is part of the world economy in which the shipment of cargo, internally and across borders, is inevitable. The task is daunting -- governments have the awesome challenge of protecting citizens and borders from terror while simultaneously facilitating the flow of legitimate trade.

After experiencing the thorough Axiolog presentation and learning from the U.S. Customs representative in attendance that roughly 30% of truckers involved in cross-border commerce are currently non-compliant with cargo security initiatives, I was motivated to recommend Axiolog to Asa Hutchinson, U.S. Department of Homeland Security Under Secretary for Borders and Transportation Security. I feel strongly that given rising threats of terrorism, the Axiolog system is an immensely important contribution, measurably enhancing our ability to protect the homeland and the economy.

I look forward to the implementation of the Axiolog system. I am thankful that you have introduced your vision for an effective and cohesive cargo shipping strategy into the global shipping industry at a time when the world needs it most.

Please do not hesitate to contact me directly at 313/567-9328 if I can be of any assistance.

Sincerely,

Craig J. Yaldoo
President & CEO



© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042



## ENDORSEMENT BY MARITIME ADMINISTRATION



**John Jamian**

Deputy Administrator
Maritime Administration

*"Obviously, positive results from a pilot project can serve as a benchmark for American port logistics and give federal policy makers a better understanding of the important role of IT in our nation's infrastructure."* — **John Jamian**



U.S. Department
of Transportation

**Maritime Administration**

Deputy Administrator     400 Seventh St., S.W.
                         Washington, D.C. 20590

October 13, 2004

Capt. H. Salloum
President & CEO
Axiolog
The Buhl Building
535 Griswold, Suite 2250
Detroit, MI 48226

Dear Capt. Salloum:

Thank you again for your excellent presentation on September 21. It is evident that Axiolog is well aware of the complexity of the various challenges facing the global logistics industry today. These challenges are most clearly present in Southern California with the current and growing freight related congestion issues surrounding the ports of Los Angeles and Long Beach. We are highly interested in helping to find a solution to this problem. The importance of these ports to our economic well being cannot be overstated. In fact, the Department of Transportation is opening an office in Long Beach to address these mounting challenges.

Our plan for the ports of Los Angeles and Long Beach is to establish a coalition of public/private stakeholders to develop a strategy that will evaluate the current situation and work towards identifying a solution. While much of the attention given to these issues today focuses on the physical infrastructure, we think that the first priority on the coalition's agenda should be to examine the efficiency and capacity of the current
infrastructure through advanced information technologies.

Therefore, we are extremely interested in your global horizontal e-logistics system and its potential application to the infrastructure and congestion problems confronting our West Coast ports. As such we will be making the recommendation that our stakeholder coalition hear a presentation of your technology and how its application could improve the current situation in Southern California.

Following the adoption of a technology program, the next logical step would be the launching of a pilot to validate the effectiveness of a global horizontal e-logistics system in meeting the challenges. Obviously, positive results from a pilot can serve as a benchmark for American port logistics nationwide and give federal policy makers a better understanding of the important role of IT in our nation's infrastructure.

Please contact me at your convenience to discuss the next steps. I look forward to hearing from you.

Sincerely,

John Jamian
Deputy Maritime Administrator



S E C U R E
C A R G O
A N T I - T E R R O R I S M
C O A L I T I O N

## ENDORSEMENT BY LEAGUE OF ARAB STATES



**Amre Moussa**

The Secretary General
League of Arab States

"I would like to express my appreciation for the efforts undertaken by your company, Axiolog (SCAC), in building a solid foundation of free trade through secure trade."
— **Amre Moussa**



**Dr. Mohamad Halaigah**

Deputy Prime Minister of Jordan

"I'm definitely glad that Jordan is at the top of the list. Having this system and having this company in Jordan is very important for us. It will help everybody, it will help the Jordanian exporters, it will help the United States Authorities be assured that the security checks have been done."
— **Dr. Mohamad Halaigah**



*League of Arab States*
*The Secretary General*

3 December 2003

Dear Mr. Salloum,

I am writing to thank you for the interest you demonstrated in pursuing business in the Arab world.

The League of Arab States is committed to the vision of an Arab Free Trade Area. During the past few years, the Arab countries have attempted to take the necessary steps required to achieve this objective. We have made some progress and we are committed to keep working on this front.

We believe that the Arab Free Trade Area would offer new and increasing opportunities in our developmental efforts. We also believe that it is in our best interest to establish stronger economic relations with our major trading partners. We are particularly interested in fostering trade relations with the US. As you well know, in cooperation with a group of active Arab-American organizations, we recently organized, in Detroit, the First US Arab Economic Forum that we hope will give a boost to the many potentials of Arab-American trade and economic cooperation.

In closing, I would like to express my appreciation for the efforts undertaken by your company, Axiolog, in building a solid foundation of free trade through secure trade. The security of trade shipments is a critical factor in ensuring an undisrupted trade flow that is necessary for economic growth and development.

Sincerely,

Amre Moussa

Mr. Houssam Salloum
Axiolog
535 Griswold - Suite 2250
Detroit, MI 48226
USA

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## ENDORSEMENT BY PROFESSOR OF ECONOMICS
## UNIVERSITY OF NORTH CAROLINA



**Dr. Nicholas Williamson**

Professor of Economics
University of North Carolina

   "I have found the Axiolog (SCAC) logistics information system,
by most standard measurements in international business presently
used, to be the most advanced system yet produced in the international
logistics industry." — **Dr. Nicholas Williamson**

Nicholas C. Williamson, PhD
8005 White Ash Court
Oak Ridge, NC  27310
336-334-4533

January 8, 2004

Captain H. Salloum, CEO
Axiolog
The Buhl Building
535 Griswold , Ste. 2250
Detroit, MI  48226

Dear Captain Salloum:

I have found the Axiolog logistics information system, by most standard measurements in international business presently used, to be the most advanced information system yet produced in the international logistics industry. A key strength lies in the shelf-to-shelf transparency of information and associated document flows. The use of the Axiolog system should permit the elimination of intermediaries with little or no consequences to the interests of shippers, and significant profit margin enhancement for participating ocean carriers. Such elimination should be permitted as Axiolog absorbs many of the functions previously performed by the intermediaries. Over 20 patents and patents pending secure the core intellectual properties of Axiolog.

The Axiolog system, when implemented, should lead to a dramatic reduction in total international logistical costs for a wide variety of shippers. Most likely estimates of these reductions are approximately 50% of current international logistical costs. The resultant reduction in associated logistical costs will lower the landed price of products in importing countries, and thus reduce by a commensurate amount the outflow of foreign exchange from importing countries.

There is acknowledged system compatibility with U. S. Governmental entities (e.g., U. S. Customs Intelligence Service). This has led to the wide acclaim of Axiolog's potential for reducing the opportunities for terrorism in international logistical activities.

If there are questions regarding the expressed or implied contents of this note to you, please do not hesitate to contact me directly.

Sincerely,



SECURE
CARGO
ANTI-TERRORISM
COALITION

# CONCLUSION AND RECOMMENDATIONS

## ACTION PLAN

The use of electronic methodologies such as GHELS will allow security officials to mitigate the significant potential threats posed by the massive volumes of domestic and international cargo shipments. The information which is readily available within the commercial logistics environment can be effectively analyzed through artificial intelligence to provide additional layers of cargo security. GHELS can provide multiple agency vertical security systems with real time global shipment activities to identify and flag suspicious shipments as early as possible.

GHELS also addresses the needs of the private market for the individual shipper as well as the supply chain for the corporate shipper. With this capability, GHELS provides a methodology to include every entity involved in the global shipping industry (land, air, and sea) into a cohesive cargo security strategy solution. This will encourage maximum private-sector involvement since GHELS will also provide clear commercial benefits as incentives to global rapid deployment.

While GHELS demonstrated enhancements to cargo security as well as improvements in customs compliance, it also demonstrated advanced traffic visibility. This capability for advance traffic visibility allows for emergency shipment rerouting in the event of ocean, port or inland service disruptions.

While the pilot project demonstrated enhancements to cargo security as well as improvements in customs compliance, the Coalition recommends an expansion in scope of a subsequent pilot to include the demonstration of operational efficiencies for the shipping participants. The ability for a system to be effective requires commercial efficiency and cargo security to be interdependent in order to gain acceptance; only a strong economic imperative will be sufficient to drive participants to provide full, accurate information. Moreover, in order for data to be available promptly, data input must be directly integrated into the shipment process, rather than remaining a separate security-related procedure – it must be an integral step in the basic commercial procedures involved with the initiation of a shipment. Similarly, the work effort required by shipment participants to meet security requirements must be minimized at the same time operational efficiencies are realized. By providing a strong efficiency impetus for full participation by shippers – the concrete realization of time and cost savings – the successful system will effectively mandate full adoption and compliance, owing to the economic necessity for shippers to maximize efficiency.

© Copyright Axiolog LLC • 535 Griswold Street : Suite 2250: Detroit • Michigan 48226 : ph: 313-962-1220 fx: 313-962-2042



SECURE
CARGO
ANTI-TERRORISM
COALITION

## NEXT STEPS

Having demonstrated GHELS ability to realize not only its stated objectives but to effectively complement the broad range of security-related initiatives either pending or already implemented, it is now necessary to provide a similar proof of concept with regards to the system's efficiency benefits. It is our objective to establish a complementary coalition of efficiency-oriented entities, a parallel of the SCAC structure, to conduct the necessary corollary pilot program to prove the GHELS system's ability to increase operational efficiencies.

There is clear, demonstrable, global demand for a working GHELS system, and our organization is optimally positioned to provide this solution. Our efforts to date have demonstrated our capability and the veracity of our proposals. If the United States is to achieve the state of true cargo security it aspires to while safeguarding its economic vitality, the time has come to complete the process of demonstrating GHELS' suitability for worldwide implementation through the efficiency-oriented multi-lane pilot project.

APPENDIX





© Copyright Axiolog LLC



Appendix B

Norther Border Pilot Overall Architecture



© Copyright Axiolog LLC



SECURE
CARGO
ANTI-TERRORISM
COALITION

Appendix C

## Roles & Participation



| DEVELOPMENT | GHELS 2.4 | GHELS 3.0 |
|---|---|---|
| Individual Shipper Portal | 40% | 100% |
| Customs Portal | 60% | 100% |
| Carrier Portal | 30% | 100% |
| Shipment Status | 30% | 100% |
| Agent Connection | 0% | 100% |
| LSP UDE Update | 30% | 100% |
| UCT Table Management | 0% | 100% |
| eKanban/DAPP | 0% | 100% |
| Quoting / Booking | 40% | 100% |
| Capacity Utilization | 0% | 100% |
| Comm / Messaging | 10% | 100% |
| Lane Management | 0% | 100% |
| Visibility (Track & Trace) | 50% | 100% |
| Check Point Notification | 0% | 100% |
| Security Risk Analysis | 50% | 100% |
| Universal Data Elements | 50% | 100% |
| Standard Documents | 40% | 100% |
| IPACD Database | 30% | 100% |
| Event Workflow | 30% | 100% |
| Business Rules | 40% | 100% |
| Event Transaction Database | 40% | 100% |
| Intelligence Query System | 50% | 100% |
| Shipment Intelligence Database | 0% | 100% |

© Copyright Axiolog LLC



CARGO SECURITY ENHANCEMENT MATRIX

# CARGO SECURITY ENHANCEMENT MATRIX

| Security Enhancements | | GHELS | U.S. Initiatives | | | | | Canadian Initiatives | |
|---|---|---|---|---|---|---|---|---|---|
| | | | C-TPAT | Fast | CSI | AMS | ACE | CSA | PIP |
| Import/Export Histories of Shipper/Warehouse | National | Yes | Yes [1] | Yes [1] | No | Yes | Yes | Yes [1] | No |
| | Global | Yes | No | No | No | No | No | No | No |
| History of the Enterprise including FF, NVOCC, Customs Brokers, Carriers, Intermediaries | National | Yes | Yes [1] | Yes [1] | No | No | Yes | Yes [1] | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Shipment Event Visibility | National | Yes | No | No | No | Yes [4] | No | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Shipment Movement Tracking | National | Yes | No | No | No | No | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| 3-D Arrival Time Comparisons (Contracted, Forecast, Actual Arrival) | National | Yes | No | No | No | No | No | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Proactive Risk Assessment and Flagging (Intelligent Targeting) | National | Yes | No | No | No | No | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Domestic Shipment Visibility | National | Yes | No | No | No | No | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Commercial Benefits for Compliance | National | Yes | Yes | No | No | No | Yes | Yes | No |
| | Global | Yes | No | No | Yes | No | Yes | No | No |
| Interagency sharing of information for risk assessment and targeting prior to arrival | National | No | No | Yes | Yes | Yes | Yes | Yes | No |
| | Global | No | No | No | No | No | No | No | No |
| Pre-arrival clearance review for truck, air, rail, and sea | National | Yes | No | Yes [3] | Yes [2] | Yes | Yes | Yes | No |
| | Global | Yes | No | No | No | No | No | No | No |

# CARGO SECURITY ENHANCEMENT MATRIX

| Security Enhancements | | GHELS | U.S. Initiatives | | | | | Canadian Initiatives | |
|---|---|---|---|---|---|---|---|---|---|
| | | | C-TPAT | Fast | CSI | AMS | ACE | CSA | PIP |
| Review of all import, export, and in-transit Customs transactions | National | Yes | No | No | No | Yes | Yes | Yes | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Indentification & expediting of low risk cargo | National | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| | Global | Yes | No | No | No | No | No | No | No |
| Timely Analysis | National | Yes | No | Yes | No | Yes | Yes | Yes | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Infrastructure for Integrated Information | National | Yes | No | No | No | Yes | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Integration with Participating Government Agencies | National | No | No | No | No | Yes | Yes | No | No |
| | Global | No | No | No | No | No | No | No | No |
| Intelligence Focus | National | Yes | No | Yes | No | Yes | Yes | Yes | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Leveraging Distributed Expertise | National | Yes | No | No | No | No | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |
| Single sign-on to Govt Integrated Systems including ACS, AES, TECS, and Targeting | National | No | No | No | No | No | Yes | No | No |
| | Global | No | No | No | No | No | No | No | No |
| Internet and EDI-based transaction receipt of Information | National | Yes | No | No | No | Yes | Yes | No | No |
| | Global | Yes | No | No | No | No | No | No | No |

1 Based on voluntary reporting in original application
2 Currently for Sea Shipping Only
3 Currently for Land Shipping Only
4 Currently for Air Only - Pre-Departure Info

# PUBLIC CONGRESSIONAL TESTIMONY

Please visit: camp.house.gov/press/pressrelease.aspx?NewsID=1117 for full document text.

# BEST BUSINESS PRACTICES FOR SECURING AMERICA'S BORDERS

# HEARING

OF THE

## SUBCOMMITTEE ON INFRASTRUCTURE

AND

## BORDER SECURITY

BEFORE THE

## SELECT COMMITTEE ON HOMELAND SECURITY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

JULY 23, 2003

## Serial No. 108–20

Printed for the use of the Select Committee on Homeland Security



Available via the World Wide Web: http://www.access.gpo.gov/congress/house

U.S. GOVERNMENT PRINTING OFFICE

98–523 PDF                WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

---

13

will feed in this data so we can have a record and a single source system that will give us the information we need to flag a suspicious shipment or suspicious enterprise.

Thank you, Mr. Chairman.

[The statement of Mr. Salloum follows:]

### PREPARED STATEMENT OF CAPTAIN HOUSSAM SALLOUM

**Introduction**

The leadership of the U.S. Department of Homeland Security in developing plans to protect our borders is to be commended. This department through the Customs & Border Protection has the extremely demanding "dual challenge of protecting our citizens and our borders from terrorists and the implements of terror, while facilitating the flow of legitimate trade."

Following September 11, 2001 multiple Homeland Security programs have been launched to protect our borders from terrorist incursions via commercial shipments. These programs include Operation Safe Commerce (OSC), The Container Security Initiative (CSI), Customs Trade Partnership Against Terrorism (C–TPAT), and the Advance Manifest System (AMS).

These initiatives have been created to address specific subsets of shipments. In essence, the flow of a shipment has been broken down by tasks. This is due to the fragmented nature of international shipping. To illustrate, a relatively simple lane from a GM Silao assembly plant in Mexico to dealerships in Jacksonville, Florida involves 19 shipping events with 11 different companies, each employing their own proprietary information management systems. In global lanes, transshipments and consolidations can significantly increase the number of events and participating organizations.

For years, the global shipping industry has been seeking new methods to integrate these participants in order to improve efficiency and boost profits. Yet, no end-to-end system to manage this industry exists today. Given this reality, the U.S. Department of Homeland Security had little choice but to concentrate enforcement efforts on specific entities. This has led to overlaps. For instance, one shipment may be impacted by five different initiatives from the Customs & Border Protection alone. Any given entity may also be impacted by multiple initiatives.



(Figure 1)

As shown above, shippers/receivers, carriers, and intermediaries are invited to join C–TPAT and FAST. While CSI is designed for ports program may impact nearly every entity involved in shipping. Likewise, under the "24-hour" rule carriers electronically file manifest information. Nevertheless, this rule affects all shipping participants, since this information is supplied by shippers and may delay delivery if it is not presented properly. Since these overlaps involve only one government agency and these programs already lead to concerns amongst shipping participants, they may wonder about the following:

• What sort of overlaps will exist once the Office of Homeland Security becomes fully operational?

• What sort of overlaps will exist when international governments and the World Customs Organization introduce their own cargo security rules?

• Why is there no coordinated, global approach to cargo security?

**Combining Efficiency and Security**

The global economy demands efficient and secure global logistics. For any security system to be embraced worldwide, it must include commercial benefits. In other words, efficiency and security must go hand in hand. Efficiency by itself may com-

14

promise security. In contrast, overarching cargo security rules and regulations could damage the economy. Therefore, a comprehensive public/private sector solution must be implemented in order to economically and effectively deal with cargo security challenges. To encourage maximum private-sector involvement, the overall solution must deliver commercial benefits.

As an illustration, consider sea ports. Ports around the world are now being squeezed by seemingly opposing forces.

- Requirements of security initiatives to provide for more inspections, and improve the security of facilities.
- Pressures from shippers and carriers to process cargo faster and more efficiently.
- Real business needs to contain costs and improve profitability.

Failing to accommodate all of these forces will lead to imbalances that may result in financial losses, delays in the processing of cargo, and/or compromised security. None of these developments is acceptable.

We assert that to effectively address cargo security whether domestically or internationally, a holistic system must be enabled that takes the entire flow of global shipments into account, from the empty container in a depot to the final receiver. Such a comprehensive approach must strive to meet two core objectives; 1) Encourage widespread private sector involvement by improving the process efficiency and profitability of all parties involved in shipment flows, and 2) Deliver cargo security improvements from the private sector that complement and reinforce official rules and regulations.

### Cargo Security Guidelines Require Global Visibility



*(Figure 2)*

Suggested cargo security guidelines include;
- To be proactive, U.S. Homeland Security agencies must collect real-time global shipping activity data and apply sophisticated artificial intelligence in order to identify and flag suspicious shipments, regardless of port or country of origin.
- When addressing U.S. national security, it is crucial to cross-check data from official sources with private sector data to test for integrity and consistency.
- U.S. national security should not depend on the integrity or capability of a single source of information or individual data sources in foreign countries.
- Limitations in technology capabilities in foreign countries should not hinder the flow of timely quality data from any foreign country.
- Despite any political or cultural differences, U.S. agencies should be able to receive reliable data from foreign countries.

### Cargo Security Initiatives Enhancement

Keeping the above guidelines in mind, let us now consider how the following three primary Customs & Border Protection initiatives can be enhanced; the Customs Trade Partnership Against Terrorism, the "24-hour" rule, and the Container Security Initiative.

### Customs Trade Partnership Against Terrorism

*C-TPAT is the Customs Trade Partnership Against Terrorism. This private/public sector partnership involves Customs inviting private companies involved in the flow of a shipment, from shipper to receiver, to help improve international supply chain security by applying "best practices" for security to their organizations.*

### Issues

C-TPAT is a good concept and the underlying ideas of voluntary "best practices" programs to improve supply chain security are reasonable. Yet, officials within homeland security have stated that mandates will be required in order to truly im-

16

- How effective is any process for identifying suspect shipments that relies on shipment manifest information self-reported by shippers?

Since freight-forwarders only charge nominal fees to submit bill of lading instructions on behalf of shippers, they can not afford to physically inspect shipments. Therefore, freight forwarders do not actually know what is in a container. The only person who actually knows what is in a container is the shipper. In essence, there are two principal issues associated with relying on shippers to provide information used to screen their own shipments.

- How can government agencies be certain of any given shipper's integrity?
- Even when a shipper is reliable, can his or her shipment still be hijacked by terrorists?

Once again, enabling EML and SML capabilities will help to confirm or deny the integrity of shippers and/or shipments on the global scale. Intelligently analyzing historical private sector shipping data concerning large and small participants involved in a shipment and surrounding real-time monitoring of shipment data will help address the issues outlined above. In addition, incorporating the systems of land, air, and/or ocean carriers will provide up-to-date information about the actual movements of the international freight of corporate and individual shippers.

### The Container Security Initiative

CSI is the Customs & Border Protection Container Security Initiative. The idea behind CSI is "pushing back the borders" to the port of origin. This plan involves stationing Customs & Border Protection inspectors in foreign ports to assist the prescreening of containers bound for the US. Initially, the top twenty mega-ports, representing "roughly 68 percent of the 5.7 million sea containers entering the U.S. annually" were invited to join CSI.

### Issues

Due to the nature of the shipping business, ships that are employed on regular service typically call on about eight ports per voyage on average. Therefore, their itineraries are not limited to mega-ports. The common risks between these ports is the vessel. A given port could invest large amounts of resources to address the security of cargo moving through that port, and yet a ship sailing from this secure port could be denied entry into a U.S. port due to suspicious containers that were loaded at smaller ports that are not part of CSI.

Additional political and economic factors have emerged that bring the present design of CSI into question. For some time, U.S. ports have been concerned that the "24-hour" rule may provide a competitive advantage for Canadian ports. This is due to the fact that shipments being unloaded in Canadian ports, ultimately bound for the U.S. via road or rail, are not subject to the "24-hour" rule. U.S. ports have legitimate concerns that cargo may be diverted from U.S. to Canadian ports as a result. Another perspective on CSI came to light in a *NY Times News Service* article *Port Security Plan Irks Europeans (11/6/02).* According to this report, "European Union officials are concerned that the program's incentives favor those ports that sign the agreements and penalize those that either refuse or are too small to take part." Likely, cargo that has been pre-screened at CSI ports will be subject to less rigorous inspection at U.S. ports than non-CSI shipments. EU officials state that "companies shipping goods to the United States will start rerouting their cargo to ports like Rotterdam, depriving others of business and potentially creating bottlenecks in some shipping regions." As if to drive home this point, 'A Dutch customs official *(stated)* the U.S. agreement was not just a way to prevent terrorist attacks. "It's good for business," she said.' The EU views European Customs agreements as European Community agreements. Therefore, "the EU is considering the possibility of beginning infringement procedures against countries that have signed on to the initiative." Even though a compromise was reached to avoid this suit, it points out how cargo security rules may have unintended consequences.

Since the common denominator regarding international ocean freight movements are ships, not ports, methods to confirm the integrity of containers aboard ships must be put into action. Incorporating vessel specific information into the EML and SML system will improve the intelligent screening of cargo at any port and terminal. When integrated into port security and customs operations, this approach will improve the targeting of cargo for scanning or inspection by customs officials. This technique will help address the competitive and operational issues associated with the present design of CSI. Significantly, this approach has been recognized by top officials within U.S. Homeland Security Departments as "ahead of the game."

### Commercial Benefits

Any commercially viable e-logistics network should be designed to standardize and simplify shipping processes for shipping participants. It should offer smart business

17

tools to enhance the reliability and dependability of logistics by bringing shippers and carriers closer together, helping organize the private shipping market, and improving logistics providers' service delivery. Increased costs of enhancing cargo security should be offset by a system that provides economic benefits. Following are key benefits such a system should deliver for members of the global shipping community.

**Carriers:**
- Unique tools for managing capacity utilization and minimizing dead space.
- Organizing the private shipping market.
- Minimizing non-value-added activities between shippers and carriers, increasing carrier and shipper ROI.
- Enhancing relationships with contracted corporate shippers via integration into global supply chain management systems.
- Compliance with new and emerging international governmental cargo security regulations.

**High-Volume Shippers:**
- Integrating Just-In-Time Inventory with JIT Shipping.
- Global Coverage and Tracking.
- Global Visibility (status, freight costs, survey).
- Global Documentation and Claim Processing.
- Automated Exception Processing.
- End-to-End Real Time Performance Monitoring.
- Compliance with new and emerging international governmental cargo security regulations.

- Low-Volume Shippers:
- Allowing shippers to evaluate and select carriers serving desired destinations, based upon individual shipment needs.
- Allowing shippers to obtain real-time rate quotes, complete bookings, and submit bills of lading online.
- Providing shippers with access to information concerning customs, insurance, financing, and warehousing, etc.
- Providing, for example, an Italian shipper moving cargo from Brazil to South Africa, with door-to-door shipment to obtain personalized service provided through the selected agent's local agent networks.
- Standardizing and expediting claims processes.
- Standardizing and expediting documentation processes.
- Delivering global coverage using multiple carriers and multiple modes of transport.
- Enabling real-time global tracking by combining GPS and/or RFID with event status reports.

**Ports:**
- Cost effective means to target suspect shipments for inspection prior to loading.
- Cost effective means to target suspect shipments entering the home country.
- Providing smart tools to help plan and maximize port capacity utilization.

Delivering commercial benefits for all participants in global logistics must be the basis of any security system. This approach will place that system in a distinctive position of helping to enhance cargo security, while improving the efficiency of private companies' global logistics networks.

**Conclusion**
The required technology should provide proactive information to multiple security agencies. Let's take as example a containers coming to the United States by ship. **Intelligence Agencies:** The system must provide intelligence to the intelligent agencies about the warehouse activities overseas. **Coast Guard:** On board ship and now six miles from the U.S. port of entry, proactive information is made available to the United States Coast Guard on the contents of the ship, and what's in the containers. The Coast Guard now knows the immediate history of the ship and its cargo. Any suspicion results in stopping the ship while it is still in international waters. **Customs:** At the ports, the US Customs agents are given all information necessary to flag suspicious shipments or enterprises. But the information flow doesn't end here. **FBI/State police / Local law enforcement:** When the freight/goods leave the port of entry for an in-country delivery or drop off, the system will automatically track each shipment. Any time the shipment deviates a signal will be sent automatically to local enforcement officers. This is necessary and now possible for domestic security.

18

In order to tackle the significant potential threats posed by the massive volumes of domestic and international cargo shipments, any solution must be commercially viable and be able to rapidly scale to handle high transaction volumes. Such a global solution must also provide methods to include every entity involved in the global shipping industry (land, air, and sea) into a cohesive cargo security strategy. To encourage maximum private-sector involvement, the overall solution must provide clear commercial benefits.

Axiolog appreciates being invited to address this committee, and looks forward to assisting your continued efforts in protecting America's borders.

## STATEMENT OF W. SCOTT GOULD, THE O'GARA COMPANY

Mr. GOULD. Mr. Chairman, thank you for inviting me here today to participate in the discussion about Best Business Practices for Securing America's Borders.

The previous witnesses and Mr. Katz have focused their remarks on specific kinds of systems and technologies that could secure our land borders and other ports of entry and prevent the entry of terrorists and weapons of mass destruction to our shores. I will focus my remarks in a different, but equally important direction, specifically on the best practices that government can utilize to ensure that it makes appropriate and beneficial investments in homeland security systemwide. These best practices are an application of portfolio investment techniques and the creation of common and open standards for technology purchased through the Federal procurement system.

Recently, my company, The O'Gara Company, published a report on these and related topics entitled "The Homeland Security Market: Corporate and Investment Strategies for the Domestic War Against Terrorism." I have copies of that for Members and staff. Key excerpts from this report can be found at the end of my written testimony. My co-author, Chris Beckner, and I would be happy to make full copies of the report available after the hearing.

Making appropriate investment decisions and allocating resources in alignment with the threats to homeland security that the country faces today are challenging issues for leaders in Congress and the administration. In the Department of Homeland Security, where it is the plan to spend large amounts of money reasonably quickly, we need a disciplined portfolio investment process which will guide the department toward a better overall outcome within its budget constraints. Such a process would require a common threat vulnerability assessment approach, a common measure of risk, a process to rank-order investments using cost-benefit analysis and resource allocation methodologies, and finally, a means to link these decisions to the budget and procurement process.

To advance this effort, we have developed a framework to help senior policy-makers think through these issues called the security portfolio investment approach. The approach borrows from analytical tools that corporations use to assess the attractiveness of investments in the private sector today.

Another approach could be developed; the point here is that one should be used to make these complex decisions. The framework is dynamic, it will require difficult judgments, but these challenges can be managed. Use of an approach like this one will help ensure that taxpayer dollars are used wisely to fight terrorism.



SECURITY INITIATIVES GRID

The following list outlines the global security requirements for current / pending legislation and related security initiatives and indicates GHELS's compliance.  Companies can avoid the cost of developing their own compliance system by adobtaing GHELS where new requirements are automatically updated.

| PROGRAM | REQUIREMENTS | COMMENTS | GHELS MEETS REQUIREMENTS |
|---------|--------------|----------|--------------------------|
| **U.S. INITIATIVES** | | | |
| **1** Maritime Transportation Antiterrorism Act of 2002 (S.1214) (U.S.) - Passed into Law 11/25/02 | Vessel / Facility Anti-Terrorism Plans | Ships and port facilities are required to submit anti-terrorism security plans to the U.S. Coast Guard. | GHELS supports security planning by delivering history information regarding  in-bound shipments and of all participants in the chain of custody.  Security risk analyses run against this data strengthens vessel and facility anti-terrorism efforts. |
| | Port Vulnerability Assessments | The vulnerability assessment is an audit of  the current state of the ports security infrastructure and is used to support the anti-terrorism plans for the port. | GHELS provides the transparency of these shipments so that risk assessments may be executed and «safe» cargo cleared.   Unauthorized entry into port facilities is prevented while maintaining the velocity of cargo movement with the complete visibility of all shipments bound for the port via land and sea. |
| | Transportation Security Cards | Transportation security cards are intended to register and identify every worker who enters the port facility. | GHELS provides the flexibility to convey transportation security card data electronically to any appropriate agency. |
| | Passenger and Crew Manifest | | Because GHELS is integrated into carrier systems, passenger and crew manifest data is captured and can be used to evaluate against history data for discrepancies, mistakes, or fraud. |
| **2** Intermodal Shipping Container Security Act of 2004 (S.2297) (U.S.) - Submitted and read 4/7/2004 | Strategic planning for integration of security for all modes of intermodal transportation for arriving, departing, or moving interstate in the U.S. | | GHELS enables the integration of international security processes with domestic ones with the management of end-to-end freight delivery. |
| | Increasing the number of containers physically inspected within the U.S. | | GHELS helps improve the targeting of high-risk shipments.  The result is an increase in the percentage of high-risk shipments that are inspected without necessarily increasing the number of containers inspected. |
| | Implementation strategy mandating use of smart seals or containers | Smart seals and containers fail to take into account pertinent shipment details such as the complete history of the shipment and all of the participants. | Used in conjunction with the GHELS Global Horizontal e-Logistics System, smart seals and containers combine real-time intrusion detection and global positioning with a wealth of information regarding who loaded the container, who touched it in route, and where it's going.  GHELS uses this information to elevate the security and efficiency across the entire chain of custody of a shipment. |
| | Standards for global tracking and the assessment of the integrity of containers | U.S. standards for container tracking must be compatible with international standards to assure the visibility of the containers across all modes of transport and all points of origin. | GHELS supports international standards while adapting to local requirements to provide a comprehensive solution. |

| PROGRAM | REQUIREMENTS | COMMENTS | | GHELS MEETS REQUIREMENTS |
|---|---|---|---|---|
| **U.S. INITIATIVES** | | | | |
| **3** **CSI (U.S.)** | Target largest foreign seaports with container traffic to the U.S. | Developing countries cannot be left out of global commerce initiatives. | ✔ | GHELS is accessible from every port without prohibitively expensive technology while preserving existing technology investments.. |
| | Prescreen container shipments at the port of origin in advance of loading onto ship | Containers pose a security risk before arriving at ports.  Pre-screening must start with empty containers and be followed up with tracking of the stuffing, transport, and load of the containers through to final delivery. | ✔ | GHELS's shipment definition, quoting, booking, and tracking processes links the empty container to the shipment, the carriers, the ports, and the destination to provide essential detailed information about every aspect of the shipment. |
| | Use non-intrusive inspection (NII) and radiation detection systems to scan containers | | ✔ | The advance knowledge of the shipment prior to arrival at the port gate that is provided by GHELS enables the expediting of low risk shipments and optimized use of scanning technologies. |
| | Provide U.S. officials with legal authority to collect data on shipments at the foreign ports | | ✔ | Shippers, carriers, and other participants provide data to GHELS, voluntarily improving efficiency and facilitate security processing at all checkpoints.  U.S. and other international security entities are authorized to access this information. |
| **4** **24-Hour Rule (U.S.)** | Advance, automated submission of cargo manifest information to the U.S. government is mandatory. Sea cargo manifests must be submitted 24-hours in advance of loading (active rule) Rail, air, and road requirements will require timeframes ranging from 4 hours to 1/2 hour (not yet activated) | Manifests are notoriously unreliable formats for depicting shipment contents. In addition, the reliance of security scans at the port of departure ignores essential data regarding the point of origin and the activities prior to that port. | ✔ | GHELS automatically delivers all of the data required by U.S. and international automated manifest programs; plus additional data regarding shipment and participant histories to assure the easiest possible review and release of cargo.  This information can be embedded into an encrypted 2D barcode seal to enhance shipment targeting, tracking and visibility. |
| | Additional rules are being implemented by the U.S. for rail, air, and truck | AMS rules creates a burden of compliance for the carriers. | ✔ | GHELS is a private sector initiative that allows for the development of international standards for a cost effective entry and submission of the data that meets any requirements. |
| | Automated targeting systems will assess shipments for risk | | ✔ | Targeting and inspection capability is enhanced with GHELS through the transparency of enterprise data regarding shippers, carriers, and all participant histories, and shipping data including activity reporting, arrival times and suspected information gaps. |
| **5** **C-TPAT (U.S.)** | Voluntary program supporting security initiatives | | ✔ | GHELS provides cross-check capability from multiple sources so that risks may be properly assessed. |
| | Development of a "trusted shipper" database | | ✔ | GHELS provides a global "trusted shipper" database that transcends nation-specific initiatives. |
| | Validation process to identify and support "best practices" in cargo security. | | ✔ | GHELS incorporates international "best practices" into all facets of its development and implementation. |

| | PROGRAM | REQUIREMENTS | COMMENTS | GHELS MEETS REQUIREMENTS |
|---|---|---|---|---|
| **U.S. INITIATIVES** | | | | |
| 6 | **Advance Cargo Information (exports) (U.S.)** | Application of automated manifest processes to U.S. exports via sea, air, rail and road using the existing AES system | Exporters and export carriers are required to submit manifest data electronically within the following time frames:<br>- Air:  No later than 2 hrs prior to scheduled flight departure<br>- Rail:  4 hrs prior to connecting to a locomotive<br>- Truck: 1 hr prior to arrival at the border<br>- Ocean:  24 hrs prior to departure | ✔ | GHELS provides AES and AMS capability to simplify the customs reporting process.  Data fields on all customs submission forms are populated from existing data. |
| 7 | **FDA Regulations (U.S.)** | Advance notification to FDA for food "imported or offered for import" into the U.S. | The FDA requires that food importers must submit a "prior notice" (PN) electronically before arrival at the border via the automated broker interface or the prior notice system interface. | ✔ | GHELS adapts to these requirements, and those of other countries, without placing the burden of compliance on the shippers and carriers. |
| | | Includes food products being unloaded at U.S. ports for transshipment to another vessel for transport to a foreign country and for food products moving in-bond for export and consumption in another country | Difficulties in implementation stem from the lack of comprehensive global data regarding the shipment and the associated logistics enterprises. | ✔ | GHELS consolidates from the entire chain of custody to deliver both security and efficiency in logistics operations.  Transshipment information, including that which is bound for a foreign country, is easily extracted for automated submission to federal authorities. |
| | | Requires scanning & electronic reporting technologies | Many technologies and information systems are not generally available to developing countries.  These countries cannot be left out of global commerce initiatives. | ✔ | GHELS is a global solution that is accessible from every port without the need prohibitive technology. |
| 8 | **Operation Safe Commerce (U.S.)** | Identification and testing of new security technologies | Technologies, by themselves, cannot be a solution. | ✔ | GHELS is a holistic solution that utilizes multiple point technologies to identify, track, and target high-risk shipments while delivering operational efficiencies. |
| | | Standards for electronic seals and smart containers | U.S. standards will apply only to the U.S. and those countries in the international community that choose to adopt them.  Different standards for seals and containers will be inevitable. | ✔ | GHELS provides the environment where different standards can be addressed.  AxioSeal, the low-cost 2D barcode seal made by GHELS, is an option that replaces or compliments the capability of current electronic seals. |
| 9 | **Electronic Filing of Crew Information (U.S.)** | INS rules that are consistent with Coast Guard Notice of Arrival (NOAs) requirements | | ✔ | Crew data will be tracked with GHELS along with existing histories in the same way that other logistics resources (i.e. equipment) are tracked. |

| | PROGRAM | REQUIREMENTS | COMMENTS | | GHELS MEETS REQUIREMENTS |
|---|---|---|---|---|---|
| | **U.S. INITIATIVES** | | | | |
| 10 | **Transportation Worker Identification Card (U.S.)** | TSA system of background checks and ID cards for transport workers in the U.S. | | | GHELS is customizable to meet the requirements of any number of security initiatives.  Transport workers and crew members are linked to their conveyances and are tracked globally. |
| 11 | **Crew List Visas (U.S.)** | Biometric seafarer identification document will contain all of the data required for the processing of a U.S. visa | | ✔ | GHELS is customizable to meet the requirements of any number of security initiatives.  Transport workers and crew members are linked to their conveyances and are tracked globally. |
| 12 | **FAST program (U.S., CA, MEX)** | Voluntary program supporting security initiatives | | ✔ | GHELS provides data from multiple sources that can be used to cross-check official documents so that risks may be properly assessed. |
| | **PROGRAM** | **REQUIREMENTS** | **COMMENTS** | | **GHELS MEETS REQUIREMENTS** |
| | **INTERNATIONAL INITIATIVES** | | | | |
| 13 | **WCO Advance Cargo Information Guidelines (International)** | ID of key data elements for pre-screening of consignments before shipment | | ✔ | GHELS collects and manages data elements that exceed all nation-specific requirements.  All of the U.S., WCO, and other required data element requirements are met within a single system. |
| | | Urging of customs administrations to participate in "cargo communities" to receive electronic data | | ✔ | GHELS is the only global horizontal cargo system that can manage the fragmented cargo industry while delivering efficiency to participants across multiple shipping enterprises. |
| | | Commitment from customs agencies to apply preferential treatment to "secure authorized economic operators" with authorized trader status | | ✔ | GHELS is committed to providing customs agencies with the data they need to review and clear shipments at their borders.  GHELS assists customs agencies by delivering shipment details including estimated times of arrival, conveyance details, crew lists, and participant histories. |
| | | Specific implementation practices are left up to individual countries | Multiple-standard implementation practices create complexity and compliance problems throughout the logistics industry. | ✔ | GHELS reduces these difficulties by centralizing the data requirements of every nation and producing nation-specific documents and processes built with existing data. |

| PROGRAM | REQUIREMENTS | COMMENTS | GHELS MEETS REQUIREMENTS |
|---|---|---|---|
| INTERNATIONAL INITIATIVES | | | |

| | | REQUIREMENTS | COMMENTS | ✓ | GHELS MEETS REQUIREMENTS |
|---|---|---|---|---|---|
| 14 | ISPS Code (IMO) & Maritime Transportation Security Act (International) | Automatic Identification Systems (AIS) for ships | | ✔ | The GHELS Global Horizontal e-Logistics System manages the data from ship AIS systems and integrates it with cargo management systems. After reading the AIS data from a ship, authorized officials can match it up with knowledge of what's on board, who's on board, where has it been, where is it going, and compare this data against their official records for validity. |
| | | Continuous Synopsis Record (CSR) onboard showing vessel history | | ✔ | GHELS's GPS tracking enables a cross-referencing of events against multiple sources of live data. GHELS's data, evaluated against official records, will provide not only the visibility of the ship, but a view of all of the shipments and their histories. |
| | | International Ship Security Certificates (ISSC) will be required for ships to participate in trade | | ✔ | GHELS includes the ISSC's in its carrier records, making the compliance status transparent to shippers and logistics service providers. As a result, carrier customers can view the certificates to guarantee the booking of approved carriers for their cargo. In addition, GHELS links these security certificates with compliance certificates for other security initiatives on a global basis. |
| | | Port Facility Security Plans are required | In addition to premises security and access controls, the facility security plans must focus on the identification of potential risks before cargo arrives. | ✔ | GHELS enhances the visibility of shipments bound for the port from the time that the shipments are booked through their arrival. Security risks can then be assessed and acted upon prior to their arrival at the port. |
| | | A "white list" of ports meeting security requirements will be published by IMO | | ✔ | GHELS includes the approved ports list as one part of the selection criteria of ports. Shippers, and others, can review the compliance status of the ports and carriers before booking their shipments. |
| | | Ships docking at ports not on the white list may be denied entry to others | | ✔ | GHELS checks ship itineraries for compliance with security initiatives before preparing a booking to maximize the potential of secure trade. |
| | | Three levels of security alerts | | ✔ | GHELS allows risk assessment rule sets to be configured using multiple risk level criteria. The built-in flexibility can accommodate any number of security alert scenarios. |
| 15 | ILO Seafarer ID Card (International) | International Labor Organization program for a universal biometric seafarer ID card | | ✔ | GHELS is customizable to meet the requirements of any number of security initiatives. Transport workers and crew members are linked to their conveyances and are tracked globally. |
| | | Electronic access is to be available | | ✔ | GHELS is customizable to meet the requirements of any number of security initiatives. Transport workers and crew members are linked to their conveyances and are tracked globally. |

| PROGRAM | REQUIREMENTS | COMMENTS | GHELS MEETS REQUIREMENTS |
|---|---|---|---|
| **INTERNATIONAL INITIATIVES** | | | |
| 16 **EU Electronic Customs (E.U.)** | Criteria to be an "Authorized Trader" | Authorized traders are still subject to random security checks at international borders. | ✔ GHELS provides a global "known shipper" database that transcends nation-specific initiatives. Without this centralized database, trading companies will have to be 'recognized' in multiple known shipper databases. GHELS's Global Horizontal e-Logistics System manages the requirements and certifications for known-shipper compliance world-wide. |
| | Single European Authority (SEA) to operate as a single business operating throughout the EU | While SEA enables companies to work across the EU, border security is still required. | ✔ GHELS provides border control agencies with the data necessary to ensure security while enabling the flow of goods globally. |
| | Pre-release of shipments | | ✔ With GHELS, the pre-release of shipments extends beyond the voluntary compliance with security initiatives. All shipment details and the global histories of all shipping participants become transparent to the authorities. Low-risk shipments and trusted shipper enterprises are identified and can be tagged for release. |
| | Single Automated Access Point | | ✔ GHELS effectively enables single points of access, release, and clearance. All information regarding the shipment, its movement, etc. is visible, facilitating the consolidation of data for access from any location |
| | Single Point of Release | | |
| | Single Point of Clearance | | |
| | Goal is implementation of a common electronic customs system for the EU | Standards for a common electronic customs system in the EU will take some time to be established. In the meantime, cargo and border security cannot be compromised. | ✔ GHELS provides a common platform for the distribution of shipping and logistics data. Each government has access to the data they need to clear shipments and improve security while maximizing their operational efficiency. |
| 17 **"Advance Commercial Information (ACI) Initiative (Canada)"** | 24-hour rule for Canada | | ✔ GHELS automatically delivers all of the data required by Canadian security programs plus additional data regarding shipment and participant histories to assure the easiest possible review and release of cargo. Participation in the global cargo management system facilitates the simultaneous security compliance across multiple international initiatives. |
| | Can include FF's to protect sensitive info from carriers or agents | | ✔ Freight forwarders are enabled within GHELS to utilize global AMS tools to submit data to the required agencies. |
| | Permits 3rd party service providers to transmit cargo and vessel data | | ✔ 3PL's are enabled within GHELS to utilize global AMS tools to submit data to the required agencies. |
| | Empty container info must be transmitted 96-hours prior to arrival | | ✔ Data submission rules are easily addressed within GHELS without placing a significant burden on the carrier or shipper. |

| | PROGRAM | REQUIREMENTS | COMMENTS | | GHELS MEETS REQUIREMENTS |
|---|---|---|---|---|---|
| | INTERNATIONAL INITIATIVES | | | | |
| 18 | "Automated Customs Data System for Advance Information" (Australia) | Automatic targeting of high risk shipments | | ✔ | GHELS enables targeting strategies for specific countries to support and enhance data gathering from the commercial sector. |
| 19 | Fiji | Considering 48-hour advance electronic manifest | | ✔ | After the rule requirements have been finalized, GHELS will provide an easy interface to produce the advance electronic manifest. |
| 20 | Hong Kong | Advance cargo data voluntary | | ✔ | GHELS simplifies the process of constructing and transmitting an advance cargo data packets.  Even though the program is voluntary, the easy production of electronic manifest data facilitates a high rate of compliance. |
| 21 | Japan | Pre-Arrival examination system | | ✔ | Pre-arrival examinations are optimized with GHELS and its capability to support intelligent targeting systems allowing a focus on higher risk containers. |

# EXHIBIT B

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Magassa v. Wolf, W.D.Wash., September 16, 2020
2015 WL 4394958
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Gulet MOHAMED, Plaintiff,

v.

Eric H. HOLDER, Jr., et al., Defendants.

Civil Action No. 1:11–cv–50 (AJT/MSN).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Gadeir Ibrahim Abbas, The Law Office of Gadeir Abbas,
Washington, DC, for Plaintiff.

Lauren A. Wetzler, R. Joseph Sher, United States Attorney's
Office, Alexandria, VA, for Defendant.

*MEMORANDUM OPINION*

ANTHONY J. TRENGA, District Judge.

**\*1** Plaintiff Gulet Mohamed (Plaintiff or "Mohamed") has
challenged his alleged placement on the No Fly List. The
No Fly List is a list of persons who are precluded from
flying on commercial aircraft because they are suspected
terrorists. Compiled by the Terrorism Screening Center (TSC)
and enforced against travelers by the Transportation Security
Administration (TSA) through commercial airlines, the No
Fly List is intended to ensure aircraft safety as well as to
restrict the ability of suspected terrorists to move freely in
furtherance of terrorist activities, within the United States and
internationally. Mohamed is an American citizen who was
denied boarding on an international flight by an American
carrier. He has not been convicted of, charged with or alleged
to have committed a criminal offense related to terrorism or
otherwise; and when applied to such an American citizen,
the No Fly List represents, as the United States concedes, an
unprecedented application of Executive branch authority in
the name of national security through secret administrative
proceedings based on undisclosed information according to
undisclosed criteria.

This litigation centrally concerns what information must
be made available to an American citizen in order to
provide a constitutionally adequate opportunity to challenge
a placement on the No Fly List. That constitutional inquiry
presents unsettled issues that are complicated in their
resolution by the criteria used to compile the No Fly List
and the classified information that, of necessity, is used to
determine whether a person satisfies that criteria.

Presently pending are the parties' cross-motions for summary
judgment with respect to Mohamed's claim in Count 3 of his
Fourth Amended Complaint that he was denied a meaningful
opportunity to challenge his inability to fly on commercial
aircraft, in violation of his Fifth Amendment procedural due
process rights.[1] Specifically, Mohamed claims that he has not
been provided notice of his placement on the No Fly List,
either before or after he was denied boarding, or a meaningful
opportunity to refute any derogatory information that was
used to place him on the No Fly List. He claims, in effect, that
he has been denied the opportunity to establish that he poses
no threat to commercial aviation. He further claims that as
result of these constitutional violations, he has been denied his
liberty interests in (1) traveling by air, (2) being able to return
to the United States after travelling abroad; and (3) being
free from false governmental stigmatization as a terrorist. *See*
Fourth Amended Complaint, Doc. No. 85, ¶ 64.

In their summary judgment motion, defendants claim that
the Department of Homeland Security's Traveler Redress
Inquiry Program (DHS TRIP), the review process by which
a person denied boarding may request a review of his status,
was constitutionally adequate, any constitutional infirmities
with that process have been cured through revised review
procedures, and Mohamed's procedural due process claims
are therefore moot. They also contend in the alternative
that should the Court not grant summary judgment in their
favor, Mohamed's procedural due process claims should
nevertheless be dismissed on the basis of the state secrets
privilege. Doc. No. 159.

**\*2** For the reasons stated herein, the defendants' Motion
for Partial Summary Judgment is DENIED and Plaintiff's
Motion for Partial Summary Judgment as to Count 3 is
GRANTED in part and DENIED in part. Briefly summarized,
the Court first concludes that DHS TRIP, as that process
existed at the time that Mohamed was denied boarding,
did not provide a constitutionally adequate opportunity to
challenge his denial of boarding. Second, after a review of

Mohamed v. Holder, Not Reported in F.Supp.3d (2015)

documents and information submitted by the defendants *in camera* and *ex parte,* the Court concludes that there is no information protected from disclosure under the state secrets privilege that is necessary either for Mohamed to establish liability under his procedural due process claims or for the defendants to establish an available defense to that claim. Third, based on the current record, the Court cannot conclude as a matter of law whether the revised DHS TRIP process now available to Mohamed is constitutionally adequate.

The Court further concludes that the constitutional adequacy of the revised DHS TRIP cannot be made until after Mohamed requests a review of his status under that revised process, the TSC and TSA respond, and an administrative record is compiled that allows a reviewing court to assess, to the extent it deems appropriate: (1) whether Mohamed has received notice that he is, in fact, on the No Fly List; (2) if on the No Fly List, the level of factual detail provided to Mohamed concerning the reasons for his inclusion on the No Fly List, including whether he has been provided the specific criteria relied on and the specific factual findings used to satisfy that specific criteria; (3) whether the factual information provided allow a reasonable opportunity to rebut any derogatory information used for his placement on the No Fly List; (4) what factual information was withheld from Mohamed concerning the reasons for his inclusion, the reasons for withholding that information and whether additional material information could have been provided, either directly or through alternative means, such as summaries or redacted documents; (5) what information Mohamed provided or had an opportunity to provide, and in what form, including whether he appropriately responded to any specific requests for information; and (6) whether Mohamed's status is at the appropriate level of security restrictions for the level of threat sufficiently established by that administrative record.

**I. Background**

The factual and procedural history of this case are set forth in detail in this Court's January 22, 2014 Memorandum Opinion. *See Mohamed v. Holder,* 995 F.Supp.2d 520, 522–27 (E.D.Va.2014).

Briefly summarized, Mohamed is a U.S. citizen of Somali descent, who alleges that in 2009, at the age of 16, he temporarily left the United States to travel to Yemen, Somalia and Kuwait in order to meet family, study Arabic and attend school. Beginning on December 20, 2010, Kuwait authorities

detained him at a deportation facility, during which time he alleges he was interrogated, beaten and tortured. FBI agents visited him twice at the deportation facility, once on December 28, 2010 and again on January 12, 2011. On January 16, 2011, Mohamed's family purchased a ticket for him to return to the United States at the suggestion of Kuwaiti officials, who delivered the ticket to Mohamed and transported him to the airport, where he was denied boarding. On January 18, 2011, Mohamed filed this action against the defendants, which include the heads of the Department of Justice (DOJ), Federal Bureau of Investigation (FBI), Terrorist Screening Center (TSC), Department of Homeland Security (DHS), and the Transportation Security Administration (TSA) (hereafter "the defendants"), seeking, *inter alia,* emergency relief to return to the United States. Doc. No. 1. On January 20, 2011, the defendants advised the Court that arrangements had been made for Mohamed to return to the United States. Mohamed returned to the United States via commercial airliner on January 21, 2011.

**\*3** The process for inclusion on the No Fly List has also been discussed in previous opinions.[2] *See Mohamed v. Holder,* No. 1:11–CV–50 AJT/TRJ, 2011 WL 3820711, at \*10 (E.D.Va. Aug. 26, 2011); *Mohamed v. Holder,* 995 F.Supp.2d 520, 525–27 (E.D.Va.2014). Briefly summarized, the Terrorist Screening Center ("TSC") is responsible for maintaining the Terrorist Screening Database (TSDB), of which the No Fly List is a subset. The standard for inclusion in the TSDB is "reasonable suspicion to establish that the individual is a known or suspected terrorist." Doc. No. 158–1, Grigg Decl. at ¶ 15. The defendants have alternatively phrased this standard as "known or appropriately suspected to be or to have engaged in conduct constituting, in preparation for, in aid of, or related to terrorism." Doc. No. 158–2, Declaration of Michael Steinbach, Assistant Director of FBI Counterterrorism Division, at ¶ 12. *See* HSPD–6. Certain government agencies may nominate individuals to be included on the TSDB. Nominations must be supported by sufficient identifying information as well as substantive criteria, also known as "derogatory information."

To be included on the No Fly List subset, there must be a reasonable suspicion that the individual meets additional, heightened derogatory criteria beyond that required for inclusion in the TSDB, namely, reasonable suspicion that the individual is a known or suspected terrorist based on meeting one of the following criteria:

The individual poses a threat of (1) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft; (2) committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; (3) committing an act of international terrorism (as defined in 18 U .S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations, U.S. ships, U.S aircraft, or other auxiliary craft owned or leased by the U.S. Government; or (4) engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Doc. No. 158–1, Declaration of G. Clayton Grigg, Deputy Director for Operations of TSC, at ¶ 18. The reasonable suspicion must be supported by "articulable" intelligence and must be based on the "totality of circumstances" and intelligence reviewed.

Over the course of the litigation, defendants have filed several motions to dismiss this action in its entirety on a variety of grounds. See Doc. Nos. 10, 22, 58 (challenging Mohamed's standing to bring the action, the Court's jurisdiction over the action, and the legal sufficiency of Mohamed's allegations). With respect to jurisdiction, by Order dated August 26, 2011, the Court dismissed certain claims and transferred others to the Fourth Circuit Court of Appeals on the grounds that the Fourth Circuit Court of Appeals had exclusive jurisdiction pursuant to 49 U.S.C. § 49110(a). See Mohamed v. Holder, No. 1:11–CV–50 AJT/TRJ, 2011 WL 3820711, at *10 (E.D.Va. Aug. 26, 2011). On May 28, 2013, the Fourth Circuit concluded that its exclusive jurisdiction pursuant to 49 U.S.C. § 49110 did not extend to claims and remedies against TSC and remanded the case for further proceedings. Doc. No. 45.[3] On January 22, 2014, following that remand, the Court held that Mohamed had standing to bring his remanded claims and that his remanded claims were ripe for review, despite Mohamed's failure to request review of his status under the DHS TRIP. It also granted the defendants' motion to dismiss Mohamed's claim, asserted in Count 1, that he was prevented from re-entering the United States in January 2011 in violation of his constitutional right of return to the United States. It denied the motion to dismiss any remaining substantive due process claims in Count 1, his Administrative Procedure Act claim in Count 2, and his procedural due process claims in Count 3. 995 F.Supp.2d. at 539.

*4 On May 28, 2014, the defendants filed a motion to dismiss the case in its entirety based on their invocation of the state secrets privilege. See Doc. Nos. 104–105. On September 15, 2014, after reviewing the declarations of certain high level officials from the TSC, as well as the Attorney General, the Court ordered the defendants to submit for ex parte, in camera review those documents pertaining to the due process claims that they considered covered by the state secrets privilege and law enforcement privilege. Doc. No. 139. The defendants complied and on October 30, 2014, after reviewing those documents in camera, the Court concluded that those documents were not "so related to [Mohamed]'s procedural due process claims as to prevent either the plaintiff or the defendant from presenting or defending against those claims without the use of any of [those] documents." The Court therefore denied the defendants' motion to dismiss Mohamed's procedural due process claims based on defendants' invocation of the state secrets privilege. Doc. No. 144. The Court specifically advised, however, that "to the extent that the defendants contend during the actual adjudication of these claims, within the context of either summary judgment or any evidentiary hearing, that it cannot adequately defend against such claims without the use of a specific document claimed to be protected under the state secrets privilege, the Court will consider that claim in that specific context." Id.

On December 9, 2014, cross-motions for summary judgment were filed as to Mohamed's procedural due process claim. Doc. Nos. 158, 161. In their motion for summary judgment, defendants again invoked the state secrets privilege to dismiss the procedural due process claim as an alternative grounds for their summary judgment motion. On January 30, 2015, the Court heard oral argument on those cross-motions for summary judgment. Following that hearing, it scheduled an ex parte, in camera closed hearing "to provide the defendants with the opportunity to provide and the Court to consider additional information concerning the defendants' claims concerning the existence of state secrets and their relevance to the pending procedural due process claims." Doc. No. 173. The Court also identified in that Order specific issues to be discussed in that closed hearing, which the Court held on March 17, 2015. See Id. at p. 2–3.[4]

### I. Legal Standard

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc .,* 478 F.3d 640, 642 (4th Cir.2007). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 247–48. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## III. Analysis

### A. The Procedural Due Process Claim (Count 3):

**\*5** In *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976), the Supreme Court outlined the applicable analysis for procedural due process claims as follows:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See also Hamdi v. Rumsfeld,* 542 U.S. 507, 529 (2004) ("The *Mathews* calculus [ ] contemplates a judicious balancing of these concerns, through an analysis of the risk of an erroneous deprivation of the private interest if the process were reduced and the probable value, if any, of additional or substitute procedural safeguards.") (internal citations omitted).

For the purposes of the *Mathews* constitutional analysis, the Court concludes that Mohamed's liberty interests implicated by any placement on the No Fly List are strong and the government's interest in protecting the safety of commercial aircraft is compelling. The Court also concludes that the administrative process used to place a person on the No Fly List has an inherent, substantial risk of erroneous deprivation, particularly with respect to a total exclusion through the No Fly List as opposed to heightened security screening through the Selectee List; and that additional procedures, other than those under DHS TRIP, as originally structured, would reduce the risk of erroneous placement on the No Fly List.[5]

The Court previously wrote at length concerning the nature of these competing interests within the context of defendants' motion to dismiss Plaintiff's procedural due process claim. *See Mohamed v. Holder,* 995 F.Supp.2d at 527–533, which is incorporated herein by reference. The District Court in *Latif v. Holder,* 28 F.Supp.3d 1134 (D. Oregon 2014) has also analyzed the constitutional adequacy of the DHS TRIP process, as it existed at the time Mohamed was denied boarding and filed this lawsuit. The Court adopts that analysis and can only marginally add to it with respect to the following issues that remain relevant to an assessment of the revised DHS TRIP.

### 1. Plaintiff's claimed travel related rights:

Central to the *Mathews* analysis in this case is the parties' dispute over the nature of the travel related liberty issues at stake. Mohamed refers to his right to travel as a "bundle of rights" that includes his right to "exit and return to the United States." Doc. No. 161 at p. 8. Mohamed asserts that the No Fly List has had the practical effect of preventing international travel. Defendants characterize Mohamed's liberty interest in international travel as "weak" and therefore subject to reasonable government regulation and subordinate to national security concerns. They distinguish international travel from the fundamental right to interstate travel, as recognized in *Saenz v. Roe,* 526 U.S. 489, 498 (1999) ("the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence."). They point to decisions that have recognized that a traveler does not have a constitutional right to "the most convenient mode of travel." *See, e.g., Gilmore v. Gonzalez,* 435 F.3d 1125, 1137 (9th Cir.2006) (plaintiff "does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him."); *Town of Southold v. Town of East Hampton,* 477 F.3d 38, 54

(2d Cir.2007) ("travelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right"); *Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir.1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.").

**\*6** The general right of free movement is a long recognized, fundamental liberty. *See Kent v. Dulles,* 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment"); *Zemel v. Rusk,* 381 U.S. 1, 15 (1965). *See also Kerry v. Din,* 135 S.Ct. 2128, 2133 (2015) (plurality opinion, Scalia, J) (referencing Blackstone's recognition that "the "personal liberty of individuals" protected under the Magna Carta "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint.").

Mohamed also has a protected liberty interest in traveling internationally. "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic to our scheme of values." *Kent v. Dulles, supra,* 357 U.S. at 126. It must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel or a right without any correlative rights with respect to the usual and available means in a modem society. To the extent courts have discussed the lack of rights with respect to the "the most convenient mode" of transportation, they have done so, not within the context of a total ban, but with respect to reasonable regulations that still facilitated access and use. *See, e.g. Gilmore, supra,* 435 F.3d at 1137. Given the wide ranging impact on a person, previously discussed in this case, *see* 995 F.Supp.2d at 528, the rights implicated by Mohamed's presumed placement on the No Fly List are strong and deserving of strong protections against unnecessary governmental restrictions.

2. Plaintiff's Reputational Interests:
Coupled with Mohamed's travel related rights are his reputational interests and his claims of reputational harm. A person has certain rights with respect to governmental action that alters or extinguishes a right or status previously recognized by state law, known as a "stigma-plus." *Paul v. Davis,* 424 U.S. 693, 711 (1976). *See Evans v. Chalmers,*

703 F.3d 636, 654 (4th Cir.2012) ( "[A] plaintiff bringing a "stigma-plus" claim under *Paul* must allege both a stigmatic statement and a "state action that 'distinctly altered or extinguished' " his legal status."). The Court previously discussed "the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public." 995 F.Supp.2d at 529.

The Court has previously ruled that a person's listing on the No Fly List, in itself, does not infringe any protected liberty interest. *See Id.* at 528. There is also a substantial question whether the dissemination of the No Fly List within or among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a stigma-plus claim.[6] *See Johnson v. Martin,* 943 F.2d 15, 17 (7th Cir.1991) (Intra- and inter-governmental communications are not public statements for the purposes of showing stigmatization); *Tarhuni v. Holder,* 8 F.Supp.3d 1253, 1275 (D.Or.2014). Nevertheless, a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person. For example, any member of the general public who would actually witness a person being excluded from boarding might draw an adverse inference concerning that person's reputation. More likely to inflict reputational harm are other scenarios not hard to imagine where a person's inability to fly would become known to those outside of government and have adverse consequences, such as to a person's actual or prospective employer who would call upon that person to travel by air, or to extended family members whom a person might not be able to visit except through air travel, or to members of religious, professional or social organizations in which participation might require air travel. Thus, while Mohamed's constitutionally protected reputational interests are not as strong as his travel related interests, and both are subject to appropriate restrictions,[7] they underscore the need overall for strong procedural protections for Mohamed's travel related rights.

3. Pre-deprivation notice or judicial review.
**\*7** Mohamed argues that the nature of the defendants' procedures will necessarily lead to mistaken determinations and erroneous placements on the No Fly List and that additional procedures would reduce that risk, without impairing legitimate governmental interests, even where there are national security concerns, reflecting the sentiments expressed in such cases as *Hamdi v. Rumsfeld,* 542 U.S. at 528

(holding unconstitutional the government procedures used to determine whether an American citizen may be detained as an "enemy combatant" since they did not sufficiently provide notice of the facts for that classification and an opportunity to rebut those factual assertions before a neutral decision maker); *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring) ("Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it"); *Hernandez v. Cremer,* 913 F.2d 230, 238 (5th Cir.1990) ("The extremely broad discretion delegated to the [government] concerning control over our nation's borders and the lack of any written guidelines regarding the exercise of that discretion render the decision-making process virtually standardless."); *Gete v. I.N.S.,* 121 F.3d 1285, 1297 (9th Cir.1997) ("without knowing the exact reasons ... as well as the particular statutory provisions and regulations they are accused of having violated, they may not be able to clear up simple misunderstandings or rebut erroneous inferences drawn by [the government]"); *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). More specifically, Mohamed contends that under Fourth Circuit law some predeprivation process is required, relying on *Sciolino v. City of Newport News,* 480 F.3d 642, 652 (4th Cir.2007), where the court ruled that a post-deprivation hearing is not sufficiently "meaningful" to allow a dismissed public employee to clear his name. *See also Rusu v. INS,* 296 F.3d 316, 321 (4th Cir.2002) (asylum petitioners must be afforded an opportunity to be heard); *Perry v. Norfolk,* No. 98–2284, 1999 WL 731100 (4th Cir. Sept. 20, 1999) (placement on child abuser registry must be preceded by notice and hearing). In response to these positions, the defendants contend that even under the pre-*Latif* DHS TRIP there are sufficient safeguards to make the risk of erroneous deprivation low since two agencies—the nominating agency and TSC—must review the nomination to ensure that there is sufficient supporting information, and the supporting information requires concrete, "appropriately restrictive" criteria to be met. *See Hodel v. Va. Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 301 (1981). They further contend that any constitutional inadequacies in

those procedures have been eliminated under the currently operating DHS TRIP.

**\*8** The lack of any independent review of No Fly List placements by a neutral decisionmaker, coupled with the limited disclosures and opportunity to respond by a person who requests that his status be reviewed, raise a substantial risk of erroneous deprivation, regardless of the internal procedures used to determine placement on the No Fly List. On the other hand, predeprivation notice and hearing would alert an individual, and through him or her, others, whom the government suspects of terrorist activity, and thereby compromise on-going investigations and endanger those persons involved in those investigations. *See Ibrahim v. DHS,* —— F.Supp.2d ——, 2014 WL 6609111, at \*18 (N.D.Cal. Jan. 14, 2014) ("the Executive Branch must be free to maintain its watchlists in secret, just as federal agents must be able to maintain in secret its investigations into organized crime, drug trafficking organizations, prostitution, child-pornography rings, and so forth. To publicize such investigative details would ruin them.").[8]

Given the effects pre-deprivation notice would have on the government's compelling interests, the Court concludes that a balancing of the respective interests does not weigh in favor of pre-deprivation notice. *See GRF v. O'Neill,* 315 F.3d 748, 754 (7th Cir.2002) ("Risks of error rise when hearings are deferred, but these risks must be balanced against the potential for loss of life if assets should be put to violent use."). The Court therefore concludes that so long as postdeprivation notice and hearing are sufficiently robust, pre-deprivation notice and hearing are not constitutionally required. *See Gilbert v. Homar,* 520 U.S. 924, 930 (1997) ("on many occasions, [ ] where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause"); *Fields v. Durham,* 909 F.2d 94, 97 (4th Cir.1990) (to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of pre-deprivation and postdeprivation process provided by the state). *See also Holy Land Found. For Relief & Dev. v. Ashcroft,* 219 F.Supp.2d 57 (D.D.C.2002), *affd,* 333 F.3d 156, 163–64 (D.C.Cir.2003) (holding that pre-deprivation process is not constitutionally required within the context of immediate asset blocking to prevent financial assistance to terrorism); *but cf. Haramain Islamic Found. v. Dep't of Treasury,* 686 F.3d 965 (9th Cir.2011) (where there are no national security concerns, OFAC must provide a Specially Designated Global Terrorist(SDGT) designee a

Mohamed v. Holder, Not Reported in F.Supp.3d (2015)

"timely" statement of reasons for the investigation); *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192 (D.C.Cir.2001) (absent adequate showing to the court that earlier notification would impinge on security and foreign policy goals, target organizations for Foreign Terrorist Organization (FTO) designation must receive pre-deprivation notice that they are under consideration for designation, the unclassified portions of the administrative record relied on in making the determination and an opportunity to rebut the administrative record).

**\*9** The Court has also considered the constitutional need for pre-deprivation judicial review, or review by some other independent decision maker comparable, in effect, to those constitutionally required *ex parte, in camera* procedures associated with the Fourth Amendment's warrant requirement for searches and seizures. *See, e.g., United States v. Jones,* 132 S.Ct. 945, 947 (2012). Given the liberty interests at stake and the substantial and enduring impact a No Fly List placement has on those liberty interests, much recommends a predeprivation *ex parte, in camera* judicial review, either before or within a reasonable time after a person is listed on the No Fly List. For example, unlike a Title III wiretap, or GPS vehicle tracking, the No Fly List represents the imposition of an open ended disability, the effects of which can be far reaching and not undone easily, even after one is removed from the List. The prospects for disclosure through that sealed process to affected individuals would be exceptionally low.

The defendants strongly object to pre-deprivation judicial review principally on the grounds that it would distract them from their mission and compromise their ability to best assess and protect against terrorists threats. But the Court sees in the substance of many of their objections claims that reduce to administrative inconvenience and insufficient resources, and a concern that such oversight would induce an undesirably cautious approach to No Fly List placement. *See* Doc. No. 184–1, Declaration of Michael Steinbach, Assistant Director of the Counterterrorism Division, FBI, at ¶¶ 8–10, 13–16 (describing the "significant burden" of judicial approval, either before placement or soon after, would impose, including "hinder[ing] the FBI's ability to act quickly to address and possibly prevent threats, and shifting the "focus of concern" away from "making predictive judgments as to the risk a person may pose," to "whether the basis of the determination would be clear to a judicial officer, who lacks similar expertise"). The Court is not in a position to assess adequately the merits of many of defendants' objections. In

any event, and notwithstanding that pre-deprivation judicial review would effectively address many of the substantial objections to a placement on the No Fly List, there is no express statutory authorization for such pre-listing judicial review; and there are substantial constitutional and practical issues with respect to imposing such a requirement. In the absence of additional evidence concerning the revised DHS TRIP, the Court cannot conclude that pre-deprivation judicial review and approval is constitutionally required, appropriate or even available.[9]

**B. Defendants' alternative motion to dismiss based on the State Secrets Privilege**

The defendants have renewed their assertion of the state secrets privilege in the context of the cross motions for summary judgment on Plaintiff's procedural due process claims.[10] In assessing defendants' invocation of the state secrets privilege, the Court engages in a three-step process. First, the Court must determine whether the assertion of the privilege is procedurally proper. Second, the Court must independently determine whether the information claimed to be privileged is, in fact, protected under the state secrets privilege. Third, the Court must determine whether the case can proceed if the information is protected by the state secrets privilege. *See Mohamed v. Jeppesen Dataplan, Inc.,* 614 F.3d 1070, 1080 (9th Cir.2010); *United States v. Reynolds,* 345 U.S. 1, 10 (1953)); *see also Abilt v. C.I.A.,* No. 1:14–CV–01031–GBL–ID, 2015 WL 566712, at \*5 (E.D.Va. Feb. 10, 2015).

1. Procedural Requirements for Invoking the Privilege

**\*10** Defendants' assertion of the state secrets privilege must satisfy three procedural requirements. "First, the state secrets privilege must be asserted by the United States. It 'belongs to the Government and ... can neither be claimed nor waived by a private party.' Second, '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter.' Third, the department head's formal privilege claim may be made only 'after actual personal consideration by that officer.' " *El–Masri v. United States,* 479 F.3d 296, 304 (4th Cir.2007) (quoting *Reynolds, supra,* 345 U.S. at 7–8). The Court concludes that the defendants have properly asserted the privilege procedurally. The defendants have all been sued in their official capacity as heads of various departments of the United States government. The defendants' assertion of the privilege has been accompanied by a publicly filed sworn declaration by former Attorney General Eric H.

Holder, Jr., filed in connection with defendants' May 28, 2014 motion to dismiss. Doc. No. 104–1 ("AG Declaration"). The AG Declaration further declares that "after careful and personal consideration of the matter, ... disclosure of the three categories of information [described in the Declaration] ... could reasonably be expected to cause significant harm to national security". *Id.* at ¶ 5.[11]

2. Evaluation of the Privilege Claim and How the Case Should Proceed

"After a court has confirmed that the *Reynolds* procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure. This inquiry is a difficult one, for it pits the judiciary's search for truth against the Executive's duty to maintain the nation's security...." *El Masri, supra,* 479 F.3d at 304–05. This balancing test leaves the judiciary "firmly in control of deciding whether an executive assertion of the state secrets privilege is valid, but subject to a standard mandating restraint in the exercise of its authority." *Id.* Nevertheless, "[a] court is obliged to honor the Executive's assertion of the privilege if it is satisfied, 'from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interests of national security, should not be divulged." *Id.* at 305 (quoting *Reynolds,* 345 U.S. at 10).[12]

In their motion for summary judgment on the procedural due process claim, the defendants identify two specific types of evidence over which they assert the state secrets privilege: first, "evidence underlying Plaintiff's alleged placement on the No Fly List" and second, "information about the process provided to Plaintiff in order to evaluate the risk of erroneous deprivation in the value of substitute procedures." Doc. No. 159 at p. 38–39. In support of this position, they have provided both a publically filed unclassified summary and an *ex parte, in camera* classified summary.

 **\*11** The public summary references three categories of information protected under the state secrets privilege: (1) subject identification (i.e. information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI investigation or intelligence operation); (2) reasons for investigation and results; and (3) sources and methods. The summary does not identify or describe any specific information but rather generally describes why information within these categories would be protected. The reasons include:

• Disclosure "would alert those subjects to the Government's interest in them and could cause them to attempt to flee, destroy evidence, or alter their conduct so as to avoid detection ... [and] would seriously impede law enforcement and intelligence officers' ability to determine their whereabouts or gain further intelligence on their activities." Doc. No. 104–1 at ¶ 8;

• "[K]nowledge that [subjects of government interest]were under investigation could enable subjects to anticipate the actions of law enforcement and intelligence officers, possibly leading to counter-surveillance that could place federal agents at higher risk, and to ascertain the identities of confidential informants or other intelligence sources, placing those sources at risk." *Id.* ¶ 8;

• "[I]f the fact that some persons are not subject to investigation is disclosed, while the status of others is left unconfirmed, the disclosure would reveal that the FBI has had an investigative interest as to those other particular persons ... [which] would enable individuals and terrorist groups alike to manipulate the system to discover whether they or their members are subject to investigation." *Id.* at ¶ 9;

• Individuals who discover that they are not being monitored could be motivated to commit terrorist acts. *Id.* at ¶ 9;

• Disclosing reasons for and results from an FBI counterterrorism investigation or an intelligence activity would "reveal to subjects who are involved in or planning to undertake terrorist activities what the FBI or the intelligence community knows or does not know about their plans and the threat they post to national security." *Id.* at ¶ 11;

• Even for those subjects without terrorist intentions, disclosure of the reasons could "reveal sensitive intelligence information about them, their associates, or a particular threat that would harm other investigations" and "could provide insights to persons intent on committing terrorist attacks as to what type of information is sufficient to trigger an inquiry by the United States Government, and what sources and methods the FBI may employ to obtain information about a person." *Id.* at ¶ 11;

• Disclosure of sources and methods "could reveal not only the identities of particular subjects but also the steps taken by the FBI in counterterrorism matters." *Id.* at ¶ 12;

• "Any effort to draw distinctions between disclosures that would and would not cause harm to national security interests would itself reveal sensitive FBI counterterrorism investigative or intelligence information," and disclosure of information as to one individual but not another, "then the very act of resisting disclosure would itself reveal the information that the Government seeks to protect." *Id.* at ¶ 13.

**\*12** Defendants argue that this case cannot proceed because privileged information is at the heart of the case and is required to litigate both Mohamed's claims and the defendants' defenses.[13] Claiming that defendants are attempting to invoke the privilege for purely tactical reasons, Mohamed emphasizes that "the record [ ] already ... provides the facts needed to sustain his claims now." Doc. No. 119 at p. 4. He points to his willingness to litigate without further discovery from the defendants and "that the government has litigated to the merits claims similar to Mohamed's, at trial and on summary judgment, without inadvertent disclosure of state secrets," *id.* at p. 7, referring to the *Latif* case, in which the state secrets privilege did not prevent the adjudication of similar due process claims.

The Court has reviewed and considered all of the submitted information in each of these categories, including the classified declarations, the underlying classified documents themselves, and the government's representations and explanations provided to the Court in its closed hearing on March 17, 2015. Based on that review, the Court concludes that there are aspects of the information and documents at issue that are protected under the state secrets privilege. The Court also concludes that some of that information may be relevant and necessary for an adjudication of Mohamed's damages claims. However, even were all the information protected under the state secrets privilege, as the defendants claim (which the Court does not find), none of that information is necessary to establish either Mohamed's claim that he was denied constitutionally required procedural due process in connection with his denial of boarding or an available defense to that claim.[14] The information claimed to be protected by the state secrets privilege in this action is not so central to Mohamed's procedural due process claims so as to prevent the adjudication of those claims on the

merits. That procedural due process claim does not require reliance on any protected fact specific analysis that may have resulted in any placement on the No Fly List; rather, it requires an analysis of the procedures afforded to any U.S. citizen who is denied boarding on an aircraft, procedures that the defendants describe in detail in their public filings. For these reasons, the Court again concludes that the case need not be dismissed since the Court can adjudicate whether Mohamed had a constitutionally adequate opportunity to contest his status without any information claimed to be protected under the state secrets privilege.

### C. Plaintiffs remedy

Mohamed seeks as a remedy for this constitutional violation that he be removed from the No Fly List, as well as an award of compensatory and punitive damages. However, at this point, Mohamed's remedy is limited to a constitutionally adequate opportunity to contest any placement on the No Fly List, with an adjudication of any damages claims subject to further consideration following the outcome of that process or Mohamed's choice to forego that process.

**\*13** On June 24, 2014, the District Court in *Latif v. Holder, supra,* a case involving a similar challenge to the No Fly List, ordered the government to "fashion new procedures that provide Plaintiffs with the requisite due process described herein without jeopardizing national security" which must include "notice ... to permit each Plaintiff to submit evidence relevant to the reasons for their respective inclusions on the No–Fly List" and "any responsive evidence that Plaintiffs submit in the record to be considered at both the administrative and judicial stages of review," which may involve providing the plaintiffs "with unclassified summaries of the reasons for their respective placement on the No–Fly List or disclose the classified reasons to properly-cleared counsel." 28 F.Supp.3d at 1161–62. On April 13, 2015, the government reported to the Court that it was adopting for all persons seeking a review of their status those revisions to the DHS TRIP made in response to the *Latif C* ourt's order. *See* Doc. No. 188.

Under the newly revised procedures, individuals who are denied boarding and apply for redress through DHS TRIP will now receive a letter stating whether or not a person is listed on the No Fly List, with the option to receive and/or submit additional information. If the individual elects to receive additional information, DHS TRIP will provide a second, more detailed letter identifying the specific criterion under which the individual has been placed on the No Fly List as

well as "an unclassified summary of information supporting the individual's No Fly List status, to the extent feasible, consistent with the national security and law enforcement interests at stake." *Id.* The government explains that the amount and type of information provided will vary on a case-by-case basis, and in some circumstances, an unclassified summary may not be possible. The second letter will also invite the individual to submit written responses, including exhibits and other materials that the individual deems relevant. The TSA Administrator or his or her designee will review such submissions, together with the unclassified and classified information that is being relied upon to support the No Fly listing, and then will issue a final determination. TSA will provide the individual with a final written determination containing the basis for the decision and notifying the individual of the ability to seek further judicial review under 49 U.S.C. § 46110.

The Court cannot conclude based on the present record whether the revised DHS TRIP, as described above, will provide a constitutionally adequate opportunity for Mohamed to have his status reviewed. Rather, the revised DHS TRIP process, as described to the Court, would appear to allow for both a constitutionally adequate post-deprivation review and also a reviewing court to be presented with an administrative record that allows a sufficient assessment concerning whether Mohamed was, in fact, given a constitutionally adequate opportunity to challenge any placement on the No Fly List. More specifically, the Court sees nothing in the revised DHS TRIP that would preclude an adequate post deprivation process and the creation of an administrative record that reflects (1) whether, if on the No Fly List, Mohamed was provided the specific criteria relied on and the specific factual findings used to satisfy that specific criteria, such that he was in a position to respond to the substance of any derogatory information relied upon for the purposes of that placement; (2) whether there was a reasonable opportunity for Mohamed to submit evidence that he does not satisfy the No Fly List criteria; (3) what information was relied on for the No Fly List placement but withheld from Mohamed, the reasons for withholding that information and the reasonableness of any such decisions, including whether additional material information could have been provided, either directly or through alternative means, such as summaries or redacted documents; (4) the extent to which Mohamed provided information, or could have provided information, that met the substance of any reasons advanced by the government

for his placement on the No Fly List and the TSA's response to any explanatory, clarifying, or exculpatory information; and (5) whether Mohamed's status is at the appropriate level of security restrictions for the level of threat sufficiently established by that administrative record, including why measures short of a total ban on air travel is warranted.[15] In short, how the revised DHS TRIP would in fact operate with respect to Mohamed's request for review of his status cannot be assessed with any certainty at this time; and the Court cannot therefore conclude as a matter of law, based on the present record, that Mohamed would not have a constitutionally adequate post-deprivation remedy through the revised DHS TRIP. That process would also allow the Court of Appeals for the Fourth Circuit to consider whether it has appropriate subject matter jurisdiction pursuant to 49 U.S.C. § 46110,[16] or whether further agency review would occur in this Court pursuant to the Administrative Procedure Act, 5 U.S.C. § 703.

**D. Remaining claims.**

**\*14**  The parties are directed to file with the Court no later than August 7, 2015 a report concerning what issues remain to be decided following the Court's rulings herein. Mohamed should also state whether at this point he wishes to request review of his status under the revised DHS TRIP, and if so, whether this action should be stayed pending the completion of that process. The parties should also state whether the Court's rulings herein should be certified under Fed.R.Civ.P. 54(b) as a final judgment.

**IV. Conclusion**

For the above reasons, the Court finds and concludes that Plaintiff is entitled to judgment as a matter of law on Count 3 of his Fourth Amended Complaint, and Plaintiff's Partial Motion for Summary Judgment [Doc. No. 161] will therefore be GRANTED in part and DENIED in part, and the defendant's Motion for Partial Summary Judgment [Doc, No. 158] will be DENIED.

An appropriate Order will issue.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4394958

Footnotes

1     The Fourth Amended Complaint sets forth three causes of action titled: (1) Violation of U.S. Citizens' Right to Reside in United States and to Reenter the United States from Abroad in violation of the Fourteenth Amendment (Count 1—Right to Citizenship); (2) Unlawful Agency Action in violation of 5 U.S.C. §§ 702, 706 (Count 2—Unlawful Agency Action); and (3) Failure to Provide Pre or Post Deprivation Notice and Hearing in violation of the Fifth Amendment (Count 3—procedural due process). The Court previously dismissed Count 1 in part as it related to Plaintiff's specific claim that he was unconstitutionally denied reentry into the United States in January 2011. *See Mohamed v. Holder,* 995 F.Supp.2d 520 (E.D.Va.2014).

2     Congressional authorization for the No Fly List has been limited. Following 9/11, Congress directed that the TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers (A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and (B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. § 114(h)(3). It mandated, however, that DHS "shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security." 49 U.S. § 44926(a). DHS is also required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S. 44903(j)(2)(C)(iii). DHS TRIP was established by the Executive branch in response to these congressional mandates.

3     Its mandate became effective on July 22, 2013. Doc. No. 47.

4     The Court identified the following issues to be discussed in closed session:

        (1) state secrets or national security information the defendants may wish to present to the Court not reflected in the documents previously filed *ex parte, in camera* and under seal;

        (2) how the under seal documents as to which the state secrets privilege is claimed precludes adjudication of the procedural due process claims without their use and disclosure;

        (3) how the defendants apply the criteria for placement on the No Fly List consistent with the restrictions listed in its publically disclosed criteria;

        (4) any criteria other than those publicly disclosed for the purposes of placing United States citizens on the No Fly List;

        (5) how defendants distinguish between United States citizens that are placed on the No Fly List and those placed on the Selectee List and the need to have a level of security beyond those protections afforded through the Selectee List;

        (6) whether, and if so, how national security considerations make it impractical or otherwise undesirable to submit for *ex parte, in camera* judicial review and approval the placement of United States citizens on the No Fly List, either before a citizen's placement on the No Fly List or within a specific time period after placement on the No Fly List; and

        (7) whether, and if so, how national security considerations make it impractical or otherwise undesirable for United States citizens who challenge their inability to board a commercial aircraft to receive information concerning their placement on the No Fly List under procedures comparable to those employed in criminal matters under the Classified Information Procedures Act ("CIPA"); and

        (8) any other national security information that the defendants believe is necessary for the Court to consider in connection with its consideration of the procedural due process claims and any remedies that may be ordered with respect to any constitutional violations that the Court may ultimately find.

5    DHS TRIP, as it existed when Mohamed was denied boarding, provided no opportunity to learn of or rebut any derogatory information or, indeed whether that person was, in fact, on the No Fly List. Rather, when a person requested review of his status, DHS TRIP first determined whether the traveler's identity is an identity listed in the TSDB. If it were a match, the TSC Redress Unit then reviewed available information to determine whether the traveler was an exact match to a TSDB identity and whether the traveler's status should be modified or maintained. DHS TRIP then would send the traveler a determination letter, which did not disclose whether the traveler is in fact on the No Fly List or any reasons why the person may be on the No Fly List. The letter constituted final agency action subject to judicial review in the U.S. Court of Appeals pursuant to 49 U.S.C. § 46110.

6    Mohamed points to the No Fly List's dissemination to agencies throughout the U.S. government, to 22 foreign governments, and to ship captains. Doc. No. 161 at p. 13.

7    See, e.g., ZemeU supra, 381 U.S. at 15 (the petitioner's due process rights were notviolated when the Secretary of State refused to validate his visa for travel to Cuba); Haig v. Agee, 453 U.S. 280, 306 ("the freedom to travel abroad with a.... passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation."). See also Califano v. Aznavorian, 439 U.S. 170,176–77 (1978) ("legislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel").

8    The defendants point out that in 2013 "a substantial number of U.S. persons on the No Fly List never attempted to board a commercial aircraft" and the Court generally agrees with their assessment that such notice might cause suspects to "lower their profile, change their location, or take other countermeasures to avoid detection and circumvent surveillance," long before the government's interest in their activity might otherwise have come to their attention. Doc. No. 159 at p. 17.

9    The No Fly List, as it presently exists, has been in effect for over ten years, with extensive experience under it. Substantial constitutional and other objections have been raised and, to some extent, sustained with respect to it. Those objections have raised challenging and unresolved issues concerning the rights of American citizens within the context of the War on Terrorism. It may be helpful to the courts' dealing with these issues for Congress, at this point, to assess further that experience and further clarify its expectations for the constitutionally adequate treatment of affected travelers, particularly those who are American citizens.

10    See infra at p. 7–8, Doc. No. 144 at p. 2–3.

11    The AG Declaration also states that the invocation of the state secrets privilege is consistent with Executive Branch policy issued on September 23, 2009 that the "Department will not defend an invocation of the privilege in order to ... conceal violations of the law, inefficiency, or administrative error ... prevent embarrassment ... or prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." Doc. No. 104–1 at p. 8.

12    Since Reynolds, Courts have expanded the state secrets privilege to matters related to "foreignaffairs," El Masri, 479 F.3d at 303, and "generally to national security concerns" such as information that could cause "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." Ellsberg v. Mitchell, 709 F.2d 51, 57 (D.C.Cir.1983).

13    The defendants point specifically to Mohamed's discovery requests, "seeking information related to his claims and allegations, namely, information concerning the watchlisting program generally and his situation individually." Doc. No. 105 at p. 5; see also Doc. No. 168 at p. 19 (where defendants argue for dismissal on the basis that "exclusion of evidence pursuant to the privilege prevents Defendants from fully litigating several aspects of the procedural due process claim, as well as from presenting a harmless error defense.").

14    The Court reaches this conclusion without the need to consider whether a level of protection short of the complete non-disclosure provided under the state secrets privilege would be adequate to protect information without endangering national security, such as the type of protective orders, redactions and summaries routinely used for highly sensitive information in other types of cases, both civil and criminal.

15    The specific criteria that would place someone on the Selectee List, whereby air travel is permitted under heightened security screening, as opposed to the No Fly List and its total ban on air travel, is not clear from the public record and that issue remains unclear to the Court even in light of the totality of the information provided to the Court.

16    Substantial issues exist concerning whether and in what form DHS TRIP adequately provides for judicial review of a decision to place someone on the No Fly List. *See Ege v. United States Department of Homeland Security,* 2015 WL 1903206,——F.3d——(D.C.Cir.2015) (Court of Appeals has no jurisdiction pursuant to 49 U.S.C. § 46110 to order a person removed from the No Fly List); *Latif v. Holder,* 686 F.3d 1122, 1129 (9th Cir.2012) (in action against TSA and TSC pursuant to 49 U.S.C. § 46110, Court of Appeals lacked subject matter jurisdiction to address the plaintiffs' procedural challenge to the DHS TRIP process). *See also* Doc. No. 45, in which the Fourth Circuit ruled that it did not have exclusive jurisdiction pursuant to 49 U.S.C. § 46110 because Mohamed's requested relief, removal from the No Fly List, would require orders against TSC as well as TSA. The Court does not believe it appropriate at this point to address this issue, which should be decided in the first instance by the Fourth Circuit upon review of a DHS TRIP decision.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Bazzi v. Gacki, D.D.C., June 24, 2020

28 F.Supp.3d 1134
United States District Court, D. Oregon.

Ayman LATIF, Mohamed Sheikh Abdirahm
Kariye, Raymond Earl Knaeble IV, Steven
William Washburn, Nagib Ali Ghaleb,
Abdullatif Muthanna, Faisal Nabin Kashem,
Elias Mustafa Mohamed, Ibraheim Y. Mashal,
Salah Ali Ahmed, Amir Meshal, Stephen
Durga Persaud, and Mashaal Rana, Plaintiffs,
v.
Eric H. HOLDER, Jr., in his official capacity
as Attorney General of the United States;
James B. Comey, in his official capacity
as Director of the Federal Bureau of
Investigation; and Christopher M. Piehota,
in his official capacity as Director of the
FBI Terrorist Screening Center, Defendants.

No. 3:10–CV–00750–BR
|
Signed June 24, 2014.

**Synopsis**
**Background:** Plaintiffs, citizens or lawful permanent residents (LPR) of the United States, brought action alleging that they were denied redress after they were not allowed to board airline flights to or from the U.S. or over U.S. airspace because they had been placed on the No-Fly List, in violation of their procedural due process rights under the Fifth Amendment rights, and that the Government's actions violated the Administrative Procedure Act (APA). Following dismissal, 2011 WL 1667471, the United States Court of Appeals for the Ninth Circuit reversed, 686 F.3d 1122. On remand, parties cross-moved for partial summary judgment and the District Court, 969 F.Supp.2d 1293, granted the motions in part, denied them in part, and deferred ruling in part.

**Holdings:** Subsequently, the District Court, Brown, J., held that:

[1] plaintiffs had constitutionally-protected liberty interests in traveling internationally by air;

[2] plaintiffs had constitutionally-protected liberty interests in their reputations;

[3] Department of Homeland Security's (DHS) process for redressing erroneous placements of airline passengers on the No-Fly List (List) carried high risk of erroneous deprivation of constitutionally-protected liberty interests;

[4] DHS's process for redressing erroneous placements of airline passengers on the List lacked any meaningful procedures to afford such passengers opportunity to contest their placement on the List; and

[5] DHS's process for redressing erroneous placements of airline passengers on the List violated APA.

Defendants' motion denied and plaintiffs' motion granted.

West Headnotes (33)

**[1]    Summary Judgment** 🔑 In conjunction with right to judgment as matter of law

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[2]    Summary Judgment** 🔑 Burden of Proof

Party moving for summary judgment must show the absence of a dispute as to a material fact. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[3]    Summary Judgment** 🔑 Burden of Proof
**Summary Judgment** 🔑 Speculation or conjecture; mere assertions, conclusions, or denials

In response to a properly supported motion for summary judgment, nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial; this burden is not a light one, since the non-moving party must do more than show there is some metaphysical doubt as to the material facts at issue. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[4]**    **Summary Judgment**   🔑   What constitutes "genuine" issue or dispute

A dispute as to a material fact is genuine, within meaning of the Rule of Civil Procedure governing summary judgment motions, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[5]**    **Summary Judgment**   🔑   Favoring nonmovant; disfavoring movant

Court considering a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[6]**    **Summary Judgment**   🔑   Conflicting inferences or conclusions

Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[7]**    **Summary Judgment**   🔑   What constitutes "genuine" issue or dispute

**Summary Judgment**   🔑   Speculation or conjecture; mere assertions, conclusions, or denials

A mere disagreement or bald assertion that a genuine dispute as to a material fact exists will not preclude a grant of summary judgment. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[8]**    **Summary Judgment**   🔑   Sufficiency of Evidence

When the nonmoving party's claims are factually implausible, in opposing a summary judgment motion that party must come forward with more persuasive evidence than otherwise would be necessary. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[9]**    **Summary Judgment**   🔑   Effect of applicable substantive law

The substantive law governing a claim or a defense determines whether a fact is material for purposes of a summary judgment motion. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[10]**    **Summary Judgment**   🔑   What Constitutes "Material" Fact

If the resolution of a factual dispute would not affect the outcome of the claim, court may grant summary judgment. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.

**[11]**    **Constitutional Law**   🔑   Procedural due process in general

Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14.

1 Case that cites this headnote

**[12]**    **Constitutional Law**   🔑   Factors considered; flexibility and balancing

**Constitutional Law**   🔑   Notice and Hearing

Fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner; due process, however, is flexible and calls for such procedural protections as the particular situation demands. U.S.C.A. Const.Amends. 5, 14.

**[13]    Constitutional Law** 👈 Factors considered;
        flexibility and balancing

Court must weigh three factors when evaluating
the sufficiency of procedural due process
protections: (1) the private interest that will
be affected by the official action, (2) the risk
of an erroneous deprivation of such interest
through the procedures used, and probative
value, if any, of additional or substitute
procedural safeguards, and (3) Government's
interest, including the function involved and
the fiscal and administrative burdens that the
additional or substitute procedural requirement
would entail. U.S.C.A. Const.Amends. 5, 14.

1 Case that cites this headnote

**[14]    Aviation** 👈 Administrative Proceedings
        **Constitutional Law** 👈 Terrorism
        **War and National Emergency** 👈 Anti-
        Terrorism Measures

Plaintiffs, United States citizens and legal
permanent residents (LPR), had constitutionally-
protected liberty interests in traveling
internationally by air, which were significantly
affected by being placed on list of known
and suspected terrorists not permitted to fly
in the United States (No-Fly List), weighing
heavily in favor of their procedural due process
claims challenging suspected inclusion on List.
U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote

**[15]    Constitutional Law** 👈 Travel and movement
The right to travel is a part of the liberty of
which the citizen cannot be deprived without
due process of law under the Fifth Amendment.
U.S.C.A. Const.Amend. 5.

1 Case that cites this headnote

**[16]    Aviation** 👈 Administrative Proceedings
        **Constitutional Law** 👈 Terrorism

**War and National Emergency** 👈 Anti-
Terrorism Measures

Plaintiffs, United States citizens and legal
permanent residents (LPR), had constitutionally-
protected liberty interests in their reputations,
which were affected by being placed on list of
known and suspected terrorists not permitted
to fly in the United States (No-Fly List),
weighing heavily in favor of their procedural due
process claims challenging suspected inclusion
on List; plaintiffs had suffered a change in
legal status because they legally could not
do something that they otherwise could do.
U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[17]    Constitutional Law** 👈 Reputation;
        defamation

To prevail on a due process claim under the
stigma-plus doctrine, plaintiffs must show (1)
public disclosure of a stigmatizing statement
by the government, the accuracy of which is
contested, plus (2) the denial of some more
tangible interest such as employment, or the
alteration of a right or status recognized by state
law. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[18]    Constitutional Law** 👈 Reputation;
        defamation

Under the stigma-plus doctrine, for purposes of
a claim for a procedural due process violation
the plus must be a deprivation of a liberty or
property interest by the state that directly affects
the plaintiffs' rights; under the "plus" prong, a
plaintiff can show he has suffered a change of
legal status if he legally cannot do something that
he could otherwise do. U.S.C.A. Const.Amend.
5.

1 Case that cites this headnote

**[19]    Aviation** 👈 Administrative Proceedings
        **Constitutional Law** 👈 Terrorism

**War and National Emergency** 🔑 Anti-Terrorism Measures

Department of Homeland Security's (DHS) process for redressing erroneous placements of airline passengers on the No-Fly List (List) carried a high risk of erroneous deprivation of constitutionally-protected liberty interests, weighing heavily in favor of the plaintiffs' procedural due process claims challenging their suspected inclusion on List; the evidentiary standard required for placement on the List was low, there was a lack of meaningful opportunity for individuals on the List to provide exculpatory evidence in an effort to be taken off it, and additional procedural safeguards would have significant probative value in ensuring that individuals were not erroneously deprived of their constitutionally-protected liberty interests. U.S.C.A. Const.Amend. 5.

5 Cases that cite this headnote

**[20]    Constitutional Law** 🔑 Factors considered; flexibility and balancing

Under the Fifth Amendment, when considering the risk of erroneous deprivation of a liberty or reputational interest, Court considers both the substantive standard Government uses to make its decision as well as the procedural processes in place. U.S.C.A. Const.Amend. 5.

**[21]    War and National Emergency** 🔑 Anti-Terrorism Measures

The reasonable suspicion standard applicable to nominations to the Terrorist Screening Database (TSDB) is the same as the traditional reasonable suspicion standard commonly applied by the courts, requiring articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual meets the substantive derogatory criteria; the standard is not a particularly high threshold to reach. U.S.C.A. Const.Amend. 4.

**[22]    Arrest** 🔑 Grounds for Stop or Investigation

Although reasonable suspicion requires more than a mere hunch, the evidence available need not rise to the level required for probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. U.S.C.A. Const.Amend. 4.

**[23]    Constitutional Law** 🔑 Terrorism

**War and National Emergency** 🔑 Anti-Terrorism Measures

Factor of Government's interests in combating terrorism and protecting classified information were particularly compelling, and, viewed in isolation, weighed heavily in favor of Government in procedural due process claims challenging plaintiffs' suspected inclusion on No-Fly List (List) and the alleged lack of redress available to them. U.S.C.A. Const.Amend. 5.

**[24]    War and National Emergency** 🔑 Anti-Terrorism Measures

Government's interest in combating terrorism is an urgent objective of the highest order; it is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.

**[25]    War and National Emergency** 🔑 Power to restrict access

Constitution does not require that government take actions that would endanger national security; government has a compelling interest in withholding national security information from unauthorized persons.

**[26]    War and National Emergency** 🔑 Power to restrict access

The United States enjoys a privilege in classified information affecting national security so strong that even a criminal defendant to whose defense such information is relevant cannot pierce that privilege absent a specific showing of materiality.

**[27]**    **Aviation** 🔑   Aviation security

     **Aviation** 🔑   Aviation facilities and services; airports

     **Aviation** 🔑   Determination and disposition

     **Constitutional Law** 🔑   Terrorism

     **War and National Emergency** 🔑   Anti-Terrorism Measures

Although Government had a compelling interests in combating terrorism and protecting classified information, Department of Homeland Security's (DHS) process for redressing erroneous placements of airline passengers on the No-Fly List (List) lacked any meaningful procedures to afford such passengers opportunity to contest their placement on the List, thus depriving them of constitutionally-protected liberty interests, in violation of their Fifth Amendment procedural due process rights; plaintiffs were not given any notice of reasons for their placement on the List nor any evidence to support their inclusion on it, and nothing in the DHS administrative or judicial-review procedures remedied that deficiency. U.S.C.A. Const.Amend. 5.

8 Cases that cite this headnote

**[28]**    **Constitutional Law** 🔑   Factors considered; flexibility and balancing

Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances; rather, due process is flexible and calls for such procedural protections as the particular situation demands. U.S.C.A. Const.Amend. 5.

**[29]**    **Constitutional Law** 🔑   Notice and Hearing

     **Constitutional Law** 🔑   Notice

Fundamental requisite of due process of law is the opportunity to be heard; this right has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. U.S.C.A. Const.Amend. 5.

**[30]**    **Constitutional Law** 🔑   Notice

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections. U.S.C.A. Const.Amend. 5.

**[31]**    **Aviation** 🔑   Aviation security

     **Aviation** 🔑   Aviation facilities and services; airports

     **Constitutional Law** 🔑   Terrorism

     **War and National Emergency** 🔑   Anti-Terrorism Measures

Appropriate remedy for procedural due process violations, arising out of failure of the Department of Homeland Security's (DHS) process for redressing erroneous placements of plaintiff airline passengers on the No-Fly List (List) to provide redress, was for Government to fashion new procedures that would provide plaintiffs with the requisite due process without jeopardizing national security; Government would be required to provide plaintiffs with notice regarding their status on the List and the reasons for placement on that List, such notice to be reasonably calculated to permit each plaintiff to submit evidence relevant to the reasons for their respective inclusions on the List, and Government would also be required to include any responsive evidence that plaintiffs might submit in the record to be considered at both the administrative and judicial stages of review. U.S.C.A. Const.Amend. 5.

10 Cases that cite this headnote

**[32]**    **War and National Emergency** 🔑   Anti-Terrorism Measures

Department of Homeland Security's (DHS) process for redressing erroneous placements of airline passengers on the No-Fly List (List) violated Administrative Procedure Act (APA) by

entirely failing to consider Congress's instruction to establish a procedure that would enable passengers who were delayed or prohibited from boarding a flight because the prescreening system determined that they might pose a security threat, to correct information contained in the system; DHS' procedures did not provide a meaningful mechanism for travelers who have been denied boarding due to their inclusion on the List to correct erroneous information in the government's terrorism databases. 5 U.S.C.A. § 706(2)(A); 49 U.S.C.A. § 44903(j)(2)(C)(iii)(I), (j)(2)(G)(i).

[33]    **War and National Emergency** 🔑 Anti-Terrorism Measures

Department of Homeland Security's (DHS) process for redressing erroneous placements of airline passengers on the No–Fly List (List) violated Administrative Procedure Act (APA) by depriving such passengers of their procedural due-process rights. U.S.C.A. Const.Amend. 5; 5 U.S.C.A. § 706(2)(B).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1138** Steven M. Wilker, Tonkon Torp LLP, Kevin Diaz, American Civil Liberties Union, **\*1139** Portland, OR, Hina Shamsi, American Civil Liberties Union, Christopher M. Egleson, Justin H. Bell, Mitchell P. Hurley, Akin Gump Strauss Hauer & Feld LLP, New York, NY, Alexandra F. Smith, Laura Schauer Ives, ACLU Foundation of New Mexico, Albuquerque, NM, Ahilan Arulanantham, Jennifer Pasquarella, ACLU Foundation of Southern California, Los Angeles, CA, Alan L. Schlosser, Julia Harumi Mass, ACLU of Northern California, San Francisco, CA, Reem Salahi, Salahi Law, Santa Monica, CA, for Plaintiffs.

Devin N. Robinson, Stewart Shadduck & Robinson LLC, Portland, OR, Rita M. Siemion, Washington, DC, for Amicus Curiae the Constitution Project.

Eric H. Holder, Jr., United States Attorney General, Amy Elizabeth Powell, United States Department of Justice, Civil Division, Washington, DC, S. Amanda Marshall, United States Attorney, James E. Cox, Jr., Assistant United States Attorney, District of Oregon, Portland, OR, for Defendants.

**OPINION AND ORDER**

BROWN, District Judge.

This matter comes before the Court on Defendants' Motion (# 85) for Partial Summary Judgment and Plaintiffs' Cross–Motion (# 91) for Partial Summary Judgment. The parties each seek summary judgment on Plaintiffs' Claim One of the Third Amended Complaint (# 83) (that Defendants violated Plaintiffs' right to procedural due process under the Fifth Amendment to the United States Constitution) and Claim Three (that Defendants violated Plaintiffs' rights under the Administrative Procedure Act (APA), 5 U.S.C. § 706). In their claims Plaintiffs specifically challenge the adequacy of Defendants' redress procedures for persons on the No–Fly List (sometimes referred to as "the List"). In addition to the parties' briefs, the record includes an Amicus Curiae Brief (# 99) in Support of Plaintiffs' Cross–Motion filed by The Constitution Project.

On June 21, 2013, after the Court first heard oral argument on the parties' Motions, the Court took these issues under advisement. On August 28, 2013, 969 F.Supp.2d 1293 (D.Or.2013), the Court issued an Opinion and Order (# 110) granting in part Plaintiffs' Cross–Motion, denying in part Defendants' Motion, and deferring ruling on the remaining portions of the pending Motions to permit additional development of the factual record and supplemental briefing. In that Opinion and Order the Court concluded Plaintiffs established the first factor under *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), because Plaintiffs had protected liberty interests in their rights to travel internationally by air and rights to be free from false governmental stigmatization that were affected by their inclusion on the No–Fly List. The Court, however, found the record was not sufficiently developed to balance properly Plaintiffs' protected liberty interests on the one hand against the procedural protections on which Defendants rely, the utility of additional safeguards, and the government interests at stake in the remainder of the *Mathews* analysis. *See id.*

After the parties filed a Third Joint Statement of Stipulated Facts (# 114) and completed their respective supplemental briefing, the Court heard oral argument on March 17, 2014, and again took the Motions under advisement.

For the reasons that follow,[1] the Court **\*1140 GRANTS** Plaintiffs' Cross–Motion (# 91)[2] and **DENIES** Defendants' Motion (# 85).

### *PLAINTIFFS' CLAIMS*

Plaintiffs are citizens and lawful permanent residents of the United States (including four veterans of the United States Armed Forces) who were not allowed to board flights to or from the United States or over United States airspace. Plaintiffs believe they were denied boarding because they are on the No–Fly List, a government terrorist watch list of individuals who are prohibited from boarding commercial flights that will pass through or over United States airspace. Federal and/or local government officials told some Plaintiffs that they are on the No–Fly List.

Each Plaintiff submitted applications for redress through the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP). Despite Plaintiffs' requests to officials and agencies for explanations as to why they were not permitted to board flights, explanations have not been provided and Plaintiffs do not know whether they will be permitted to fly in the future.

Plaintiffs allege in their Third Amended Complaint (# 83), Claim One, that Defendants have violated Plaintiffs' Fifth Amendment right to procedural due process because Defendants have not given Plaintiffs any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No–Fly List. In Claim Three Plaintiffs assert Defendants' actions have been arbitrary and capricious and constitute "unlawful agency action" in violation of the APA.

### *PROCEDURAL BACKGROUND*

Plaintiffs filed this action on June 30, 2010. On May 3, 2011, 2011 WL 1667471, this Court issued an Order (# 69) granting Defendants' Motion (# 43) to Dismiss for failure to join the Transportation Security Administration (T3A) as an indispensable party and for lack of subject-matter jurisdiction on the ground that the relief Plaintiffs sought could only come from the appellate court in accordance with 49 U.S.C. § 46110(a). Plaintiffs appealed the Court's Order to the Ninth Circuit. *See Latif v. Holder,* 686 F.3d 1122 (9th Cir.2012).

On July 26, 2012, the Ninth Circuit issued an opinion in which it reversed this Court's decision and held "the district court ... has original jurisdiction over Plaintiffs' claim that the government failed to afford them an adequate opportunity to contest their apparent inclusion on the List." *Id.* at 1130. The Court also held "[49 U.S.C.] § 46110 presents no barrier to adding TSA as an indispensable party." *Id.* The Ninth Circuit issued its mandate on November 19, 2012, remanding the matter to this Court.

As noted, the parties subsequently filed Motions for Partial Summary Judgment.

### **\*1141 *FACTUAL BACKGROUND***

The following facts are undisputed unless otherwise noted:

### I. The No–Fly List
The Federal Bureau of Investigation (FBI), which administers the Terrorist Screening Center (TSC), develops and maintains the federal government's consolidated Terrorist Screening Database (TSDB or sometimes referred to as "the watch list"). The No–Fly List is a subset of the TSDB.

TSC provides the No–Fly List to TSA, a component of the Department of Homeland Security (DHS), for use in pre-screening airline passengers, TSC receives nominations for inclusion in the TSDB and generally accepts those nominations on a showing of "reasonable suspicion" that the individuals are known or suspected terrorists based on the totality of the information. TSC defines its reasonable-suspicion standard as requiring "articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual 'is known or suspected to be, or has been engaged in conduct constituting, in preparation for, in aid of or related to, terrorism or terrorist activities.' " Joint Statement of Stipulated Facts (# 84) at 4.

The government also has its own "Watchlisting Guidance" for. internal law-enforcement and intelligence use, and the No–Fly List has its own minimum substantive derogatory criteria. The government does not release these documents.[3]

### II. DHS TRIP Redress Process

DHS TRIP is the mechanism available for individuals to seek redress for any travel-related screening issues experienced at airports or while crossing United States borders; *i.e.,* denial of or delayed airline boarding, denial of or delayed entry into or exit from the United States, or continuous referral for additional (secondary) screening,

### A. Administrative Review

Travelers who have faced such difficulties may submit a Traveler Inquiry Form to DHS TRIP online, by email, or by regular mail. The form prompts travelers to describe their complaint, to produce documentation relating to the issue, and to provide identification and their contact information. If the traveler is an exact or near match to an identity within the TSDB, DHS TRIP deems the complaint to be TSDB-related and forwards the traveler's complaint to TSC Redress for further review.

On receipt of the complaint, TSC Redress reviews the available information, including the information and documentation provided by the traveler, and determines (1) whether the traveler is an exact match to an identity in the TSDB and (2) whether the traveler should continue to be in the TSDB if the traveler is an exact match. When making this determination, TSC coordinates with the agency that originally nominated the individual to be included in the TSDB. If the traveler has been misidentified as someone who is an exact match to an identity in the TSDB, TSC Redress informs DHS of the misidentification. DHS, in conjunction with any **\*1142** other relevant agency, then addresses the misidentification by correcting information in the traveler's records or taking other appropriate action.

When DHS and/or TSC finish their review, DHS TRIP sends a determination letter advising the traveler that DHS TRIP has completed its review. A DHS TRIP determination letter neither confirms nor denies that the complainant is in the TSDB or on the No–Fly List and does not provide any further details about why the complainant may or may not be in the TSDB or on the No–Fly List. In some cases a DHS TRIP determination letter advises the recipient that he or she can pursue an administrative appeal' of the determination letter with TSA or can seek judicial review in a United States court of appeals pursuant to 49 U.S.C. § 46110.[4]

Determination letters, however, do not provide assurances about the complainant's ability to undertake future travel. In fact, DHS does not tell a complainant whether he or she is in

the TSDB or a subset of the TSDB or give any explanation for inclusion on such a list at any point in the available administrative process. Thus, the complainant does not have an opportunity to contest or knowingly to offer corrections to the record on which any such determination may be based.

### B. Judicial Review

When a final determination letter indicates the complainant may seek judicial review of the decisions represented in the letter, it does not advise whether the complainant is on the No–Fly List or provide the legal or factual basis for such inclusion. If the complainant submits a petition for review to the appropriate court, the government furnishes the court (but not the petitioner) with the administrative record.

If the administrative DHS TRIP review of a petitioner's redress file resulted in a final determination that the petitioner is not on the No–Fly List, the administrative record will inform the court of that fact. If, on the other hand, the administrative DHS TRIP review of a petitioner's redress file resulted in a final determination that the petitioner is and should remain on the No–Fly List, the administrative record will include the information that the government relied on to maintain that listing. The government may have obtained this information from human sources, foreign governments, and/or "signals intelligence." The government may provide to the court *ex parte* and *in camera* information that is part of the administrative record and that the government has determined is classified, Sensitive Security Information, law-enforcement investigative information, and/or information otherwise privileged or protected from disclosure by statute or regulation.

The administrative record also includes any information that the petitioner submitted to the government as part of his or her DHS TRIP request, and the petitioner has access to that portion of the record. As noted, at no point during the judicial-review process does the government provide the petitioner with confirmation as to whether the petitioner is on the No–Fly **\*1143** List, set out the reasons for including petitioner's name on the List, or identify any information or evidence relied on to maintain the petitioner's name on the List.

For a petitioner who is on the No–Fly List, the court will review the administrative record submitted by the government in order to determine whether the government reasonably determined the petitioner satisfied the minimum substantive derogatory criteria for inclusion on the List. If after review the court determines the administrative record

supports the petitioner's inclusion on the No–Fly List, it will deny the petition for review. If the court determines the administrative record contains insufficient evidence to satisfy the substantive derogatory criteria, however, the government takes the position that the court may remand the matter to the government for appropriate action.

### III. Plaintiffs' Pertinent History

Solely for purposes of the parties' Motions (# 85, # 91) presently before the Court, Defendants do not contest the following facts as asserted by Plaintiffs:[5]

Plaintiffs are thirteen United States citizens who were denied boarding on flights over United States airspace after January 1, 2009, and who believe they are on the United States government's No–Fly List. Airline representatives, FBI agents, or other government officials told some Plaintiffs that they are on the No–Fly List.

Each Plaintiff filed DHS TRIP complaints after being denied boarding and each received a determination letter that does not confirm or deny any Plaintiff's name is on any terrorist watch list nor provide a reason for any Plaintiff to be included in the TSDB or on the No–Fly List.

Many of these Plaintiffs cannot travel overseas by any mode other than air because such journeys by boat or by land would be cost-prohibitive, would be time-consuming to a degree that Plaintiffs could not take the necessary time off from work, or would put Plaintiffs at risk of interrogation and detention by foreign authorities. In addition, some Plaintiffs are not physically well enough to endure such infeasible modes of travel.

While Plaintiffs' circumstances are similar in many ways, each of their experiences and difficulties relating to and arising from their alleged inclusion on the No–Fly List is unique as set forth in their Declarations filed in support of their Motion and summarized briefly below.

***Ayman Latif:*** Latif is a United States Marine Corps veteran and lives in Stone Mountain, Georgia, with his wife and children. Between November 2008 and April 2010 Latif and his family were living in Egypt. When Latif and his family attempted to return to the United States in April 2010, Latif was not allowed to board the first leg of their flight from Cairo to Madrid. One month later Latif was questioned by FBI agents and told he was on the No–Fly List. Because

he was unable to board a flight to the United States, Latif's United States veteran disability benefits were reduced from $899.00 per month to zero as the result of being unable to attend the scheduled evaluations required to keep his benefits. In August 2010 Latif returned home after the United States government **\*1144** granted him a "one-time waiver" to fly to the United States. Because the waiver was for "one time," Latif cannot fly again, and therefore, he Is unable to travel from the United States to Egypt to resume studies or to Saudi Arabia to perform a *hajj,* a religious pilgrimage and Islamic obligation.

***Mohamed Sheikh Abdirahm Kariye:*** Kariye lives in Portland, Oregon, with his wife and children. In March 2010 Kariye was not allowed to board a flight from Portland to Amsterdam, was surrounded in public by government officials at the airport, and was told by an airline employee that he was on a government watch list. Because Kariye is prohibited from boarding flights out of the United States, he could not fly to visit his daughter who was studying in Dubai and cannot travel to Saudi Arabia to accompany his mother on the *hajj* pilgrimage.

***Raymond Earl Knaeble IV:*** Knaeble is a United States Army veteran and lives in Chicago, Illinois. In 2006 Knaeble was working in Kuwait. In March 2010 Knaeble flew from Kuwait to Bogota, Colombia, to marry his wife, a Colombian citizen, and to spend time with her family. On March 14, 2010, Knaeble was not allowed to board his flight from Bogota to Miami. Knaeble was subsequently questioned numerous times by FBI agents in Colombia. Because Knaeble was unable to fly home for a required medical examination, his employer rescinded its job offer for a position in Qatar. Knaeble attempted to return to the United States through Mexico where he was detained for over 15 hours, questioned, and forced to return to Bogota. Knaeble eventually returned to the United States in August 2010 by traveling for 12 days from Santa Marta, Colombia, to Panama City and then to Mexicali, California. United States and foreign authorities detained, interrogated, and searched Knaeble on numerous occasions during that journey.

***Faisal Nabin Kashem:*** In January 2010 Kashem traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program and eventually to enroll in a four-year Islamic studies program. In June 2010 Kashem attempted to fly from Jeddah, Saudi Arabia, to New York for summer vacation; was denied boarding; and was told by an airline employee that he was on the No–Fly List. FBI

agents later questioned Kashem and told him that he was on the No–Fly List. After Kashem joined this lawsuit, the United States government offered him a "one-time waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

**Elias Mustafa Mohamed:** In January 2010 Mohamed traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program. In June 2010 Mohamed attempted to fly from Jeddah, Saudi Arabia, to his home in Seattle, Washington, via Washington, D.C., but he was not allowed to board his flight and was told by an airline employee that he was on the No–Fly List. FBI agents later questioned Mohamed and told him that he was on the No–Fly List. After joining this lawsuit, the United States government offered Mohamed a "one-time-waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

**Steven William Washburn:** Washburn is a United States Air Force veteran and lives in New Mexico. In February 2010 Washburn was not allowed to board a flight from Ireland to Boston. He later **\*1145** attempted to fly from Dublin to London to Mexico City. Although he was allowed to board the flight from Dublin to London, on the London to Mexico City flight the aircraft turned around 3 ½ hours after takeoff and returned to London where Washburn was detained. On numerous later occasions FBI agents interrogated Washburn. In May 2010 Washburn returned to New Mexico by taking a series of five flights that eventually landed in Juarez, Mexico, where he crossed the United States border on foot. During this trip Mexican officials detained and interrogated Washburn. In June 2012 an FBI agent told Washburn that the agent would help remove Washburn's name from the No–Fly List if he agreed to speak to the FBI. Since May 2010 Washburn has been separated from his wife who is in Ireland because she has been unable to obtain a visa to come to the United States and Washburn is unable to fly to Ireland.

**Nagib Ali Ghaleb:** Ghaleb lives in Oakland, California. In February 2010 Ghaleb attempted to travel from Yemen where his wife and children were living to San Francisco via Frankfurt. Ghaleb was not allowed to board his flight from Frankfurt to San Francisco. FBI agents later interrogated Ghaleb and offered to arrange to fly him back to the United States if he agreed to tell them who the "bad guys" were in Yemen and San Francisco and to provide names of people

from his mosque and community. The agents threatened to have Ghaleb imprisoned. In May 2010 Ghaleb again attempted to return to the United States. He was able to fly from Sana'a, Yemen, to Dubai, but he was not allowed to board his flight from Dubai to San Francisco. In July 2010 Ghaleb accepted a "one-time waiver" offered by the United States government to return to the United States. Because Ghaleb cannot fly, he cannot go to Yemen to be with his ill mother or to see his brothers or sisters.

**Abdullatif Muthanna:** Muthanna lives in Rochester, New York. In June 2009 Muthanna left Rochester to visit his wife and children who live in Yemen. In May 2010 Muthanna was to return to the United States on a flight from Aden, Yemen, to New York via Jeddah, Saudi Arabia, but he was not allowed to board his flight from Jeddah to New York. In September 2010 Muthanna accepted a "one-time waiver" offered by the United States government to return home. In June 2012 Muthanna wanted to be with his family and attempted to fly to Yemen, but he was not allowed to board a flight departing from New York. In August 2012 Muthanna attempted a journey of thirty-six days over land and by ship from Rochester to Yemen, but a ship captain refused to let Muthanna sail on a cargo freighter departing from Philadelphia on the recommendation of United States Customs and Border Protection. Muthanna was not allowed to board flights on four separate occasions before he finally boarded a flight from New York to Dubai in February 2013.

**Mashaal Rana:** Rana moved to Pakistan to pursue a master's degree in Islamic studies in 2009. In February 2010 Rana was not allowed to board a flight from Lahore, Pakistan, to New York. An FBI agent later interrogated Rana's brother, who lives in the United States. In October 2012 Rana was six-months pregnant and again attempted to return to New York to receive needed medical care and to deliver her child. Rana's brother worked with United States officials to clear Rana to fly. Rana received such clearance, but five hours before her flight was to depart she received notice that she would not be allowed to board. Rana was not able to find a safe alternative to travel to the United States before the birth of her child. In November 2010 the United States government offered Rana a "one-time waiver," **\*1146** which she has not used because she fears she would not be able to return to Pakistan to be with her husband.

**Ibraheim Y. Mashal:** Mashal is a United States Marine Corps veteran. Mashal was not allowed to board a flight from Chicago, Illinois, to Spokane, Washington, and was told by

an airline representative that he was on the No–Fly List. FBI agents later questioned Mashal and told him that his name would be removed from the No–Fly List and he would receive compensation if he helped the FBI by serving as an informant. When Mashal asked to have his attorney present before answering the FBI's questions, the agents ended the meeting. Mashal owns a dog-training business. Because he is unable to fly, he has lost clients; had to turn down business; and has been prevented from attending his sister-in-law's graduation in Hawaii, the wedding of a close friend, the funeral of a close friend, and fundraising events for the nonprofit organization that he founded.

**Salah Ali Ahmed:** Ahmed lives in Norcross, Georgia. In July 2010 Ahmed attempted to travel from Atlanta to Yemen via Frankfurt and was not allowed to board the flight in Atlanta. FBI agents later questioned Ahmed. Because he is unable to fly, Ahmed was unable to travel to Yemen in 2012 when his brother died and is unable to travel to Yemen to visit his extended family and to manage property that he owns in Yemen.

**Amir Meshal:** Meshal lives in Minnesota. In June 2009 Meshal was not allowed to board a flight from Irvine, California, to Newark, New Jersey. FBI agents told Meshal that he was on a government list that prohibits him from flying. In October 2010 FBI agents offered Meshal the opportunity to serve as a government informant in exchange for assistance in removing his name from the No–Fly List. Because Meshal is unable to fly, he cannot visit his mother and extended family in Egypt.

**Stephen Durga Persaud:** Persaud lives in Irvine, California. In May 2010 Persaud was not allowed to board a flight from St. Thomas to Miami, An FBI agent told Persaud that he was on the No–Fly List, interrogated him, and told him the only way to get off the No–Fly List was to "talk to us." In June 2010 Persaud took a five-day boat trip from St. Thomas to Miami and a four-day train ride from Miami to Los Angeles so he could be home for the birth of his second child. Because he cannot fly, Persaud cannot travel to Saudi Arabia to perform the *hajj* pilgrimage.

## STANDARDS

**[1]** **[2]** **[3]** Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut.*

*Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir.2011). *See also* Fed.R.Civ.P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir.2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one.... The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 387 (9th Cir.2010) (citation omitted).

**[4]** **[5]** **[6]** **[7]** **[8]** A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." **\*1147** *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.,* 606 F.3d 584, 587 (9th Cir.2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.,* 381 F.3d 948, 957 (9th Cir.2004) (citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07–CV–1521–JAM–DAD, 2011 WL 202797, at *2 (E.D.Cal., Jan. 20, 2011) (citing *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989)), When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1137 (9th Cir.2009) (citation omitted).

**[9]** **[10]** The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.,* 454 F.3d 975, 987 (9th Cir.2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

As noted, Plaintiffs allege Defendants have violated Plaintiffs' Fifth Amendment rights to procedural due process because Defendants have not provided Plaintiffs with any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No–Fly List. Plaintiffs also allege Defendants violated Plaintiffs' rights under the APA.

## I. Claim One: Procedural Due–Process

**[11]** **[12]** "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews,* 424 U.S. at 332, 96 S.Ct. 893. *See also MacLean v. Dep't of Homeland Sec.,* 543 F.3d 1145, 1151 (9th Cir.2008). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). *See also Villa–Anguiano v. Holder,* 727 F.3d 873, 881 (9th Cir.2013). Due process, however, " 'is flexible and calls for such procedural protections as the particular situation demands.' " *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). *See also Wynar v. Douglas Cnty. School Dist.,* 728 F.3d 1062, 1073 (9th Cir.2013).

**[13]** The court must weigh three factors when evaluating the sufficiency of procedural protections: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. *See also Vasquez v. Rackauckas,* 734 F.3d 1025, 1044 (9th Cir.2013).

### A. First Factor: Private Interest

**[14]** Plaintiffs contend the first factor under *Mathews* weighs in their favor because **\*1148** Defendants' inclusion of Plaintiffs on the No–Fly List has deprived Plaintiffs of their constitutionally-protected liberty interests in travel and reputation.

### 1. Right to Travel

**[15]** "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). *See also Eunique v. Powell,* 302 U.S. 971, 976–77 (9th Cir., 2002). "[T]he [Supreme] Court has consistently treated the right to

*International* travel as a liberty interest that is protected by the Due Process Clause of the Fifth Amendment." *DeNieva v. Reyes,* 966 F.2d 480, 485 (9th Cir.1992) (emphasis added). *See also Eunique,* 302 F.3d at 973.

Relying primarily on *Gilmore v. Gonzales,* 435 F.3d 1125 (9th Cir.2006), and *Green v. Transp. Sec. Admin.,* 351 F.Supp.2d 1119 (W.D.Wash.2005), Defendants argue there is not a constitutional right to travel by airplane or by the most convenient form of travel. Defendants, therefore, contend Plaintiffs' rights to travel are not constitutionally burdened because the No–Fly List only prohibits travel by commercial aviation.

As the Court found in its Opinion and Order (# 110), *Gilmore* and *Green* are distinguishable from this case for a number of reasons. First, those cases involve burdens on the right to *interstate* as opposed to *international* travel. Although there are viable alternatives to flying for domestic travel within the continental United States such as traveling by car or train, the Court disagrees with Defendants' contention that international air travel is a mere convenience in light of the realities of our modern world. Such an argument ignores the numerous reasons that an individual may have for wanting or needing to travel overseas quickly such as the birth of a child, the death of a loved one, a business opportunity, or a religious obligation. In *Ibrahim v. Department of Homeland Security* the court rejected an argument similar to the one that Defendants make in this case:

> While the Constitution does not ordinarily guarantee the right to travel by any particular form of transportation, given that other forms of travel usually remain possible, the fact remains that for *international* travel, air transport in these modern times is practically the only form of transportation, travel by ship being prohibitively expensive.... Decisions involving *domestic* air travel, such as the *Gilmore* case, are not on point.

No. C 06–00545 WHA, 2012 WL 6652362, at \*7 (N.D.Cal. Dec. 20, 2012). Other cases Defendants cite are similarly distinguishable. *See, e.g., Miller v. Reed,* 176 F.3d 1202 (9th Cir.1999) (restrictions on interstate travel as it relates to the right to drive); *Town of Southold v. Town of E. Hampton,* 477 F.3d 38 (2d Cir.2007) (restrictions on interstate travel as it relates to riding ferries); *Cramer v. Skinner,* 931 F.2d 1020 (5th Cir.1991) (restrictions on interstate air service to one airport).

Second, the burdens imposed by the restrictions on the plaintiffs in *Green* and *Gilmore* are far less than the alleged

burdens in this matter. *Gilmore* involved the requirement that passengers present photo identification before boarding a commercial flight and *Green* involved passengers being subjected to enhanced security screening because they had been mistakenly identified as being on a terrorist watch list. Unlike the security-screening restrictions in *Green* and *Gilmore*, Plaintiffs' placement on the No–Fly List operates as a complete and indefinite ban on boarding commercial flights.

**\*1149** The Court also disagrees with Defendants' assertion that *all* modes of transportation must be foreclosed before any infringement of an individual's due-process right to international travel is triggered. In *DeNieva* the Ninth Circuit found the plaintiff's protected liberty interest in her right to international travel had been infringed in that "retention of [her] passport infringed upon her ability to travel internationally" because "[w]ithout her passport, she could travel internationally *only with great difficulty, if at all.*" *DeNieva,* 966 F.2d at 485 (emphasis added). In other words, her protected liberty interest in international travel had been infringed even though she may not have been completely banned from traveling.

As Plaintiffs' difficulties with international travel demonstrate, placement on the No–Fly List is a significant impediment to international travel. It is undisputed that inclusion on the No–Fly List completely bans listed persons from boarding commercial flights to or from the United States or over United States airspace. In addition, the realistic implications of being on the No–Fly List are far-reaching. For example, TSC shares watch-list information with 22 foreign governments, and United States Customs and Border Protection makes recommendations to ship captains as to whether a passenger poses a risk to transportation security. Thus, having one's name on the watch list can also result in interference with an individual's ability to travel by means other than commercial airlines as evidenced by some Plaintiffs' experiences as they attempted to travel internationally or return to the United States by sea and by land. In addition, the ban on air travel has exposed some Plaintiffs to extensive detention and interrogation at the hands of foreign authorities. With perhaps the exception of travel to a small number of countries in North and Central America, a prohibition on flying turns routine international travel into an odyssey that imposes significant logistical, economic, and physical demands on travelers. Thus, while the nature of the deprivation in this case may be different from the retention of the plaintiff's passport in *DeNieva,* placement on the No–Fly

List, as noted, results in an individual being able to "travel internationally only with great difficulty, if at all." *Id.*

Accordingly, the Court concludes on this record that Plaintiffs have constitutionally-protected liberty interests in traveling internationally by air, which are significantly affected by being placed on the No–Fly List.

The first step of the *Mathews* inquiry, however, does not end with mere recognition of a liberty interest. The Court must also weigh the liberty interest deprived against the other factors. *See Wilkinson v. Austin,* 545 U.S. 209, 225, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).

As noted, placement on the No–Fly List renders most international travel very difficult or impossible. One need not look beyond the hardships suffered by Plaintiffs to understand the significance of the deprivation of the right to travel internationally. Due to the major burden imposed by inclusion on the No–Fly List, Plaintiffs have suffered significantly including long-term separation from spouses and children; the inability to access desired medical and prenatal care; the inability to pursue an education of their choosing; the inability to participate in important religious rites; loss of employment opportunities; loss of government entitlements; the inability to visit family; and the inability to attend important personal and family events such as graduations, weddings, and funerals. The Court concludes international travel is not a mere convenience or luxury in this modern world. Indeed, for many international **\*1150** travel is a necessary aspect of liberties sacred to members of a free society.

Accordingly, on this record the Court concludes Plaintiffs' inclusion on the No–Fly List constitutes a significant deprivation of their liberty interests in international travel.

### 2. Stigma–Plus—Reputation

**[16]** Plaintiffs also assert the first factor under *Mathews* has been satisfied because Plaintiffs have been stigmatized "in conjunction with their right to travel on the same terms as other travelers." First Am. Compl. ¶ 141.

**[17]** **[18]** Under the "stigma-plus" doctrine, the Supreme Court has recognized a constitutionally-protected interest in "a person's good name, reputation, honor, or integrity." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507,

27 L.Ed.2d 515 (1971). *See also Miller v. Cal.,* 355 F.3d 1172, 1178–79 (9th Cir.2004). "To prevail on a claim under the stigma-plus doctrine, Plaintiffs must show (1) public disclosure of a stigmatizing statement by the government, the accuracy of which is contested; *plus* (2) the denial of some more tangible interest such as employment, or the alteration of a right or status recognized by state law." *Green,* 351 F.Supp.2d at 1129 (emphasis added)(citing *Ulrich v. City & Cnty. of San Francisco,* 308 F.3d 968, 982 (9th Cir.2002), and *Paul v. Davis,* 424 U.S. 693, 701, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). " 'The plus must be a deprivation of a liberty or property interest by the state that directly affects the [Plaintiffs'] rights.' " *Green,* 351 F.Supp.2d at 1129 (quoting *Miller,* 355 F.3d at 1178). Under the "plus" prong, a plaintiff can show he has suffered a change of legal status if he "legally [cannot] do something that [he] could otherwise do." *Miller,* 355 F.3d at 1179 (discussing *Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)).

Plaintiffs contend, and Defendants do not dispute, that placement on the No–Fly List satisfies the "stigma" prong because it carries with it the stigma of being a suspected terrorist that is publicly disclosed to airline employees and other travelers near the ticket counter. According to Defendants, however, Plaintiffs cannot meet the "plus" prong of the test because (1) Plaintiffs do not have a right to travel by commercial airline and (2) there is not a "connection" between the stigma and the "plus" in light of the fact that Plaintiffs have alternative means of travel.

As noted, the Court has concluded Plaintiffs have constitutionally-protected liberty interests in the right to travel internationally by air. In addition, the Court concludes Plaintiffs have satisfied the "plus" prong because being on the No–Fly List means Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No–Fly List. Thus, Plaintiffs have suffered a change in legal status because they "legally [cannot] do something that [they] otherwise could do." *Miller,* 355 F.3d at 1179. The Court, therefore, concludes on this record that Plaintiffs have constitutionally-protected liberty interests in their reputations.

On the other hand, Plaintiffs' private interests at the heart of their stigma-plus claim are not as. strong. Although placement on the No–Fly List carries with it the significant stigma of being a suspected terrorist and Defendants do not contest the fact that the public disclosure involved may be

sufficient to satisfy the stigma-plus test, the Court notes the limited nature of the public disclosure in this case mitigates Plaintiffs' claims of injury to their reputations. Because the No–Fly List is not released publicly, the "public" disclosure is **\*1151** limited to a relatively small group of individuals in the same area of the airport as the traveler when the traveler is denied boarding. Notwithstanding the fact that being denied boarding an airplane and, in some instances, being arrested or surrounded by security officials in an airport is doubtlessly stigmatizing, the Court notes the breadth and specificity of the public disclosure in this case is more limited than in the ordinary "stigma-plus" case. *See, e.g., Paul v. Davis,* 424 U.S. 693, 694–96, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (distribution of a list and mug shots of "active shoplifters" to approximately 800 merchants); *Constantineau,* 400 U.S. at 435–36, 91 S.Ct. 507 (posting a list of the identities of those who have caused harm "by excessive drinking" in all retail liquor outlets); *Ulrich v. City & Cnty. of San Francisco,* 308 F.3d 968, 973 (9th Cir.2002) (filing of an adverse action report with the California Medical Board and the National Practitioner Data Bank detailing the reasons why a psychologist relinquished his privileges at a hospital). Nevertheless, the Court concludes the injury to Plaintiffs' reputations is sufficient to implicate Plaintiffs' constitutionally-protected interests in their reputations.

On this record the Court concludes Plaintiffs' claims raise constitutionally-protected liberty interests both in international air travel and in reputation, and, therefore, the first factor under the *Mathews* test weighs heavily in Plaintiffs' favor.

### B. Second Factor: Risk of Erroneous Deprivation

**[19]** As noted, in the second *Mathews* factor the Court weighs "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. *See also Vasquez,* 734 F.3d at 1044.

### 1. Risk of Erroneous Deprivation

**[20]** When considering the risk of erroneous deprivation, the Court considers both the substantive standard that the government uses to make its decision as well as the procedural processes in place. *See Santosky v. Kramer,* 455 U.S. 745, 761–64, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

[21] [22] As noted, nominations to the TSDB are generally accepted based on a "reasonable suspicion" that requires "articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual" meets the substantive derogatory criteria.[6] Joint Statement of Stipulated Facts (# 84) ¶ 16. This "reasonable suspicion" standard is the same as the traditional reasonable suspicion standard commonly applied by the courts. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting investigatory stops based on a reasonable suspicion supported by "articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."). *See also Ramirez v. City of Buena Park,* 560 F.3d 1012, 1020–21 (9th Cir.2009). "The reasonable-suspicion standard is not a particularly high threshold to reach." *United States v. Valdes–Vega,* 738 F.3d 1074, 1078 (9th Cir.2013). Although reasonable suspicion requires more than "a mere 'hunch,' " the evidence available "need not rise to the level required for probable cause, and ... falls considerably short of **\*1152** satisfying a preponderance of the evidence standard." *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

It is against the backdrop of this substantive standard that the Court considers the risk of erroneous deprivation of the protected interests; *i.e.,* the risk that travelers will be placed on the No–Fly List under Defendants' procedures despite not having a connection to terrorism or terrorist activities.

Defendants argue there is little risk of erroneous deprivation because the TSC has implemented extensive quality controls to ensure that the TSDB includes only individuals who are properly placed there. Defendants point out that the TSDB is updated daily and audited for accuracy and currentness on a regular basis and that each entry into the TSDB receives individualized review if the individual files a DHS TRIP inquiry. Finally, Defendants argue judicial review of the DHS TRIP determination further diminishes the risk of erroneous deprivation.

Plaintiffs, in turn, cite a 2007 report by the United States Government Accountability Office and a 2009 report by the Department of Justice Office of the Inspector General that concludes the TSDB contains many errors and that the TSC has failed to take adequate steps to remove or to modify records in a timely manner even when necessary. In addition, Plaintiffs maintain the lack of notice of inclusion on the No–

Fly List or the reasons therefor forces aggrieved travelers to guess about the evidence that they should submit in their defense and, by definition, creates a one-sided and insufficient record at both the administrative and judicial level that does not provide a genuine opportunity to present exculpatory evidence for the correction of errors.

Defendants point out that the information on which Plaintiffs rely to support their contention that the TSC has failed to modify adequately or to remove records when necessary is outdated and that the 2009 report indicated significant progress in maintenance of the TSDB. Although Defendants are correct that the TSC appears to have made improvements in ensuring the TSDB is current and accurate, Plaintiffs' contention that the TSDB carries with it a risk of error, nevertheless, carries significant weight. This point was recently reinforced in *Ibrahim* where the plaintiff was nominated to the No–Fly List in 2004 as a consequence of human error despite the fact that she did not pose a threat to national security. *Ibrahim v. Dep't of Homeland Sec.,* No. C 06–00545 WHA (# 682)(N.D.Cal. Jan. 14, 2014) at 9. Although Ibrahim was taken off the No–Fly List shortly after the 2004 listing, the mistake itself was not discovered until 2013 and Ibrahim continued to experience substantial difficulties through the date of the order in which Judge William Alsup ultimately ordered the government to purge references to the erroneous 2004 nomination in all of its databases. *Id.* at 16–25, 38. The fact that the TSDB could still contain erroneous information more than nine years after commission of the error belies Defendants' argument that the TSDB front-end safeguards substantially mitigate the risk of erroneous deprivation.

In any event, the DHS TRIP process suffers from an even more fundamental deficiency. As noted, the reasonable suspicion standard used to accept nominations to the TSDB is a low evidentiary threshold. This low standard is particularly significant in light of Defendants' refusal to reveal whether travelers who have been denied boarding and who submit DHS TRIP inquiries are on the No–Fly List and, if they are on the List, to provide the **\*1153** travelers with reasons for their inclusion on the List. "Without knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations." *Al Haramain Islamic Found., Inc. v. United States Dep't of Treasury,* 686 F.3d 965, 982 (9th Cir.2012).

The availability of judicial review does little to cure this risk of error. While judicial review provides an independent

examination of the existing administrative record, that review is of the same one-sided and potentially insufficient administrative record that TSC relied on in its listing decision without any additional meaningful opportunity for the aggrieved traveler to submit evidence intelligently in order to correct anticipated errors in the record.[7] Moreover, judicial review only extends to whether the government reasonably determined the traveler meets the minimum substantive derogatory criteria; *i.e.,* the reasonable suspicion standard. Thus, the fundamental flaw at the administrative-review stage (the combination of a one-sided record and a low evidentiary standard) carries over to the judicial-review stage.

Accordingly, on this record the Court concludes the DHS TRIP redress process, including the judicial review of DHS TRIP determinations, contains a high risk of erroneous deprivation of Plaintiffs' constitutionally-protected interests.

**2. Utility of Substitute Procedural Safeguards**

In its analysis of the second *Mathews* factor, the Court also considers the probative value of additional procedural safeguards. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Plaintiffs contend due process requires Defendants to provide post-deprivation notice of their placement on the No–Fly List; notice of the reasons they have been placed on the List; and a post-deprivation, in-person hearing to permit Plaintiffs to present exculpatory evidence. Notably, Plaintiffs argue these additional safeguards are only necessary after a traveler has been denied boarding. Defendants, in turn, assert the current procedures are sufficient in light of the compelling government interests in national security and protection of classified information.

Clearly, additional procedural safeguards would provide significant probative value. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893. In particular, notice of inclusion on the No–Fly List through the DHS TRIP process after a traveler has been denied boarding would permit the complainant to make an intelligent decision about whether to pursue an administrative or judicial appeal. In addition, notice of the reasons for inclusion on the No–Fly List as well as an opportunity to present exculpatory evidence would help ensure the accuracy and completeness of the record to be considered at both the administrative and judicial stages and, at the very least, would provide aggrieved travelers the opportunity to correct "simple factual errors" with "potentially easy, ready, and persuasive explanations." *See Al Haramain Islamic Found.,* 686 F.3d

at 982. Thus, the Court concludes additional procedural safeguards would have significant probative value.

In summary, on this record the Court concludes the DHS TRIP process presently carries with it a high risk of erroneous deprivation in light of the low evidentiary standard required for placement on the **\*1154** No–Fly List together with the lack of a meaningful opportunity for individuals on the No–Fly List to provide exculpatory evidence in an effort to be taken off of the List. Moreover, the Court finds additional procedural safeguards would have significant probative value in ensuring that individuals are not erroneously deprived of their constitutionally-protected liberty interests. Accordingly, the Court concludes the second *Mathews* factor weighs heavily in favor of Plaintiffs.

**C. The Government's Interest**

**[23]**   When considering the third *Mathews* factor, the Court weighs "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. *See also Vasquez,* 734 F.3d at 1044.

**[24]**   "[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee,* 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (quoting *Aptheker v. Sec'y of State,* 378 U.S. 500, 509, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964)). *See also Al Haramain,* 686 F.3d at 980 ("[T]he government's interest in national security cannot be understated.").

**[25]**   **[26]**   "[T]he Constitution certainly does not require that the government take actions that would endanger national security." *Al Haramain,* 686 F.3d at 980. Moreover, the government has a " 'compelling interest' in withholding national security information from unauthorized persons." *Dep't of the Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (quoting *Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980)). "Certainly the United States enjoys a privilege in classified information affecting national security so strong that even a criminal defendant to whose defense such information is relevant cannot pierce that privilege absent a specific showing of materiality." *Nat'l Council of Resistance of Iran*

*v. Dep't of State,* 251 F.3d 192, 207 (D.C.Cir.2001) (*NCORI*). Obviously, the Court cannot and will not order Defendants to disclose classified information to Plaintiffs.

On this record the Court concludes the governmental interests in combating terrorism and protecting classified information are particularly compelling, and, viewed in isolation, the third *Mathews* factor weighs heavily in Defendants' favor.

### D. Balancing the *Mathews* Factors

**[27]  [28]**  " '[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (quoting *Cafeteria & Rest. Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). *See also Ching v. Mayorkas,* 725 F.3d 1149, 1157 (9th Cir.2013). " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' " *Gilbert v. Homar,* 520 U.S. at 930, 117 S.Ct. 1807 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). *See also Ching,* 725 F.3d at 1157.

**[29]  [30]**  " 'The fundamental requisite of due process of law is the opportunity to be heard.' " *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (quoting **\*1155** *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914)). *See also In re Rains,* 428 F.3d 893, 903 (9th Cir.2005). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane,* 339 U.S. at 314, 70 S.Ct. 652. *See also Circu v. Gonzales,* 450 F.3d 990, 993 (9th Cir.2006). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *Id. See also Al Haramain,* 686 F.3d at 980 ("[T]he Constitution [requires] that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests.").

### 1. Applicable Caselaw

Although balancing the *Mathews* factors is especially difficult in this case involving compelling interests on both sides, the Court, fortunately, does not have to paint on an empty canvass when balancing such interests. Indeed, several other courts have done so in circumstances that also required balancing a plaintiff's due-process right to contest the deprivation of important private interests with the government's interest in protecting national security and classified information. *See, e.g., Al Haramain,* 686 F.3d 965; *Jifry v. Fed. Aviation Admin.,* 370 F.3d 1174 (D.C.Cir.2004); *NCORI,* 251 F.3d 192 (D.C.Cir.2001); *Ibrahim,* No. C 06–00545 WHA (# 682); *KindHearts for Charitable and Humanitarian Dev., Inc. v. Geithner,* 647 F.Supp.2d 857 (N.D.Ohio 2009).

#### a. *Ibrahim v. Department of Homeland Security*

As noted, the plaintiff in *Ibrahim* was placed on the No–Fly List in November 2004 as a result of human error. *Ibrahim,* No. C 06–00545 WHA (# 682), at 16. Nonetheless, Ibrahim's student visa was revoked in January 2005 because of "law enforcement interest in her as a *potential* terrorist." *Id.* at 17–18 (emphasis added). Even though Ibrahim was taken off of the No–Fly List shortly after her initial listing and the government had determined by February 10, 2006, that she had "no nexus to terrorism," she remained in the TSDB until September 18, 2006. *Id.* at 16–18. Shortly after her removal from the TSDB, Ibrahim was placed back in the TSDB before once again being removed at the end of May 2007. *Id.* at 18–19. On October 20, 2009, however, Ibrahim was again nominated to the TSDB pursuant to a secret exception to the reasonable-suspicion standard. She was not, however, placed on the No–Fly List. *Id.* at 19.

When Ibrahim applied for a visa in 2009, her application was. denied pursuant to 8 U.S.C. § 1182(a)(3)(B), which is a section of the Immigration and Nationality Act that relates to terrorist activities. The word "Terrorist" was handwritten on the letter informing her of the denial. *Id.* at 20–22. Although Ibrahim again applied for a visa in 2013, it was denied even though the government conceded during litigation that Ibrahim did not pose a threat to national security. *Id.* at 18, 19–24.

In 2013 Ibrahim's daughter, a United States citizen, was not permitted to board a flight to the United States because her name was in a section of the TSDB in which travelers' admissibility to enter the United States is evaluated. Within six minutes, however, United States Customs and Border

Patrol discovered the error **\*1156** and corrected it the next day, and Ibrahim's daughter was removed from the TSDB. *Id.* at 24–25.

The *Ibrahim* court applied the *Mathews* factors to Ibrahim's procedural due-process challenge and found: (1) Ibrahim's presence on the No–Fly List and subsequent events infringed on her right to travel, right to be free from incarceration, and right to be free from the stigma associated with her public denial of boarding an airplane and subsequent incarceration; (2) there was not merely the *risk* of erroneous deprivation, but an *actual* erroneous deprivation; and (3) the government interest was low because the government conceded Ibrahim did not pose a threat to national security. *Id.* at 27. The court ordered the defendants to purge from government databases all references to the erroneous 2004 listing and ordered the government to give Ibrahim the opportunity to apply for a discretionary waiver of visa ineligibility. After reviewing classified information, however, the court refused to overturn Ibrahim's visa denial. *Id.* at 27–28, 31–34.

#### b. *National Council of Resistance of Iran (NCORI) v. Department of State*

In *NCORI* two organizations sought review of the Secretary of State's actions designating them as "foreign terrorist organizations" under the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 8 U.S.C. § 1189. 251 F.3d at 195–96. Such a designation under AEDPA results in the blocking of all funds that the organization has on deposit in United States banks, bans certain members and representatives of the organization from entry into the United States, and forbids all persons within the United States "from 'knowingly providing material support or resources' to the organization." *Id.* at 196 (quoting 18 U.S.C. § 2339B(a)(1)). During the administrative review of the State Department's determination, the Secretary of State "compiles an 'administrative record,' " but the Secretary does not provide the target organizations with notice of the materials used against them in that record, the opportunity to comment on such materials, or the opportunity to develop the administrative record further. *Id.* The administrative record may contain classified materials. *Id.* Judicial review is available, but it is based solely on the administrative record and the classified portion of the record that the government submits to the court *ex parte* and *in camera*. *Id.* at 196–97.

When analyzing the procedural due-process claim, the District of Columbia Circuit found the plaintiffs were deprived of their property interests and a stigma-plus liberty interest by their designation as foreign terrorist organizations. *Id.* at 203–05. After considering the risk of erroneous deprivation and the government's interests, the court held the Secretary must provide the organizations with " 'notice of the action sought,' along with the opportunity to effectively be heard." *Id.* at 208 (quoting *Mathews,* 424 U.S. at 334, 96 S.Ct. 893). Accordingly, the court held the Secretary must (1) afford the target organizations *pre-deprivation* notice that they are under consideration for designation; (2) provide the organizations with notice of the unclassified portions of the administrative record on which the Secretary will rely in making the designation determination; and (3) provide the organizations with some "opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." *Id.* at 208–09. Notably, however, the court left open "the possibility of the Secretary, in an appropriate case, **\*1157** demonstrating the necessity of withholding all notice and all opportunity to present evidence until the designation is already made." *Id.* at 208.

#### c. *KindHearts for Charitable Humanitarian Development v. Geithner*

In *KindHearts* the plaintiff challenged the Office of Foreign Assets Control's provisional designation of KindHearts as a Specially Designated Global Terrorist (SDGT). 647 F.Supp.2d at 864. On February 19, 2006, the Office of Foreign Assets Control (OFAC) sent notice to KindHearts that OFAC had frozen all of Kindhearts's assets and property pending investigation into whether KindHearts was subject to designation as an SDGT. *Id.* at 866–67. The "blocking notice" reflected KindHearts was being investigated "for being controlled by, acting for or on behalf of, assisting in or providing financial or material support to, and/or otherwise being associated with Hamas." *Id.* at 867.

After ignoring a responsive letter from KindHearts and its request for a copy of the administrative record relied on in the investigation, OFAC provisionally designated KindHearts as an SDGT on May 25, 2007, more than a year after the initial asset freeze. *Id.* With that letter OFAC included 35 unclassified and nonprivileged documents; "acknowledged it also relied on other 'classified and

privileged documents' " and provided a three-page summary of the classified evidence; and informed KindHearts that it could present any evidence or other information for OFAC's consideration in making the final determination. *Id.* at 868. After unsuccessfully requesting access to the full classified and unclassified record, KindHearts sent OFAC a 28–page preliminary submission on June 25, 2007, together with 1,369 pages of evidence to address OFAC's concerns to the best of Kindhearts' ability. *Id.* OFAC later misplaced Kindhearts' submission. *Id.* at 868 n. 4.

KindHearts filed a lawsuit in which it argued, among other things, that "OFAC provided inadequate post-deprivation process" by failing "to specify any objective criteria for blocking KindHearts' assets" and by failing to provide either pre- or post-deprivation process. *Id.* at 899. While finding other issues unripe for review on the merits, the court addressed the sufficiency of the procedural protections associated with the initial freeze of Kindhearts' assets.

In a summary of the notice provided to KindHearts, the court noted "KindHearts remains largely uniformed about the basis for the government's actions." *Id.* at 904. The government's failure to provide notice was particularly important in that "[n]otice is to come from the government because it alone knows what *it* believes, and why what it believes justifies its action." *Id.* at 904 n. 25 (emphasis in original). Accordingly, after weighing the *Mathews* factors, the court found OFAC failed to provide KindHearts with proper notice, and, therefore, "violated KindHearts' fundamental right to be told on what basis and for what reasons the government deprived it of all access to all its assets and shut down its operations." *Id.* at 906. In addition to the notice deficiencies, the court found OFAC "failed to provide a meaningful hearing, and to do so with sufficient promptness to moderate or avoid the consequences of delay." *Id.* at 907–08.

### d. *Jifry v. Federal Aviation Administration*

In *Jifry* the Federal Aviation Administration (FAA) revoked the airman certificates of Jifry and Zarie on the ground that the two pilots "presented 'a security risk to civil aviation or national security.' " *Jifry,* 370 F.3d at 1176–77. Jifry and Zarie were both nonresident alien pilots who used **\*1158** their FAA certificates to pilot aircraft abroad, but they had not piloted commercial aircraft in the United States for four and nine years respectively. *Id.* at 1177.

The airman certificate-revocation process involved both the TSA and FAA. *Id.* When the TSA finds a pilot poses a security threat, TSA issues an Initial Notification of Threat Assessment (Initial Notice) to the individual and serves that determination on the FAA. *Id.* The pilot may request "releasable materials upon which the Initial Notice was based." *Id.* On receipt of the releasable materials, the pilot has 15 days to submit a substantive response to the Initial Notice. *Id.* The TSA Deputy Administrator then reviews the record *de novo* and issues a Final Notification of Threat Assessment (Final Notice) if he finds the pilot poses a security threat, and the FAA revokes the pilot's certificate. *Id,* The pilot may appeal to the National Transportation Safety Board and then to the court of appeals. *Id.* at 1177–78.

Jifry and Zarie received the Initial Notice and requested the releasable materials. The materials that TSA provided, however, did not include the factual basis for TSA's determination because it was based on classified information. *Id.* at 1178. Jifry and Zarie stated in their written response that "the 'lack of evidence and information about the basis for the determination contained in the TSA's response' made it impossible for them to specifically rebut the TSA's allegations, and [they denied] that they were security threats." *Id.* The TSA Deputy Administrator issued a Final Notice, and the FAA subsequently revoked the pilots' certificates. *Id.*

Jifry and Zarie argued the procedures for revoking their certificates violated their rights to due process. After assuming Jifry and Zarie were entitled to constitutional protections as nonresident alien pilots with FAA certificates, the court found the balance of the *Mathews* factors favored the FAA. The court noted the pilots' interest in possessing FAA airman certificates to fly foreign aircraft outside of the United States "pales in significance to the government's security interests in preventing pilots from using civil aircraft as instruments of terror." *Id.* at 1183. The court also noted "whatever the risk of erroneous deprivation, the pilots had the opportunity to file, a written reply to the TSA's initial determination and [the] independent de *novo* review of the entire administrative record by the Deputy Administrator of the TSA ... and *ex parte, in camera* judicial review of the record" and that "substitute procedural safeguards may be impracticable" in light of the government's interest in protecting classified information. The court relied on *NCORI* for the proposition that the government needed to " 'afford to the entities under consideration notice that the designation is impending,' ... and 'the opportunity to present, at least in written form, such evidence as those entities may be able to

*Latif v. Holder, 28 F.Supp.3d 1154 (2014)*

produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations.' " *Id.* at 1183–84 (quoting *NCORI,* 251 F.3d at 208–09). The court found the TSA and FAA's procedures satisfied this standard. *Id.* at 1184.

### e. *Al Haramain Islamic Foundation v. United States Department of the Treasury*

The issues in *Al Haramain* are similar to those in this case. In *Al Haramain* the Ninth Circuit addressed the sufficiency of the procedural safeguards in OFAC's investigation and designation of AHIF–Oregon as an SDGT. On February 19, 2004, OFAC issued a press release stating it had blocked the assets of AHIF–Oregon pending an investigation concerning the **\*1159** potential designation of AHIF–Oregon as an SDGT. *Al Haramain,* 686 F.3d at 973. OFAC did not provide notice before blocking AHIF–Oregon's assets nor did the press-release reveal the reasons for the investigation. OFAC and AHIF–Oregon exchanged "voluminous documents on a range of topics," the bulk of which concerned AHIF–Oregon's possible connections to and financial support of Chechen terrorism. *Id.* On September 9, 2004, OFAC issued a press-release declaring that it had designated AHIF–Oregon as an SDGT because of direct links between AHIF–Oregon and Osama bin Laden, violations of tax and money-laundering laws, attempts to conceal the movement of funds intended for Chechnya by falsely representing that those funds were for the purpose of purchasing a prayer house in Missouri, and re-appropriation of funds donated for the purpose of humanitarian relief to support mujahideen in Chechnya. *Id.* at 973–74.

On September 16, 2004, OFAC sent a letter advising AHIF–Oregon that it had been designated as an SDGT and that it could request administrative reconsideration. *Id.* at 974. In early 2005 AHIF–Oregon submitted additional documents for the administrative record and requested reconsideration of the designation. AHIF–Oregon asserted it did not have a connection to terrorism and provided a detailed explanation of its Chechen donation. *Id.* Thereafter it repeatedly sought an explanation for its designation and a determination of its request for reconsideration, but OFAC did not respond. *Id.* AHIF–Oregon then filed a lawsuit in which it asserted the procedural protections. provided by OFAC violated AHIF–Oregon's procedural due-process rights under the United States Constitution.

In November 2007 after the commencement of AHIF–Oregon's lawsuit and more than three years after the letter informing AHIF–Oregon of its designation, OFAC sent AHIF–Oregon a letter advising that OFAC provisionally intended "to 'redesignate' " AHIF–Oregon and offering AHIF–Oregon a final opportunity to submit documentation for OFAC's consideration. *Id.* AHIF–Oregon again submitted nearly 1,000 pages of documents. *Id.* On February 6, 2008, OFAC sent AHIF–Oregon a letter stating OFAC had determined AHIF–Oregon continued to meet the criteria for designation as an SDGT and specified three reasons for the designation: (1) two designated persons owned or controlled AHIF–Oregon; (2) AHIF–Oregon acted for or on behalf of those designated persons; and (3) AHIF–Oregon operated as a branch office of the Al Haramain Islamic Foundation, an international charity that provided support for al-Qaeda and other SDGTs. *Id.*

The court found the procedural protections afforded to AHIF–Oregon did not satisfy due process. Applying the *Mathews* factors, the court found AHIF–Oregon's "property interest is significant" because the designation "completely shutters all [of AHIF–Oregon's] domestic operations" indefinitely. *Id.* at 979–80. On the other hand, the court found "the government's interest in national security cannot be understated." *Id.* at 980.

"[W]ith respect to the use of classified information without disclosure," the court observed " '[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations.' " *Id.* (quoting *American–Arab Anti–Discrimination Comm. v. Reno,* 70 F.3d 1045, 1069 (9th Cir.1995)). As to the probative value of additional procedural safeguards, the court found "[t]o the extent that an unclassified summary could provide helpful information, such as the subject matter of the agency's concerns, and to the extent that it **\*1160** is feasible to permit a lawyer with security clearance to view the classified information, the value of those methods seems undeniable." *Id.* at 982–83.

The *Al Haramain* court noted the Ninth Circuit held in *Gete v. Immigration and Naturalization Service,* 121 F.3d 1285, 1287–91 (9th Cir.1997), that in the context of the government's seizure of vehicles from aliens who allegedly transported unauthorized aliens into the country, "[d]ue [p]rocess required the INS to disclose the 'factual bases for seizure[ ]' and 'the specific statutory provision allegedly violated.' " *Al Haramain,* 686 F.3d at 987 (quoting *Gete,* 121 F.3d at 1298). The court specifically rejected the defendants' argument that *NCORI* and a subsequent

District of Columbia Circuit case, *Holy Land Foundation for Relief and Development v. Ashcroft,* 333 F.3d 156, 163–64 (D.C.Cir.2003), stood for the proposition that the agency need not provide a statement of reasons for its investigation. The Ninth Circuit observed the District of Columbia Circuit did not address whether the agency was required to provide notice of the reasons for the deprivation in either *NCORI* or *Holy Land Foundation. Al Haramain,* 686 F.3d at 987–88. To the extent that *NCORI* and *Holy Land Foundation* could be interpreted as permitting the agency to avoid providing a statement of reasons for the deprivation, the *Al Haramain* court explicitly stated those cases were inconsistent with the Ninth Circuit's precedent in *Gete. Id.* at 988. Accordingly, the court held: "In the absence of national security concerns, due process requires OFAC to present the entity with, at a minimum, a timely statement of reasons for the investigation." *Id.* at 987. As to national security concerns about providing a statement of reasons for the deprivation or permitting counsel with security clearance to view the classified information, the court "recognize[d] that disclosure may not always be possible" and that the agency may in some cases withhold such mitigating measures after considering "at a minimum, the nature and extent of the classified information, the nature and extent of the threat to national security, and the possible avenues available to allow the designated person to respond more effectively to the charges." *Id.* at 983–84.

## 2. Application to the DHS TRIP Process

As noted, the Court finds Plaintiffs here have significant protected liberty interests at stake. Plaintiffs' interests in traveling internationally by air are substantially greater than the interest "in possessing FAA airman certificates to fly foreign aircraft outside the United States" as in *Jifry.* Although the private interests involved in *Al Haramain, KindHearts,* and *NCORI* are somewhat different from Plaintiffs' individual interests, the analysis in those three cases (particularly in *Al Haramain* ) is more closely applicable to this case.

As in *Al Haramain,* "the government's interest in national security cannot be understated" in this case. *Id.* at 980. Nevertheless, the Ninth Circuit in *Al Haramain* found additional probative procedural protections were possible without jeopardizing the government's interest in national security. The adequacy of current procedures and potential additional procedures, however, affect the weight given to the

governmental interest. *See Al Haramain,* 686 F.3d at 983 ("In many cases, though, some information could be summarized or presented to a lawyer with a security clearance without implicating national security."). Thus, while the government's interest in national security in this case weighs heavily, the sufficiency of the DHS TRIP redress process ultimately turns on the **\*1161** procedural protections provided to Plaintiffs.

A comparison of the procedural protections provided in this case with those provided in *Al Haramain, Jifry, KindHears,* and *NCORI* reveals the DHS TRIP process falls far short of satisfying the requirements of due process. In *Al Haramain, Jifry,* and *KindHearts* the defendants provided the plaintiffs with some materials relevant to the respective agencies' reasons for the deprivation at some point in the proceedings. In *KindHearts* the initial notice of the asset freeze advised the plaintiff that the investigation concerned connections between KindHearts and Hamas and a later, provisional designation notice included the unclassified administrative record and a three-page summary of the classified evidence. 647 F.Supp.2d at 866–68. In *Jifry* TSA provided the pilots with the Initial Notice and, upon request, the "releasable materials" before issuing the Final Notice. 370 F.3d at 1177. Finally, in *Al Haramain* during the months after AHIF–Oregon's assets were initially frozen, OFAC and AHIF–Oregon "exchanged voluminous documents," the "bulk" of which "concerned AHIF–Oregon's possible connections to Chechen terrorism in Russia." *Al Haramain,* 686 F.3d at 973.

Unlike the plaintiffs in *Al Haramain, KindHearts,* and *Jifry,* however, Plaintiffs in this case were not given any notice of the reasons for their placement on the No–Fly List nor any evidence to support their inclusion on the No–Fly List. Indeed, the procedural protections provided to Plaintiffs through the DHS TRIP process fall substantially short of even the notice that the courts found insufficient in *KindHearts* and *Al Haramain.* In this respect, this case is similar to *NCORI* in which the plaintiffs were not afforded "notice of the materials used against [them], or a right to comment on such materials or [to develop the] administrative record." *NCORI,* 251 F.3d at 196.

Defendants' failure to provide any notice of the reasons for Plaintiffs' placement on the No–Fly List is especially important in light of the low evidentiary standard required to place an individual in the TSDB in the first place. When only an *ex parte* showing of reasonable suspicion supported by "articulable facts ... taken together with rational inferences" is necessary to place an individual in the TSDB,

it is certainly possible, and probably likely, that "simple factual errors" with "potentially easy, ready, and persuasive explanations" could go uncorrected. *See Al Haramain,* 686 F.3d at 982. Thus, without proper notice and an opportunity to be heard, an individual could be doomed to indefinite placement on the No–Fly List. Moreover, there is nothing in the DHS TRIP administrative or judicial-review procedures that remedies this fundamental deficiency. The procedures afforded to Plaintiffs through the DHS TRIP process are wholly ineffective and, therefore, fall short of the "elementary and fundamental requirement of due process" to be afforded "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *See Mullane,* 339 U.S. at 314, 70 S.Ct. 652.

Accordingly, on this record the Court concludes the absence of any meaningful procedures to afford Plaintiffs the opportunity to contest their placement on the No–Fly List violates Plaintiffs' rights to procedural due process.

### 3. Due–Process Requirements

 **[31]** Although the Court holds Defendants must provide a new process that satisfies the constitutional requirements for due process, the Court concludes Defendants (and not the Court) must fashion **\*1162** new procedures that provide Plaintiffs with the requisite due process described herein without jeopardizing national security.

Because due process requires Defendants to provide Plaintiffs (who have all been denied boarding flights and who have submitted DHS TRIP inquiries without success) with notice regarding their status on the No–Fly List and the reasons for placement on that List, it follows that such notice must be reasonably calculated to permit each Plaintiff to submit evidence relevant to the reasons for their respective inclusions on the No–Fly List. In addition, Defendants must include any responsive evidence that Plaintiffs submit in the record to be considered at both the administrative and judicial stages of review. As noted, such procedures could include, but are not limited to, the procedures identified by the Ninth Circuit in *Al Haramain;* that is, Defendants may choose to provide Plaintiffs with unclassified summaries of the reasons for their respective placement on the No–Fly List or disclose the classified reasons to properly-cleared counsel.

Although this Court cannot foreclose the possibility that in some cases such disclosures may be limited or withheld altogether because any such disclosure would create an undue risk to national security, Defendants must make such a determination on a case-by-case basis including consideration of, at a minimum, the factors outlined in *Al Haramain; i.e.,* (1) the nature and extent of the classified information, (2) the nature and extent of the threat to national security, and (3) the possible avenues available to allow the Plaintiff to respond more effectively to the charges. *See Al Haramain,* 686 F.3d at 984. Such a determination must be reviewable by the relevant court.

## II. Claim Three: Administrative Procedure Act

 **[32]** Plaintiffs also raise claims under 5 U.S.C. §§ 706(2)(A) and 706(2)(B) of the APA.

### A. Section 706(2)(A)

Under Section 706(2)(A) the court will only set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

When prescreening passengers, Congress instructed the Executive to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination *and correct information contained in the system.*" 49 U.S.C. § 44903(j)(2)(C)(iii)(I) (emphasis added). *See also* 49 U.S.C. § 44903(j)(2)(G)(i)(the Executive "shall establish a timely and fair process for individuals identified as a threat ... to appeal to the [TSA] the determination and correct any erroneous information.").

As discussed herein at length, the DHS TRIP process does not provide a meaningful mechanism for travelers who have been  **\*1163** denied boarding to correct erroneous information in

the government's terrorism databases. A traveler who has not been given any indication of the information that may be in the record does not have any way to correct that information. As a result, the DHS TRIP process "entirely fail[s] to consider an important aspect" of Congress's instructions with respect to travelers denied boarding because they are on the Mo–Fly List. *See Motor Veh. Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

Accordingly, on this record the Court concludes the DHS TRIP process violates § 706(2)(A) of the APA.

### B. Section 706(2)(B)

[33]  Under 5 U.S.C. § 706(2)(B) the court must set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." As noted, the Court has concluded the DHS TRIP process violates Plaintiffs' rights to procedural due process under the United States Constitution. Accordingly, Plaintiffs' claim under § 706(2)(B) merely mirrors Plaintiffs' procedural due-process claim.

Because the Court has already concluded the DHS TRIP process violates Plaintiffs' procedural due-process rights, the Court also concludes the DHS TRIP process violates § 706(2)(B) of the APA.

### C. Remedy

As noted, Plaintiffs' APA claims are closely related to Plaintiffs' procedural due-process claims, and the substantive

deficiencies in the DHS TRIP redress process are the same under the APA as they are under procedural due process. Accordingly, the substitute procedures that Defendants select to remedy the violations of Plaintiffs' due-process rights, if sufficient, will also remedy the violations of Plaintiffs' rights under the APA.

### *CONCLUSION*

For these reasons, the Court **DENIES** Defendants' Motion (# 85) for Partial Summary Judgment and **GRANTS** Plaintiffs' Cross–Motion (# 91) for Partial Summary Judgment as to Claims One and Three in Plaintiffs' Third Amended Complaint (# 83).

The Court directs the parties to confer as to the next steps in this litigation and to file no later than July 14, 2014, a Joint Status Report with their respective proposals and schedules. The Court will schedule a Status Conference thereafter at which primary counsel for the parties should plan to attend in person.

IT IS SO ORDERED.

### All Citations

28 F.Supp.3d 1134

---

Footnotes

1    In order to complete the procedural due-process analysis in this Opinion and Order that the Court began in its August 28, 2013, Opinion and Order (# 110), the Court repeats and summarizes herein many of the facts and analyses from the prior Opinion and Order to ensure a clear and comprehensive record.

2    Plaintiffs also seek a declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment of the United States Constitution and the APA and also seek an injunction requiring Defendants (1) to remedy such violations, including removal of Plaintiffs' names from any watch list or database that prevents them from flying; (2) to provide Plaintiffs with notice of the reasons and bases for their inclusion on the No–Fly List; and (3) to provide Plaintiffs with the opportunity to contest inclusion on the List. Although the Court concludes Plaintiffs are entitled to summary judgment on the bases described herein, the issues concerning the substance of any declaratory judgment and/or injunction remain for further development.

3    The Court has reviewed the minimum substantive derogatory criteria for the No–Fly List and a summary of the guidelines contained within the Watchlisting Guidance submitted to the Court by Defendants *ex parte* and *in camera*. Because this information constitutes Sensitive Security Information, the Court does not refer to its substance in this Opinion and Order.

4    49 U.S.C. § 46110(a) provides in part: "[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation ... in whole or in part under this part ... may apply for review of the order by filing a petition for review in the

United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." When the relief sought from judicial review of a DHS TRIP inquiry requires review and modification of a TSC order, original jurisdiction lies in the district court. *Arjmand v. United States Dep't of Homeland Sec.,* 745 F.3d 1300, 1302–03 (9th Cir.2014).

5    As a matter of policy, the United States government does not confirm or deny whether an individual is on the No–Fly List nor does it provide any other details as to that issue. Accordingly, Defendants have chosen not to refute Plaintiffs' allegations that they are on the No–Fly List for purposes of these Motions only. The Court, therefore, assumes for purposes of these Motions only that Plaintiffs' assertions regarding their inclusion on the No–Fly List are true.

6    As noted, the Court has reviewed *in camera* and considered the additional substantive derogatory criteria for the No–Fly List, but the Court does not refer to the substance of those criteria or the Watchlisting Guidance.

7    Because the risk of erroneous deprivation arises from the insufficiency of the administrative record rather than the reviewing court's analysis, the Ninth Circuit's holding in *Arjmand* is inapplicable. 745 F.3d at 1302–03.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

473 F.Supp.3d 479
United States District Court, D. Maryland.

Rami Khaled EL ALI, et al., Plaintiffs,

v.

William BARR, et al., Defendants.

Civil Action No. 8:18-cv-02415-PX
|
Signed 07/20/2020

**Synopsis**
**Background:** Prospective air and land travelers brought action against heads of federal agencies in their official capacities and against council, responsible for decisions regarding terrorist watchlist policies, comprised of agencies in question, alleging plaintiffs' status on terrorism screening database and related watchlists violated their due process, equal protection, and related rights. Defendants filed motion to dismiss.

**Holdings:** The District Court, Paula Xinis, J., held that:

[1] plaintiffs alleged traceable and redressable injuries, as necessary for Article III standing;

[2] statute establishing exclusive jurisdiction in federal courts of appeals for review of orders of Transportation Security Administration (TSA) Administrator did not deprive district court of jurisdiction to consider plaintiffs' claims alleging Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) failed to provide constitutionally sufficient procedure concerning absolute ban on travel;

[3] same statute deprived district court of jurisdiction to consider plaintiffs' claims alleging DHS TRIP failed to provide constitutionally sufficient procedure concerning enhanced screenings as result of placement on lists;

[4] plaintiffs were not required to exhaust DHS TRIP procedures;

[5] plaintiffs adequately alleged that their status on terrorist watchlist deprived them of their Fifth Amendment liberty interests in travel, as necessary to state due process claim;

[6] plaintiffs adequately alleged that government's dissemination of defamatory information about their status as known or suspected terrorists resulted in stigma and caused alteration of previously recognized state law rights, and thus deprived them of Fifth Amendment reputational liberty interests; and

[7] plaintiffs sufficiently alleged constitutionally inadequate redress procedures for harms they suffered as result of inclusion on various terrorist watchlists, as necessary to state due process claim.

Motion granted in part and denied in part.

West Headnotes (96)

**[1]**   **Federal Civil Procedure**  🔑  Construction of pleadings

   **Federal Civil Procedure**  🔑  Matters deemed admitted;  acceptance as true of allegations in complaint

   In reviewing a motion to dismiss for failure to state a claim, the court accepts the well-pled allegations of the complaint as true, and construes all facts and reasonable inferences in the light most favorable to the plaintiffs. Fed. R. Civ. P. 12(b)(6).

**[2]**   **Federal Courts**  🔑  Weight and sufficiency

   On a motion to dismiss for lack of subject matter jurisdiction, a plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Fed. R. Civ. P. 12(b)(1).

**[3]**   **Federal Courts**  🔑  Evidence;  Affidavits

   On a motion to dismiss for lack of subject matter jurisdiction, in determining whether subject matter jurisdiction exists, the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue. Fed. R. Civ. P. 12(b)(1).

**[4]**    **Federal Courts**  🗝 Pleadings and motions

On a motion to dismiss for lack of subject matter jurisdiction, where a defendant contends that the complaint simply fails to allege facts upon which subject matter jurisdiction can be based, the court construes the factual allegations as true and most favorably to the plaintiff. Fed. R. Civ. P. 12(b)(1).

**[5]**    **Federal Courts**  🗝 Necessity of Objection; Power and Duty of Court

On a motion to dismiss for lack of subject matter jurisdiction, whether the court retains subject matter jurisdiction must be decided before reaching the merits of a case. Fed. R. Civ. P. 12(b)(1).

**[6]**    **Federal Courts**  🗝 Pleadings and motions

**Federal Courts**  🗝 Evidence; Affidavits

Motions to dismiss for lack of subject matter jurisdiction may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting that the jurisdictional allegations of the complaint are not true. Fed. R. Civ. P. 12(b)(1).

**[7]**    **Federal Courts**  🗝 Pleadings and motions

Where defendants mount a facial challenge to plaintiffs' allegations of subject matter jurisdiction, plaintiffs are afforded the same procedural protection as they would receive under consideration of a motion to dismiss for failure to state a claim, and the court must assume the truthfulness of the facts alleged. Fed. R. Civ. P. 12(b)(1, 6).

**[8]**    **Federal Courts**  🗝 Evidence; Affidavits

A factual challenge to subject matter jurisdiction allows the court to go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts. Fed. R. Civ. P. 12(b)(1).

**[9]**    **Federal Civil Procedure**  🗝 Pleading, Defects In, in General

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6).

**[10]**    **Federal Civil Procedure**  🗝 Insufficiency in general

**Federal Civil Procedure**  🗝 Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a complaint's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true, even if doubtful in fact. Fed. R. Civ. P. 12(b)(6).

**[11]**    **Federal Civil Procedure**  🗝 Matters considered in general

In ruling on a motion to dismiss for failure to state a claim, the court generally may not consider extrinsic evidence. Fed. R. Civ. P. 12(b)(6).

**[12]**    **Federal Civil Procedure**  🗝 Matters considered in general

In ruling on a motion to dismiss for failure to state a claim, the court may consider documents attached to a motion if integral to and explicitly relied on in the complaint. Fed. R. Civ. P. 12(b)(6).

**[13]**    **Evidence**  🗝 Public records and documents in general

**Federal Civil Procedure**  🗝 Matters considered in general

**Summary Judgment**  🗝 Motion to dismiss

*El Ali v. Barr*, 473 F.Supp.3d 479 (2020)

In ruling on a motion to dismiss for failure to state a claim, the court may take judicial notice of matters of public record without converting the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(b)(6).

**[14]**    **Federal Civil Procedure**   🔑   In general; injury or interest

A court retains jurisdiction only where a plaintiff has standing to bring the claim.

**[15]**    **Federal Civil Procedure**   🔑   In general; injury or interest

**Federal Courts**   🔑   Case or Controversy Requirement

A legal action meets the case-or-controversy requirement for Article III standing where the questions are presented in an adversary context. U.S. Const. art. 3, § 2, cl. 1.

**[16]**    **Federal Civil Procedure**   🔑   In general; injury or interest

**Federal Courts**   🔑   Case or Controversy Requirement

For a case to satisfy the case-or-controversy requirement for Article III standing, the plaintiff must have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination. U.S. Const. art. 3, § 2, cl. 1.

**[17]**    **Federal Civil Procedure**   🔑   In general; injury or interest

**Federal Civil Procedure**   🔑   Causation; redressability

For a case to satisfy the injury-in-fact element for Article III standing, each plaintiff must demonstrate (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

**[18]**    **Aviation**   🔑   Persons entitled to seek review or enforcement; parties; standing

**Constitutional Law**   🔑   Due Process

**Constitutional Law**   🔑   Equal Protection

**War and National Emergency**   🔑   Anti-Terrorism Measures

Prospective air and land travelers alleged traceable and redressable injuries, as necessary for Article III standing to bring action against heads of various federal agencies in their official capacities, alleging plaintiffs' status on terrorism screening database and related watchlists violated their due process, equal protection, and related rights; defendants were members of council responsible for decisions regarding terrorist watchlist policies, and plaintiffs alleged that each council member had "decision-making authority" and "veto power" over decisions. U.S. Const. Amend. 5; U.S. Const. art. 3, § 2, cl. 1.

**[19]**    **Federal Civil Procedure**   🔑   Causation; redressability

The traceability and redressability elements for Article III standing are best addressed jointly as they rise or fall together. U.S. Const. art. 3, § 2, cl. 1.

**[20]**    **Federal Civil Procedure**   🔑   Causation; redressability

The traceability element for Article III standing requires plaintiffs to aver plausibly that their injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court. U.S. Const. art. 3, § 2, cl. 1.

**[21]**    **Federal Civil Procedure**   🔑   Causation; redressability

The redressability element for Article III standing requires that the requested relief as to the challenged defendants is likely, and not merely speculative to remedy the plaintiff's injury. U.S. Const. art. 3, § 2, cl. 1.

**[22]    Federal Civil Procedure** 🔑 Causation; redressability

No explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's Article III standing. U.S. Const. art. 3, § 2, cl. 1.

**[23]    Federal Civil Procedure** 🔑 Causation; redressability

Where Article III standing turns on involvement with policymaking, a plaintiff must show that the defendant is involved in the promulgation or enforcement of such policies, or otherwise exerts control over the disputed provision. U.S. Const. art. 3, § 2, cl. 1.

**[24]    Aviation** 🔑 Finality; interlocutory review

For a Transportation Security Administration (TSA) order to be subject to jurisdictional channeling under statute establishing exclusive jurisdiction in federal courts of appeals for review of orders of the TSA Administrator, the order must be the consummation of TSA's independent action, and not action undertaken by any other agencies such as the Terrorist Screening Center (TSC). 49 U.S.C.A. § 46110.

**[25]    Federal Courts** 🔑 Aviation

Statute establishing exclusive jurisdiction in federal courts of appeals for review of orders of Transportation Security Administration (TSA) Administrator did not deprive district court of jurisdiction to consider claims of prospective air and land travelers, arising from their alleged placement on Terrorist Screening Center (TSC) no fly list, alleging Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) failed to provide constitutionally sufficient procedure concerning absolute ban on

travel; plaintiffs had either received no final determination from DHS TRIP or had not engaged process at all, no plaintiff challenged any TSA final determination arising out of DHS TRIP, and TSC remained key actor in deciding who was included on list. 49 U.S.C.A. § 46110.

**[26]    Federal Courts** 🔑 Aviation

Statute establishing exclusive jurisdiction in federal courts of appeals for review of orders of Transportation Security Administration (TSA) Administrator deprived district court of jurisdiction to consider claims of prospective air and land travelers, arising from their alleged placement on TSA-maintained aviation surveillance lists, alleging Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) failed to provide constitutionally sufficient procedure concerning enhanced screenings as result of placement on lists; TSA implemented lists as part of Congressional mandate, and exclusively chose how to search, screen, and question travelers on lists. 49 U.S.C.A. §§ 114(h)(3), 46110.

**[27]    Federal Courts** 🔑 Administrative agencies and proceedings in general

Under the doctrine of inescapable intertwinement, statutes that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are inescapably intertwined with review of such orders.

**[28]    Federal Courts** 🔑 Administrative agencies and proceedings in general

The purpose of the doctrine of inescapable intertwinement is to prevent a plaintiff from circumventing the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court.

**[29]    Federal Courts** 🔑 Administrative agencies and proceedings in general

In determining whether a district court is precluded from hearing a claim under the doctrine of inescapable intertwinement, the appropriate inquiry is whether the claim that the plaintiff seeks to raise is inescapably intertwined with an order of an agency covered by a statute that vests judicial review of its orders exclusively in the courts of appeals.

**[30]    Aviation** 🖝 Exhaustion of administrative remedies

**Constitutional Law** 🖝 Exhaustion of other remedies

Prospective air and land travelers were not required to exhaust Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) procedures prior to bringing action against heads of various federal agencies, alleging plaintiffs' status on terrorism screening database and related watchlists violated their due process, equal protection, and related rights; DHS TRIP procedure historically offered little redress with no prospects of improvement, and responses from watchlists in question were mostly lacking in pertinent information, including whether individual plaintiffs were on or had been removed from lists. U.S. Const. Amend. 5.

**[31]    Administrative Law and Procedure** 🖝 Nature and purpose

Exhaustion of administrative remedies does not implicate a district court's jurisdiction unless Congress expressly says so.

**[32]    Administrative Law and Procedure** 🖝 Exhaustion of Administrative Remedies

In the absence of express instruction from Congress, whether to require exhaustion of administrative remedies is left to a district court's sound judicial discretion.

**[33]    Administrative Law and Procedure** 🖝 Exhaustion of Administrative Remedies

For claims challenging a final agency action under the Administrative Procedure Act (APA), a court cannot require exhaustion of administrative remedies where neither the relevant statute nor an agency rule imposes such a requirement. 5 U.S.C.A. § 551 et seq.

**[34]    Administrative Law and Procedure** 🖝 Exhaustion of Administrative Remedies

In determining whether to require exhaustion of administrative remedies, for claims not challenging a final agency action under the Administrative Procedure Act (APA), a court must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion. 5 U.S.C.A. § 551 et seq.

**[35]    Administrative Law and Procedure** 🖝 Exhaustion of Administrative Remedies

Institutional interests favoring exhaustion of administrative remedies include allowing an agency to correct its own mistakes with respect to programs it administers before it is haled into federal court.

**[36]    Constitutional Law** 🖝 Procedural due process in general

The procedural component of due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause. U.S. Const. Amend. 5.

**[37]    Constitutional Law** 🖝 Procedural due process in general

To state a procedural due process claim, a plaintiff must allege (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate. U.S. Const. Amend. 5.

**[38]    Constitutional Law** 🔑 Factors considered; flexibility and balancing

If a plaintiff making a procedural due process claim plausibly avers government deprivation of a cognizable interest, the trier of fact must then weigh three factors to determine if a due process violation has occurred: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[39]    Constitutional Law** 🔑 Travel and movement

The right to travel is a part of the liberty of which a citizen cannot be deprived without the due process of law under the Fifth Amendment. U.S. Const. Amend. 5.

**[40]    Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 Terrorism

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers adequately alleged that their status on terrorist watchlist deprived them of their Fifth Amendment liberty interests in air travel, as necessary to state due process claim against heads of federal agencies; several plaintiffs alleged experiencing pattern of multi-hour delays nearly every time they traveled, arising from hours-long searches, detentions, and interrogations, some involving

displays of force, threats, property confiscation, and verbal humiliation. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[41]    Constitutional Law** 🔑 Travel and movement

Routine travel-related delays are not actionable as deprivations of the right to travel as a liberty interest under the Fifth Amendment. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[42]    Constitutional Law** 🔑 Terrorism

When watchlist status results in repeated, prolonged delays that actually deter travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right to travel, an individual suffers a due process deprivation of constitutional dimension; such deprivation occurs even if a plaintiff could avail himself of a less convenient form of transportation. U.S. Const. Amend. 5.

**[43]    Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 Terrorism

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers adequately alleged stigma and alteration of previously recognized state law rights, arising from defamatory labeling of them as known or suspected terrorists, as required to state a claim for deprivation of due process liberty interests; plaintiffs alleged that defendants allowed various government and private entities access to terrorism screening database that falsely touted members as known and suspected terrorists, effectively outed plaintiffs as terrorists in front of family, friends, and travel companions, by publicly performing detentions, interrogations, and searches, and that, as result, one plaintiff lost access to travel program, two others lost access to military bases, and another plaintiff was denied access to purchase firearm. U.S. Const. Amend. 5.

**[44]**   **Constitutional Law** 👈 Reputation; defamation

Injury to reputation by itself is not a liberty interest protected under the Due Process Clause. U.S. Const. Amend. 5.

**[45]**   **Constitutional Law** 👈 Reputation; defamation

To show that reputational harm infringes a due process liberty interest, plaintiffs must satisfy the stigma-plus test, under which plaintiffs must aver plausibly that they suffered (1) a stigma from governmental action; plus (2) an alteration or extinguishment of a right or status previously recognized by state law. U.S. Const. Amend. 5.

**[46]**   **Constitutional Law** 👈 Reputation; defamation

In establishing stigma from a government action, for purposes of demonstrating that reputational harm infringed upon a due process liberty interest, a plaintiff must plausibly aver that the government publicly disseminated defamatory information. U.S. Const. Amend. 5.

**[47]**   **Constitutional Law** 👈 Reputation; defamation

In establishing an alteration or extinguishment of a previously recognized state law right, for purposes of demonstrating that reputational harm infringed upon a due process liberty interest, a plaintiff must allege suffering a change in a right or status previously recognized by law; simple reputational damage alone is not sufficient. U.S. Const. Amend. 5.

**[48]**   **Aviation** 👈 Aviation security
**Constitutional Law** 👈 Terrorism
**War and National Emergency** 👈 Anti-Terrorism Measures

Prospective air and land travelers sufficiently alleged constitutionally inadequate redress procedures for harms they suffered as result of inclusion on various terrorist watchlists, as necessary to state due process claim against heads of federal agencies in their official capacities and against council responsible for decisions regarding terrorist watchlist policies; plaintiffs alleged that terrorist screening database nomination and approval was governed by amorphous criteria, devoid of any notice and lacking any safeguards, so that over 98% of those nominated are approved, and further alleged that Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) process provided no information about how agencies evaluated complaints. U.S. Const. Amend. 5.

**[49]**   **Constitutional Law** 👈 Substantive Due Process in General

Substantive due process protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. U.S. Const. Amend. 5.

**[50]**   **Constitutional Law** 👈 Levels of scrutiny; strict or heightened scrutiny

Heightened substantive due process protections against government interference that apply regardless of fairness of procedures used extend to a narrower set of rights and liberties which are, objectively, deeply rooted in the nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. U.S. Const. Amend. 5.

**[51]**   **Constitutional Law** 👈 Levels of scrutiny; strict or heightened scrutiny

In context of a substantive due process claim, surviving strict scrutiny requires the government to demonstrate that its interference is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest. U.S. Const. Amend. 5.

**[52]**  **Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 Terrorism

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers plausibly alleged that deprivation of their fundamental right to travel, via placement on "no-fly list," was not narrowly tailored to achieve compelling interest of combatting terrorism and protecting national borders, as necessary to state substantive due process claim against heads of federal agencies; tremendous effort and inconvenience was often required to take alternative means of transportation. U.S. Const. Amend. 5.

**[53]**  **Aviation** 🔑 Persons entitled to seek review or enforcement; parties; standing

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers failed to allege injury-in-fact, as element for standing, stemming from government agencies' dissemination of their identities and personal information through National Crime Information Center (NCIC), as necessary to state claim that such dissemination violated Administrative Procedure Act; complaint was silent as to how NCIC actually affected any plaintiff, and, though plaintiffs alleged law enforcement could query NCIC during police encounters, no plaintiff adequately pleaded any police encounter arising from NCIC query. 5 U.S.C.A. § 706.

**[54]**  **Constitutional Law** 🔑 Similarly situated persons; like circumstances

The Equal Protection Clause prohibits governmental decisionmakers from treating differently persons who are in all relevant respects alike. U.S. Const. Amend. 5.

**[55]**  **Constitutional Law** 🔑 Intentional or purposeful action requirement

**Constitutional Law** 🔑 Similarly situated persons; like circumstances

To survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus. U.S. Const. Amend. 5.

**[56]**  **Constitutional Law** 🔑 Questions of law or fact

**Constitutional Law** 🔑 Similarly situated persons; like circumstances

In considering a motion to dismiss an equal protection claim, after the plaintiff pleads sufficient facts to demonstrate he was treated differently from others similarly situated as result of discriminatory animus, a court must assess, as a matter of law, whether the disparate treatment is justified, employing the requisite level of scrutiny. U.S. Const. Amend. 5.

**[57]**  **Constitutional Law** 🔑 Strict scrutiny and compelling interest in general

In context of an equal protection claim, strict scrutiny dictates that only such action suitably tailored to serve a compelling state interest will survive challenge. U.S. Const. Amend. 5.

**[58]**  **Constitutional Law** 🔑 Enforcement, application, or administration in general

In context of an equal protection claim, where the claimed unconstitutional discrimination is based on a facially neutral law or policy, a plaintiff must allege facts that allow the plausible inference that such law or policy has been applied in an intentionally discriminatory manner, or that its adoption was motivated by discriminatory animus. U.S. Const. Amend. 5.

**[59]**  **Constitutional Law** 🔑 Intentional or purposeful action

In an equal protection claim based on a facially neutral policy, evidence of discriminatory intent is key; even when a facially neutral statute has a racially disproportionate impact, discriminatory animus must nevertheless be proved to establish an equal protection violation. U.S. Const. Amend. 5.

[60] **Civil Rights** 🔑 Weight and Sufficiency of Evidence

In determining whether discriminatory intent existed, for purposes of an equal protection claim based on a facially neutral policy, both direct and circumstantial evidence of discrimination may be considered. U.S. Const. Amend. 5.

[61] **Civil Rights** 🔑 Admissibility of Evidence

In determining whether discriminatory intent existed, for purposes of an equal protection claim based on a facially neutral policy, the court may look to consistent patterns of governmental conduct that adversely affect a protected class, as well as statements of the policy makers, or lack thereof. U.S. Const. Amend. 5.

[62] **Constitutional Law** 🔑 Intentional or purposeful action requirement

In determining whether discriminatory intent existed, for purposes of an equal protection claim based on a facially neutral policy, while purposeful discrimination is the condition that offends the Constitution, impact provides an important starting point. U.S. Const. Amend. 5.

[63] **Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 War and national security

**Constitutional Law** 🔑 War and national security

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers plausibly alleged that their placement in terrorist screening database and on various watchlists was result of application of facially neutral terrorist database criteria in intentionally discriminatory manner, as necessary to state equal protection claim against heads of federal agencies; some plaintiffs contended that their answers regarding religious and cultural practices during various interrogations were what landed them in terrorist database and on watchlists, and further alleged that, in nominating individuals to watchlists, agencies glossed over stereotypically white names. U.S. Const. Amend. 5.

[64] **Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 Other particular issues and applications

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers plausibly alleged that government's discriminatory placement of travelers in terrorist screening database and on watchlists was not narrowly tailored to achieve compelling interest of combatting terrorism, as necessary to state equal protection claim against heads of federal agencies; plaintiffs alleged watchlist and database system had never prevented any act of terrorism within United States and that none of the 250 acts of terrorism committed within country were perpetrated by anyone from within database. U.S. Const. Amend. 5.

[65] **Federal Courts** 🔑 Injunctions

Past exposure to illegal conduct does not in itself show a present case or controversy requiring injunctive relief if unaccompanied by any continuing, present adverse effects. U.S. Const. art. 3, § 2, cl. 1.

[66] **Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

Speculative claims of future injury will not suffice to establish ongoing or future injury in fact for purposes of injunctive relief.

**[67]**   **Injunction**   🔑   Presumptions and burden of proof

In determining whether a plaintiff has established ongoing or future injury necessary for injunctive relief, where a plaintiff avers a historic pattern of illegal conduct, the court may plausibly infer that such infringements will continue in the future.

**[68]**   **Searches and Seizures**   🔑   Necessity of and preference for warrant, and exceptions in general

Searches conducted outside the judicial process, without prior approval by judge or magistrate, are generally per se unreasonable under the Fourth Amendment. U.S. Const. Amend. 4.

**[69]**   **Customs Duties**   🔑   Grounds or cause for stop, search, or seizure

One exception to the Fourth Amendment warrant requirement covers searches conducted at the border; recognizing that national security remains at its zenith at ports of entry, including international airports, law enforcement may conduct routine searches of persons and property even in the absence of a warrant, probable cause, or even any individualized suspicion. U.S. Const. Amend. 4.

**[70]**   **Customs Duties**   🔑   Grounds or cause for stop, search, or seizure

The border exception to the Fourth Amendment warrant requirement is grounded in the recognition that individual liberties must sometimes yield to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country; to protect and secure U.S. borders, the Fourth Amendment's balance of reasonableness is qualitatively different than in the interior. U.S. Const. Amend. 4.

**[71]**   **Customs Duties**   🔑   Grounds or cause for stop, search, or seizure

The border exception to the Fourth Amendment warrant requirement is not limitless; not every search at the U.S. border is routine, and thus immune from the individualized suspicion requirement. U.S. Const. Amend. 4.

**[72]**   **Customs Duties**   🔑   Scope and Nature; Successive or Secondary Searches

A forensic border search of a phone must be treated as nonroutine, not subject to the border exception to the Fourth Amendment warrant requirement, and permitted only with individualized reasonable suspicion. U.S. Const. Amend. 4.

**[73]**   **Customs Duties**   🔑   Particular Objects or Products

Reasonable suspicion, necessary to justify a warrantless forensic border search of a phone under the Fourth Amendment, exists when specific and articulable facts known to the searching officers, along with rational inferences from those facts, demonstrate that criminal activity is afoot; a mere hunch is not enough. U.S. Const. Amend. 4.

**[74]**   **Customs Duties**   🔑   Particular Objects or Products

Whether reasonable suspicion, as necessary to justify a warrantless forensic border search of a phone under the Fourth Amendment, exists depends on the totality of the circumstances observed by a reasonable law enforcement officer in the agent's position. U.S. Const. Amend. 4.

**[75]**   **Aviation**   🔑   Aviation security

**War and National Emergency**   🔑   Anti-Terrorism Measures

Prospective air and land travelers who were allegedly in terrorist screening database and on terrorist watchlists plausibly alleged that warrantless confiscations and examinations of their electronic devices, at international airports as ports of entry, were performed without requisite individualized reasonable suspicion, as necessary to state claim, for violation of Fourth Amendment right to be free from warrantless searches and seizures, against heads of federal agencies; plaintiffs alleged that, since over one million people were in database, mere presence in database could not supply individualized reasonable suspicion. U.S. Const. Amend. 4.

[76]   **Self-Incrimination** 👈 Government compulsion in general

**Self-Incrimination** 👈 Scope of Privilege

The Fifth Amendment's constitutional protection against self-incrimination is triggered only when an individual is (1) compelled to make a (2) testimonial communication (3) that is incriminating. U.S. Const. Amend. 5.

1 Case that cites this headnote

[77]   **Self-Incrimination** 👈 Determination of Right to Assert Privilege

Determining whether the Fifth Amendment protection against self-incrimination applies is a fact-intensive inquiry. U.S. Const. Amend. 5.

[78]   **Self-Incrimination** 👈 Self-Incrimination

A statement is compelled, for purposes of the Fifth Amendment's constitutional protection against self-incrimination, when, considering the totality of the circumstances, the free will of the person making the statement was overborne. U.S. Const. Amend. 5.

[79]   **Self-Incrimination** 👈 Waiver or Forfeiture

To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, for purposes of the Fifth

Amendment's constitutional protection against self-incrimination, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. U.S. Const. Amend. 5.

[80]   **Aviation** 👈 Aviation security

**Self-Incrimination** 👈 Government compulsion in general

**War and National Emergency** 👈 Anti-Terrorism Measures

Prospective air and land travelers who were allegedly in terrorist screening database and on terrorist watchlists sufficiently alleged that their will had been overcome during interrogations at international airports as ports of entry, as necessary to state claim for violation of Fifth Amendment's constitutional protection against self-incrimination against heads of federal agencies; several plaintiffs alleged that their interviews arose under coercive circumstances such as being held at gunpoint, in handcuffs, or in separate interrogation rooms. U.S. Const. Amend. 5.

[81]   **Constitutional Law** 👈 Freedom of Association

The First Amendment right to free association is not absolute; some difficulty imposed on such freedoms do not, without more, result in violation of the First Amendment. U.S. Const. Amend. 1.

[82]   **Constitutional Law** 👈 Freedom of Association

To be cognizable, an interference with First Amendment associational rights must be direct and substantial or significant. U.S. Const. Amend. 1.

[83]   **Constitutional Law** 👈 Freedom of Association

Interferences with First Amendment associational rights that qualify as direct and substantial could include imposing penalties or withholding benefits from individuals because of their membership in a disfavored group, attempting to require disclosure of the fact of membership in a group seeking anonymity, and interfering with the internal organization or affairs of the group. U.S. Const. Amend. 1.

**[84]** **Constitutional Law** 🔑 **Freedom of Association**

Plaintiffs alleging a violation of First Amendment free association rights must allege government action that imposed a direct and substantial interference with association in pursuit of political, social, economic, educational, religious, or cultural ends. U.S. Const. Amend. 1.

**[85]** **Aviation** 🔑 Aviation security

**Constitutional Law** 🔑 Freedom of Association

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air and land travelers who were allegedly in terrorist screening database and on terrorist watchlists failed to allege that any interference with their associational rights posed by border searches of their electronic devices was direct and substantial, as necessary to state claim for violation of their First Amendment associational rights against heads of federal agencies; even though plaintiffs alleged that government agents obtained their "contacts" through searches in question, plaintiffs failed to give any examples of how those searches hampered or affected their associational rights. U.S. Const. Amend. 1.

**[86]** **Civil Rights** 🔑 Particular cases and contexts

In analyzing a claim under the RFRA, the court must ask whether the government's action imposes a substantial burden on religious exercise, and if so, whether those actions are the least restrictive means of serving a compelling government interest. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

**[87]** **Civil Rights** 🔑 Religion

**Civil Rights** 🔑 Particular cases and contexts

For a litigant to state a claim under RFRA, the litigant's claimed beliefs must be sincere and the practices at issue must be of a religious nature. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

**[88]** **Civil Rights** 🔑 Particular cases and contexts

A "substantial burden" on religious exercise, as necessary for a RFRA claim, is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

1 Case that cites this headnote

**[89]** **Civil Rights** 🔑 Religion

In assessing whether a plaintiff's exercise of her religious beliefs has been substantially burdened, for purposes of a RFRA claim, a court must not judge whether the plaintiff's beliefs are mistaken or insubstantial, but rather whether the line drawn reflects an honest conviction. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

**[90]** **Civil Rights** 🔑 Particular cases and contexts

Prospective air and land travelers who were allegedly in terrorist screening database and on terrorist watchlists sufficiently alleged that government's inquiry into their religious beliefs during border interrogations constituted substantial burden on religious exercise, as

necessary to state claim against heads of federal agencies that such inquiries violated RFRA; plaintiffs alleged that defendants' persistent inquiries into their religion placed pressure on plaintiffs to modify or violate those beliefs or risk being subjected to patten of detention and interrogation in connection with travel. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

1 Case that cites this headnote

[91]    **Civil Rights** 🔑 Particular cases and contexts

The very process of inquiry into a litigant's religious beliefs may itself impose a substantial burden on the individuals' religious beliefs, such that it amounts to a RFRA violation. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

[92]    **Civil Rights** 🔑 Particular cases and contexts

Prospective air and land travelers sufficiently alleged that their inclusion in terrorist screening database and on terrorist watchlists substantially burdened their ability to perform religious pilgrimages, as necessary to state RFRA claim against heads of federal agencies; two plaintiffs alleged they were afraid to travel abroad to lead annual pilgrimages due to defendants' stigmatizing and burdensome searches, interrogations, and detentions. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

[93]    **Civil Rights** 🔑 Particular cases and contexts

A RFRA violation does not turn on government's total prohibition of religious exercise; where allegations reflect a substantial burden on such exercise in the absence of a compelling government interest effected by the least restrictive means, the claim must survive. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

[94]    **Civil Rights** 🔑 Particular cases and contexts

Prospective air and land travelers failed to allege that government offers to act as FBI informants in exchange for resolution of travel issues, resulting from their alleged inclusion in terrorist screening database and on terrorist watchlists, substantially burdened plaintiffs' free exercise of religion, as required to state RFRA claim against heads of federal agencies; government agents merely asked for assistance, offering something to gain, and did not demand assistance. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

1 Case that cites this headnote

[95]    **Aviation** 🔑 Persons entitled to seek review or enforcement; parties; standing

**War and National Emergency** 🔑 Anti-Terrorism Measures

Prospective air traveler who was allegedly in terrorist screening database and on terrorist watchlists lacked standing to make claim, against heads of federal agencies, that defendants' disclosure of his watchlist status caused correctional institute to end his stint as volunteer prison chaplain; traveler did not allege that non-party correctional institute's action was anything other than independent, voluntary decision. Religious Freedom Restoration Act of 1993 § 2, 42 U.S.C.A. § 2000bb et seq.

[96]    **Constitutional Law** 🔑 Delegation of Powers

Congress may not constitutionally delegate its legislative power to another branch of government. U.S. Const. art. 1, § 1.

**Attorneys and Law Firms**

**\*490** Ahmed Mohamed, Pro Hac Vice, CAIR, Queens, NY, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, for Plaintiffs Khaled El Ali, Mohammad Paryavi, Hawa Wehelie, Abdirizak Wehelie, Shamsa Hashi Noor, Fatima Wehelie, Moustafa El-Shahat, Farid Sulayman,

Mohamad Albadawi, Khalil Thadi, Esmaeel Paryavi, Faraz Siddiqui.

Ahmed Mohamed, Pro Hac Vice, CAIR, Queens, NY, Amy V. Doukoure, Pro Hac Vice, CAIR, Farmington Hills, MI, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, for Plaintiff Mutasem Jardaneh.

Ahmed Mohamed, Pro Hac Vice, CAIR, Queens, NY, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, Omar Saleh, Pro Hac Vice, CAIR, Sunrise, FL, Thania Clevenger, Pro Hac Vice, CAIR, Tampa, FL, for Plaintiffs Bilal Aburrashid, Fadi Suliman.

Ahmed Mohamed, Pro Hac Vice, CAIR, Queens, NY, Birjees Rehman, Pro Hac Vice, CAIR, South Plainfield, NJ, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, for Plaintiff John Doe.

Ahmed Mohamed, Pro Hac Vice, CAIR, Queens, NY, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, for Plaintiffs Hicham Hall, Faatimah Knight, John Doe 2, Zijad Bosnic, Mahad Mohallim, Hashem Nader Sehwail.

Amanda Misasi, Pro Hac Vice, CAIR, Seattle, WA, Amy V. Doukoure, Pro Hac Vice, CAIR, Farmington Hills, MI, Birjees Rehman, Pro Hac Vice, CAIR, South Plainfield, NJ, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, Thania Clevenger, Pro Hac Vice, CAIR, Tampa, FL, for Plaintiffs Abdu Wakil Cyeef Din, Mirrakhmat Muminov, Anisa Muianovic, Mohamad Hachem, Ashraf Riad, Mustafa Kamel, Alaa Abunijem, Abdaljalil Hijaz, Abdallah Soueidan, Abdelmoniem Elamin, Hassan Shirwa, Fadhel Al-Sahlani.

Amanda Misasi, Pro Hac Vice, CAIR, Seattle, WA, Birjees Rehman, Pro Hac Vice, CAIR, South Plainfield, NJ, Caridad Pastor (Cardinale), Pastor & Associates, P.C., Troy, MI, Carolyn Homer, Latham & Watkins LLP, Gadeir F. Abbas, Justin Mark Sadowsky, Lena F. Masri, CAIR, Washington, DC, Thania Clevenger, Pro Hac Vice, CAIR, Tampa, FL, for Plaintiff Imad Kadoumi.

Antonia M. Konkoly, Christopher R. Healy, U.S. Department Of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

Paula Xinis, United States District Judge

**\*491** Plaintiffs are 39 individuals—37 U.S. citizens and two legal residents—who claim that inclusion in the Government's Terrorism Screening Database ("TSDB") and various related Watchlists impair or prohibit air and land travel in the United States.[1] Plaintiffs allege that their list status, or status by association with those on a list, subjects them to constitutionally impermissible detentions, searches, and screening at airports and land border entries, or in some cases, denial of air travel altogether. Relatedly, Plaintiffs allege that **\*492** their list status has burdened their families and businesses, and inflicted other wide-ranging harms.

Plaintiffs have filed this mass action, averring that their inclusion in the TSDB and Watchlists violates (1) Procedural Due Process (Count I), (2) Substantive Due Process (Count II), (3) the Administrative Procedure Act (Counts III and IV), (4) the Equal Protection Clause (Count V), (5) the Fourth Amendment (Count VI), (6) the First Amendment (Count VII), (7) the Fifth Amendment Right against self-incrimination (Count VIII),[2] (8) The Religious Freedom Restoration Act (Counts X, XI, XII, and XIII), and (9) the non-delegation doctrine (Count XIV).

Pending before the Court is a Motion to Dismiss (ECF No. 49-1), filed jointly by 26 Defendants[3] who, with the exception of the Watchlisting Advisory Council (WLAC), each head a federal agency and have been sued in their official capacities. Defendants contend that this Court lacks jurisdiction over the claims and, alternatively, that the claims fail as a matter of law. On June 18 and 26, 2020, the Court held a virtual hearing on the motion. ECF Nos. 70, 72. For the reasons below, Defendants' motion will be granted in part and denied in part.

### I. Background[4]

### A. The TSDB and Watchlist Infrastructure

**[1]** Plaintiffs have been the objects of an interagency watchlisting system, led by **\*493** the WLAC. The WLAC is comprised of member agencies who are the defendants in this case. According to Plaintiffs, the WLAC is:

[A] government entity that promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.

ECF No. 48 ¶ 82. It is through the WLAC's interagency watchlisting system that Defendants have identified Plaintiffs as worthy of scrutiny and placement in the TSDB and Watchlists, to include the No Fly List, the Selectee List, and the Expanded Selectee List. *Id.* ¶ 3.

The WLAC operates by consensus and each member agency retains decision-making authority and veto power over all WLAC decisions. *See, e.g.*, *id.* ¶¶ 57, 64, 69. The member agencies play a variety of roles. Some nominate individuals to Watchlists, *see, e.g.*, *id.* ¶¶ 60, 61, 63, 68, 74, some accept nominations, *see id.* ¶¶ 59, 54, and some disseminate Watchlist information to "state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others." *See e.g.*, *id.* ¶¶ 57, 79, 80. Some conduct frontline screening of Watchlist listees, *see, e.g.*, *id.* ¶¶ 65, 66, 67,68, 75, while others develop policies for the frontline screening agencies. *Id.* ¶ 73, 74. The WLAC also reviews and approves by consensus written Watchlisting Guidance (WLG). ECF No. 67-1 at 5–6. The WLG governs the Watchlisting process and is considered government policy once adopted. *Id.*

The TSDB functions as a "master repository for suspected international and domestic terrorist records." *Id.* ¶ 93. The TSDB is developed and maintained by the Terrorist Screening Center ("TSC"), which was established in 2003 by Attorney General John Ashcroft to consolidate the government's approach to terrorism screening. *Id.* The TSC itself is a multi-agency center, administered by the Federal Bureau of Investigation ("FBI") and consisting of the Department of Homeland Security ("DHS"), the National Counterterrorism Center ("NCTC"), the Transportation Security Administration ("TSA"), and U.S. Customs and Border Protection ("CBP"). *Id.* ¶ 59; ECF No. 48-6 at 3 ("Overview of the U.S. Government's Watchlisting Process and Procedures as of January 2018").

The WLAC and the TSDB work as follows: agency members of WLAC "nominate" individuals to the TSDB. ECF No. 48-6 at 4; ECF No. 48 ¶¶ 60, 61, 63, 68, 74. The TSC reviews the individual nominee and, if he or she is "reasonably suspected of being a known or suspected terrorist," adds the individual to the TSDB. ECF No. 48-6 at 4, 6; ECF No. 48 ¶ 94. In particular, an individual is placed in the TSDB based on:

articulable intelligence or information which, based on the totality of the circumstances **\*494** and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities.

ECF No. 48-6 at 5. This inclusion standard, according to the Second Amended Complaint ("Amended Complaint"), is so broad and amorphous as to render it useless in identifying known or suspected terrorists. ECF No. 48 ¶ 220. In practice, TSDB inclusion is driven not by suspected terrorism but by an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, mere associations,[5] travel history, and social media history—criteria determined by WLAC. *Id.* ¶¶ 82, 95, 199. Approximately 99% of all proposed additions to the TSDB are accepted each year, and between 2009 and 2016, the number of individuals added to the TSDB has tripled. *Id.* ¶ 14.

The TSDB has grown to over one million people whose inclusion, say Plaintiffs, has done nothing to improve national security. *Id.* A DHS-funded study performed by the University of Maryland assessed the efficacy of the TSDB and concluded that of the approximately 250 terrorist acts committed inside the United States over the last decade, *none* of the offenders were included in the database. *Id.* ¶¶ 179–80. The study demonstrates that the Watchlisting system would perform similarly if persons were included in TSDB by random selection rather than using the existing inclusion criteria. *Id.* ¶ 188.

The TSDB acts as a feeder for placement on the Expanded Selectee List, Selectee List, and No Fly List—Watchlists related to air travel. *Id.* ¶ 97. Everyone in the TSDB is

automatically also on the Expanded Selectee List if minimum identifiers for the person are available. *Id.* ¶ 98. The Selectee List includes individuals for whom undefined "derogatory information" exists and for whom the government suspects association or affiliation with a foreign or domestic terrorist organization, or other association with terrorist activities. *Id.* ¶ 99. Boarding passes for Expanded Selectee List or Selectee List individuals have "SSSS" printed on them for ease of identification among airline and airport employees, agents, and screeners. Consequently, those listees are routinely subjected to extra screening at airports. *Id.* ¶ 100.

A person makes the No Fly List if, in addition to non-specific "derogatory information," the government suspects the individual presents a threat of committing an act of terrorism in the United States, against an international United States government facility, or with respect to an aircraft, or if the individual is capable of carrying out a violent act of terrorism. *Id.* ¶ 101. Persons on the No Fly List are prevented altogether from boarding an aircraft that flies through United States airspace. *Id.* ¶ 102.

Still other lists exist that are not dependent on inclusion in the TSDB. The "Quiet Skies" and "Silent Partner" lists are developed and maintained by the TSA and operate in parallel to the TSDB. *Id.* ¶ 112. Quiet Skies and Silent Partner lists may cross-reference with the TSDB and may be used to help identify individuals whose backgrounds result in nomination to the TSDB. *Id.* ¶¶ 95 n. 2, 113, 114. Those identified through the Quiet Skies and Silent Partners programs are surveilled at **\*495** the airport and in the air, and their information is shared with foreign carriers and governments. *Id.* ¶ 112, 115.

Any TSDB listee may be blocked from crossing U.S. land borders or from boarding international flights headed to the United States. *Id.* ¶ 103. CPB refers to those in the TSDB as "Armed and Dangerous," subjecting them to secondary inspection or flagging them as potential terrorists in automatic alerts sent to officers. *Id.* ¶ 104. The secondary inspection often includes advanced electronic searches. *Id.* ¶ 105.

More generally, state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-faring vessels have access to the TSDB. *Id.* ¶¶ 82, 154. In addition, a subset of the TSDB is placed in a "Known or Suspected Terrorist" ("KST") file that is distributed to the National Crime Information Center (NCIC) for access by

more than 18,000 law enforcement agencies and 100,000 law enforcement officers. *Id.* ¶ 106.

## B. Plaintiffs in the TSDB and on Watchlists

Most Plaintiffs, of whom all are Muslim, allege placement in the TSDB and related Watchlists. *Id.* ¶¶ 119, 232.[6] Plaintiffs often surmise on which lists they are included, but rarely receive confirmation. Nor do they know why they are in the TSDB or on Watchlists. None have been arrested, charged, or convicted of any type of terrorism-related offense. *Id.* ¶ 234. A few other Plaintiffs are family members of TSDB Plaintiffs, and primarily allege harms flowing from membership in the Quiet Skies and Silent Partner programs. *Id.* ¶ 119.

Plaintiffs allege, collectively, a host of injuries resulting from the above-described surveillance programs. The Court summarizes those related to air and land travel, as well as broadly applicable consequential harms.

### 1. Air Travel

Watchlisted Plaintiffs are routinely selected for screening, searches, and questioning at airports beyond that of the normal traveler. Plaintiffs first must be cleared by airline administrators and TSA at check-in. Next, they are screened and searched at the security checkpoint, and then again at the gate prior to boarding. Such screenings include full-body patdowns, chemical residue testing, extensive searches of personal belongings, and interrogations. *See, e.g., id.* ¶¶ 325–34 (Jardaneh); ¶¶ 424–43 (Abdurrashid); ¶¶ 459–78 (M. Paryavi); ¶¶ 498–502 (H. Wehelie); ¶¶ 655–59 (El-Shahat); ¶¶ 1212–18 (Riad).

Almost all searches are conducted in front of travel companions and other passengers. Plaintiffs Hicham Hall and Faatimah Knight, after undergoing extensive public screening at the security checkpoint, were subjected to additional chemical testing and protracted pat downs at the gate and were publicly photographed by agents as they boarded their flight. *Id.* ¶¶ 922–25. A TSA agent made Mustafa El-Shahat "stand with his hands against the wall" in front of fellow travelers, and "then kicked [him] to force his legs apart, causing him pain." *Id.* ¶ 661.

Plaintiffs' travel companions typically receive similar treatment simply because they accompany Plaintiffs. *See,*

*e.g., id.* ¶¶ 444, 479, 552–585, 686, 1083. Imam Farid **\*496** Sulayman's disabled, seventy-eight-year-old mother was subjected to patdowns, chemical testing, and interrogations because she was traveling with her son. *Id.* ¶¶ 686–90, 697–98. Faraz Siddiqui's two-months-old baby was screened, *id.* ¶ 1004, and the children who are old enough to talk, such as Anisa Mujanovic's son and daughter, had to answer questions about their mother. *Id.* ¶ 1154–55. Fourteen-year-old Mia El Ali was patted down and questioned, and her body subjected to chemical testing, both at the security checkpoint and in front of other passengers at the gate, while en route to visit her father. *Id.* ¶ 256–57.

Even after Plaintiffs are cleared at security checkpoints and the gate, they continue to endure adverse treatment due to their status. Alaa Abunijem, his wife, and their two young children, were forcibly removed from their flight because, according to airport officials, "Americans did not want them to travel on the flight." *Id.* ¶¶ 1315–17. On other occasions, undercover agents surveilled Plaintiffs en route to their final destinations. *See, e.g., id.* ¶ 334 (Jardaneh); ¶¶ 1116–19 (Muminov). Upon arrival, agents sometimes removed certain Plaintiffs from the plane in front of fellow passengers. *See e.g., id.* ¶ 999 (Siddiqui); ¶ 1513 (Al-Sahlani). On Hicham Hall's flight, the pilot instructed all passengers to present their passports to the CBP officers. *Id.* ¶ 909. Once CPB officers identified Hall, they announced publicly "[w]e got him" and then proceeded to take Hall off the plane and to a private room. *Id.* ¶ 910. There, CBP officers questioned him about the purposes of his trip, copied his Arab language books, and seized and searched his laptop and phone. *Id.* ¶¶ 910–14.

FBI agents or CPB officers often detain and interrogate Plaintiffs during their travel. Plaintiffs are pressed about work and travel history, Islamic practices and culture, associations with persons in Muslim-majority countries, social media usage, personal religious beliefs and practices, topics of study, political opinions, and mosque attendance. *See, e.g., id.* ¶ 485 (M. Paryavi); ¶¶ 635–41 (Mohallim); ¶¶ 646, 650 (El-Shahat); ¶ 941 (Knight); ¶ 1279 (Kamel); ¶ 1519–20 (Al-Sahlani). Further, agents often search Plaintiffs' phones and laptops, confiscate the devices, and download their contents. *See, e.g., id.* ¶ 648 (El-Shahat); ¶ 1312 (Abunijem); ¶ 1348 (Hijaz); ¶ 1491 (Kadoumi). The devices are sometimes not returned for weeks, months, or at all. *See, e.g., id.* ¶ 761 (Suliman).

Because these procedures are lengthy, Plaintiffs often miss their flights. Many Plaintiffs having experienced such delays in the past, and so they make sure to arrive at the airport

several hours in advance of their scheduled departure. Nonetheless, the extensive delays result in missed flights. *See, e.g., id.* ¶¶ 663, 908. In one instance, Mohamad Albadawi missed *four flights* on the same trip. *Id.* ¶ 868. *See also id.* ¶¶ 501–13 (Hawa Wehelie and sister Fatima Wehelie subjected to four-hour interrogation and, after missing a connecting flight, re-interrogated the following day before boarding their new flight).

To avoid such invasive searches and interrogations, Plaintiffs have chosen to travel by means other than air or not at all. As a result, Plaintiffs have lost business opportunities and have missed important family gatherings and other celebrations. *See, e.g., id.* ¶ 337 (Jardaneh); ¶ 446–48 (Abdurrashid).

No Fly List Plaintiffs have been denied air travel altogether. *See, e.g., id.* ¶¶ 600, 607, 617 (Mohallim); ¶¶ 814, 818 (Sehwail); ¶¶ 1023, 1041 (Bosnic); ¶1432 (Shirwa). Mahad Mohallim was twice denied from boarding a flight from Doha, Qatar back to **\*497** the United States. *Id.* ¶¶ 587–643. It would be over a year until he and his mother were able to return home. *Id.* ¶ 616. Nader Sehwail, too, could not return to the United States for a month, despite the aid of counsel and multiple exchanges with the U.S. embassy. *Id.* ¶¶ 812–37. Even when he was finally allowed to fly into the United States, he was immediately denied boarding for a domestic flight and had to rent a car and drive the last leg of his journey. *Id.* ¶ 840. As of the filing of this lawsuit, seventy-one-year-old Hassan Shirwa was stranded in Kenya, unable to return home. *Id.* ¶ 1433.

### 2. Land Travel

Certain Plaintiffs are also subjected to similar searches, screening, and interrogations when they enter the United States at a land border. CBP officers have ordered Plaintiffs and their companions out of their car, sometimes at gunpoint, where they are then patted down and questioned at length while held in confinement. *See, e.g., id.* ¶¶ 309–13 (Jardaneh undergoing four-hour interrogation and invasive pat down); ¶¶ 493–94 (H. Wehelie); ¶¶ 664–67 (El-Shahat). Mirrakhmat Muminov, returning from a business trip in Canada, was ordered out of his car by gunpoint by several CBP officers, handcuffed, and detained in a cold cell for several hours. *Id.* ¶¶ 1096–99. He was then interrogated—for four hours—about his religious views and mosque attendance, as well as subjected to a pat down, finger printing, hair analysis, iris scan, mouth swab, and search of his belongings. *Id.* ¶¶

1100–105. He has, as a result, stopped traveling to Canada for business. *Id.* ¶ 1106.

As for searches and seizures, agents take Plaintiffs' portable electronic devices (phones and laptops) and in some instances download electronic data, all without a warrant or consent. *See, e.g., id.* ¶¶ 316 (Jardaneh); ¶ 495 (Wehelie); ¶ 673, 680 (Sulayman). Agents sometimes return devices after a couple of days, *id.* ¶ 319 (Jardaneh), or a couple of months. *Id.* ¶ 577 (Wehelies).

Certain Plaintiffs also have been approached to act as informants in exchange for being pulled off Watchlists. During Hall's detention at the border, the FBI offered to streamline his travel and remove him from all Watchlists if he assisted them. *Id.* ¶¶ 934–35. Hall understood that acting in such capacity would require that he associate under false pretenses with religious leaders to gather information for the FBI. *Id.* ¶ 936.

### 3. Other Harms from TSDB and Watchlist Placement

Collectively, Plaintiffs correlate placement in the TSDB and Watchlists with a wide variety of deprivations. Plaintiffs aver that because their placement in the TSDB and watchlists is shared liberally, their bank accounts have been closed, *see, e.g., id.* ¶ 1007–09 (Siddiqui); ¶ 1161 (Mujanovic); ¶ 1205 (Hachem). Other Plaintiffs have been denied government accommodations such as membership in TSA PreCheck and Global Entry, both of which allow for expedited screenings at ports of entry. *See, e.g., id.* ¶¶ 483–84 (M. Paryavi), ¶ 764 (Suliman); ¶¶ 972–79 (E. Paryavi). Several Plaintiffs have experienced delays in immigration proceedings for their loved ones. *See e.g., id.* ¶ 669 (immigration application for El-Shahat's wife delayed over three years); ¶ 1124 (Muminov's mother's visitor visa revoked).

Plaintiffs also contend that placement results in receiving the undeserved moniker of "known or suspected terrorist." They are identified by the "SSSS" printed on their boarding passes and are searched openly in front of family and friends. As a result, no one will travel with them. *See, e.g., id.* ¶ 891 (Albadawi); ¶ 1005 (Siddiqui); ¶¶ 1177–94 (Hachem); ¶ 1421 (Elamin); **\*498** ¶ 1156 (after experiencing interrogations due to their mother's list status, Mujanovic's son and daughter told her they "never wanted to travel with her again").

For some Plaintiffs, this shunning has resulted in clear loss of business opportunity. Fadi Suliman had been repeatedly screened and searched in front of his employees, a customer, and a vendor. *Id.* ¶¶ 718–26. His Muslim travel companions withstood similar treatment. *Id.* As a result, Suliman missed his flight and was forced to travel separately from his companions. *Id.* ¶ 731. At his next stop, he was delayed again because of additional screening, and therefore missed several meetings. *Id.* ¶ 737. The same thing happened on the return trip. Consequently, his travel companions—his employees, customer, and vendor—vowed to never again travel with him. *Id.* ¶ 740.

Plaintiffs have also lost jobs, accounts, and contracts after repeatedly missing flights because they were subjected to protracted searches and interrogations. *See, e.g., id.* ¶¶ 340–41 (Jardaneh); ¶ 1382 (Soueidan); ¶ 1537 (Al-Sahlani); ¶ 1192 (Hachem). Farid Sulayman, an uber driver, could not pick up his passenger at a military base; he was instead handcuffed and detained for an hour. *Id.* ¶¶ 702–13. Khalil Thadi, similarly, could not access a military base to provide a work estimate. *Id.* ¶ 950–53. When he arrived for his job, he was detained at the entrance gate, questioned, photographed, and ultimately denied access. *Id.* Not surprisingly, Thadi lost the government subcontract. *Id.* Zijad Bosnic, a truck driver, had his Transportation Worker Identification Credential (TWIC) suspended such that he can no longer complete many of his work routes. *Id.* ¶ 1046. Some have simply forgone jobs that require travel. *See, e.g., id.* ¶ 1011 (Siddiqui).

### C. Limited Recourse for TSBD-Watchlisted Plaintiffs

Plaintiffs have found limited avenues to redress erroneous placement on the TSDB or Watchlists. The only extra-judicial redress procedure lies with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP was established to assist in resolving travel complaints, including those related to Watchlist status. *Id.* ¶ 15.

When an individual in the TSDB files a DHS TRIP inquiry, the inquiry is forwarded to TSC for review. *Id.* ¶ 212; ECF No. 48-6 at 9. TSC may then contact the NCTC and the agency that nominated the individual to the TSDB to assist in its review. ECF No. 48-6 at 9. TSC next decides whether to keep or remove the individual from the TSDB and sends the results to DHS TRIP. *Id.*; ECF No. 48 ¶ 217. DHS TRIP, in turn,

sends a standard form letter that neither confirms nor denies the individual's Watchlist status. *Id.* ¶ 217.

However, in 2015, and in response to litigation, DHS TRIP procedures were revised as to persons on the No Fly List.[7] Under the revised procedures, TSC after review may remove the individual from the No Fly List. ECF No. 48-6 at 10. If the TSC decides not to remove the individual, the TSC provides such a recommendation to the TSA administrator who, in turn, decides either to remove or maintain the individual on the No Fly List, or to seek additional information from the TSC. *Id.* In the end, the TSA Administrator provides the individual with a final determination. *Id.* If the person remains on the No **\*499** Fly List, TSA states the reasons for continued placement unless doing so would compromise national security or law enforcement interests. ECF No. 48 ¶ 218; ECF No. 48-6 at 10.[8] According to Plaintiffs, since 2015, TSA has not processed a single No Fly List determination under its new DHS TRIP procedure. ECF No. 48 ¶ 222.

In practice, DHS TRIP "refuses to discuss specific facts and refuses to even process many redress complaints[,]" including for those on the No Fly List. ECF No. 48 ¶ 15. For those Plaintiffs who have filed DHS TRIP inquiries, some have simply received a letter which includes only a "redress control number." Plaintiffs have often waited months or years for additional information, but none has been provided. *See, e.g., id.* ¶ 339 (Jardaneh receiving letter in September 2017); ¶ 964 (Thadi receiving letter on March 13, 2018); ¶ 455 (Aburrashid); ¶ 487 (M. Paryavi); ¶ 586 (Noor); ¶ 879 (Albadawi). The only two Plaintiffs who received confirmation that they are on the No Fly List, Bosnic and Shirwa, have since been removed from the list during the pendency of this case. ECF Nos. 49-2, 49-3. Still others have received no response at all. *See, e.g., id.* ¶ 1495 (Kadoumi).

## II. Standards of Review

Defendants lodge an array of challenges, some of which implicate the Court's subject matter jurisdiction, while others attack the merits of the claims. The applicable review standard is set forth for each.

### A. Subject Matter Jurisdictional Challenges, Federal Rule 12(b)(1)

[2] [3] [4] [5] Rule 12(b)(1) motions challenge a court's authority to hear the matter. *See Jones v. Calvert Group,*

*Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Lovern v. Edwards,* 190 F.3d 648, 654 (4th Cir. 1999). In determining whether jurisdiction exists, "the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003) (internal marks and citation omitted). Where a defendant contends that the complaint "simply fails to allege facts upon which subject matter jurisdiction can be based," the Court construes the factual allegations as true and most favorably to the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Whether the Court retains subject matter jurisdiction must be decided before reaching the merits of the case. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999).

[6] [7] [8] Motions to dismiss brought pursuant to Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *see also* **\*500** *Richardson v. Mayor & City Council of Baltimore*, No. A. RDB-13-1924, 2014 WL 60211, at \*2 (D. Md. Jan. 7, 2014). Where Defendants mount a facial challenge, Plaintiffs are "afforded the same procedural protection as [they] would receive under a Rule 12(b)(6) consideration" and the court must "assume the truthfulness of the facts alleged." *Kerns*, 585 F.3d at 192–93 (citations omitted). A factual challenge, in comparison, allows the Court to "go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.* at 193. In this case, Defendants attack Plaintiffs' allegations on both fronts and the Court therefore uses both standards.

### B. Merits Challenges, Federal Rule 12(b)(6)

[9] [10] A motion brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

[11] [12] [13] In ruling on a Rule 12(b)(6) motion, the Court generally may not consider extrinsic evidence. *Zak v. Chelsea Therapeutics, Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) ("Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment."). However, the Court may consider documents attached to a motion if "integral to and explicitly relied on in the complaint." *Id.* at 606–07 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *see also Marshall v. Anne Arundel Cty., Md*, No. ELH-18-74, 2019 WL 568676, *5 (D. Md. Feb. 12, 2019). Moreover, the Court may take judicial notice of "matters of public record" without converting the motion to dismiss into a motion for summary judgment. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III. Subject Matter Jurisdiction

### A. Standing

[14] [15] Defendants argue that all Plaintiffs lack standing as to certain defendants, and that certain Plaintiffs lack standing as to all defendants. A court retains jurisdiction only where the plaintiff has standing to bring the claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Pursuant to Article III of the United States Constitution, federal courts are of limited jurisdiction, hearing only live "cases" and "controversies." *Id.* at 559, 112 S.Ct. 2130; U.S. Const. art. III, § 2. A legal action meets the case-or-controversy requirement where the "questions [are] presented in an adversary context." *Massachusetts v. E.P.A.*, 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)) (internal quotation marks omitted).

[16] [17] For a case to satisfy the case-or-controversy requirement, the plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts*, 549 U.S. at 517, 127 S.Ct. 1438. Each Plaintiff must demonstrate "(1) ... an 'injury in fact' that

is (a) concrete *501 and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

### 1. Standing as to WLAC Agency Defendants

[18] The WLAC Agency Defendants argue that Plaintiffs lack standing to bring any claim against them because Plaintiffs have failed to allege both traceable and redressable injuries. ECF No. 49-1 at 41–45. Although these Defendants do not dispute membership in the WLAC, they contend that the majority of them play no role in the creation or management of the Watchlisting system sufficient to confer standing. Accordingly, the Court focuses its standing analysis on whether the claimed injuries are both traceable and redressable as to all WLAC Agency Defendants.

[19] [20] [21] [22] Traceability and redressability are best addressed jointly as "they rise or fall together." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 323 n. 1 (4th Cir. 2002). Traceability requires plaintiffs to aver plausibly that their injury "was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court." *Stasko*, 282 F.3d at 320 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) and *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). Redressability requires that the requested relief as to the challenged defendants is "likely, and not merely speculative ... [to] remedy the plaintiff's injury." *Id.* (citations omitted). However, "no explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100 (4th Cir. 2011).

[23] Where, as here, standing turns on involvement with policymaking, a plaintiff must show that the defendant is involved in the promulgation or enforcement of such policies, or otherwise exerts control over the disputed provision. *See, e.g., Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014); *Nat'l Ass'n for Advancement of Multijurisdiction Practice, (NAAMJP) v. Howell*, 851 F.3d 12, 17 (D.C. Cir. 2017) (standing absent where plaintiff "failed to identify any role whatsoever of the Attorney General" in enforcement of challenged rule); *Calzone v. Hawley*, 866 F.3d 866, 870 (8th

Cir. 2017) (plaintiff lacked standing to sue entities without enforcement authority as to challenged provision).

Plaintiffs assert that the WLAC as a whole "promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist," ECF No. 48 ¶ 82, and that each WLAC member has "decision-making authority" and "veto power" over those decisions. *See id.* ¶¶ 57–81. Defendants respond that the WLAC retains no such authority. Rather, the member agencies operate by consensus to review and adopt the WLG, which in turn becomes the policy governing the TSDB and Watchlisting system. ECF No. 49-1 at 43; ECF No. 67-1 ¶ 3. According to Defendants, WLAC and its members "address (a) questions from participant agencies about how specific provisions of the [WLG] should be interpreted or implemented, (b) technical issues arising from the exchange of TSDB information between and among participant agencies, and (c) whether portions of the WLG should be changed or updated." **\*502** ECF No. 67-1 ¶ 6. Absent objections from the National Security Council, the WLG then becomes government policy. *Id.* ¶ 9.

The facts in this respect are hotly contested and invoke matters of first impression.[9] At this stage, the Court must allow further factual development to resolve the scope of the WLAC Agency Defendants' participation in the TSDB and Watchlists. *See Kerns*, 585 F.3d at 193 (recognizing standing may require factual development to resolve jurisdictional question). The Court is centrally concerned that WLAC Agency Defendants' role in approving WLG changes as "policy" is sufficient to confer standing. This is because, as averred, the WLG governs the TSDB and Watchlist inclusion criteria, as well as dissemination of the same. Thus, the Court will not dismiss the WLAC Agency Defendants at this time. The Court, however, will entertain a streamlined discovery plan, tightly focused on the WLAC's role in management of the TSDB and Watchlists, to include promulgating WLG. The motion to dismiss on this basis is denied.

### 2. Standing for Rami Khaled El Ali

Defendants urge the Court to dismiss Plaintiff Rami Khaled El Ali from the suit because he has not alleged inclusion on the TSDB or any inhibition of travel whatsoever. ECF No. 49-1 at 49. Rami is the son of former Plaintiff Khaled El Ali who has voluntarily withdrawn from this suit after the State Department granted his tourist visa. ECF No. 68. Rami

has pleaded constitutional injuries arising from Defendants' initial refusal to admit his father into the United States. ECF No. 48 ¶ 276. *See Trump v. Hawaii*, ––– U.S. ––––, 138 S. Ct. 2392, 2416, 201 L.Ed.2d 775 (2018) ("a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury"). Because Khaled El Ali may now return to the United States, and Rami only sought to redress the injury flowing from his inability to see his father in the United States, Rami no longer maintains any cognizable injury. ECF No. 68. Defendants' motion is granted as to him.

### B. Other Jurisdictional Challenges

### 1. Lack of Jurisdiction Pursuant to 49 U.S.C. § 46110

Defendants next contend that this Court lacks subject matter jurisdiction pursuant to the statutory jurisdictional channeling provision, 49 U.S.C. § 46110 ("Section 46110") for certain of Plaintiffs' claims implicating DHS TRIP redress procedures. Section 46110 provides that any person who seeks to challenge "an order" issued by "the Administrator of the [TSA] with respect to security duties and powers designated to be carried out by the Administrator of the [TSA]" must first petition for review in the Circuit Court in which the person lives or works. 49 U.S.C. § 46110(a). Section 46110 expressly mandates that federal courts of appeals retain exclusive jurisdiction to review "orders" issued by the TSA. *See Long v. Barr*, No. 1:15-CV-1642, 451 F.Supp.3d 507, 523–25 (E.D. Va. Apr. 2, 2020). What constitutes a TSA order, however, is less than straightforward.

 **[24]**  On this question, *Long v. Barr* provides important guidance. *Id. Long* recognized that an "order" under Section 46110 is any "final disposition of the matter" issued by TSA. 454 F.Supp.3d at 523–25 (citing *Blitz v. Napolitano*, 700 F.3d 733, 740 (4th Cir. 2012) and *Alexandria v. Helms*, 728 F.2d 643, 646 (4th Cir. 1984)). **\*503** *Long* also recognized such an order may encompass broader constitutional challenges to TSA's actions, *id.* at 522–23 (citing *Blitz*, 700 F.3d at 741), as well as TSA procedures and protocols that represent the TSA's final disposition. *Id.* at 523–25 (citing *Blitz*, 700 F.3d at 740). *See also Amerijet Int'l, Inc. v. U.S. Dept. of Homeland Security, et al.*, 43 F. Supp. 3d 4, 13–14 (D.D.C. 2014) (finding a TSA Security Directive to be an "order" as it was the consummation of the agency's decision-making process.). However, for an order to be subject to Section 46110's jurisdictional channeling, it must be the "consummation of

TSA's *independent* action," and not action undertaken by any other agencies such as the TSC. *Long*, 451 F.Supp.3d at 527–28 (emphasis added) (detailing intersection between Section 46110 and Article III's causation and redressability requirements). *See also Mohamed v. Holder*, No. 11–1924 (4th Cir. May 28, 2013) (Circuit court unable under Section 46110 to "directly review the TSC's actions, direct the agency to develop necessary facts or evidence, or compel its compliance with any remedy [it] might fashion.") (citing *Elgin v. Dept. of Treasury*, 567 U.S. 1, 132 S. Ct. 2126, 2138, 183 L.Ed.2d 1 (2012)).

Defendants maintain that two broad categories of claims are subject to Section 46110 channeling; namely, Plaintiffs' challenges to the adequacy of the DHS TRIP procedures and Plaintiffs' placement in the TSDB. The Court discusses each separately.

### a. Adequacy of DHS TRIP

The parties' arguments concerning the adequacy of DHS TRIP are circumscribed by whether the Plaintiffs are on the No Fly List, the Selectee Lists, or the Quiet Skies/Silent Partner Lists. For the reasons stated below, the Court rejects Defendants' contentions as to the No Fly and Selectee List Plaintiffs but agrees that challenges related to the Quiet Skies/Silent Partner programs and attendant screenings must be dismissed for lack of jurisdiction.

### i. No Fly List Plaintiffs

 [25]  The Amended Complaint includes a handful of No Fly List Plaintiffs, only two of whom received confirmation of their placement on the list after availing themselves of DHS TRIP procedures. ECF No. 48 ¶¶ 1041, 1455.[10] The remaining No Fly List Plaintiffs have either inquired through DHS TRIP about their status and not received a response or have never sought redress through DHS TRIP. All squarely challenge that the revised 2015 DHS TRIP procedures fail to provide a constitutionally sufficient procedure concerning their absolute ban on air travel.

Defendants principally contend that the 2015 revisions to DHS TRIP compel this Court to transfer all claims for the No Fly List Plaintiffs to the Fourth Circuit because the 2015 DHS TRIP revised process renders TSA the final arbiter of DHS TRIP complaints. ECF No. 49-1 at 52. Although the Court

agrees that the 2015 revisions nominally identify the TSA as the final decisionmaker, this change alone does not invoke Section 46110 channeling here. Unlike the plaintiff in *Long*, no Plaintiff is currently challenging TSA's final determination arising out of DHS TRIP. Either the No Fly list Plaintiffs have availed themselves of DHS TRIP and not received a final determination, or had not engaged the process at all.

 **\*504**  Moreover, the No Fly List Plaintiffs squarely challenge the adequacy of DHS TRIP procedure itself which does not solely implicate the "independent action" of TSA. Under the 2015 revisions, TSC still remains a "key actor" in deciding who is included on, and removed from, the No-Fly List. *See Long* at 451 F.Supp.3d at 527–28; *see also* ECF No. 48-6 at 10. In this respect, the 2015 revisions have not altered the analysis much at all. *See Long*, 451 F.Supp.3d at 527 (finding that "[a]side from the removal of a name from the No Fly List," the 2015 revisions did not alter either TSA's or TSC's roles). ECF No. 49-1 at 52; ECF No. 48-6 at 10 (TSC initially decides after review whether to remove or retain a complainant on the No Fly List; if the TSC retains the individual on the No Fly List, TSA then issues the ultimate determination on removal or retention for that individual). Where, as here, TSC remains the driving force behind DHS TRIP, challenges to adequacy of the procedure are not subject to Section 46110 channeling. *See Latif v. Holder*, 686 F.3d 1122, 1128 (9th Cir. 2012) ("TSC—not TSA—actually reviews the classified intelligence information about travelers and decides whether to remove them from the List. And it is TSC—not TSA—that established the policies governing that stage of the redress process."); *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015) (TSC, not TSA, is responsible for putting a name on the No Fly List and for maintaining classified information; thus, the Court of Appeals cannot "provide relief to an individual ... by simply amending, modifying, or setting aside TSA's orders") (citations omitted); *Mohamed v. Holder*, No. 11–1924 (Order) (Section 46110 only extends to the TSA's orders, and not those actions where a remedy would involve both the TSA and the TSC.).[11] The claims brought by No Fly List Plaintiffs are properly before this Court.

### ii. Selectee List Plaintiffs

The same analysis applies to Selectee List Plaintiffs. The 2015 DHS TRIP revisions did not affect Selectee Listee inquiries. TSC remains integral to any DHS TRIP procedures relevant to Selectee Listees and therefore DHS TRIP procedures

do not constitute a TSA "order." Moreover, Selectee List Plaintiffs either did not avail themselves of the DHS TRIP process, or if they sought redress, never heard anything from DHS TRIP. Accordingly, none have received any determination from which they could seek review in the Fourth Circuit.

### iii. Quiet Skies/Silent Partner Plaintiffs

[26] Defendants finally argue that Section 46110 bars any claims brought by Plaintiffs challenging "particular security measures authorized by Congress and chosen by TSA to ensure aviation security," namely inclusion on the Quiet Skies and Silent Partner programs and the enhanced screenings that result. ECF No. 53 at 8. The Court agrees with Defendants.

Congress has directed that TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers—use **\*505** information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," and "prevent [that] individual from boarding an aircraft or take other appropriate action with respect to that individual[.]" 49 U.S.C. § 114(h)(3). TSA implements Quiet Skies and Select Partners as part of this mandate. TSA exclusively chooses how to implement these programs, including how to search, screen, and question travelers in the programs. ECF No. 48 ¶ 67. Implementation of these programs constitute "orders" within the meaning of Section 46110. *See Blitz, 700 F.3d at 740* (standard operating procedure including advanced imaging technology and invasive patdowns is an "order" subject to Section 46110 channeling; *Corbett v. United States*, 458 F. App'x 866, 870 (11th Cir. 2012) (same); *Gilmore v. Gonzales*, 435 F.3d 1125, 1133 (9th Cir. 2006) (TSA security directive governing presentation of passenger identification constitutes an "order" under Section 46110). Challenges to these programs, therefore, must proceed before the Fourth Circuit, not this Court. The claims arising from placement in these programs are dismissed for lack of jurisdiction.[12]

### b. Challenges to Placement in TSDB

[27] [28] [29] Watchlisted Plaintiffs also lodge several procedural due process challenges to their initial placement on the TSDB. Defendants urge that these challenges too fall within the scope of Section 46110 under the doctrine of "inescapable intertwinement." ECF No. 49-1 at 53. Under this doctrine, "statutes ... that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inescapably intertwined' with review of such orders." *Merritt v. Shuttle, Inc. (Merritt II*), 245 F.3d 182, 187 (2d Cir. 2001) (citation omitted). The purpose of the doctrine is to prevent a plaintiff from "circumvent[ing] the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court." *Ligon v. LaHood*, 614 F.3d 150, 155 (5th Cir. 2010) (citation omitted). The appropriate inquiry is "whether the claim that the plaintiff seeks to raise ... is inescapably intertwined with an order of a covered agency." *Mokdad*, 804 F.3d at 813.

Because the Court has already determined that Plaintiffs' challenges to DHS TRIP are not subject to Section 46110's channeling provision, their related challenges to initial placement on the TSDB necessarily are also not subject to the provision. Moreover, even if the DHS TRIP challenges were subjected to Section 46110 channeling, the claims are not inescapably intertwined with challenges to initial placement on the TSDB. The doctrine "cannot do such heavy lifting as to bring all of plaintiff's constitutional claims to the Courts of Appeals," *Long*, 451 F.Supp.3d at 529 (citing *Amerijet Int'l*, 43 F. Supp. 3d at 14–15). This is particularly true where, as here, the subject of the broader claims is TSDB inclusion and the challenged TSA "order" is "entirely derivative" of those broader claims. *Id.*

In sum, Section 46110 does not divest this Court of jurisdiction for the lion's share of the challenged claims. Rather, the Court lacks jurisdiction only as to those **\*506** claims related to the Quiet Skies and Silent Partner programs. Those claims only shall be dismissed.

### 2. Failure to Exhaust DHS TRIP Procedures

[30] Defendants next contend that this Court lacks jurisdiction to hear claims for which Plaintiffs did not exhaust DHS TRIP procedures. Defendants seem to suggest that unexhausted claims are not "ripe" for adjudication and thus deprive this Court of the power to hear the claim. ECF No. 49-1 at 54. Defendants do not cite any statute or regulation requiring exhaustion, but instead argue that exhaustion "would serve the 'twin purposes of protecting administrative agency authority and promoting judicial efficiency' that the ripeness doctrine is meant to support." ECF No. 53 at 10

(quoting *McCarthy v. Madigan*, 503 U.S. 140, 144–45, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992)).

**[31] [32] [33] [34] [35]** Exhaustion does not implicate this Court's jurisdiction unless Congress expressly says so. *See Fort Bend Cty., Texas v. Davis*, ––– U.S. ––––, 139 S. Ct. 1843, 1850, 204 L.Ed.2d 116 (2019). Otherwise, whether to require exhaustion is left to the Court's "sound judicial discretion." *McCarthy*, 503 U.S. at 144, 112 S.Ct. 1081. For claims challenging a final agency action under the APA, a court cannot require exhaustion where neither the relevant statute nor an agency rule imposes such a requirement. *Darby v. Cisneros*, 509 U.S. 137, 144–45, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). For all other claims, the court must balance the "interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146, 112 S.Ct. 1081. Institutional interests include allowing the agency to "correct its own mistakes with respect to programs it administers before it is haled into federal court." *Id.* at 145, 112 S.Ct. 1081.

Defendants urge this Court to follow *Shearson v. Holder* in requiring Plaintiffs to exhaust remedies in advance of pressing their claims here. 725 F.3d 588, 594 (6th Cir. 2013). *Shearson* involved a single plaintiff's challenge to her placement on the TSDB and Watchlists. The Sixth Circuit affirmed the district court's determination that the *Shearson* plaintiff must first raise her broad constitutional challenges to her placement through DHS TRIP. *Id.* Notably, while the *Shearson* plaintiff raised many of the same arguments that Plaintiffs lodge against the sufficiency of the redress procedure, the *Shearson* Court held out hope that the "Redress Program's inquiry process" would develop an administrative record and "may help remove her from the terrorist list and help end her continuing injury." *Id.*

By contrast, Plaintiffs have pleaded robustly that the DHS TRIP procedure has historically offered little redress with no prospects of improvement. ECF No. 48 ¶¶ 211–17. Plaintiffs expressly contend that as to the Selectee Lists, most responses are wholly lacking in pertinent information, including whether the complainant is on or has been removed from a Watchlist. As to the No Fly List Plaintiffs, many complaints fall into a DHS TRIP black hole. *Id.* ¶¶ 218, 222. This Court simply does not share the *Shearson* Court's optimism that exhaustion will aid the decision-making process. *See Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014). Defendants' exhaustion argument is rejected.

### 3. Statute of Limitations

Defendants' last jurisdictional contention is quickly disposed. Defendants maintain that many Plaintiffs have filed suit well beyond the applicable limitations period set for challenging placement on the TSDB **\*507** and watchlists. ECF No. 49-1 at 54. But each Plaintiff has alleged continuous and *current* inclusion on the TSDB and Watchlists. ECF No. 48 ¶ 247. Because limitations do not begin to run until the violation ends, and the violations continue for as long as Plaintiffs remain on the TSDB and Watchlists, the claims are not time barred. *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653 (4th Cir. 1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *see also Rehab. Ass'n of Virginia, Inc. v. Kozlowski*, 838 F. Supp. 243, 249 (E.D. Va. 1993), *aff'd*, 42 F.3d 1444 (4th Cir. 1994) (denying defendants' motions on the statute of limitation bar "due to the continuing nature of the alleged harm" resulting from the continued application of an allegedly unlawful policy).

### IV. Merits

Having concluded that Defendants' jurisdictional challenges do not significantly alter the landscape of this case, the Court turns to the legal sufficiency of each claim.

### A. Violation of the Fifth Amendment – Procedural Due Process (Count I)

**[36] [37]** Count I, broadly stated, challenges the TSDB and Watchlisting system as lacking in adequate procedural safeguards when governmental action visits substantial deprivation of a constitutional right. The Fifth Amendment provides that a person shall not "be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. "The procedural component of due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citation and quotation marks omitted). To state a procedural due process claim, Plaintiffs must allege "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308,

314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528) (4th Cir. 2011).

[38]  If Plaintiffs plausibly aver government deprivation of a cognizable interest, the trier of fact must then weigh three factors, commonly referred to as the *Mathews* factors, to determine if a due process violation has occurred: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

With this framework in mind, the Court turns to whether Plaintiffs have plausibly averred deprivation of an interest protected under the Due Process Clause.

### 1. Travel-Related Liberty Interests

[39]  Both Selectee and No Fly List Plaintiffs aver erroneous deprivation of a protected interest in travel. It is undisputed that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *See Kent v. Dulles*, 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); *see also Saenz v. Roe*, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (noting that the right to travel is "firmly embedded" within the jurisprudence of the Supreme Court). Plaintiffs maintain a clear liberty interest  **508** in domestic travel, *see id.*; *Shapiro v. Thompson*, 394 U.S. 618, 630, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), as well as international travel. "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Kent*, 357 U.S. at 126, 78 S.Ct. 1113; *see also Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019) ("Plaintiffs undoubtedly have a strong liberty interest in domestic and international travel."); *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015); ("It must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel ...").

Defendants do not meaningfully challenge that No Fly List Plaintiffs have adequately averred that placement on this list results in a total ban on air travel. The Court easily concludes such Plaintiffs have averred deprivation of a protected liberty interest.

[40]  [41]  Defendants instead vigorously contend that Selectee List Plaintiffs have not averred sufficient impediments to travel to constitute a deprivation of a constitutional right to travel. In this respect, the Court recognizes that routine travel-related delays are not actionable. *See generally Cramer v. Skinner*, 931 F.2d 1020, 1030 (5th Cir. 1991); *U.S. v. Shenandoah*, 595 F.3d 151, 162–63 (3d Cir. 2010); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007). Even several hour delays do not amount to a constitutional deprivation in the eyes of some courts. *Cf. Beydoun v. Sessions*, 871 F.3d 459, 467–68 (6th Cir. 2017) (delays from airport screenings, even if resulting in missed flights, do not implicate the fundamental right to travel under substantive due process); *Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), *aff'd*, 942 F.3d 1019 (10th Cir. 2019) (dismissing procedural due process claim because challenges such as obtaining a boarding pass from a ticketing agent rather than a kiosk and undergoing a lengthy screening process, even if resulting in the occasional missed flight, were minor "inconveniences").

[42]  That said, when Watchlist status results in repeated, prolonged delays that "actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right," an individual suffers a deprivation of constitutional dimension. *See generally Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *see also Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017) (deprivation of right where plaintiffs avoided travel because of "invasive additional screening and other liberty-constraining activities" such as hours-long detentions and interrogations). Such deprivation occurs even if a plaintiff could avail himself of a less convenient form of transportation. *Compare Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (holding, in the equal protection context, that "travelers do not have a constitutional right to the most convenient form of travel ...") (quotation marks and alterations omitted) *with Kashem*, 941 F.3d at 378 (finding, in the procedural due process context, that "plaintiffs may not possess a fundamental right to travel *by airplane*, but in many instances air travel constitutes the only practical

means of traveling across great distances") (internal citation and quotation marks omitted) (emphasis in original).

Using the collective wisdom of the decisions defining the contours of this right, the Court turns to Plaintiffs' claims. Regrettably, the structure of the Amended **\*509** Complaint frustrates straightforward application. Although all Watchlisted Plaintiffs assert the claim, clearly all do not plead significant impediment to travel. Some Plaintiffs have suffered only a one-time lengthy delay, or screening processes that engender nonspecific "humiliation" or "inconvenience." *Cf. Abdi,* 2018 WL 1940411, at \*3 (rejecting claim where plaintiff alleging minor delays on four occasions, only one resulting in a missed flight); *Beydoun,* 871 F.3d at 467 (rejecting claim where plaintiff had "not attempted to provide any information about when those delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling.").

Others, however, allege experiencing a pattern of multi-hour delays nearly every time they travel, arising from hours-long searches, detentions, and interrogations, often conducted in front of fellow passengers and travel companions. *See, e.g.,* ECF No. 48 ¶¶ 324–34, 424–43, 459–78, 498–513, 656–59, 1212–18 (by air); *id.* ¶¶ 309–13, 493–94, 664–67, 1096–105 (by land). Some have endured displays of force, *see, e.g., id.* ¶ 1098 (detention by gunpoint), ¶ 661 (kicking plaintiff's legs open for a search); threats, *see, e.g., id.* ¶¶ 392, 614; property confiscation, *see, e.g., id.* ¶¶ 534, 495; and verbal humiliation, *see, e.g., id.* ¶ 1269 (airline representative informing Kamel "America doesn't want you"). These experiences, as pleaded, amount to a significant impediment to travel—a far cry from the "delays that many individuals are likely to experience at the airport." *Beydoun,* 871 F.3d at 468 (concluding that a fundamental right cannot be implicated if Plaintiffs allegations are similar to those typically experienced by regular travelers).

For example, Plaintiff Sulayman is "afraid to travel again" after he was detained twice and interrogated with his wife and four children for hours upon arriving at the U.S.–Canadian border. ECF No. 48 ¶¶ 674–680, 715. There, he was forced to undergo multiple extensive searches and lengthy interrogations in front of his fellow Muslim community members and family. *Id.* ¶¶ 681–701. Plaintiff Jardaneh went so far as to move to Canada, restrict his travel, and seek asylum from the U.S. government after being subjected to humiliating searches and interrogations at the U.S.–Canadian

border. *Id.* ¶¶ 308–41. On one occasion, he was handcuffed to a stretcher on the way to the hospital. *Id.* ¶ 318. On another, he was searched at the airport and surveilled by air marshals while on flight. *Id.* ¶ 334. Plaintiff Muminov, when arriving home from a business trip, was detained at the U.S.-Canadian border, ordered out of his car at gunpoint, handcuffed, held in a cold cell, interrogated for four hours, and subjected to a pat down, finger printing, hair analysis, iris scan, mouth swab, and search of his personal property. *Id.* ¶¶ 1096–105. He has consequently ceased all travel to Canada. *Id.* ¶ 1106.

Viewing the Amended Complaint facts as true and most favorably to Plaintiffs, the court concludes that several have adequately alleged deprivation of a liberty interest triggering due process protection.[13]

**2. Reputational Liberty Interests**

**[43]** **[44]** **[45]** Certain Plaintiffs also allege an infringement of their constitutionally protected interest in their "good name, **\*510** reputation, honor, or integrity." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). But, "injury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]." *Siegert v. Gilley,* 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). To show that reputational harm infringes a liberty interest, Plaintiffs must satisfy the "stigma-plus" test. *See Paul v. Davis,* 424 U.S. 693, 710–12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In particular, Plaintiffs must aver plausibly that they suffered (1) a "stigma" from governmental action; "plus" (2) an alteration or extinguishment of "a right or status previously recognized by state law." *Id.*; *see also Evans v. Chalmers,* 703 F.3d 636, 654 (4th Cir. 2012); *Shirvinski,* 673 F.3d at 315; *Piehota,* 303 F. Supp. 3d at 464–65.

**[46]** **[47]** With respect to the "stigma" prong, plaintiffs must plausibly aver that the government publicly disseminated defamatory information. *See Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Palka v. Shelton,* 623 F.3d 447, 454 (7th Cir. 2010). As to state action, or the "plus" prong, each plaintiff must allege suffering "a change in a right or status previously recognized by law." *Piehota,* 303 F. Supp. 3d at 464–65 (quoting *Paul,* 424 U.S. at 711, 96 S.Ct. 1155) (quotation marks omitted). Simple reputational damage alone

*El Ali v. Barr*, 473 F.Supp.3d 479 (2020)

is not sufficient. *Id.* (citing *Siegert*, 500 U.S. at 234, 111 S.Ct. 1789).

Plaintiffs aver that Defendants have publicly disseminated defamatory content by allowing "state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-faring vessels" access to the TSDB which falsely touts that members are "known and suspected terrorists." ECF No. 48 ¶ 154. Defendants have also shared the database with "553 private entities including airlines, universities, hospitals, private correctional facilities, private security services and private city attorneys." *Id.* ¶ 160. Such widespread dissemination is "tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives." *Piehota*, 303 F. Supp. 3d at 465.

Adding to the "stigma," the Court notes that Plaintiffs are effectively outed as supposed "known or suspected terrorists" in front of family, friends, travel companions, fellow passengers, and even business acquaintances who witness Plaintiffs' detentions, interrogations, and searches during travel. *Cf. Mohamed*, 2015 WL 4394958, at *6. This, aver Plaintiffs, has undoubtedly diminished their standing in the community. *See Roth*, 408 U.S. at 573, 92 S.Ct. 2701 (plaintiff can show state imposition of stigma where government's action "seriously damage[d] [the plaintiff's] standing and associations in his community[.]"). Members of the public have ceased to travel with Plaintiffs, *see, e.g., id.* ¶¶ 740, 891, 1005, 1156, 1177–94, 1421, refused to do business with them, *see, e.g., id.* ¶ 1192 (business leader cancelling all meetings with Hall after learning he had been subjected to enhanced screenings), or avoided them altogether. *See, e.g., id.* ¶¶ 715 ("Imam Sulayman ... is also discouraged from organizing and leading Muslim community members"). *Cf. Mohamed*, 995 F. Supp. 2d at 532 ("Inclusion on the No Fly List [ ] labels an American citizen a disloyal American who is capable of, and disposed toward committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public"). When **\*511** viewing the facts most favorably to Plaintiffs, they have averred sufficient government dissemination of defamatory information.

Only certain Plaintiffs, however, have even arguably alleged that the defamatory dissemination has altered their legal status to establish the "plus" in the stigma-plus deprivation. Esmaeel

Paryavi has alleged that he lost access to the Global Entry travel program implemented by CBP. ECF No. 48 ¶¶ 972–79. Likewise, Bosnic has averred that he lost his TWIC credentials, which he needs to perform his job, due to his Watchlist status. *Id.* ¶ 1045–46. Sulayman and Thadi too aver that they are no longer permitted to access military bases. *Id.* ¶¶ 702–13, 950. And Abdurrashid has been denied a state license to purchase a firearm. *Id.* ¶¶ 450–54. All other Plaintiffs have failed to allege sufficiently a constitutional deprivation on this liability theory.

Defendants pressed at oral argument that as to these specific Plaintiffs, none of the alleged denials amount to an alteration of legal status sufficient to constitute a "plus." However, Defendants provide no reasoned basis at this stage for the Court to so conclude.[14] Plaintiffs pressed in the opposite direction, urging that this Court find any of the other alleged constitutional injuries, such as the unconstitutional searches and interrogations discussed *infra*, to constitute a "plus." They too provide no support for expanding the doctrine to include any and every possible infringement as a loss of legal status.

The Court notes the relative dearth of applicable precedent addressing the nature of the state "right" sufficient to support the "plus" prong. To the extent courts have held that deprivation of state-authorized "privileges" as opposed to "rights" are insufficient to constitute a "plus," clearly more factual development in this case is warranted. *See, e.g., Al Turki v. Tomsic*, 926 F.3d 610 (10th Cir. 2019) (prisoner transfer is a "privilege" not a "right," the loss of which would be sufficient to constitute a "plus"); *Behrens v. Regier*, 422 F.3d 1255 (11th Cir. 2005) (state discretionary decision to allow adoption not a "right or interest guaranteed" sufficient to establish "plus" prong); *cf. University Gardens Apts. Joint Venture v. Jack B. Johnson*, 419 F.Supp 2d 733, 739 (D. Md. 2006) (recognizing "loss of a government-issued license" as a "plus"); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F.Supp 3d 712, 722 (ED. Va. 2015) (expulsion from public university sufficient as a "plus".) Accordingly, those Plaintiffs who have pleaded *some* loss of a specific state authorized status will proceed. The Court awaits further factual development as to the question of loss of "legal status" before concluding whether the deprivation satisfies the "plus" as a matter of law.[15]

**\*512 3. The *Mathews* Factors**

**[48]** Having found that certain Plaintiffs have pleaded a deprivation of a constitutional liberty interest, the Court turns to weighing the *Mathews* factors to determine whether the Plaintiffs have pleaded constitutionally inadequate redress procedures.

As to the first two *Mathews* factors, Defendants contend that the redress procedures afforded are sufficient to address the constitutional deprivations when balanced against the Government's keen interest in protecting the country's borders. Defendants maintain the internal procedures applicable to the TSDB protect against erroneous constitutional deprivations. ECF 49-1 at 69. They highlight that potential TSDB listees must be nominated and approved before being placed in the database and that the TSDB is then subject to ongoing internal audits. The DHS TRIP procedure, say Defendants, provides further protection in that it draws attention to possible erroneous placement in the database. *Id.* Although TSDB Plaintiffs not on the No Fly List have no way to confirm their watchlist list status, No Fly List individuals do receive such confirmation after submitting a DHS TRIP inquiry. *Id.* Thus, according to Defendants, the Amended Complaint fails to demonstrate that procedures were inadequate to protect against erroneous deprivation of a protected liberty interest.

Viewing the Amended Complaint most favorably to Plaintiffs, the TSDB nomination and approval process is, in short, a black box. The process is governed by "amorphous criteria," devoid of any notice, and utterly lacking in safeguards, such that over 98% of those nominated are approved. ECF No. 48 ¶¶ 135, 185, 220. As a result, the risk of erroneous deprivation is high, according to Plaintiffs: given that none of the million-plus individuals in the database have ever perpetrated an act of domestic terrorism, the government would be better off randomly choosing individuals to include in the TSDB. *Id.* ¶¶ 179–80, 188. Once in the TSDB, no redress mechanism exists for individuals who suffer overly broad and seemingly irrational restrictions with air and land travel, government credentialing, or financial institutions. *Id.* ¶ 211.

Plaintiffs further aver the DHS TRIP process is unavailing. DHS TRIP provides no information on how the TSA and TSC evaluates complaints, *id.* ¶ 212; inquiries generate merely a "standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual." *Id.* ¶ 217. Allegedly, "as of December 2017, the TSA Administrator had taken no action regarding the

removal of TSDB Listees in two years." *Id.* ¶ 213. Indeed, each affected Plaintiff alleges having received only a "redress control number" in response to their DHS TRIP inquiries, nothing else. *See, e.g., id.* ¶¶ 765, 879.

As for the DHS TRIP inquiries filed by those on the No Fly List, the 2015 revisions require DHS TRIP response letters to "affirmatively state" whether an individual appears on the list. *Id.* ¶ 218; ECF No. 49-1 at 36. DHS TRIP also is supposed to provide No Fly list individuals "criteria on which his placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the No Fly List determination." ECF No. 49-1 at 36. Further, the individual should be able to submit information to DHS TRIP relevant to his No Fly List status, which DHS TRIP will then review. *Id.* But the Amended Complaint allegations do not square with these revisions: DHS TRIP "continue[s] to provide no information on historical watchlist status, no information as to **\*513** whether a person is included in the TSDB generally, no meaningful factual basis for the individuals inclusion on the watchlist, and no information as to whether the government has resolved the specific complaint at issue." ECF No. 48 ¶ 218. And not a single No Fly List determination arising out of DHS TRIP has been processed, say Plaintiffs, since 2015. *Id.* ¶ 222.

Accordingly, the existing procedural protections are inscrutable, opaque, and as to DHS TRIP No Fly List inquires, not followed. The process affords little to no opportunity to be heard, before, during, or after being placed in the TSDB and deprived of protected liberty interests. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 80, 92, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (due process requires "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.") (internal quotation marks omitted); *see also Mathews*, 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). As pleaded, therefore, the claims survive.

As to the third *Mathews* factor, whether the Watchlist system furthers national security interests, is best addressed after discovery. To be sure, the Government maintains a strong interest in national security. *See Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *Wayte v. United States*, 470 U.S. 598, 612, 105 S.Ct. 1524, 84

*El Ali v. Barr*, 473 F.Supp.3d 479 (2020)

L.Ed.2d 547 (1985); *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017) ("There is obviously a compelling government interest in preventing terrorist attacks against commercial aviation."). The central question, however, is whether government has implemented "reasonable measures to ensure basic fairness" to include implementing reasonably designed procedures. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012). Discovery as to whether and how TSDB and the Watchlisting system furthers national security interests, as well as the administrative burdens that additional procedural protections will place on the Government, remain critical to the final analysis.

The Court recognizes that, in the end, the Government's internal processes may provide sufficient protection to withstand scrutiny. But the Court cannot make that determination as a matter of law when considering all complaint facts most favorably to Plaintiffs. Indeed, the *Mathews* balancing test depends upon "fact-intensive considerations" not capable of resolution now. *Piehota*, 303 F. Supp. 3d at 465; *see also Kovac v. Wray*, 363 F. Supp. 3d 721, 758 (N.D.Tex.2019). Striking the balance between the parties' competing interests, as well as the value of additional or substitute procedural safeguards, cannot be done in the abstract. The procedural due process claims survive challenge as to those plaintiffs who plausibly aver deprivation of travel and reputational liberty interests.[16]

**B. Violation of the Fifth Amendment – Substantive Due Process (Count II)**

**[49]** **[50]** **[51]** The substantive due process claim is confined to the No Fly List Plaintiffs **\*514** [17] who allege deprivation of their fundamental right to travel, or as they say "movement," as recognized by the Supreme Court in *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citation and quotation marks omitted). However, such heightened protections against government interference extend to a narrower set of "rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty,

such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotations and citations omitted). To assert a substantive due process claim, Plaintiffs must allege that Defendants' action burdens a fundamental right and cannot withstand strict scrutiny. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999). Surviving strict scrutiny requires the government to demonstrate that its interference is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest. *Id.*

**[52]** The No Fly List burdens a plaintiff's fundamental right to interstate travel. *See Shapiro*, 394 U.S. at 630, 89 S.Ct. 1322; *Kent*, 357 U.S. at 125, 78 S.Ct. 1113; *Saenz*, 526 U.S. at 498, 119 S.Ct. 1518; *Kashem*, 941 F.3d at 378. That the No Fly List Plaintiffs may use a less convenient means of transportation does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option. *See Kashem*, 941 F.3d at 378. Further, although protecting U.S. borders and combatting terrorism is clearly a compelling government interest, whether Defendants' actions are narrowly tailored to achieve that purpose cannot be decided now. The Amended Complaint makes plausible that the No Fly List, as an outgrowth of the TSDB, is both under and overinclusive and so has been wholly ineffectual in furthering the government's legitimate security interests. *See* ECF No. 48 ¶¶ 177–90. This question is fact-dependent and inappropriate for complete resolution at this stage. The Count therefore survives, but only as to the No Fly List Plaintiffs.

**C. Violation of the APA, 5 U.S.C. § 706 – DHS TRIP (Count III)**

The Court next turns to the legal sufficiency of Count III. Under the Administrative Procedure Act ("APA"), the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Plaintiffs allege the decisions to place Plaintiffs in the TSDB constitute agency actions that fall under the ambit of the APA, 5 U.S.C. § 706. ECF No. 48 ¶ 1592. Plaintiffs further

aver that such placement was driven solely, or primarily, because of race, ethnicity, national origin, religious **\*515** affiliation, or other First Amendment protected activities, that they do not "present a security threat to commercial aviation." *id.* ¶¶ 1595–96, 1598, and that they have not been afforded an adequate redress process. *Id.* ¶ 1597. Defendants' decision as to Plaintiffs' TSDB and Watchlist status, according to Plaintiffs, is arbitrary, capricious, and otherwise not in accordance with law, and thus in violation of the APA. *Id.* ¶¶ 1594, 1597–98.

The parties agree that Plaintiffs' APA claim is coextensive with their procedural due process claims. ECF No. 70. Accordingly, to the extent the procedural due process claims survive for certain Plaintiffs, so too do their APA claims.

### D. Violation of the APA, 5 U.S.C. § 706 – National Crime Information Center (Count IV)

 [53]   Plaintiffs allege that Defendants lack authority to share Plaintiffs' identities and personal information through the National Crime Information Center (NCIC), and as such, Defendants' actions violate the APA, 5 U.S.C. § 706. ECF No. 48 ¶¶ 1600–07. Defendants challenge both the sufficiency of the claim and Plaintiffs' standing for failure to allege any injury-in-fact that stems from the dissemination. ECF No. 49-1 at 77–80. Because the Court concludes that Plaintiffs have pleaded absolutely no injury arising from the NCIC, it grants Defendants' motion on this basis alone.

In the 268 page Amended Complaint, two factual allegations relate to NCIC. First, that NCIC includes some nonspecific cohort of TSDB identified as "Known or Suspected Terrorists" ("KSTs"), which can be accessed by more than 18,000 law enforcement agencies and 100,000 law enforcement officers. ECF No. 48 ¶ 106. And second, that law enforcement may query NCIC during routine police encounters such as traffic stops. *Id.* ¶ 158.

The Amended Complaint, however, is silent as to how NCIC actually affected any named Plaintiff. No Plaintiff adequately pleads any police encounters arising from an NCIC query or any factual basis to support that law enforcement access to NCIC caused any injury. Although the disclosure mechanism through NCIC may provide helpful context regarding the wide-ranging uses of the TSDB, the allegations do not give rise to a legally cognizable claim for any Plaintiff. Count IV, therefore, must be dismissed.

### E. Violation of the Fifth Amendment – Equal Protection (Count V)

 [54]   [55]   [56]   Watchlist and TSDB Plaintiffs allege their inclusion amounts to intentional discrimination based on race, alienage, religion, and national origin, without a compelling, legitimate, or rational justification and in violation of Equal Protection under the Fifth Amendment. ECF No. 48 ¶¶ 1608–20. *See* U.S. Const. amend. XIV, § 1 (the government may not "deny to any person within its jurisdiction the equal protection of the laws."); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). The Equal Protection Clause prohibits "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). "To survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citations omitted). The court must then assess, as a **\*516** matter of law, whether the disparate treatment is justified, employing the requisite level of scrutiny. *Garraghty*, 239 F.3d at 654.

 [57]   Plaintiffs maintain that they are subjected to ongoing adverse differential treatment based upon membership in a suspect class. Accordingly, the Court must apply "strict scrutiny" to the governmental action, which dictates that only such action "suitably tailored to serve a compelling state interest" will survive challenge. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

 [58]   [59]   Where, as here, the claimed unconstitutional discrimination is based on a facially neutral law or policy, Plaintiffs must allege facts that allow the plausible inference that such law or policy has been applied in an intentionally discriminatory manner, *see Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995), or that its adoption was motivated by discriminatory animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Evidence of discriminatory intent is key. Thus, even when a facially neutral statute has

a "racially disproportionate impact," discriminatory animus must nevertheless be proved to establish an equal protection violation. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

 **[60]    [61]    [62]**  Both direct and circumstantial evidence of discrimination may be considered. *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555. Among such circumstantial evidence most relevant to this claim, the Court may look to consistent patterns of governmental conduct that adversely affect a protected class, as well as statements of the policy makers (or lack thereof). *Sylvia Dev. Corp.,* 48 F.3d at 819 (citing *Arlington Heights,* 429 U.S. at 266–68, 97 S.Ct. 555). While "purposeful discrimination is the condition that offends the Constitution[,]" "impact provides an important starting point." *Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citation and quotation marks omitted).

The criteria for TSDB inclusion amounts to a facially neutral policy. *See* ECF No. 48-6 at 5. It states expressly that nominations "must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." *Id.* Although Plaintiffs would invite the Court to take this policy statement as evidence of discrimination, ECF No. 52 at 55–56, the policy points in the opposite direction. The policy does *not* demand consideration of those factors, and in fact prohibits consideration of such factors alone. Accordingly, the Court begins with the presumption that the TSDB criteria are facially neutral.

As for evidence of discriminatory animus, the Court notes, as do Defendants, that the Amended Complaint is peppered with bald allegations that alone would not survive challenge. *See, e.g.,* ECF No. 48 ¶ 1611 ("Defendants selectively apply and enforce watchlist and screening policies to individuals who appear to be or who are known or suspected to be Muslim or Middle Eastern"); ¶ 1612 ("The disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination."); ¶ 194 ("Defendants, knowingly, intentionally, and purposefully use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds.").

 **[63]**  However, the Amended Complaint also avers sufficient detail to "nudg[e] the **\*517** claim of purposeful discrimination across the line from conceivable to plausible."

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Some Plaintiffs contend, for instance, that their answers regarding religious and cultural practices is what landed them in the TSDB and on the respective Watchlists. *See, e.g.,* ECF No. 48 ¶¶ 485–86 (FBI interrogation of M. Paryavi as to his Islamic religious beliefs and practices and political opinions, including the mosque he attends and details about its imam, contributed to his TSDB designation); ¶¶ 649–51 (Interrogation of El-Shahat regarding "what he thinks of jihad, what mosque he attends, how religious he is, whether he teaches at a mosque, whether he is an imam" contributed to his TSDB designation). Probing interrogations about travel to Muslim-majority countries, religious pilgrimages, learning Arabic, attending mosques, affiliations with Muslim organizations, religious donations, and associations with other Muslims, provide further factual basis to infer plausibly that placement on the list was tied directly, and perhaps solely, to Plaintiffs' race, alienage, religion, and national origin. *Compare id.* ¶¶ 485, 635–41, 646–50, 941–42, 1279, 1147–48, 1519–20 *with Cherri v. Mueller,* 951 F. Supp. 2d 918, 937 (E.D. Mich. 2013) (upholding equal protection claim because "[p]laintiffs have adequately pled that Defendants have a policy, custom and practice of questioning only Muslim–American[s] at the border about their religious practices and beliefs.").

In further support of the equal protection claim, the Amended Complaint also provides sufficient facts from which to infer that similarly situated white or Christian individuals do not receive the same treatment as their Muslim counterparts. Plaintiffs allege that

> [W]hen Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone. Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues. This is true even when the only distinction between a nominated person and a non-nominated person are improper race, religion, or national origin criteria.

ECF No. 48 ¶ 198. *See also id.* ¶ 201 ("[T]hough they facially satisfy the same known associate watchlist criteria, close families and friends of convicted white-nationalist domestic terrorists are not routinely added to the federal terrorist watchlist, while distant families and friends of innocent Muslims often discover that their mere association with

other watchlisted individuals has caused them to be labeled potential terrorists.").

The Amended Complaint next provides specific instances of white Christians not in the TSDB whose conduct would likely have led to TSDB inclusion if they were Muslim. Lieutenant Christopher Hasson was indicted on February 20, 2019 for plotting a large-scale domestic terrorist attack. *Id.* ¶ 202. Yet, "[d]espite significant evidence of Hasson's extremism and potential for terrorism, not only does it appear that [ ] Hasson not on the terrorism watchlist, he held a Secret level security clearance." *Id.* "Nor is there any reason to believe any of Hasson's friends or relatives have been added to the watchlist," even though the same would not have been true of the Muslim friends and relatives of a known or suspected Muslim terrorist. *Id.*

With regard to Plaintiffs' own experiences, Plaintiff Suliman and his Muslim **\*518** travel companions were subjected to extensive additional screening and searches at the airport arising from Suliman's inclusion in the TSDB. However, a similarly situated non-Muslim travel companion was inexplicably *not* searched, detained, or subjected to any additional screening. *Id.* ¶¶ 739. Such allegations, construed broadly, underscore how Muslim individuals may be nominated to Watchlists while similarly situated non-Muslims may not.

In addition to concrete examples of disparate treatment, Plaintiffs also aver direct evidence of discriminatory animus. To be sure, a stray remark by a non-decisionmaker does not alone support an equal protection violation. *See Orgain v. City of Salisbury*, 521 F. Supp. 2d 465, 492–93 (D. Md. 2007), *aff'd in part sub nom. Orgain v. City of Salisbury, Md.*, 305 F. App'x 90 (4th Cir. 2008). When viewed cumulatively, however, such remarks can support an equal protection claim. *See* ECF No. 48 ¶ 1148 (CBP officer telling Mujanovic to remove her *hijab* to avoid travel delays); ¶ 759 (CBP officer telling Suliman that "lately, most of the people that come into [a secondary screening] room are from your background"); ¶ 659 (TSA agent interrogating El-Shahat and informing him that "he is subjected to enhanced screening because he frequently travels to countries in the Middle East, because he travels alone, and because he is a Muslim male"). Viewing the entirety of these facts as true and most favorably to Plaintiffs, Defendants' discriminatory intent is plausibly established.

The Court determines next whether Defendants' discriminatory actions are "suitably tailored to serve a

compelling state interest" such that they survive strict scrutiny. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. If the government's stated interests "could be achieved by narrower ordinances that burden [the right] to a far lesser degree," then the actions are not narrowly tailored. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). National security undoubtedly constitutes a compelling government interest. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order."); *Mohamed v. Holder*, 266 F. Supp. 3d at 880. Whether Defendants' actions are narrowly tailored, however, is a fact-dependent question inappropriate for complete resolution at this stage.

 **[64]**  Plaintiffs thus far have alleged enough to show that the government's interests could be achieved in a more effective and targeted, and less burdensome, alternative. Specifically, Plaintiffs argue that the TSDB and Watchlist system is ineffective, having "never prevented an act of terrorism inside the United States." ECF No. 48 ¶ 8. It is also imprecise and overbroad, as it fails to include those committing attacks. Indeed, Plaintiffs allege that none of the 250 acts of terrorism committed within the U.S. were perpetrated by anyone from within the database. *Id.* ¶ 179–80. Further, the government's internal audits reveal "serious flaws" and "significant problems with the nomination and removal process." *Id.* ¶ 228. Defendants may later show that the policy is effective and suitably tailored to achieving its national security interests, but for now, Plaintiffs' allegations are sufficient. Count V survives as to Plaintiffs who have alleged inclusion in the TSDB.

## F. Violation of the Fourth Amendment (Count VI) and Fifth Amendment Self-Incrimination (Count VIII)

The Court next turns to claims asserting violations of the Fourth and Fifth Amendments **\*519** arising from discrete searches and seizures, as well as interrogations, of certain Plaintiffs (Counts VI, VIII). ECF No. 49-1 at 81–82. Defendants again correctly note that these claims must go forward, if at all, only as to those Plaintiffs who allege an unconstitutional search or interrogation. Defendants further press that even those Plaintiffs who allege a historic Fourth or Fifth Amendment violation lack standing because none have alleged any specific plans for future international travel and so have not averred risk of future injury. ECF No. 49-1 at 81.

 **[65]**  **[66]**  Defendants are correct that because Plaintiffs seek declaratory and injunctive relief, "they must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. 669. Speculative claims of future injury will not suffice. *Id.* at 497, 94 S.Ct. 669.

 **[67]**  However, where as here, Plaintiffs aver a historic pattern of such violations during similar travel, the Court may plausibly infer that such infringements will continue in the future. *See Elhady v. Kable*, 391 F. Supp. 3d 562, 575 (E.D. Va. 2019); *Mohamed*, 266 F.Supp.3d at 875 ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing."); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) (same); *Alasaad v. Nielsen*, No. 17-CV-11730-DJC, 2018 WL 2170323, at *11 (D. Mass. May 9, 2018) (similar); *Cherri*, 951 F. Supp. 2d at 929 (similar); *but see Jibril v. Wolf*, No. 1:19-CV-2457-RCL, 2020 WL 2331870, at *4 (D.D.C. May 9, 2020) (no standing for plaintiffs who alleged a series of minimal disruptions during the course of one international trip because they could not show concrete and immediate future travel plans). Simply put, Plaintiffs may demonstrate that what is past is also prologue, and this is sufficient to confer standing.

The Plaintiffs averring Fourth and Fifth Amendment violations have alleged not only historic and repeated illegal searches and seizures but particular needs or desires to travel in the future. *See, e.g.,* ECF No. 48 ¶ 1164 (Mujanovic) ¶ 448 (Abdurrashid), ¶ 715 (Sulayman). The Court may thus reasonably infer that Plaintiffs not only will travel in the future, *see Alasaad*, 2018 WL 2170323, at *11, but be subjected to similar unconstitutional searches and seizures when they do. *See Suhre v. Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("[P]ast injury [i]s probative of likely future injury."). The Court rejects Defendants' standing challenge.

The Court next turns to the Amended Complaint to determine whether Plaintiffs sufficiently aver Fourth and Fifth Amendment violations.

**1. Violation of the Fourth Amendment (Count VI)**

 **[68]**  Certain Plaintiffs allege that government agents seized and forensically searched their electronic devices in violation of their Fourth Amendment right to be free from warrantless searches and seizures. ECF No. 48 ¶¶ 1621–31. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the **\*520** place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

 **[69]**  **[70]**  One well established exception to the warrant requirement covers searches conducted at the border. Recognizing that national security remains at its "zenith" at ports of entry, including international airports, law enforcement may conduct *routine* searches of persons and property even in the absence of a warrant, probable cause, or even any individualized suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018), as amended (May 18, 2018). The "border exception" is grounded in the recognition that individual liberties must sometimes yield to the "longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," *United States v. Flores-Montano*, 541 U.S. 149, 152–53, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004) (quoting *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). Thus, to protect and secure U.S. borders, "the Fourth Amendment's balance of reasonableness is qualitatively different ... than in the interior...." *Montoya de Hernandez*, 473 U.S. at 537–40, 105 S.Ct. 3304.

 **[71]**  But the exception is not limitless. After all, "[t]he suspicionless search is the very evil the Fourth Amendment was intended to stamp out." *Samson v. California*, 547 U.S. 843, 858, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (Stevens, J., dissenting). Not every search at the border is "routine" and thus immune from the individualized suspicion requirement. Although the Supreme Court has not clarified the precise standard used for non-routine searches, where

law enforcement conducts "highly intrusive searches of the personal-dignity and privacy interests of the person" some "support a requirement of some level of suspicion" is necessary. *Flores-Montano*, 541 U.S. at 152, 124 S.Ct. 1582. *See also Montoya de Hernandez*, 473 U.S. at 541, 105 S.Ct. 3304 (requiring reasonable suspicion of alimentary drug smuggling in order to extensively detain individual).

**[72] [73] [74]** In the Fourth Circuit, a "forensic border search of a phone must be treated as nonroutine," and permitted only with individualized reasonable suspicion. *Kolsuz*, 890 F.3d at 144–45 (a forensic search of devices "dwarfs the amount of personal information that can be carried over a border ... [t]he average 400–gigabyte laptop hard drive can store over 200 million pages ... [e]ven a car full of packed suitcases with sensitive documents cannot hold a candle to the sheer, and ever-increasing, capacity of digital storage.") (quotation marks and citation omitted). *See also U.S. v. Aigbekaen*, 943 F.3d 713, 723 (4th Cir. 2019) ("We simply apply the teaching of Kolsuz: where a search at the border is so intrusive as to require some level of individualized suspicion, the object of that suspicion must bear some nexus to the purposes of the border search exception in order for the exception to apply."). Reasonable suspicion exists when "specific and articulable facts" known to the searching officers, along with "rational inferences from those facts," demonstrate that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A "mere hunch" is not enough. *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Whether reasonable suspicion exists **\*521** depends on the totality of the circumstances observed by a reasonable law enforcement officer in the agent's position. *Id.* at 274–75, 122 S.Ct. 744; *see also United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**[75]** For certain Plaintiffs, agents confiscated their electronic devices and downloaded their contents with a level of intrusiveness sufficient to deem the search nonroutine and thus requiring individualized reasonable suspicion of criminal activity. *See, e.g.*, ECF No. 48 ¶¶ 495, 563, 636, 1151, 1492, 1516, 1625. Further, these searches, as pleaded, were without reasonable suspicion that each Plaintiff was engaged in terrorist activity. Thus, as to those Plaintiffs subjected to this kind of warrantless search, the claims survive challenge.

Defendants respond that the searching agents possessed such reasonable articulable suspicion by virtue of Plaintiffs' inclusion in the TSDB. ECF No. 53 at 32–33.

TSDB membership, argue Defendants, provides the very individualized evidence that every Plaintiff "is engaged, has been engaged, or intends to engage, in conduct ... in preparation for, in aid or furtherance of, or related to, terrorism and/or terrorist activities." ECF No. 48-6 at 5.

Although Defendants may be correct in the end, the Court must at this stage confine its analysis to the Amended Complaint. Plaintiffs aver lifetime inclusion in the TSDB based on associational status, religious belief, race, or travel preference. *See* ECF No. 48 ¶¶ 10, 194–95. They claim that the TSDB includes over one million people precisely because the inclusion criteria is grossly nonspecific. Mere membership in the database, therefore, cannot supply individualized reasonable articulable suspicion. As the Court in *Mohamed v. Holder* aptly noted:

> What constitutes conduct sufficiently "related to" or "in aid of terrorism" is not explained, but it is not difficult to imagine completely innocent conduct serving as the starting point for a string of subjective, speculative inferences that result in a person's inclusion on the No Fly List. For example, is the academic study of terrorism or the investigative reporting of terrorist activities "related to terrorism and terrorist activities"? Is providing financial support to a charitable organization enough, even without knowledge that some of the organization's activities are "in aid of ... terrorist activities"? Is it enough to be a member of a lawfully operating social or religious organization whose membership may include other persons suspected of terrorism? Is studying Arabic abroad, as Mohamed concedes he did, conduct "in preparation for ... terrorist activities"?

995 F. Supp. 2d at 532.

The TSDB cannot serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search. *Id.* Accordingly, for those Plaintiffs who have averred facts to make plausible that they had been subjected to a non-routine search of their devices, Defendants' motion is denied.[18] As to all other Plaintiffs, the motion is granted.

**2. Violation of the Fifth Amendment – Self-Incrimination (Count VIII)**

Plaintiffs whose electronic devices were searched during border interrogations **\*522** bring a companion Fifth Amendment challenge for being "forced" to provide cellphone and laptop passwords and "biometric means such as facial recognition or fingerprints" to facilitate searches of the devices. ECF No. 48 ¶ 1644. They argue specifically that such information amounts to compelled testimony sufficient to support a Fifth Amendment self-incrimination claim. *Id.* ¶ 1646.

 **[76]   [77]** The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This constitutional protection is triggered only when the individual is (1) compelled to make a (2) testimonial communication (3) that is incriminating. *Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007). Determining whether the right applies is decidedly a fact-intensive inquiry. *See Fisher*, 425 U.S. at 410, 96 S.Ct. 1569.

The parties focus on whether Plaintiffs' "forced" use of "biometric" information to unlock devices is testimonial. Plaintiffs urge the Court to narrow the focus solely to whether "forcing" Plaintiffs to give over electronic pass codes, to or use their thumbs or faces to unlock their devices, can make out a Fifth Amendment violation. Perhaps in the hope that yet another Court will weigh in on an unsettled question of law, *see, e.g., Matter of Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1015–16 (N.D. Ca. 2019), *dismissing review*, No. 19-MJ-70053-KAW-1 (JD), 2019 WL 6716356 (N.D. Cal. Dec. 10, 2019), Plaintiffs artificially attempt to parse the claim in a manner which does violence to the settled jurisprudence in this area. This Court is not willing to do.

 **[78]   [79]** Rather, the Court must consider the more fundamental question of whether any Plaintiff has alleged sufficiently coercive circumstances that plausibly give rise to an inference that *any* incriminating testimony was involuntarily obtained. The Fifth Amendment "speaks of compulsion." *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (citation omitted). A statement is compelled when "considering the totality of the circumstances, the free will of the [person making the statement] was overborne." *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) (citing *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)). "To determine whether a defendant's will has been overborne or his capacity for self-

determination critically impaired, courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (citation and quotation marks omitted).

 **[80]** Certain Plaintiffs have averred sufficient facts to make plausible the claim that their will had been overborne during their interrogations. These are the Plaintiffs whose interviews arose under coercive circumstances such as being held at gunpoint, *see, e.g.,* ECF No. 48 ¶ 1098, in handcuffs, *see, e.g., id.* ¶¶ 318, 382, 390, 1099, or in separate interrogation rooms. *See, e.g. id.* ¶¶ 530, 613, 1279. These same plaintiffs were often subjected to lengthy detentions during which access to family or counsel was denied. *See, e.g., id.* ¶¶ 313–15, 506, 614–15, 640, 1197–201. Additionally, Defendants do not dispute that the purpose of the interrogations was to gather information regarding terrorist activities, so any such interview may be plausibly inferred as designed to elicit incriminatory statements. Thus, certain Plaintiffs allege sufficient facts to make plausible that their Fifth Amendment **\*523** rights against compelled self-incrimination had been violated.[19]

Accordingly, the more nuanced and perhaps legally titillating question of whether provision of cell phone passcodes or biometric information amounts to testimonial statements simply cannot be ascertained at the motion to dismiss stage. Once discovery is obtained on each alleged incident in which Plaintiffs' right against self-incrimination was allegedly abridged, the Court will be in a better position to determine whether this narrower question matters at all as to those Plaintiffs who have pleaded facts sufficient to make plausible a Fifth Amendment self-incrimination violation.

### G. Violation of the First Amendment (Count VII)

Plaintiffs separately allege that the searches of their electronic devices violate their freedom of expressive association as protected under the First Amendment. ECF No. 48 ¶¶ 1634, 1638; ECF No. 52 at 63. Because the "[g]overnment takes the data they obtain from private searches and uses it to nominate the friends and relatives of Plaintiffs to the watchlist as well," avers Plaintiffs, the government "directly interferes with Plaintiffs' ability to freely associate with those individuals." ECF No. 52 at 63.

The First Amendment to the U.S. Constitution provides that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. CONST. amend. I. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. U.S. Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

**[81] [82] [83] [84]** This right, however, is not absolute. The law recognizes that some difficulty imposed on such freedoms do not "without more, result in violation of the First Amendment." Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996). "To be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.' " Id. (quoting Lyng v. Int'l Union, 485 U.S. 360, 366, 367 & n. 5, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988)) (further citation omitted). Interferences that qualify as "direct and substantial" could include "impos[ing] penalties or withhold[ing] benefits from individuals because of their membership in a disfavored group ..., attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity, and ... interfere[ing] with the internal organization or affairs of the group." U.S. Jaycees, 468 U.S. at 622–23, 104 S.Ct. 3244 (internal citations omitted). Plaintiffs, therefore, must allege government action that imposed a direct and substantial interference with association in pursuit of political, social, economic, educational, religious, or cultural ends. See id.

**[85]** Defendants level a host of arguments to defeat this claim. The Court need not tick through all of them because the bare bones allegations simply do not make the claim plausible. The Amended Complaint alleges loosely that Plaintiffs have the protected right to associate, but wholly fails to identify the association—religious, social, religious, or otherwise—that government **\*524** action has inhibited. U.S. Jaycees, 468 U.S. at 622, 104 S.Ct. 3244. Desired association with the contacts in one's phone is simply not enough. This alone defeats the claim.

Alternatively, no averred facts make plausible that any interference was "direct and substantial." Plaintiffs aver only that government agents obtained their "contacts" and included that information on the TSDB after cursory investigation. But they give not one example of how such government conduct has hampered, hindered, impacted, or affected in

any way their association with said "contacts." Cf. NAACP v. State of Ala. ex rel. Patterson, 357 U.S. 449, 462–63, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (disclosure of membership in organization sufficient to "induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure."); AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168 (D.C. Cir. 2003). Without any allegations regarding the limitations on Plaintiffs' ability to associate, the Court cannot even begin to determine whether Defendants' actions infringe on Plaintiffs' associational rights protected under the First Amendment. The claim must be dismissed.

## H. Plaintiffs' RFRA Claims (Counts X, XI, XII, XIII)[20]

Plaintiffs bring four discrete claims pursuant to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.A. § 2000bb et seq. Plaintiffs allege that: (1) agents' interrogations related to religious beliefs substantially burden Plaintiffs' exercise of religion (Count X); (2) Watchlist placement as to Sulayman and Siddiqui substantially burdens Sulayman's and Siddiqui's performance of Umrah[21] and Hajj,[22] respectively, id. ¶¶ 1667–80 (Count XI); (3) agents' offers to remove Hall and John Doe from Watchlists if they agreed to act as informants burdened their religious freedom, id. ¶¶ 1681–93 (Count XII); and (4) disclosure of Plaintiff Elamin's Watchlist status burdened his religion by leading to his termination as a prison chaplain, id. ¶¶ 1694–706 (Count XIII).

**[86]** The RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except ... if it demonstrates that application of the burden to the person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a)-(b). Thus, in analyzing a claim under the RFRA, the Court must ask whether the government's action imposes a substantial burden on religious exercise, and if so, whether those actions are the least restrictive means of serving a compelling government interest. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 691, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).

**[87] [88]** The RFRA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb–2(4), 2000cc–5(7). A litigant's **\*525** claimed beliefs

"must be sincere and the practices at issue must be of a religious nature." *Levitan v. Ashcroft,* 281 F.3d 1313, 1320 (D.C. Cir. 2002). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs ... or one that forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand." *Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) and *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

[89]   In assessing whether a plaintiff's exercise of her religious beliefs has been substantially burdened, a court must not judge whether the plaintiff's beliefs "are mistaken or insubstantial," but rather "whether the line drawn reflects an honest conviction." *Hobby Lobby,* 573 U.S. at 724–25, 134 S.Ct. 2751 (2014) (citation and quotation marks omitted); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.").

Defendants broadly argue that all the RFRA claims must be dismissed because, as a matter of law, the challenged actions are the least restrictive means of achieving a compelling government interest. ECF No. 49-1 at 108. It is undisputed that the government maintains a compelling interest in national security, which includes protection of our borders and prevention of terrorist attacks. *See Haig,* 453 U.S. at 307, 101 S.Ct. 2766 ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *Humanitarian Law Project,* 561 U.S. at 28, 130 S.Ct. 2705. The Court will not belabor that point here. But whether the government's implementation of such policies aimed at protection are in fact the least restrictive means is inextricably intertwined with whether the same acts impose a substantial burden on the individual Plaintiffs forming the subject of the RFRA counts. The inquiry, therefore, is best left for exploration at discovery to the extent the claim survives challenge on more specific grounds addressed below.

The Court next turns to each RFRA claim separately.

### 1. General Intrusion of Religious Practice (Count X)

[90]   Plaintiffs confine this claim to the substantial burden exacted "when the government conducts an intrusive inquiry into a person's religious beliefs as a component of official government action." ECF No. 48 ¶ 1660. This is because "[s]uch inquiries place pressure on the person to modify or violate their beliefs and singles them out for disfavored treatment." *Id.* ¶ 1660. The Court finds certain Plaintiffs allege plausible violations.

[91]   In conjunction with invasive screening at airports and land borders, Plaintiffs have been detained and questioned for hours specifically about their religious beliefs. Although Defendants maintain the questioning is "wholly secular," the Amended Complaint facts say otherwise. *See e.g., id.* ¶ 485 (mosque details, religious beliefs and practices); ¶ 504 (church attendance, enrollment in religious courses); ¶ 650 (mosque attendance, views on jihad, religious leadership, degree of religiousness); ¶ 1147 (differences between Sunni and Shia Muslims); ¶ 1238 (Hajj attendance, discussions with others about **\*526** religion). The "very process of inquiry" may itself impose a substantial burden on the individuals' religious beliefs, such that it amounts to a RFRA violation. *See generally N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Cf. Mitchell v. Helms,* 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) ("[I]nquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or constitution's religious beliefs"). As pleaded, Defendants' singling out of Plaintiffs and their persistent inquiry into Plaintiffs' religious beliefs and practices places pressure on Plaintiffs to modify or violate those beliefs or risk being subjected to the pattern of detentions and interrogations in connection with their travel. *See United States v. Ramon,* 86 F. Supp. 2d 665, 676 (W.D. Tex. 2000) (finding that governmental policy of detaining and questioning individuals who display religious decals on their vehicles "threatens to burden the sincerely held beliefs of those who do so for the purpose of emphasizing their faith."); ECF No. 48 ¶ 488; ¶ 507; ¶ 1152.

Plaintiffs further aver that the questioning has punitive consequences because the "details of Plaintiffs' adherence to the Muslim faith" *is* the reason they end up on the Watchlists, *id.* ¶ 1662, and so all of the attendant harms

that flow from Watchlist placement imposes a substantial burden on their free exercise of religion. *Cf. Brown v. Woodland Joint Unified School Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994) ("A government practice has the effect of impermissibly ... disapproving of religion if it is 'sufficiently likely to be perceived by ... nonadherents [of the controlling denomination] as a disapproval[ ] of their individual religious choices.' ") (quoting *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985)); *Cherri*, 951 F. Supp. 2d at 935 (dismissing RFRA claim where plaintiffs did not plead that questioning "require[d] them to affirm or deny a belief that is contrary to their faith" nor that the Government "sought to impose civil or criminal sanctions on religiously motivated conduct."). The Court agrees and finds that the Amended Complaint sufficiently states a RFRA claim as to Count X. Once again, the Court denies dismissal only as to those Plaintiffs who have averred interrogations about their Muslim beliefs or practices.[23] The claim is dismissed as to all other Plaintiffs.

**2. Violation of the RFRA – Umrah/Hajj (Count XI)**

 [92]  Count XI is brought solely by Plaintiffs Sulayman and Siddiqui, who allege that inclusion in the Watchlist interferes with their ability to perform Umrah and Hajj respectively. ECF No. 48 ¶ 1667–80. Defendants do not contest that Plaintiffs maintain sincerely held religious beliefs in performing Umrah and Hajj. Rather, they argue that "nothing alleged ... has prevented or will prevent Sulayman or Siddiqui from travelling abroad to perform religious pilgrimages or from participating in any religious exercise." ECF No. 49-1 at 106.

The Court cannot agree with Defendants. Sulayman, as an Imam, "routinely" leads groups on an annual Umrah pilgrimage to Mecca. ECF No. 48 ¶ 671. However, due to Defendants' stigmatizing and burdensome searches, interrogations, and detentions, he is afraid to travel abroad  *527  again, *id.* ¶ 715, and so is "discouraged" from engaging in Umrah. *Id.* Sulayman has also lost his standing in his religious community, which has jeopardized his effectiveness as their leader going forward, and more particularly in guiding his congregation in Umrah. *Id.* ¶¶ 715, 1671. Similarly, Siddiqui alleges that repeated invasive detentions and searches has caused him to abandon performing Hajj "out of fear of the terrorist scrutiny and treatment he would receive by Defendants." *Id.* ¶¶ 1672; 1012. The Court concludes that both Plaintiffs adequately allege that they had to modify their

behavior in a manner that violates their religious beliefs. *Cf. Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99–100 (4th Cir. 2013).

 [93]  Defendants alternatively argue that the claim fails because Plaintiffs have been only deprived, in part, of certain aspects of religious exercise. ECF No. 49-1 at 107 ("That Plaintiffs do not cross the border anymore so that they can avoid religious questioning is not the equivalent of ceasing their participation in the tenets of their religion."). But a RFRA violation does not turn on government's total prohibition of religious exercise; rather where, as here, allegations reflect a substantial burden on such exercise in the absence of a compelling government interest effected by the least restrictive means, the claim must survive. *See Hobby Lobby*, 573 U.S. at 724, 134 S.Ct. 2751; *Smith*, 494 U.S. at 887, 110 S.Ct. 1595. Defendants' motion to dismiss Count XI is denied.

**3. Violation of the RFRA – Informant Pressure (Count XII)**

 [94]  Count XII focuses on Plaintiffs Hall and John Doe 2 who specifically aver that offers to act as informants for the FBI in exchange for resolution of their travel woes substantially burden their free exercise of religion. ECF No. 48 ¶¶ 795, 935. In particular, Hall and Doe 2 contend that because their religious beliefs restrict bearing false witness and betraying the trust of their religious community, they are prohibited from accepting this offer. *Id.* ¶¶ 797, 937, 1686–87.

Defendants do not contest that acting as an informant is in fact at odds with Hall and Doe 2's sincerely held religious beliefs. However, Defendants rightfully point out that a mere "ask" for assistance in exchange for favorable treatment does not constitute a substantial burden on free exercise. ECF No. 49-1 at 107. The Court agrees with Defendants.

As with all potential law enforcement informants, the relationship begins with an "ask," and possible favorable treatment in exchange for helpful information. Also, as with many "asks," they too begin with the potential informant having something to gain, and often something to lose, from saying yes. Suspects are sometimes paid for their testimony or "work off charges" in exchange for turning on their friends, coworkers, family, and community leaders. This Hobson's choice is the same faced by scores of suspects who enter into cooperation agreements with the government on a daily basis. Plaintiffs' choice is a variation on this theme. As pleaded, the

Court can discern no principled reason to find the mere offer of a chance to cooperate as placing a substantial burden on the exercise of religion sufficient to support a RFRA violation. Count XI is dismissed.

#### 4. Inability to Volunteer at Prisons or Jails (Count XIII)

 **[95]**  In the fourth RFRA Count (Count XIII), Plaintiff Elamin alleges that Defendants' disclosure of his Watchlist status caused Jessup Correctional Institute ("Jessup") to end his stint as a volunteer prison chaplain. ECF No. 48 ¶¶ 1423–27; 1694–706. Defendants, in response, argue that Elamin does not have standing to  **\*528**  bring a RFRA claim as Jessup is not a party to this suit. ECF No. 49-1 at 101–03. Defendants do not contest that Jessup knew of Elamin's Watchlist status, but instead argue that it was the state correctional facility's independent decision to deny Elamin's volunteer services that imposed, even in theory, the substantial burden on the exercise of his religion. ECF No 49-1 at 101. When viewing the Amended Complaint facts as true and most favorably to Elamin, the Court must agree with Defendants.

In *Frank Krasner Enterprises, Ltd. v. Montgomery County. Md.*, the Fourth Circuit had the opportunity to address under what circumstances a non-party's intervening decisions break the "causal chain" between the claimed government action and the plaintiff's potentially redressable injury. 401 F.3d 230 (4th Cir. 2005). There, the government regulation at issue was a law prohibiting the appropriation of county funds to any entity permitting the display of guns at any of its facilities. *Id.* at 232. The non-party convention center, in response to the County regulation, refused to provide display space to the plaintiff gun-show promoter. *Id.* at 232–33. Plaintiff sued the County, not the convention center, for violating, among other things, his First Amendment free speech rights. *Id.* at 233.

The Fourth Circuit held that the plaintiff lacked standing because the injuries stemmed from the non-party convention center's independent decision to not lease the space. *Id.* at 236. Importantly, the Court reasoned that when standing "depends on the *unfettered choices made by independent actors not before the courts* and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," the causal chain necessary to confer standing has been severed. *Frank Krasner*, 401 F.3d at 235 (quoting *Lujan*, 504 U.S. at 562) (emphasis in original). The Court went on to find that the plaintiff could not obtain redress because even

if it were to succeed in its claim, invalidating the County regulation would not necessarily result in plaintiff's ability to lease space from the convention center. *Id.*

As pleaded, Elamin's claims suffer the same fate. The Amended Complaint avers that non-party Jessup, having received information regarding Elamin's Watchlist status, terminated Elamin. ECF No. 48 at ¶ 1426. No facts support that Jessup's decision was other than independent, voluntary, and intervening, even if prompted by Elamin's presence on the various Watchlists. *Id.* at ¶¶ 1423–27. Further, to the extent such information is corrected and he is removed from the Watchlist, this does not redress Elamin's injury as it pertains to his removal as Jessup's chaplain. Only Jessup may redress the substantial burden that it placed on Elamin's exercise of his position as prison chaplain. Jessup, however, is not a party to this case. Accordingly, Count XIII is dismissed for lack of standing.

### I. Violation of the Non-Delegation Doctrine (Count XIV)

Plaintiffs' last claim is mired in confusion. Plaintiffs initially alleged that Congress violated the non-delegation doctrine by failing to provide the Executive Branch with intelligible principles from which the Executive could implement its watchlist schemes regarding civil aviation and national security. ECF No. 48 ¶¶ 1708–12. Plaintiffs later withdrew such allegations entirely. ECF No. 52 at 77 ("To be fair, this is not a typical nondelegation claim, in which there is a statute authorizing the creation of a massive, far-reaching, and highly-consequential terrorist watchlist, but did not provide an intelligible principle.").

 **\*529**  **[96]**  Plaintiffs also allege that Defendants acted outside of their statutory authority. ECF No. 48 ¶¶ 1713–18. The Court notes that such allegations do not amount to a violation of the non-delegation doctrine, which provides that "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Plaintiffs have done little to assist the Court or Defendants in understanding this claim—not in their 268 page Amended Complaint or in the robust pleadings submitted over the course of several months. As the Court views it, Plaintiffs have jettisoned the claim; the Court will not shore it up for them now. The claim is dismissed.[24]

### V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.[25] Following the issuance of the opinion, the Court will hold a discovery conference to address the most efficient and streamlined procedure for exchange of evidence critical to addressing threshold issues while balancing important questions of privacy and national security clearly raised in this matter.

A separate Order follows.

### All Citations

473 F.Supp.3d 479

## Footnotes

1    Plaintiff Khaled El Ali, a foreign national residing outside of the United States, voluntarily withdrew his claims against Defendants. ECF No. 68. He is dismissed from this action.

2    Plaintiffs voluntarily dismissed Count IX (violation of the Second Amendment). ECF No. 52 at 70.

3    Defendants are William Barr, Attorney General, U.S. Department of Justice ("DOJ"); Christopher Wray, Director of the Federal Bureau of Investigation; Charles H Kable, IV, Executive Assistant Director of the Terrorism Screening Center; Joseph Maguire, Director of the National Counterterrorism Center, Office of the Director of National Intelligence; John C. Demers, Assistant Attorney General for National Security, National Security Division, DOJ; Beth A. Williams, Assistant Attorney General, Office of Legal Policy, DOJ; Peter A. Winn, Acting Chief Privacy and Civil Liberties Officer, Office of Privacy and Civil Liberties, DOJ; Daniel R. Coats, Director of National Intelligence, Office of the Director of National Intelligence; Kirstjen Nielson, Secretary of Homeland Security, U.S. Department of Homeland Security ("DHS"); Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection; David P. Pekoske, Administrator, Transportation Security Administration, DHS; L. Francis Cissna, Director, U.S. Citizenship and Immigration Services, DHS; Tracy Renaud, Deputy Director, U.S. Immigration and Customs Enforcement; Cameron Quinn, Officer, Office for Civil Rights and Civil Liberties, DHS; David J. Glawe, Under Secretary, Office of Intelligence and Analysis, DHS; John Mitnick, General Counsel, DHS; James W. McCament, Deputy Under Secretary, Office of Strategy, Policy, and Plans, DHS; Jonathan R. Cantor, Chief Privacy Officer, Privacy Office, DHS; Mike Pompeo, Secretary of State, U.S. Department of State; Patrick M. Shanahan, Acting Secretary of Defense, U.S. Department of Defense; General Paul M. Nakasone, Commander, U.S. Cyber Command and Director, National Security Agency/Chief, Central Security Service, U.S. Department of Defense; Lieutenant General Robert P. Ashley, Jr., Director, Defense Intelligence Agency; Steven Mnuchin, Secretary of the Treasury, U.S. Department of Treasury; Ken Blanco, Director, Financial Crimes Enforcement Network, U.S. Department of the Treasury; Gina Haspel, Director, Central Intelligence Agency; and the Watchlisting Advisory Council.

      Plaintiffs also name several unidentified "John Doe" defendants, against whom they purport to state individual capacity and/or *Bivens* claims. None of these defendants have been identified or served, and the time period to do so has long passed. Fed. R. Civ. P. 4(m). As such, all claims against the "John Doe" defendants are dismissed.

4    In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences in the light most favorable to the plaintiffs. *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997).

5    The close association with someone already in the TSDB may itself be the catalyst for placement on the TSDB and Watchlists. *See, e.g., id.* ¶ 896 (Faatimah Knight placed on TSDB and Watchlists due to association with her husband Hicham Hall).

6    Defendants object to Doe Plaintiffs proceeding anonymously without leave of Court. ECF No. 49-1 at 41 n.9. The Court grants Plaintiffs 14 days to move for the Doe Plaintiffs to proceed pseudonymously. If no motion is filed, the Doe Plaintiffs shall be dismissed without further consideration.

7    The 2015 revisions do not affect all other inquiries related to TSDB and Selectee Lists or Quiet Skies/Silent Partner lists. ECF No. 48 ¶ 220; *see also* ECF No. 48-6; ECF No. 49-6 at 9–10.

8    Although the Amended Complaint alleges that the 2015 revisions *require* that No Fly List complaints receive confirmation from DHS TRIP of their status, ECF No. 48 ¶ 218, the government overview document states otherwise. *See* ECF No. 48-6 ("*In certain instances*, however, a U.S. person denied boarding because of their presence on the No Fly list *may* be apprised of their status through the DHS TRIP process. When a U.S. citizen or Lawful Permanent Resident applying for redress is, in fact, on the No Fly List, DHS TRIP *may* inform the applicant of his or her status on the list.) (emphases added).

9    Although individuals subjected to Watchlist restrictions have pursued similar litigation in other districts, *see, e.g., Elhady v. Piehota*, 303 F. Supp. 3d 453, 457 (E.D. Va. 2017), none have named as defendants the WLAC and all its member agencies.

10    These two Plaintiffs, Bosnic and Shirwa, were then "removed" from the No Fly List during the pendency of this litigation. ECF Nos. 49-2, 49-3.

11    Defendants rely heavily on *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015), for the proposition that the adequacy of the DHS TRIP redress procedures amounts to a TSA "order" that cannot be reviewed by the district court. ECF No. 49-1 at 50–51. However, *Mokdad* never reached this question. *See Mokdad*, 804 F.3d at 812 ("We decline to opine at this time whether § 46110 would deprive the district court of subject-matter jurisdiction over Mokdad's claims challenging the adequacy of the redress process, including any broad constitutional claims, if he were to file a new suit naming TSA as a defendant.")

12    The Court cannot discern which Plaintiffs clearly challenge placement or processes related to Quiet Skies/Silent Partners. The Court surmises that those Plaintiffs who allege placement in the TSDB or Watchlists would not also be members of Quiet Skies or Silent Partners. However, the Amended Complaint does not differentiate claims on this basis. Accordingly, the Court can conclude only that claims challenging the placement or process related to Quiet Skies or Silent Partners are dismissed.

13    Plaintiffs who have adequately pled deprivation of their travel-related liberty interest are: Jardaneh, Doe, H. Wehelie, A. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Bosnic, Muminov, Mujanovic, Hachem, Riad, Abunijem, Elamin, Shirwa, and Al-Sahlani.

14    Defendants' reliance on stigma-plus cases treating loss of government employment are inapposite. *See Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 51 (2d Cir. 2001), *rev'd sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) (finding that cases addressing "stigma plus" claims in the context of termination of government employment "yield principles that are sometimes difficult to apply in delineating 'plus' factors in other contexts.").

15    Defendants also argue that Plaintiffs lack standing to challenge denials of Military Base Access, TWIC, and TSA Precheck and Global Entry. ECF No. 49-1 at 45–46. Plaintiffs, however, do not ask the Defendants to restore their rights of access and placement in these programs directly. Rather, these are identified as the alleged harms that flow from placement in the TSDB. These deprivations are particularly relevant to the stigma-plus claim, which highlights that this standing argument is misplaced.

16    Plaintiffs who have sufficiently pled deprivation of their protected travel or reputational liberty interests are: Jardaneh, Doe, H. Wehelie, A. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Bosnic, Mujanovic, Muminov, Hachem, Riad, Abunijem, Elamin, Shirwa, Al-Sahlani, Thadi, E. Paryavi, and Abdurrashid.

17    Plaintiffs conceded in the June 18, 2020 hearing that the substantive due process claims were only brought by Plaintiffs on the No Fly List: Doe, Mohallim, Sehwail, Bosnic, and Shirwa.

18    Plaintiffs are: Jardaneh, Doe, Abdurrashid, H. Wehelie, A. Wehelie, Noor, F. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2, Sehwail, Albadawi, Hall, Knight, Thadi, E. Paryavi, Siddiqui, Muminov, Mujanovic, Hachem, Riad, Kamel, Abunijem, Hijaz, Soueidan, Elamin, Kadoumi, and Al-Sahlani.

19    The Plaintiffs that plead sufficient facts to make plausible a Fifth Amendment Self-Incrimination violation are: Jardaneh, Doe, Abdurrashid, M. Paryavi, H. Wehelie, A. Wehelie, F. Wehelie, Mohallim, El-Shahat, Sulayman, Suliman, Doe 2,

Sehwail, Albadawi, Hall, Knight, E. Paryavi, Siddiqui, Cyeef Din, Muminov, Mujanovic, Hachem, Riad, Kamel, Hijaz, Soueidan, Elamin, Kadoumi, and Al-Sahlani.

20  Plaintiffs reaffirm they are not seeking money damages under RFRA against any of the Defendants in their official capacities. ECF No. 52 at 77. The Court limits the claims and defenses accordingly.

21  Umrah is a pilgrimage made by Muslims to Mecca, Saudi Arabia, that may be performed at any time during the year. ECF No. 48 ¶ 671.

22  Hajj is a pilgrimage made by Muslims to Mecca during a specific time of the year. *Id.*

23  Those Plaintiffs are: Doe, M. Paryavi, H. Wehelie, El-Shahat, Sulayman, Doe 2, Knight, Mujanovic, Muminov, Hachem, Riad, Kamel, Hijaz, Elamin, Kadoumi, and Al-Sahlani.

24  Plaintiffs also summarily argue that this "lack of delegation separately constitutes a violation of the Administrative Procedures Act, in that the TSDB—as well as many of its components, including the CBP's usage and participation—are wholly without any statutory authorization." ECF No. 52 at 79. In attempting to shoehorn their theory—which is, again, not even about the nondelegation doctrine—now into Count III (Violation of the APA–DHS TRIP), they add confusion in place of any clarity. Nowhere in Count III do Plaintiffs plausibly aver such a claim, and the Court cannot discern any facts which support the bare legal assertion. ECF No. 48 ¶¶ 1591–99.

25  After comprehensively reviewing the Amended Complaint and the parties' arguments, the Court finds that Plaintiffs Mia Khaled El Ali, Baby Doe, Child Doe, and Child Doe 2 have failed to sufficiently allege any plausible claims against any Defendants. They are dismissed from this case.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.