UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL SALLOUM,

      Plaintiff,

v.

CHARLES KABLE IV, *et al.*,

      Defendants.

Case No. 19-cv-13505
Hon. Matthew F. Leitman

_____/

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 65) AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 67)

In this action, Plaintiff Samuel Salloum alleges that the Defendants – officials with certain federal law enforcement and national security agencies – unlawfully designated him for inclusion in the Terrorist Screening Database (the "TSD"[1]) and that his placement in that database has caused violations of his constitutional rights. Salloum has four remaining claims against the Defendants: (1) a procedural due process claim related to interference with his liberty interests in foreign and domestic travel, (2) a substantive due process claim related to interference with those same interests, (3) a Fourth Amendment claim arising out of the seizure and search of his electronic devices at airports and (4) a Fourth Amendment claim arising out of his

_____

[1] The Terrorist Screening Database is now called the Terrorist Screening Dataset. (*See* Defs.' Mot., ECF No. 65, PageID.3051 at n.1.) For ease of reference, the Court will refer to the list that Salloum claims he is on as the "TSD."

detention at airports.   The parties have now filed cross-motions for summary judgment on all of Salloum's remaining claims. (*See* Defs.' Mot., ECF No. 65; Salloum's Mot., ECF No. 67.)  For the reasons explained below, Defendants' motion is **GRANTED** and Salloum's motion is **DENIED**.

**I**

**A**

Before turning to the facts and offering its analysis, the Court notes that the parties dispute which evidence the Court may consider when ruling on the parties' summary judgment motions.   The Defendants argue that the Court's review is limited an Administrative Record that the parties submitted in this case. (*See* Defs.' Supp. Br., ECF No. 86, PageID.4047-4052.)  The Defendants contend that because Salloum "challeng[es a] final agency action[]" – *i.e.*, Salloum's alleged placement in the TSD – this case arises under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (*Id.*)   And Defendants say that "[i]n such cases, 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" (*Id.*, PageID.4047, quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  Salloum counters that the Court should consider other evidence not included in the Administrative Record, most notably, an affidavit that Salloum filed and attached to his summary judgment papers. (*See* Salloum's Supp. Br., ECF No. 82, PageID.3937-3940.)  Salloum insists that his claims are not

2

limited to an appeal of agency action, and thus the bar on evidence outside of the Administrative Record does not apply here. (*See id.*)

The Court need not – and does not – resolve this dispute because the result here would be the same even if the Court considered the evidence offered by Salloum outside of the Administrative Record.  Instead of resolving the dispute, the Court will assume, without deciding, that it may consider the evidence relied upon by Salloum.

**B**

The Court now turns to the facts of this case.  The Court previously described the TSD and the factual background of this action in detail in its Opinion and Order granting in part and denying in part Defendants' motion to dismiss and in its order granting Defendants' motion for leave to file *ex parte* and *in camera* materials. (*See* Op. and Order, ECF No. 23, PageID.1052-1059; Order, ECF No. 59.)  The Court incorporates those previous recitations of the background of this case into this order. It sets forth below only a brief summary of the relevant facts, supplemented as necessary and appropriate with facts presented in the Administrative Record and Salloum's affidavit. (*See* Admin. R., ECF No. 37; Salloum Aff., ECF No. 73, PageID.3824-3827.)

## C

The TSD is "the U.S. government's consolidated terrorist watchlist." *Mokdad v. Lynch*, 804 F.3d 807, 810 (6th Cir. 2015).  It is "developed and maintained by the Terrorist Screening Center (TSC), a multi-agency center that was created in 2003 and is administered by the Federal Bureau of Investigation (FBI), which in turn is part of the Department of Justice." *Beydoun v. Sessions*, 871 F.3d 459, 463 (6th Cir. 2017) (quoting *Mokdad,* 804 F.3d at 809).  Individuals included in the TSD – and in a subset of the TSD known as the "Selectee List" – may be designated "for enhanced security screening [at airports] due to the threat they may pose to civil aviation or national security." *Beydoun*, 871 F.3d at 462 (internal quotation marks omitted).[2]

Two federal agencies conduct such enhanced screenings at airports.  First, the Transportation and Safety Administration ("TSA") is "charged with screening all passengers and property prior to boarding an aircraft, as set forth in the Aviation Transportation Security Act." (Decl. of Michael Turner, Executive Director of Vetting in the Intelligence and Analysis office at the TSA, at ¶ 3, ECF No. 37-2, PageID.1220.)   Second, United States Customs and Border Protection ("CBP")

---

[2] While Salloum alleges that he is included in the TSD, he does not specifically allege that he is included on a "subset" of the TSD such as the Selectee List. However, his allegations are consistent with the additional screening individuals on the Selectee List experience. For security reasons, Defendants have neither confirmed nor denied that Salloum is included in the TSD and/or any subset of the TSD.

screens passengers arriving to United States airports from foreign countries.[3]  (*See*

Decl. of Diane Sabatino, Deputy Executive Assistant Commissioner, Office of Field

Operations, at CPB, at ¶¶ 5-6, ECF No. 37-4, PageID.1238-1239.)

### D

Salloum is a naturalized United States citizen who was born in Lebanon.

Salloum says that the Defendants placed him in the TSD, that there was no basis for

that placement, and that the placement has "hindered" both his "domestic and

foreign travel." (Salloum Aff. at ¶ 9, ECF No. 73, PageID.3824.)  With respect to

domestic travel, Salloum says that prior to boarding an airplane for travel within the

United States, he is unreasonably "questioned and/or detained." (*Id.*)  Salloum says

this questioning "takes place both beside the line in front of other travelers and in a

separate room." (*Id.* at ¶ 19, PageID.3825.)  With respect to foreign travel, Salloum

says that he is "detained anywhere from 1 to 5 hours by airport security every time"

he travels "to and from the United States." (*Id.* at ¶ 11, PageID.3824.)  He adds that

when he is so detained, his "laptop computer and cell phone are taken from [him]

---

[3] It also appears that CBP may play at least some limited role in screening and/or questioning passengers who are leaving the United States on an international flight. (*See* Sabatino Decl. at ¶ 19, ECF No. 37-4, PageID.1245, noting that "[a]ll persons, conveyances, cargo, baggage, personal effects, and merchandise are subject to a border inspection, *whether entering or exiting the United States*" (emphasis added); *see also id.* at ¶ 37(h), PageID.1258, describing "brief[] question[ing] by CBP" that took place "before travel[] out of the United States.")

and all of the data on them is downloaded by airport security." (*Id.* at ¶ 12, PageID.3824.)

Defendants have provided further details about the detentions that Salloum experiences when he flies to and from the United States. According to the evidence that Defendants produced in the Administrative Record, Salloum "was referred to secondary inspection 13 times between 2014 and 2020" when flying to and from the United States.[4] (*See* Sabatino Decl. at ¶ 31, ECF No. 37-4, PageID.1250.) Most of these "inspections last[ed] under 3 hours," six of the inspections lasted less than an hour, and several lasted no more than 31 minutes.[5] (*Id.* at ¶ 32, PageID.1250.) On a

---

[4] It appears from the evidence produced in the Administrative Record that nearly all of these inspections took place upon Salloum's arrival in the United States following a flight from an international point of departure. (*See* Sabatino Decl. at ¶ 37, ECF No. 37-2, PageID.1251-1261.)

[5] The Court may rely on the specific portion of the Administrative Record identified above without violating its obligation under Rule 56 of the Federal Rules of Civil Procedure to construe the evidence in the light most favorable to Salloum. That portion of the Administrative Record does not conflict with Salloum's affidavit. For instance, Salloum says that when he travels to and from the United States on an international flight, he is detained for between 1 and 5 hours. The evidence cited above from the Administrative Record (1) confirms that Salloum's detentions during his flights to and from the United States generally fell within that range and (2) for the most part, simply provides more detail about those detentions. While the evidence in the Administrative Record also indicates that some of these detentions lasted less than an hour, that does not conflict with Salloum's contentions in this action because Salloum's counsel confirmed during the hearing on the parties' motions that when Salloum traveled to and from the United States without his electronic devices, his detentions were often less than an hour in length. (*See* 10/10/2023 Hr'g Tr., ECF No. 83, PageID.3991, 4005-4007.)

related note, Salloum acknowledges that he is detained for shorter periods –
generally one hour or less – when he travels to and from the United States without
his electronic devices. (*See* 10/10/2023 Hr'g Tr., ECF No. 83, PageID.3991, 4005-
4007.)

## II

## A

Salloum's First Amended Complaint is the operative pleading in this action.
(*See* First Am. Compl., ECF No. 10.)  As filed, that pleading asserted the following
claims.

- In Count I, Salloum asserted a procedural due process claim. Salloum
  alleged, among other things, that he had a "constitutionally protected
  liberty interest in his freedom of movement, the right to freely travel in the
  United States, and to-and-from the United States, without undue burden
  being placed upon him by the government." (*Id.* at ¶ 100, PageID.444.)  He
  said that the Defendants "infringed" those liberty interests and violated his
  procedural due process rights when they placed him in the TSD and
  thereby caused him to be subject to enhanced screenings and detentions at
  airports. (*Id.* at ¶ 103, PageID.445.)

- In Count II, Salloum asserted a substantive due process claim.  Salloum
  again alleged that he "ha[d] a constitutionally protected liberty interest in

his freedom of movement, the right to freely travel in the United States, and to-and-from the United States, without undue burden being placed upon him by the government." (*Id.* at ¶ 108, PageID.446.)  He claimed that the Defendants "infringed" those liberty interests and violated his substantive due process rights when they placed him in the TSD and thereby caused him to be subject to enhanced screenings and detentions at airports. (*Id.* at ¶ 111, PageID.447.)

- In Count III, Salloum alleged that as a result of the Defendants placing him in the TSD, the data from "his phone [and] laptop" are searched and/or downloaded when he travels to and from the United States. (*Id.* at ¶ 121, PageID.449.)  He claimed that that review of his electronic devices violates his Fourth Amendment rights. (*See id.*)

- In Count IV, Salloum alleged that as a result of the Defendants placing him in the TSD, he is detained and interrogated (1) before he is allowed to board domestic flights and (2) when he flies to and from the United States. (*See id.* at ¶ 125, PageID.449.)  He said that these "seizure[s]" violate his Fourth Amendment rights. (*Id.*)

- In Count V, Salloum alleged that the Defendants discriminated against him on the basis of his race, religion, ethnicity, and nationality in violation of

the Equal Protection Clause when they placed him in the TSD. (*See id.* at ¶ 138, PageID.452.)

- In Count VI, Salloum asserted that the Defendants interfered with his "right to free association" with his family and inhibited his ability to freely travel when they placed him in the TSD. (*Id.* at ¶ 145, PageID.453.)

- Finally, in Count VII, Salloum alleged that the Defendants exceeded the scope of their lawful authority when they created the TSD. (*See id.* at ¶¶ 156-157, PageID.456.)

Salloum brought those claims against the following Defendants in their official capacity:

- Charles H. Kable, Director of the TSC;
- Rick Kopel, Principal Deputy Director of the TSC;
- G. Clayton Grigg, Deputy Director of Operations of the TSC;
- Russell Travers, Director of the National Counterterrorism Center;
- Chad F. Wolf, Acting Secretary of the United States Department of Homeland Security;
- David P. Pekoske, Administrator of the TSA;
- Christopher H. Wray, Director of the Federal Bureau of Investigation; and
- Mark A. Morgan, Commissioner of CBP.

Salloum also brought his claims against John and Jane Doe Defendants in their individual capacity. The Doe Defendants were the "individual agents and government employees" who "physically enforced the violations of [his]

9

constitutional rights" when he traveled through Detroit Metropolitan Airport. (*Id.* at ¶ 19, PageID.428-429.)  In Salloum's First Amended Complaint, he said that he would "discover [the Doe Defendants'] identities through discovery in this action" and that he would "name those defendants individually as soon as possible." (*Id.*) But there is no indication that Salloum ever sought to discover the names or identities of the Doe Defendants.  Moreover, Salloum has not filed a motion to file a Second Amended Complaint identifying the Doe Defendants by name.

Salloum sought as relief, among other things, (1) a declaration "that Defendants' policies, practices, and customs violate the Fourth and Fifth Amendments to the United States Constitution, the Administrative Procedure Act, and the non-delegation doctrine of the United States Constitution," (2) "a permanent injunction on Defendants requiring them to remove [Salloum] from any and all of their watch lists, including the [TSD], and notify all agencies, domestic and foreign of this removal," and (3) "a permanent injunction on Defendants requiring them to destroy all data downloaded from [Salloum's] phones or computers, at any time, however and wherever stored." (*Id.*, PageID.458.)

**B**

The Defendants moved to dismiss Salloum's First Amended Complaint on April 14, 2020. (*See* Mot. to Dismiss, ECF No. 12.)  On December 18, 2020, the Court granted the motion in part and denied it in part. (*See* Op. and Order, ECF No.

23.)  The Court ruled that Salloum had plausibly alleged the following claims: (1) a procedural due process claim related to interference with his liberty interests in foreign and domestic travel; (2) a substantive due process claim related to those same interests; (3) a Fourth Amendment claim arising out of the seizures and searches of his electronic devices at airports; and (4) a Fourth Amendment claim arising out of his detention at airports. (*See id.*)  Those are the only claims that remain pending in this action.

## C

The legal landscape changed significantly after the Court issued its ruling on Defendants' motion to dismiss.  Two of the primary decisions on which the Court relied were reversed, and the viability of a third was called into serious question.

First, as support for the conclusion that Salloum had plausibly alleged a deprivation of his liberty interest in foreign and domestic travel, the Court cited two decisions from district courts within the Fourth Circuit: *Elhady v. Kable*, 391 F.Supp.3d 562, 568 (E.D. Va. 2019) and *El Ali v. Barr*, 473 F.Supp.3d 479, 508-09 (D. Md. July 20, 2020).  In both of those decisions, the courts concluded that plaintiffs had sufficiently alleged that their placement in the TSD and/or the Selectee List led to a deprivation of their liberty interest in travel.  However, after this Court issued its decision on Defendants' motion to dismiss, the United States Court of Appeals for the Fourth Circuit reversed the decision in *Elhady*. *See Elhady v Kable*,

993 F.3d 208 (4th Cir. 2021).  That reversal also cast doubt on the portions of *El Ali* cited by the Court.

Second, as support for its conclusion that Salloum had plausibly alleged that the search of his electronic devices violated the Fourth Amendment, the Court relied, in part, on the decision in *Alassad v. Nielsen*, 419 F.Supp.3d 142, 163 (D. Mass. 2019).  But after the Court issued its decision, the United States Court of Appeals for the First Circuit reversed the part of the *Alassad* decision on which the Court relied. *See Alassad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021).

The Court's analysis below accounts for these developments in the case law.

## D

On March 3, 2023, the parties filed cross-motions for summary judgment on the remaining claims. (*See* Defs.' Mot., ECF No. 65; Salloum's Mot., ECF No. 67.) The Court held a hearing on the motions on October 10, 2023. (*See* 10/10/2023 Hr'g Tr., ECF No. 83.)  The parties thereafter filed supplemental briefs. (*See* Supp. Brs., ECF Nos. 82, 86.)

## III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56).  When reviewing the record, "the court must view the evidence

in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## IV

The Court begins with Defendants' motion for summary judgment. Defendants have moved for summary judgment on each of the remaining claims in Salloum's First Amended Complaint. The Court will review Defendants' arguments separately.

## A

Defendants first argue that they are entitled to summary judgment on Salloum's claim that his alleged placement in the TSD violates his procedural due process rights. (*See* Defs.' Mot., ECF No. 65, PageID.3513-3521.) The Court agrees.

"To establish a procedural due process violation under 42 U.S.C. § 1983, [a plaintiff] is required to demonstrate three elements: (1) that [he] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth

Amendment; (2) that [he] was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [him] adequate procedural rights before depriving [him] of its protected interest." *Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). Here, Salloum says that he has been deprived of two liberty interests as a result of Defendants allegedly placing him in the TSD: his liberty interest in travel within the United States and his liberty interest in international travel. The Court will examine the purported deprivation of these two interests separately because they are subject to differing degrees of regulation. *See Beydoun*, 871 F.3d at 459 (explaining that while "[t]he constitutional right to interstate travel is virtually unqualified," the "the freedom to travel abroad ... is subject to reasonable governmental regulation"). For the reasons explained below, Salloum has not shown a deprivation of his liberty interests in either domestic or foreign travel.

### 1

To begin, Salloum has not demonstrated that his alleged placement in the TSD deprived him of his protected right with respect to domestic travel. In his affidavit, Salloum says that his domestic travel is "hindered" because he is "questioned and/or detained upon airline check in" when he attempts to board an airplane for travel within the United States. (Salloum Aff. at ¶ 9, ECF No. 73, PageID.3824.) But Salloum does not say how long these pre-flight screenings last when he travels

domestically.[6]    The absence of that evidence is fatal to Salloum's claim that the screenings unduly interfere with his right to travel domestically.  That is because in order to establish a deprivation of that right, Salloum must show that the screenings subject him to more than the common delays that air travelers ordinarily face. *See Abdi v. Wray*, 942 F.3d 1019, 1031-32 (10th Cir. 2019) (explaining that "[d]elays of a few hours are not uncommon for many air travelers and do not amount to a substantial interference with the right to travel interstate"); *Elhady*, 933 F.3d at 221 (noting that "minor delays" at airports "do not rise to the level of [a] constitutional concern").  Salloum cannot possibly make that showing without evidence as to how long these pre-flight screenings during domestic travel lasted.

Salloum's claim that the pre-flight screenings impermissibly infringe on his right to travel domestically is further undermined by the fact that the screenings occur during only a single mode of travel – by airplane. "Many courts have held that individuals do not have a protected liberty interest in a *particular mode* of transportation." *Id.* at 222 (emphasis added).  *See also Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (noting that "burdens on a single mode of transportation do not implicate the right to interstate travel")*; Abdi*, 942 F.3d at 1027 (holding that plaintiff

---

[6] While Salloum says that he is "detained anywhere from 1 to 5 hours" when he travels to and from the United States (*i.e.*, internationally) (Salloum Aff. at ¶ 11, ECF No. 73, PageID.3824), he does not provide any similar timeframe for how long enhanced pre-flight screenings take before he is allowed to board a domestic flight.

failed to state either procedural or substantive due process claim arising out of placement on the Selectee List because, among other things, plaintiff had other modes of transportation available to him for domestic travel).  For example, in *Elhady*, the Fourth Circuit noted that "even of [it] accepted plaintiffs' assertions that [the] inconveniences [plaintiffs experienced while flying] have actually deterred them from flying," the plaintiffs still could not show a deprivation of a protected right in travel because "[a]lthough our law may guarantee the citizen's right to travel, it is less attentive to how he gets there." *Id.* at 222.  Here, Salloum has not produced any evidence that traveling within the United States by means other than airplane would subject him to a hardship that could amount to an interference with his right to travel domestically.[7]

Finally, Salloum does not cite any persuasive authority to support his contention that the pre-flight screenings unduly interfere with his right to travel domestically.  In his response to Defendants' motion, Salloum largely relies on the decision of the United States District Court for the District of Maryland in *El Ali v. Barr*, 473 F.Supp.3d 479 (D. Md. 2020). (*See* Salloum's Resp., ECF No. 73,

---

[7] At the motion to dismiss stage, the Court concluded that Salloum had plausibly alleged that he "could not reasonably satisfy his need to travel through modes of travel other than air." (Op. and Order, ECF No. 23, PageID.1071 at n.3.)  But since that time, Salloum has not produced any *evidence* that traveling domestically by car, bus, or train would have imposed a meaningful burden on him.  His affidavit does not address that issue.

PageID.3798-3799.)   But as explained above, when the United States Court of Appeals for the Fourth Circuit overruled the *Elhady* decision, it cast doubt on the continued viability of the portions of *El Ali* on which Salloum relies.   And none of the other authority that Salloum cites persuades the Court that Salloum has established a violation of his protected liberty interest in domestic travel.   Several of those cases analyzed claims by travelers on the No-Fly List. *See Latif v. Holder*, 28 F.Supp.3d 1134, 1149 (D. Or. 2014) (analyzing claims by primarily international travelers on No-Fly List); *Mohammad v. Holder*, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015) (same).   But the No-Fly List is "unlike the security-screening restrictions" that result from "being [listed] on a terrorist watch list" because "inclusion on the No-Fly List completely bans listed persons from boarding commercial flights to or from the United States or over United States airspace." *Latif*, 28 F.Supp.3d at 1148-49 (explaining differences between being included in the TSD and being listed on the No-Fly List).   Thus, the cases analyzing the No-Fly List are materially distinguishable.   Moreover, several other cases that Salloum relies on are distinguishable because they were decided at the motion to dismiss stage.   *See Beydoun v. Lynch*, 2016 WL 3753561 (E.D. Mich. July 14, 2016) (granting Defendants' motion to dismiss claims challenging placement on Selectee List); *Wilwal v. Nielson*, 346 F.Supp.3d 1290, 1296 (D. Minn. 2018) (granting in part and denying in part motion to dismiss claims arising out of a detention).

For all of these reasons, Salloum has failed to establish that his alleged placement in the TSD deprived him of his fundamental right to travel domestically. Thus, his procedural due process claim fails as a matter of law to the extent it rests upon an alleged deprivation of that right.

**2**

Salloum's procedural due process claim also fails to the extent that it is based upon the alleged deprivation of his lesser liberty interest in international travel.  As noted above, in his affidavit, Salloum says that as a result of Defendants allegedly placing him in the TSD, when he travels "to and from the United States," he is detained for screenings that last from "1 to 5 hours." (Salloum Aff. at ¶ 11, ECF No. 73, PageID.3824.)  Salloum has failed to show that those screenings unduly interfere with his international travel.

First, Salloum provides no details concerning the number and percentage of screenings during his international travel that fall toward the higher end of the 1-to-5-hour range that he provides.  The absence of those details is important because screenings that are closer to the shorter end of his range are not uncommon and do not rise to the level of an interference with a protected liberty interest in international travel. *See*, *e.g.*, *Elhady*, 933 F.3d at 221 (explaining that "burdens [that] are not dissimilar from what many travelers routinely face, whether in standard or enhanced screenings, particularly at busy airports" do not "rise to the level of constitutional

18

concern"); *Abdi*, 942 F.3d at 1031 (noting that "[d]elays of a few hours are not uncommon for many air travelers and do not amount to a substantial interference with the rights to travel interstate or internationally"). Moreover, evidence in the Administrative Record establishes that the majority of the screenings of Salloum that occur when he travels on international flights fall toward the shorter end of his 1-to-5-hour range. (*See* Sabatino Decl. at ¶ 32, ECF No. 37-2, PageID.1250-1251.) Simply put, the evidence of record is not sufficient to support a finding that Salloum is subject to a sufficient number of lengthy screenings during international travel as to rise to the level of an undue interference with his liberty interest in that travel.

Second, as Salloum acknowledges, he has the ability to substantially shorten the length of the screenings that he experiences when he travels to and from the United States on international flights. He reports that the bulk of the time that he is detained is devoted to the searching of his electronic devices. In his words, "[w]hen I am detained at the airport, my electronic devices have been searched and *the download of data took several hours*." (Salloum Aff. at ¶ 20, ECF No. 73, PageID.3825; emphasis added.) And his counsel conceded at the hearing before the Court that Salloum is able to avoid these longer screenings by traveling without his electronic devices on his person. Counsel reported that when Salloum does not carry his electronic devices with him, his screenings are in most cases less than an hour in length and in some cases fifteen minutes or less. (*See* 10/10/2023 Hr'g Tr., ECF No.

83, PageID.3991, 4005-4007.)  The fact Salloum can substantially shorten the length of the screenings by traveling without his devices on his person supports the conclusion that the screenings do not rise to the level of an undue interference with his liberty interest in international travel.

The Court recognizes that traveling without electronic devices in hand is not ideal.  Indeed, having access to these devices while on a long international flight undoubtedly makes the trip more enjoyable and, perhaps, more productive.  But Salloum has not cited any authority for the proposition that he has a cognizable liberty interest in having access to electronic entertainment or work devices while traveling internationally.  Moreover, Salloum may presumably travel with at least some electronic devices during international travel without subjecting himself to a lengthy screening for data review purposes.  For instance, he could travel with a cellular telephone that does not store data or have internet access[8] and/or with a DVD player that plays videos without recording capability or internet connectivity.  While

---

[8] The use of such phones is gaining in popularity as individuals attempt to use less screen time and become less reliant on smartphones. *See*, *e.g.*, Marc Saltzman, *Why are flip phones coming back? Gen Z is powering a renaissance for the forgotten device*, USA TODAY (Jan. 21, 2023), http://www.usatoday.com/story/tech/2023/01/21/flip-phone-samsung-nokia-tracfone/11088551002/; Brian O'Connell, *What's Old Is New Again, so Gen Z Is Bringing Back this 'Dumb' Tech*, TheStreet.com (Mar. 30, 2023), http://www.thestreet.com/technology/whats-old-is-new-again-so-gen-z-is-bringing-back-this-dumb-tech ("Nobody is calling for the return of the hula hoop or the Edsel, but there is a burgeoning demand for early 2000-era 'dumb' phones" that "have low- or no-internet accessing capabilities.")

these solutions are admittedly imperfect, they are a potentially better option than traveling without electronic devices at all – which Salloum has shown a willingness to do in order to shorten his detentions at the border. Finally, Salloum has not presented any evidence that he could not have shortened his screening time when he travels to and from the United States by placing his electronic devices in his checked baggage and thereby avoiding the lengthy review of those devices.

Salloum's procedural due process claim therefore fails to the extent that it rests upon an alleged deprivation of his liberty interest in international travel.

### 3

For the reasons explained above, the Court will **GRANT** Defendants' motion with respect to Salloum's procedural due process claim.

### B

Defendants next argue that they are entitled to summary judgment on Salloum's claim that his alleged placement in the TSD violates his substantive due process rights. (*See* Defs.' Mot., ECF No. 65, PageID.3521-3523.) The Court again agrees.

"[S]ubstantive due process protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). "The Supreme Court has found substantive due process violations where government

action has infringed a fundamental right without a compelling government purpose, as well as where government action deprives a person of life, liberty, or property in a manner so arbitrary it shocks the conscience." *Abdi*, 942 F.3d at 1027 (internal punctuation and citations omitted). Salloum's substantive due process claim rests primarily on his allegation that Defendants interfere with his "constitutionally protected liberty interest in his freedom of movement, the right to freely travel in the United States, and to-and-from the United States, without undue burden being placed upon him by the government." (First Am. Compl. at ¶ 108, ECF No. 10, PageID.446.)

For all of the reasons explained above, Salloum has failed to show that the Defendants interfered with his fundamental right to domestic travel and/or his liberty interest in international travel. The Defendants are therefore entitled to summary judgment on Salloum's substantive due process claim to the extent that the claim is based upon the alleged interference with his fundamental right to travel domestically and his lesser liberty interest in international travel. *See*, *e.g.*, *Abdi*, 942 F.3d at 1032-33 (holding that plaintiff's allegations that "his placement on the Selectee List subject[ed] him to extra airport security" and caused him to experience up to a 48-hour delay while traveling did not amount of a violation of his substantive due process right to engage in domestic or international travel).

Salloum also argues that his placement in the TSD violates his "substantive due process rights to his life and liberty" because it "puts him and his life at great risk." (Salloum's Resp., ECF No. 73, PageID.3812.)  Salloum explains that one time when he traveled to Kuwait, Kuwaiti authorities "detained and questioned [him] in a small room for 9 hours." (*Id.*)  Salloum also says that on another occasion, "[u]pon his return to Lebanon from Kuwait," his "passport was taken and the Lebanese authorities investigated [him] for two days." (*Id.*)  Salloum seems to imply that his alleged placement in the TSD caused these detentions and interrogations. But Salloum has not produced any *evidence* connecting those incidents to his alleged placement in the TSD.  Thus, he does not have a viable claim that the Defendants put his life and liberty in jeopardy.

For all of these reasons, the Court will **GRANT** Defendants' motion with respect to Salloum's substantive due process claim.

## C

The Court next turns to Salloum's Fourth Amendment claims.  As described above, there are three components to these claims.  More specifically, Salloum alleges that his rights under the Fourth Amendment are violated when: (1) he is detained and questioned before he is allowed to board domestic flights, (2) he is detained and questioned when he flies to and from the United States, and (3) the data from his personal electronic devices is reviewed and downloaded when he flies to

and from the United States. The Court will examine each component of Salloum's Fourth Amendment claims individually.   For the reasons explained below, Defendants are entitled to summary judgment on all components of the claims.

**1**

The Fourth Amendment bars "unreasonable searches and seizures." U.S. Const. Amend. IV.  Searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate," like those Salloum challenges here, "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established… exceptions." *Katz v United States*, 389 U.S. 347, 357 (1967).  One such exception is what is known as the border-crossing exception. The border-crossing exception applies both when "*entering* the country" and "where persons or articles attempt to *exit* the country as well." *United States v. Humphries*, 308 F. App'x 892, 896 (6th Cir. 2009) (emphasis in original). *See also United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003).  "Under that exception, searches of people and their property at the borders are *per se* reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013).  But this exception authorizes only searches and seizures that are "routine," *United States v. Ramsey*, 431 U.S. 606, 619 (1977), and not "highly intrusive." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  Simply put, "at a border or its functional

24

equivalent, like an international airport[,] government agents may conduct *routine* searches and seizures of persons and property without a warrant or any individualized suspicion." *United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019) (internal punctuation omitted; emphasis added).   Government agents at a border may go "beyond the scope of a routine customs search and inspection" if, "considering all the facts surrounding the traveler and her trip," the agents have "reasonable suspicion" that the traveler is involved in criminal activity. *United States v. Montoya de Hernandez*, 473 U.S. 531, 540-41 (1985).

**2**

The Court starts with Salloum's contention that his Fourth Amendment rights are violated when he is detained and interrogated before being allowed to board domestic flights.  This claim fails because Salloum has not shown that any of the Defendants named in this action are responsible for the alleged detentions and interrogations that occur during his purely domestic travel.

First, Salloum has not presented any evidence that the agencies with which Defendants Kable, Kopel, Grigg, Travers, Morgan, and Wray are affiliated – the TSC, the National Counterterrorism Center, the FBI, and the CBP – have any connection to any pre-flight screening that occurs during his domestic travel.[9]  And

---

[9] Indeed, in his First Amended Complaint, Salloum did not even appear to know which government agencies conducted the pre-flight security screenings for domestic travel. (*See* First Am. Compl. at ¶ 19, ECF No. 10, PageID.428-429,

the Defendants have presented evidence that the TSA is the only agency that conducts pre-flight security screenings for purely domestic travel. (*See*, *e.g.*, Turner Decl. at ¶ 3, ECF No. 37-2, PageID.1220.)   On this record, there is no basis for holding Defendants Kable, Kopel, Grigg, Travers, Morgan, and Wray – who are sued only in their official capacities – liable for any overly intrusive pre-flight screenings that occur in connection with Salloum's domestic travel.

Second, Salloum has also failed to show that the remaining Defendants – Pekoske and Wolf – may be held liable in their official capacities for such screenings. While the agencies with which these Defendants are affiliated – the TSA and the Department of Homeland Security,[10] respectively – do have a connection to pre-flight screening for domestic travel, Salloum has not presented any evidence that these agencies have policies that authorize the type of prolonged pre-flight detention and interrogation that Salloum claims to experience. To the contrary, the evidence in the record shows that the policies of the TSA (which, as noted above, conducts pre-flight screening for domestic travel) do *not* authorize the prolonged detention or interrogations of passengers. More specifically, the evidence demonstrates that (1) "TSA issues security screening [standard operating procedures] that that address

---

referring to "agents and governmental employees" without specifying who those agents or government employees worked for.)

[10] The TSA is a "component agency" of the United States Department of Homeland Security. (*See* Turner Decl. at ¶ 1, ECF No. 37-2, PageID.1219.)

specific aspects of the security screening process and set forth the uniform procedures and standards that must be followed in TSA's security operations in order to enforce its mandate of providing aviation security;" (2) those standard operating procedures provide that "TSA security officers do not physically detain passengers;"[11] and (3) those procedures do not authorize TSA officers to conduct lengthy interrogations. (Turner Decl. at ¶¶ 6, 16, ECF No. 37-2, PageID.1220-1221, 1226.)  Even "an individual's designation for enhanced screening, including those with TSD[] status, is not a basis for further questioning of [that] individual." (*Id.* at ¶ 15, PageID.1226.)  Therefore, if and to the extent Salloum is detained and/or interrogated for long periods before he is permitted to board domestic flights, that detention and interrogation is not pursuant to an official policy of the TSA (or the Department of Homeland Security).[12]  Instead, it is conducted by individual TSA

---

[11] In addition, "TSA security officers do not seize evidence, arrest individuals, execute criminal investigative searches, or carry weapons." (Turner Decl. at ¶ 17, ECF No. 37-2, PageID.1226.)  Finally, even where a TSA officer selects an individual for "enhanced" screening, that screening is "typically" limited to "screening of the person through a walk-through metal detector, Advanced Imaging Technology (AIT), and a patdown." (*Id.* at ¶ 13, PageID.1223.)  "Enhanced screening may be conducted in any screening lane, and there is no special lane or area designated for enhanced screening. A typical enhanced screening process takes 10 to 15 minutes." (*Id.*, PageID.1224.)

[12] Salloum has not presented evidence that the alleged lengthy detention and questioning happens so frequently during his domestic travel that the Court can infer that the TSA officers are acting according to a policy of the TSA or the Department of Homeland Security.

officers outside of TSA's standard operating procedures.[13]   Since the offending

seizures and interrogations are not tied to an official policy or to any action or

directive that Defendants Pekoske and/or Wolf take in their official capacity,

Salloum is not entitled to any relief against Pekoske and/or Wolf on his claim that

he is subjected to unlawful seizures before he boards domestic flights.

3

The Court next turns to Salloum's contention that his Fourth Amendment

rights are violated when he is detained and questioned during his travel to and from

the United States – *i.e.*, when he crosses the border.   This component of Salloum's

Fourth Amendment claim fails for two reasons.   First, many of these detentions were

not uncommonly long.   For instance, several of those detentions – such as when

---

[13] Those TSA officers are not properly named as Defendants in this case.   As noted above, in his First Amended Complaint, Salloum did bring his claim against unnamed "John and Jane Doe" Defendants whom Salloum identified as "the individual agents and governmental employees who physically enforced the violations of Plaintiff's constitutional rights in the Detroit Metropolitan Airport." (First Am. Compl. at ¶ 19, ECF No. 10, PageID.428-429.)   But, as explained above, it does not appear that Salloum has made any effort to identify those John and Jane Doe Defendants, nor has Salloum served them with the First Amended Complaint. Finally, Salloum has not referenced those unnamed defendants in his response to Defendants' summary judgment motion.   The Court therefore declines to "consider" claims brought against the Doe Defendants. *Graham v. Best Buy Stores, L.P.*, 289 F. App'x 487, 492 (6th Cir. 2008) (refusing to "consider" claims against "John Doe" defendants where the unidentified defendants were "never served, never more fully identified, they never appeared, and they ha[d] not been a factor in this case"). *See also Houser v. City of Akron*, 2009 WL 10720094, at *7 (N.D. Ohio Nov. 30, 2009) (dismissing claims against John Doe defendants where plaintiffs "never identified, nor served her complaint, on the [unidentified] defendants").

Salloum traveled without his electronic devices – were under an hour in length. These types of delays are "routine in the border context and thus [do] not violate the Fourth Amendment." *Tabbaa v. Chertoff*, 509 F.3d 89, 100-01 (2d Cir. 2007). Other, longer detentions that Salloum experiences when he crosses the border in connection with his international travel may be considered non-routine. For the reasons explained in the classified supplement to this order, those non-routine searches are supported by reasonable suspicion and therefore do not violate the Fourth Amendment.

### 4

Finally, the Court turns to Salloum's contention that his Fourth Amendment rights are violated when, during his international travel to and from the United States, the data from his personal electronic devices is reviewed and/or downloaded.[14] Salloum says that he "has a legitimate privacy and possessory right

---

[14] In his response to Defendants' motion for summary judgment, Salloum appears to imply that his Fourth Amendment claim challenges the searches and/or downloading of his electronic devices that occur when he travels *both* domestically *and* internationally. But Salloum's First Amended Complaint and affidavit make clear that he is not asserting a Fourth Amendment claim arising out the searches and/or downloading of his electronic devices prior to domestic travel. Salloum titles this claim "Fourth Amendment Violation Illegal Seizing of Data on Cell Phones," and in the claim he says that he "suffered an irreversible harm in that the information seized and disseminated, and which continues to be disseminated, is private, personal, and/or proprietary *as Plaintiff, a United States citizen, does not check his constitutional rights at the border when Plaintiff travels abroad*." (First Am. Compl. at ¶ 122, ECF No. 10, PageID.449; emphasis added.) Likewise, in his affidavit, Salloum says that Defendants search and/or download his electronic devices "every

in his cell phone, laptop, and the data contained therein" (First Am. Compl. at ¶ 120, ECF No. 10, PageID.449), and he asserts that Defendants violate his Fourth Amendment rights when they "conduct[ [] warrantless electronic search[es] of [his] electronics" without "reasonable suspicion." (Salloum's Resp., ECF No. 73, PageID.3817.) For the reasons explained below, Defendants are entitled to summary judgment on this component of Salloum's Fourth Amendment claims.

a

To begin, any "basic" or "routine" searches of Salloum's electronic devices when he flies to and from the United States – and thus crosses the border – do not require reasonable suspicion and therefore do not violate the Fourth Amendment. *See Alasaad*, 988 F.3d at 18-19 ("We thus agree with the holdings of the Ninth and Eleventh Circuit that basic border searches are routine searches and need not be supported by reasonable suspicion"). Likewise, any non-routine searches of Salloum's electronic devices in connection with his border-crossing flights do not

---

time [he] travel[s] *to and from* the United States." (Salloum Aff. at ¶¶ 10-12, ECF No. 73, PageID.3824; emphasis added.) Salloum's affidavit does not suggest or present any evidence that the Defendants search and/or download his electronic devices prior to any purely domestic travel. The Court therefore construes Salloum's Fourth Amendment claim concerning the searches and/or downloading of his electronic devices as related solely to his international travel. In any event, for the reasons explained above in Section (IV)(C)(4)(b), even if the Court construed this component of Salloum's Fourth Amendment claim to include a claim arising out of searches and/or downloading of Salloum's electronic devices that occur before Salloum can board a domestic flight, that claim is not viable.

violate the Fourth Amendment because, for the reasons explained in the classified supplement to this order, those non-routine searches are supported by reasonable suspicion.

**b**

Finally, even if the Court construed this claim to include the searches and/or downloading of Salloum's electronic devices that occur prior to his purely domestic travel, the claim would still fail.  First, there is no possible basis for the claim against Defendants Kable, Kopel, Grigg, Travers, Morgan, and Wray because, as explained above, there is no evidence that the agencies with which those Defendants are affiliated have any connection to any pre-flight screening for domestic travel. Second, the claim would also fail with respect to Defendants Pekoske and Wolf because there is no evidence in the record that Pekoske, Wolf, or their agencies' policies are responsible for the any alleged searching and/or downloading of Salloum's electronic devices that may occur when Salloum travels domestically. Under the TSA's official policies, the "TSA does not search electronic devices for electronic content that may be contained on the device[,] does not extract or download data from passenger electronic devices[, and does not] review any stored data on the electronic device." (*Id.* at ¶ 14, PageID.1224.)  Thus, to the extent that individuals search and/or download Salloum's electronic devices before Salloum can board a domestic flight, those searches are done outside of TSA's standard

31

operating procedures, and Defendants Pekoske or Wolf may not be held liable for those searches in their official capacities.

For all of these reasons, even if Salloum had brought a Fourth Amendment claim based upon the alleged search of his electronic devices during his purely domestic travel, he would not be entitled to any relief against the named Defendants based upon that claim.

**5**

For all of these reasons, the Court will **GRANT** Defendants' motion with respect to Salloum's Fourth Amendment claims.

**V**

The Court now turns to Salloum's motion for summary judgment.  The record that the Court considers is the same for Salloum's motion as it was for Defendants' motion.  For all of the same reasons explained above that Defendants are entitled to summary judgment on all of Salloum's claims, Salloum is not entitled to summary judgment on those same claims.   The Court therefore **DENIES** Salloum's summary judgment motion.

**VI**

The Court recognizes that Salloum has been placed in a difficult position in this litigation.  He asks the Court to determine whether he has wrongfully been placed in a database for suspected terrorists, but the Defendants refuse to confirm

whether he is even in the database and, more importantly, refuse to identify any evidence that they may have considered if they placed him into the database. Moreover, the Defendants presented a fair amount of evidence to the Court that they have withheld from Salloum on the basis of the law enforcement privilege.  While that withholding was lawful (*see* Order, ECF No. 61), it has forced Salloum to present some of his arguments with one hand effectively "tied behind his back."

The unusual procedures here have also put the Court in a challenging and somewhat uncomfortable position.  In the ordinary civil action, the parties sharpen the issues to be decided by offering their arguments and critiquing the factual and legal assertions of their opponents.  Judges count on this adversarial process to help them reach correct results.  But here, the adversarial process has been curtailed because Salloum has not had a full opportunity to review and critique all of the evidence offered by the Defendants.  Without that input from Salloum, the Court has been forced, in some respects, to assume the role of advocate and to ask itself how Salloum may have critiqued that evidence.  That is not a comfortable or customary position for a judge. The Court has done its best to navigate this challenging terrain and to reach a just and fair result.

## VII

For all of the reasons explained above, and the reasons further explained in the classified supplement to this order, **IT IS HEREBY ORDERED** as follows:

- Defendants' motion for summary judgment (ECF No. 65) is **GRANTED**;

- Salloum's motion for summary judgment (ECF No. 67) is **DENIED**; and

- Salloum's remaining claims against the Defendants are **DISMISSED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman<br>
MATTHEW F. LEITMAN<br>
UNITED STATES DISTRICT JUDGE

Dated:  March 4, 2024

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 4, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan<br>
Case Manager<br>
(313) 234-5126